# EXHIBIT 1

*screenshot-investor.lululemon.com-2021.04.03-22_40_44*
*https://investor.lululemon.com/news-releases/news-release-details/lululemon-athletica-inc-acquire-home-fitness-innovator-mirror*
*03.04.2021*

HOME   ›   INVESTOR RELATIONS   ›   LULULEMON ATHLETICA INC ACQUIRE HOME FITNESS INNOVATOR MIRROR

## Lululemon Athletica Inc. To Acquire Home Fitness Innovator MIRROR     PRINT



<< BACK

Jun 29, 2020

*Acquisition will advance lululemon's strategic vision by strengthening its omni guest experiences through digital sweat*

VANCOUVER, British Columbia--(BUSINESS WIRE)--Jun. 29, 2020-- lululemon athletica inc. (NASDAQ:LULU) today announced that it has entered into a definitive agreement to acquire MIRROR, a leading in-home fitness company that created an interactive workout platform that features live and on-demand classes, for a purchase price of $500 million.

With its best-in-class content and versatile platform, MIRROR positions lululemon to accelerate its vision and build upon an ecosystem that will fuel the Company's Power of Three growth plan, which includes driving the business through omni guest experiences. MIRROR will bolster the company's digital sweatlife offerings and bring immersive and personalized in-home sweat, and mindfulness solutions to new and existing lululemon guests.

Calvin McDonald, Chief Executive Officer, commented, "In 2019, we detailed our vision to be the experiential brand that ignites a community of people living the sweatlife through sweat, grow and connect. The acquisition of MIRROR is an exciting opportunity to build upon that vision, enhance our digital and interactive capabilities, and deepen our roots in the sweatlife. We look forward to learning from and working with Brynn Putnam and the team at MIRROR to accelerate the growth of personalized in-home fitness."

MIRROR offers weekly live classes and thousands of on-demand workouts as well as immersive one-on-one personal training. MIRROR has seen rapid growth and strong engagement since it launched in 2018 as demand for in-home fitness offerings continue to increase significantly.

This transaction builds on a successful partnership between the two companies, which began in mid-2019 with an initial investment in MIRROR by lululemon, and also includes a content partnership which brought sweat and meditation classes to the MIRROR platform by lululemon's Global Ambassadors. This acquisition will further expand the content creation partnership between the two brands and will help lululemon, MIRROR and lululemon Ambassadors reach new guests.

Ms. Putnam, founder and chief executive officer of MIRROR, and a former lululemon Ambassador said, "We are thrilled to officially become a part of the lululemon family. As part of lululemon, MIRROR can further strengthen its position and accelerate its growth by leveraging lululemon's deep relationships with its guests, ambassadors and communities, as well as the company's infrastructure, including its store network and ecommerce channels, to acquire new users."

The purchase price is expected to be paid from the company's primary sources of liquidity, which include over $800 million in cash, its existing $400 million revolving credit facility, and a new one-year, $300 million revolving credit facility.

Following completion of the transaction, MIRROR will operate as a standalone company within lululemon and Ms. Putnam will continue as MIRROR's chief executive officer, reporting to Mr. McDonald. The transaction is subject to customary closing conditions and is expected to close in the second quarter of fiscal 2020.

A conference call to discuss this transaction with analysts and investors is scheduled for today, June 29, at 4:45 p.m. Eastern time. If you would like to participate in the call, please dial (800) 319-4610 or (604) 638-5340, if calling internationally, approximately 10 minutes prior to the start of the call.

A live webcast of the conference call and downloadable slides will be available online at:
HTTP://INVESTOR.LULULEMON.COM/EVENTS.CFM. A replay will be made available online approximately 2 hours following the live call for a period of 30 days.

**Advisors**

Barclays served as the financial advisor to lululemon and Fenwick & West LLP and Blake, Cassels & Graydon LLP served as legal counsel. Cooley LLP served as legal counsel to MIRROR.

**About lululemon athletica inc.**

lululemon athletica inc. (NASDAQ:LULU) is a healthy lifestyle inspired athletic apparel company for yoga, running, training, and most other sweaty pursuits, creating transformational products and experiences which enable people to live a life they love. Setting the bar in technical

fabrics and functional designs, lululemon works with yogis and athletes in local communities for continuous research and product feedback. For more information, visit W W W . L U L U L E M O N . C O M .

**About MIRROR**

MIRROR is a nearly invisible, interactive home gym featuring live and on-demand fitness classes and personal training in a variety of workout genres. MIRROR is creating a new category of in-home fitness with cutting-edge hardware, responsive software, and best-in-class content that transforms any room into a complete home gym. For the first time, the essential components of a great studio workout – variety, personalization, and community – are brought to the most convenient place: the home. MIRROR was founded by Brynn Putnam, creator of Refine Method, named "New York's Smartest Workout." MIRROR is headquartered in New York City. H T T P S : / / M I R R O R . C O

**Forward-Looking Statements:**

This press release includes statements relating to the acquisition and the Company's business plans, objectives, and expected results that are "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995, Section 27A of the Securities Act of 1933 and Section 21E of the Securities Exchange Act of 1934. In many cases, you can identify forward-looking statements by terms such as "may," "will," "should," "expects," "plans," "anticipates," "outlook," "believes," "intends," "estimates," "predicts," "potential" or the negative of these terms or other comparable terminology. These statements are based on management's current expectations but they involve a number of risks and uncertainties. Actual results and the timing of events could differ materially from those anticipated in the forward-looking statements as a result of risks and uncertainties, which include, without limitation: that the potential benefits and synergies sought in the acquisition may not be fully realized, if at all; that the Company may need to use significant resources to respond to a resurgence in COVID-19 cases; that the Company will incur significant costs in connection with the acquisition, which could limit its operating flexibility and ability to take responsive actions to current and future economic uncertainty; that the Company's current management team has limited experience in addressing the challenges of integrating the management teams, strategies, cultures and organizations of the two companies; that the acquisition may not be well received by customers or employees of the two companies; that the acquisition may not be completed in a timely manner or at all; and other risks and uncertainties set out in filings made from time to time with the United States Securities and Exchange Commission and available at W W W . S E C . G O V , including, without limitation, its most recent reports on Form 10-K and Form 10-Q. You are urged to consider these factors carefully in evaluating the forward-looking statements contained herein and are cautioned not to place undue reliance on such forward-looking statements, which are qualified in their entirety by these cautionary statements. The forward-looking statements made herein speak only as of the date of this press release and the Company undertakes no obligation to publicly update such forward-looking statements to reflect subsequent events or circumstances, except as may be required by law.

View source version on B U S I N E S S W I R E . C O M :
H T T P S : / / W W W . B U S I N E S S W I R E . C O M / N E W S / H O M E / 2 0 2 0 0 6 2 9 0 0 5 7 8 9 / E N /

**Investor Contact:**
lululemon athletica inc.
Howard Tubin
604-732-6124
or
ICR, Inc.
Joseph Teklits/Caitlin Churchill
203-682-8200

**Media Contact:**
lululemon athletica inc.
Tatiana Jovic
T J O V I C @ L U L U L E M O N . C O M
604-250-9823
or
Brunswick Group
Eleanor French
E F R E N C H @ B R U N S W I C K G R O U P . C O M
415-671-7676

Source: lululemon athletica inc.

**INVESTOR RELATIONS SEARCH**

| Search Investors | | SEARCH |
|---|---|---|

# EXHIBIT 2





June 29, 2020

# lululemon to  acquire MIRROR



This presentation includes statements relating to the acquisition and the Company's business plans, objectives, and expected results that are "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995, Section 27A of the Securities Act of 1933 and Section 21E of the Securities Exchange Act of 1934. In many cases, you can identify forward-looking statements by terms such as "may," "will," "should," "expects," "plans," "anticipates," "outlook," "believes," "intends," "estimates," "predicts," "potential" or the negative of these terms or other comparable terminology. These statements are based on management's current expectations but they involve a number of risks and uncertainties. Actual results and the timing of events could differ materially from those anticipated in the forward-looking statements as a result of risks and uncertainties, which include, without limitation: that the potential benefits and synergies sought in the acquisition may not be fully realized, if at all; that the Company may need to use significant resources to respond to a resurgence in  COVID-19 cases; that the Company will incur significant costs in connection with the acquisition, which could limit its operating flexibility and ability to take responsive actions to current and future economic uncertainty; that the Company's current management team has limited experience in addressing the challenges of integrating the management teams, strategies, cultures and organizations of the two companies; that the acquisition may not be well received by customers or employees of the two companies; that the acquisition may not be completed in a timely manner or at all;  and other risks and uncertainties set out in filings made from time to time with the United States Securities and Exchange Commission and available at www.sec.gov, including, without limitation, its most recent reports on Form 10-K and Form 10-Q. You are urged to consider these factors carefully in evaluating the forward-looking statements contained herein and are cautioned not to place undue reliance on such forward-looking statements, which are qualified in their entirety by these cautionary statements. The forward-looking statements made herein speak only as of the date of this press release and the Company undertakes no obligation to publicly update such forward-looking statements to reflect subsequent events or circumstances, except as may be required by law.





There's something special about lululemon—a well-informed intuition

We listen deeply to our guests, ambassadors, and our collective

We developed our five-year vision and strategy understanding the future, and the opportunity to:

- Integrate both digital and physical experiences

- Recognize the power of versatile sweat activities

- Bring together physical, social and emotional health

Our five-year strategic roadmap was built around these premises.

We have invested in this future -- through omni experiences, our partnership with MIRROR in 2019, digital sweat offerings, and a dynamic channel infrastructure

We are seeing these trends accelerate to create a structural change, and we're ready

MIRROR is an important step in our strategy and creating the future of the sweatlife



# MIRROR overview

### Known for

Innovative in-home interactive fitness studio experience

Versatile fitness and activity offering

Energized community and influencer buzz

Powerful and scalable content platform

### What they're doing well

Lean and efficient revenue-generating operating model

Compelling value proposition

Strong online channel sales and marketing

### lululemon + MIRROR partnership

lululemon made initial investment in MIRROR in mid-2019

MIRROR launched Meditation content vertical with lululemon Global Ambassador Gabby Bernstein in January





# MIRROR overview: Key stats

**2018**
Launched Sept 2018 in NY by Brynn Putnam

**$100M+**
2020 revenue run rate

**50%**
Female / male demographic

**70+**
New classes per week

**40+**
Class types

**10%**
Familiar with product



**'MIRROR fitness' search trend**
Google trends: Level of interest in US past 2 years

Trendline

2018          2019          2020





# Our Vision

Be the experiential brand that **ignites a community** of people **living the sweatlife** through **sweat**, **grow** and **connect**





# The Power of Three





**Innovative products**

**Omni guest experiences**

**Expand markets**

Men's:
**double**

Digital:
**double**

International:
**quadruple**



# Omni guest experience and digital sweatlife have been key to our strategic roadmap



Digital content is changing **how and where** our guests sweat, grow and connect



Digital content is changing **studio and trainer models** for our Ambassadors

**1** **Support our community vision**
To foster connection among people in the practice of the sweatlife, inspired by our ambassadors, in a seamless physical and digital journey

**2** **Scale the sweatlife**
Reach more of our guests and future guests with the power of our community

**3** **Bolster our competitive advantage**
Modernize our grass roots marketing

**4** **Accelerate Membership growth**
Integrate a digital solution to enable faster expansion



# MIRROR unlocks the ecosystem of our omni assets to create new sweatlife experiences



| A place in the home | Daily mindshare | Platform for ambassadors |

**Versatile + immersive hardware in-home**

**Community**
MIRROR gains access to our guests + members

**Open + curated platform**
MIRROR gains our trusted lens to curation

**Physical infrastructure**
MIRROR can be used to further connect to physical: events, experiential stores, local studios

**Ambassadors**
MIRROR gains access to our ambassadors for content creation



# Synergies with MIRROR and lululemon





**What we can bring to MIRROR**

Access to our large, growing and loyal guests

Leverage distribution channels to scale growth

Utilize marketing channels to lower guest acquisition costs

Expand talent through our unique Ambassador community

Reduce consideration barriers with strong brand credibility

Lead generation from our most engaged guests

**What MIRROR can bring to lululemon**

Expand and innovate our omni guest experiences

Dynamic platform to enhance and scale guest offerings

Accelerate monetization of digital sweat

Create immediate revenue stream with a path to profitability

Amplify lululemon ambassadors and creates community

Establish product integration opportunities



# Deal related financials

**Purchase price**

$500 million*

**Financing**

Paid from the company's
$1.5 billion of liquidity
>$800 million cash, $400 million
existing revolver, $300 million
new revolver

**Closing**

Within the next 1-2 weeks

*Subject to certain adjustments at closing.



MIRROR: on track to generate
in excess of $100 million in
revenue in 2020.

Transaction is modestly
dilutive in 2020 and modestly
profitable in 2021 (excluding
deal related costs)

No change to the revenue
or EPS outlook we provided
on our Q1 conference call.





# Summary

MIRROR brings a **content platform** that connects our **sweatlife ecosystem**, and integrates our strong assets

MIRROR allows us to offer **new omni experiences** to our guest and support them to live the sweatlife in new ways

lululemon can **bring significant awareness** to MIRROR, through our marketing and distribution channels:  helping them grow and reduce customer acquisition costs

Our vision and Power of Three plan has not changed: **MIRROR growth adds to the potential**

We have the **financial strength and liquidity** to complete this transaction and continue to run our business day to day and plan for contingencies



# EXHIBIT 3

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

---

# FORM 8-K

---

### CURRENT REPORT
**Pursuant to Section 13 or 15(d)**
**of the Securities Exchange Act of 1934**

**July 7, 2020**
**Date of Report (Date of earliest event reported)**

---

# lululemon athletica inc.
**(Exact name of registrant as specified in its charter)**

---

| **Delaware** | **001-33608** | **20-3842867** |
|:---:|:---:|:---:|
| (State or other jurisdiction of incorporation) | (Commission File Number) | (IRS Employer Identification No.) |

**1818 Cornwall Avenue**
**Vancouver, British Columbia**
**Canada, V6J 1C7**
**(Address of principal executive offices, including Zip Code)**

**Registrant's telephone number, including area code: (604) 732-6124**

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading symbol(s) | Name of each exchange on which registered |
|:---:|:---:|:---:|
| Common Stock, par value $0.005 per share | LULU | Nasdaq Global Select Market |

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐     Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐     Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐     Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐     Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

Indicate by check mark whether the registrant is an emerging growth company as defined in Rule 405 of the Securities Act of 1933 (§230.405 of this chapter) or Rule 12b-2 of the Securities Exchange Act of 1934 (§240.12b-2 of this chapter).

Emerging growth company ☐

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

**Item 2.01.          Completion of Acquisition or Disposition of Assets.**

On July 7, 2020, we completed the acquisition of all of the outstanding shares of Curiouser Products Inc., dba MIRROR, for the previously reported purchase price of approximately $500.0 million in cash in accordance with the terms of the agreement and plan of merger, dated June 26, 2020. As described in our current report on Form 8-K filed on July 1, 2020, the purchase price was subject to working capital and other adjustments described in the agreement and $10.0 million of the purchase price will be held in escrow to satisfy certain indemnification obligations of MIRROR. Approximately $57 million of the purchase price payable to certain continuing employees is subject to the continued employment of those individuals through various vesting dates up to three years after the transaction closing date.

A copy of the transaction agreement was filed as Exhibit 2.1 to our current report on Form 8-K filed on July 1, 2020.

The foregoing description of the transaction and the transaction agreement does not purport to be complete and is qualified in its entirety by reference to the information provided under Item 1.01 of our current report on Form 8-K filed on July 1, 2020, and to the full text of the transaction agreement.

SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, as amended, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

lululemon athletica inc.

Dated: July 7, 2020

/s/ CALVIN MCDONALD

Calvin McDonald
Chief Executive Officer

# EXHIBIT 4

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

## FORM 8-K

**CURRENT REPORT**
Pursuant to Section 13 or 15(d)
of the Securities Exchange Act of 1934

**June 26, 2020**
**Date of Report (Date of earliest event reported)**

# lululemon athletica inc.
(Exact name of registrant as specified in its charter)

| Delaware | 001-33608 | 20-3842867 |
|---|---|---|
| (State or other jurisdiction of incorporation) | (Commission File Number) | (IRS Employer Identification No.) |

**1818 Cornwall Avenue**
**Vancouver, British Columbia**
**Canada, V6J 1C7**
(Address of principal executive offices, including Zip Code)

**Registrant's telephone number, including area code: (604) 732-6124**

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading symbol(s) | Name of each exchange on which registered |
|---|---|---|
| Common Stock, par value $0.005 per share | LULU | Nasdaq Global Select Market |

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐ Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐ Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐ Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐ Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

Indicate by check mark whether the registrant is an emerging growth company as defined in Rule 405 of the Securities Act of 1933 (§230.405 of this chapter) or Rule 12b-2 of the Securities Exchange Act of 1934 (§240.12b-2 of this chapter).

Emerging growth company ☐

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

**Item 1.01.**                    **Entry into a Material Definitive Agreement.**

On June 26, 2020, we entered into an Agreement and Plan of Merger with Curiouser Products Inc., dba MIRROR, in connection with which, subject to the satisfaction or waiver of certain conditions stated in the agreement, we will acquire all of the outstanding shares of MIRROR in an all-cash transaction for an aggregate purchase price of approximately $500.0 million. The parties to the agreement include lululemon athletica inc., a Delaware corporation; Snowflake Acquisition Corp., a Delaware corporation and our wholly-owned subsidiary; Curiouser Products Inc., a Delaware corporation; and Shareholder Representative Services LLC, a Colorado limited liability company, in its capacity as the holder representative. Under terms of the agreement, the acquisition will be effected through a merger of Snowflake Acquisition Corp. with and into MIRROR, with MIRROR surviving the transaction as our wholly-owned subsidiary.

We expect to pay the purchase price from our primary sources of liquidity, which include our current balances of cash and cash equivalents, our existing $400.0 million revolving credit facility, and a new $300.0 million revolving credit facility described in Item 2.03. The aggregate purchase price payable in the transaction is subject to working capital and other adjustments described in the agreement. Approximately $57 million of the purchase price payable to certain continuing employees is subject to the continued employment of those individuals through various vesting dates up to three years after the transaction closing date.

The transaction agreement contains customary representations, warranties and covenants by the parties, including covenants with respect to the conduct of MIRROR during the period between execution of the agreement and the closing of the transaction. The agreement also contains customary indemnities, with respect to which $10.0 million of the purchase price will be held in escrow to satisfy certain indemnification obligations of MIRROR and the parties will jointly share in the cost of a representation and warranty insurance policy. The transaction is subject to customary closing conditions and is expected to close in the second quarter of fiscal 2020. The agreement contains certain customary termination rights for both parties.

The foregoing description of the transaction agreement does not purport to be complete and is qualified in its entirety by reference to the full text of the transaction agreement, a copy of which is filed as Exhibit 2.1 to this current report and is incorporated by reference in this Item 1.01.

The transaction agreement and the above description have been included to provide investors with information regarding the terms of the transaction agreement. They are not intended to provide any other factual information about lululemon or any other parties. The representations, warranties and covenants contained in the transaction agreement were made only for purposes of that agreement and as of the dates specified therein, are solely for the benefit of the parties to the agreement, and may be subject to limitations agreed upon by the parties, including being qualified by confidential disclosures made by each contracting party to the other for the purposes of allocating contractual risk between them that differ from those applicable to investors. The representations, warranties and covenants, or any description thereof, may not reflect the actual state of facts or condition of lululemon or any other parties to the agreement. Moreover, information concerning the subject matter of the representations, warranties and covenants may change after the date of the transaction agreement, which subsequent information may or may not be fully reflected in our public disclosures.

The information included in Item 2.03 of this current report is incorporated by reference in this Item 1.01.

**Item 2.03.**          **Creation of a Direct Financial Obligation or an Obligation under an Off-Balance Sheet Arrangement of a Registrant.**

On June 29, 2020, we entered into a 364-day credit agreement providing for a $300.0 million unsecured revolving credit facility available for our use for the acquisition of MIRROR described in Item 1.01 and for general corporate purposes. The credit agreement matures on June 28, 2021. The parties to the credit agreement include lululemon athletica inc., a Delaware corporation ("LAI"); lululemon athletica canada inc., a corporation organized under the laws of British Columbia ("LACI"); Lulu Canadian Holding, Inc., a corporation organized under the laws of British Columbia ("LCHI"); lululemon usa inc., a Nevada corporation ("LUI"); each lender from time to time a party to the credit agreement; and Bank of America, N.A., as administrative agent and swing line lender.

Borrowings under the credit facility may be prepaid and commitments may be reduced or terminated without premium or penalty (other than customary breakage costs). Subject to the exceptions stated in the credit agreement, all borrowings under the credit facility are guaranteed by LAI and LUI, and borrowings made by LACI and LCHI under the credit facility are guaranteed by LACI and LCHI.

Borrowings made under the credit facility bear interest at a rate per annum equal to, at our option, either (1) a rate based on the rates applicable for deposits on the interbank market for U.S. Dollars or the applicable currency in which the borrowings are made ("LIBOR") or (2) an alternate base rate, plus, in each case, an applicable margin. The applicable margin is determined by reference to a pricing grid, based on the ratio of indebtedness to earnings before interest, tax depreciation, amortization, and rent ("EBITDAR") and ranges between 1.50%–2.25% for LIBOR loans and 0.50%–1.25% for alternate base rate or Canadian prime rate loans. Additionally, a commitment fee of between 0.25%–0.55%, also determined by reference to the pricing grid, is payable on the average daily unused amounts under the credit facility.

The credit agreement contains negative covenants that, among other things and subject to certain exceptions, limit the ability of our subsidiaries to incur indebtedness, incur liens, undergo fundamental changes, make dispositions of all or substantially all of their assets, alter their businesses and enter into agreements limiting subsidiary dividends and distributions.

We are also required to maintain a consolidated rent-adjusted leverage ratio of not greater than 3.50:1.00 and we are not permitted to allow the ratio of consolidated EBITDAR to consolidated interest charges (plus rent) to be less than 2.00:1.00. The credit agreement also contains certain customary representations, warranties, affirmative covenants, and events of default (including, among others, an event of default upon the occurrence of a change of control). If an event of default occurs, the credit agreement may be terminated, and the maturity of any outstanding amounts may be accelerated.

The foregoing description of the credit agreement does not purport to be complete and is qualified in its entirety by reference to the full text of the credit agreement, which is filed as Exhibit 10.1 to this current report and is incorporated by reference in this Item 2.03.

**Item 7.01.**      **Regulation FD Disclosure.**

On June 29, 2020, we issued a press release announcing the execution of the merger agreement. A copy of the press release is furnished as Exhibit 99.1 to this current report.

We are also furnishing as Exhibit 99.2 to this current report an investor presentation relating to the acquisition of MIRROR, which we intend to use for presentations to investors and others from time to time.

**Item 9.01.**      **Financial Statements and Exhibits.**

(d) Exhibits.

| Exhibit No. | Description |
| --- | --- |
| 2.1 | Agreement and Plan of Merger, dated June 26, 2020, among lululemon athletica inc., a Delaware corporation; Snowflake Acquisition Corp., a Delaware corporation; Curiouser Products Inc., a Delaware corporation; and Shareholder Representative Services LLC, a Colorado limited liability company, in its capacity as the holder representative |
| 10.1 | 364-Day Credit Agreement, dated June 29, 2020, among lululemon athletica inc., a Delaware corporation; lululemon athletica canada inc., a corporation organized under the laws of British Columbia; Lulu Canadian Holding, Inc., a corporation organized under the laws of British Columbia; lululemon usa inc., a Nevada corporation; each lender from time to time a party to the credit agreement; and Bank of America, N.A., as administrative agent and swing line lender |
| 99.1 | Press release issued on June 29, 2020 |
| 99.2 | Form of investor presentation |

SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, as amended, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

lululemon athletica inc.

Dated: June 30, 2020

/s/ CALVIN MCDONALD

Calvin McDonald
Chief Executive Officer

**EXHIBIT INDEX**

| Exhibit No. | Description |
| --- | --- |
| 2.1 | Agreement and Plan of Merger, dated June 26, 2020, among lululemon athletica inc., a Delaware corporation; Snowflake Acquisition Corp., a Delaware corporation; Curiouser Products Inc., a Delaware corporation; and Shareholder Representative Services LLC, a Colorado limited liability company, in its capacity as the holder representative |
| 10.1 | 364-Day Credit Agreement, dated June 29, 2020, among lululemon athletica inc., a Delaware corporation; lululemon athletica canada inc., a corporation organized under the laws of British Columbia; Lulu Canadian Holding, Inc., a corporation organized under the laws of British Columbia; lululemon usa inc., a Nevada corporation; each lender from time to time a party to the credit agreement; and Bank of America, N.A., as administrative agent and swing line lender |
| 99.1 | Press release issued on June 29, 2020 |
| 99.2 | Form of investor presentation |

**AGREEMENT AND PLAN OF MERGER**

**by and among**

**LULULEMON ATHLETICA INC.,**

**SNOWFLAKE ACQUISITION CORP.,**

**CURIOUSER PRODUCTS INC.,**

**and**

**SHAREHOLDER REPRESENTATIVE SERVICES LLC**

**as the HOLDER REPRESENTATIVE**

**Dated as of June 26, 2020**

**TABLE OF CONTENTS**

Article I THE MERGER ................................................................................................ 2
    1.1    The Merger ......................................................................................... 2
    1.2    The Closing ........................................................................................ 2
    1.3    Effective Date and Time ..................................................................... 2
    1.4    Certificate of Incorporation and Bylaws of the Surviving Corporation ... 2
    1.5    Directors and Officers ....................................................................... 2
    1.6    Effect of the Merger .......................................................................... 2
    1.7    Company Options ............................................................................... 8
    1.8    Tax Withholding ................................................................................ 8
    1.9    Tax Consequences. ............................................................................. 9
Article II REPRESENTATIONS AND WARRANTIES OF THE COMPANY ............... 9
    2.1    Organization and Good Standing; Books and Records; Subsidiaries. ...... 9
    2.2    Authority and Enforceability .............................................................. 10
    2.3    Capitalization and Stock Rights; Consideration Spreadsheet ................. 10
    2.4    No Approvals; No Conflicts ................................................................ 12
    2.5    Financial Statements; No Undisclosed Liabilities ................................ 13
    2.6    Absence of Certain Changes or Events ............................................... 14
    2.7    Property ............................................................................................ 14
    2.8    Labor and Employment Matters; Nondisclosure and Non-Competition Agreements ... 15
    2.9    Employee Benefit Plans ..................................................................... 17
    2.10    Intellectual Property .......................................................................... 19
    2.11    Material Contracts ............................................................................. 25
    2.12    Company Permits; Compliance with Laws. ......................................... 28
    2.13    Environmental, Health and Safety Matters .......................................... 29
    2.14    Taxes ................................................................................................ 29
    2.15    Related Party Interests ....................................................................... 33
    2.16    Insurance .......................................................................................... 34
    2.17    Brokers or Finders ............................................................................. 34
    2.18    Bank Accounts .................................................................................. 34
    2.19    Suppliers .......................................................................................... 34
    2.2    Company Products; Warranties; and Related Matters. ........................... 35
Article III REPRESENTATIONS AND WARRANTIES OF PARENT AND MERGER SUB ... 35
    3.1    Organization and Good Standing ........................................................ 35
    3.2    Authority and Enforceability .............................................................. 36
    3.3    No Approvals; No Conflicts ................................................................ 36
    3.4    Financing .......................................................................................... 36
Article IV COVENANTS .............................................................................................. 36
    4.1    Covenants of the Company Prior to the Effective Time ......................... 36
    4.2    Third-Party Consents; Notices ........................................................... 40

|  | 4.3 | Further Action | 40 |
|  | 4.4 | Confidentiality | 41 |
|  | 4.5 | Exclusivity | 42 |
|  | 4.6 | Tax Matters | 43 |
|  | 4.7 | Employee Compensation Matters | 45 |
|  | 4.8 | Notification of Certain Matters | 46 |
|  | 4.9 | Promised Options | 46 |
|  | 4.10 | Section 280G Matters | 46 |
|  | 4.11 | Stockholder Approval Matters | 47 |
|  | 4.12 | R&W Policy | 48 |
|  | 4.13 | Certain Closing Deliverables | 48 |
|  | 4.14 | Director and Officer Indemnification | 49 |
| Article V CONDITIONS PRECEDENT TO OBLIGATIONS OF PARENT and Merger Sub TO THE CLOSING | | | 50 |
|  | 5.1 | Accuracy of Representations and Warranties | 50 |
|  | 5.2 | Performance of Agreements | 50 |
|  | 5.3 | HSR Act; Governmental Orders | 50 |
|  | 5.4 | Legal Proceedings | 51 |
|  | 5.5 | Employment Arrangements | 51 |
|  | 5.6 | Material Adverse Effect | 51 |
|  | 5.7 | Section 280G Matters | 51 |
|  | 5.8 | Receipt of Closing Deliveries | 51 |
| Article VI CONDITIONS PRECEDENT TO OBLIGATIONS OF THE COMPANY TO THE CLOSING | | | 53 |
|  | 6.1 | Accuracy of Representations and Warranties | 53 |
|  | 6.2 | Performance of Agreements | 53 |
|  | 6.3 | HSR Act; Governmental Orders. | 53 |
|  | 6.4 | Escrow Agreement. The Escrow Agreement shall have been duly executed by Parent and the Escrow Agent and delivered to the Company. | 53 |
| Article VII INDEMNIFICATION | | | 53 |
|  | 7.1 | Survival | 53 |
|  | 7.2 | Indemnification by the Vested Equityholders | 54 |
|  | 7.3 | Limitations and Adjustments | 55 |
|  | 7.4 | Procedure for Indemnification | 57 |
|  | 7.5 | Third-Party Claims | 58 |
|  | 7.6 | Holder Representative | 59 |
|  | 7.7 | Adjustment to Purchase Price | 60 |
|  | 7.8 | Payment | 60 |
| Article VIII TERMINATION | | | 61 |
|  | 8.1 | Termination | 61 |
|  | 8.2 | Effect of Termination | 61 |
| Article IX GENERAL | | | 62 |

-ii-

| 9.1 | Expenses | 62 |
| 9.2 | Notices | 62 |
| 9.3 | Severability | 62 |
| 9.4 | Entire Agreement | 63 |
| 9.5 | Assignment; Parties in Interest | 63 |
| 9.6 | Governing Law; Jurisdiction; Waiver of Jury Trial | 63 |
| 9.7 | Headings; Construction | 63 |
| 9.8 | Counterparts | 64 |
| 9.9 | Remedies | 64 |
| 9.10 | Amendment | 64 |
| 9.11 | Waiver | 64 |
| 9.12 | Waiver of Conflicts; Privilege | 65 |

Annexes:

Annex A    –    Definitions

Exhibits:

Exhibit A    –    Form of Joinder Agreement
Exhibit B    –    Consenting Stockholders
Exhibit C-1    –    Key Employees
Exhibit C-2    –    Additional Employees
Exhibit D    –    Form of Letter of Transmittal
Exhibit E-1    –    Form of FIRPTA Notice
Exhibit E-2    –    Form of FIRPTA Notification Letter
Exhibit F    –    Form of Promised Option Waiver
Exhibit G    –    Form of Warrant Termination Agreement
Exhibit H    –    Form of Option Consent
Exhibit I    –    Form of Escrow Agreement
Exhibit J    –    Knowledge Persons
Exhibit K    –    Form of Parachute Payment Waiver
Exhibit L    –    Section 4.1 Authorized Individuals
Exhibit M    –    Working Capital Example
Exhibit N    –    Certain Equity Matters

-i-

**AGREEMENT AND PLAN OF MERGER**

This Agreement and Plan of Merger (this "**Agreement**") is made and entered into as of June 26, 2020 (the "**Agreement Date**"), by and among lululemon athletica inc., a Delaware corporation ("**Parent**"), Snowflake Acquisition Corp., a Delaware corporation and wholly owned subsidiary of Parent ("**Merger Sub**"), Curious Products Inc., a Delaware corporation (the "**Company**"), and Shareholder Representative Services LLC, a Colorado limited liability company, solely in its capacity as the Holder Representative. Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in **Annex A**.

WHEREAS, the board of directors of the Company has unanimously (a) determined that this Agreement and the Transactions, including the Merger, are fair to, and in the best interests of, the Company and the Stockholders, (b) approved and declared advisable the execution, delivery, and performance of this Agreement and the consummation of the Transactions, including the Merger, and (c) resolved to recommend that the Stockholders adopt this Agreement and approve the Merger and the other Transactions;

WHEREAS, the board of directors of Merger Sub has approved and declared advisable the execution, delivery, and performance of this Agreement and the consummation of the Transactions, including the Merger;

WHEREAS, as promptly as practicable, but in no event later than eight (8) hours after execution and delivery of this Agreement, the Company shall deliver to Parent a stockholder written consent evidencing the Stockholder Approval and joinders to this Agreement substantially in the form attached hereto as **Exhibit A** (each, a "**Joinder Agreement**"), in each case executed by each Stockholder listed in the attached **Exhibit B** (each, a "**Consenting Stockholder**");

WHEREAS, simultaneously with the execution of this Agreement and as a material inducement to the willingness of Parent and Merger Sub to enter into this Agreement, the Person set forth on Schedule A to the Disclosure Letter (the "**Founder**") has executed a Holdback Agreement (the "**Holdback Agreement**"), which shall become effective upon the Closing; and

WHEREAS, simultaneously with the execution of this Agreement and as a material inducement to the willingness of Parent and Merger Sub to enter into this Agreement, each of the individuals listed in the attached **Exhibit C-1** (each, a "**Key Employee**" and together, the "**Key Employees**") is executing and delivering to Parent (a) an offer letter that describes, among other matters, the terms of his or her employment with a Parent Entity after the Closing (each, a "**Key Employee Offer Letter**"), (b) a confidentiality and invention assignment agreement (each, a "**CIAA**"), (c) a noncompetition and nonsolicitation agreement, (d) an Option Consent (if such Key Employee holds a Company Option) and (e) a Promised Option Waiver (if such Key Employee has Promised Options), the effectiveness of all of such agreements being conditioned upon the Closing (such documents, collectively and together with the Holdback Agreement (as applicable in the case of the Founder), the "**Key Employee Documents**").

NOW, THEREFORE, in consideration of the premises, representations, warranties, and the mutual agreements and covenants set forth herein, and intending to be legally bound, the Company, Parent, Merger Sub, and the Holder Representative hereby agree as follows:

ARTICLE I
**THE MERGER**

1.1    The Merger. Upon the terms and subject to the conditions of this Agreement, (a) at the Effective Time, the separate existence of Merger Sub shall cease and Merger Sub shall be merged with and into the Company (the "**Merger**"), with the Company as the surviving corporation after the Effective Time (the "**Surviving Corporation**"), and (b) from and after the Effective Time, the Merger shall have all the effects of a merger under the DGCL and other Applicable Law.

1.2    The Closing. Upon the terms and subject to the conditions of this Agreement, the closing of the Merger (the "**Closing**") shall take place by exchange of electronic deliveries and signatures, unless another method or place is mutually agreed upon in writing by Parent and the Company, upon the later of (a) July 7, 2020 and (b) two (2) Business Days after the satisfaction or waiver of the conditions set forth in Article V and Article VI (other than such conditions that, by their terms, are intended to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions). The date on which the Closing occurs is referred to herein as the "**Closing Date**."

1.3    Effective Date and Time. On the Closing Date, upon the terms and subject to the conditions of this Agreement, the parties hereto shall cause appropriate certificates (together, the "**Certificate of Merger**") complying with the applicable provisions of the DGCL to be properly executed and filed with the Secretary of State of the State of Delaware (the "**Delaware Secretary of State**"). The Merger shall become effective on the date and at the time of the filing of the Certificate of Merger or at such other date and time as may be specified in the Certificate of Merger (the "**Effective Time**").

1.4    Certificate of Incorporation and Bylaws of the Surviving Corporation. Unless otherwise specified by Parent prior to the Effective Time, at the Effective Time, by virtue of the Merger, the certificate of incorporation and bylaws of the Company shall be amended and restated to read in their entireties as the certificate of incorporation and bylaws of Merger Sub in effect immediately prior to the Effective Time, and as so amended and restated shall be the certificate of incorporation and bylaws of the Surviving Corporation, except that the name of the Surviving Corporation shall be "Curiouser Products Inc." Thereafter, the certificate of incorporation and bylaws of the Surviving Corporation may be amended in accordance with their respective terms and as provided by Applicable Law.

1.5    Directors and Officers. At the Effective Time, the directors and officers of the Company shall resign and the directors and officers of Merger Sub shall continue in office as the directors and officers of the Surviving Corporation, and such directors and officers shall hold office until their respective successors are duly elected or appointed and qualified or until their earlier death, resignation, or removal in accordance with, and subject to, the certificate of incorporation and bylaws of the Surviving Corporation.

1.6    Effect of the Merger.

1.6.1    Treatment of Equity. At the Effective Time, upon the terms and subject to the conditions of this Agreement (including, as and to the extent applicable, each of the terms and conditions set forth in this Section 1.6 and the conditions set forth in the Holdback Agreement), by virtue of the Merger and without any action on the part of any party hereto or the holders thereof:

(a)    All shares of any class of Capital Stock held by the Company as treasury shares shall be canceled.

-2-

(b)    Each issued and outstanding share of Preferred Stock (including each share of Preferred Stock held by Parent) and each issued and outstanding share of Common Stock, in each case other than Dissenting Shares, shall, subject to the other terms and conditions contained herein, be converted into the right to receive from Parent the Per Share Merger Consideration.

(c)    Each Company Option shall be canceled and terminated at the Closing, and subject to the other terms and conditions contained herein:

(i)    each holder of a Company Option that is not a Substitution Option shall be entitled to receive from Parent a portion of the Merger Consideration, equal to (A) the Per Share Merger Consideration that would have been payable pursuant hereto in respect of each share issuable in respect of such Company Option had such Company Option been exercised immediately prior to the Closing <u>less</u> (B) the exercise price with respect to such Company Option; <u>provided</u> that each Company Option issued and outstanding as of immediately prior to the Closing with an exercise price that is greater than the Per Share Merger Consideration shall be canceled and terminated without any cash payment or any other consideration being made in respect thereof; and

(ii)    each holder of a Company Option that is a Substitution Option will be entitled to receive from Parent a nonstatutory stock option to purchase shares of Parent Common Stock (each, a "**Parent Option**"), which will (A) be subject to a two-year vesting schedule, pursuant to which fifty percent (50%) of the Parent Option will vest and become exercisable on each of the two consecutive anniversaries following the Closing Date, provided that the holder continues in service with a Parent Entity through each of the two vesting dates, (B) be exercisable for a number of shares of Parent Common Stock equal to (1) the number of shares of Company Common Stock subject to such Substitution Option immediately prior to the Closing <u>multiplied by</u> (2) the Exchange Ratio, rounded down to the nearest whole share, (C) will have a per share exercise price equal to (x) the per share exercise price of the Substitution Option immediately prior to the Closing <u>divided by</u> the Exchange Ratio, rounded up to the nearest cent and (D) otherwise be issued in accordance with the Parent Option Plan.

(d)    Subject to <u>Section 4.9</u>, each Promised Option shall be canceled and terminated at the Closing, and subject to the other terms and conditions contained herein:

(i)    each holder of a Promised Option that is not a Substitution Promised Option shall be entitled to receive from Parent a portion of the Merger Consideration, equal to (A) the Per Share Merger Consideration that would have been payable pursuant hereto in respect of each share in respect of such Promised Option had such Promised Option been issued as promised and exercised immediately prior to the Closing, <u>less</u> (B) the Deemed Exercise Price with respect to such Promised Option (the "**Spread Value**");

(ii)    each holder of a Substitution Promised Option will be entitled to receive restricted stock units ("**Parent RSUs**") that will settle into the number of shares of Parent Common Stock equal to (A) the Spread Value of the Substitution Promised Option <u>divided by</u> (B) the Parent Stock Price, rounded down to the nearest whole share, and be subject to a three-year vesting schedule, pursuant to which 33% of the Parent RSUs will vest on each of the first and second anniversaries of the Closing Date, and 34% of the Parent RSUs will vest on the third anniversary of the Closing Date, provided that the holder continues in service

with a Parent Entity through each of the three vesting dates, and be issued in accordance with the Parent Option Plan.

(e)  Each Company Warrant shall be canceled and terminated at the Closing. Each holder of a Company Warrant shall be entitled to receive from Parent for each share of Preferred Stock or Common Stock subject to each Company Warrant a portion of the Merger Consideration, equal to (i) the Per Share Merger Consideration that would have been payable pursuant hereto in respect of such share had such Company Warrant been exercised immediately prior to the Effective Time, <u>less</u> (ii) the exercise price with respect to such Company Warrant; <u>provided</u> that each Company Warrant issued and outstanding as of immediately prior to the Closing with an exercise price that is greater than the Per Share Merger Consideration shall be canceled and terminated without any cash payment or any other consideration being made in respect thereof.

(f)  Each issued and outstanding share of capital stock of Merger Sub shall be converted into one (1) share of common stock of the Surviving Corporation.

1.6.2   Indemnification Escrow; Expense Fund.

(a)  Notwithstanding anything to the contrary herein, as a partial mechanism to satisfy the indemnification obligations of the Vested Equityholders set forth in <u>Article VII</u>, an aggregate of $10,000,000 (the "*Escrow Amount*") and the aggregate amount of cash (including any interest or other amounts earned thereon) so held by the Escrow Agent from time to time, the "*Escrow Fund*") shall not be paid to the Vested Equityholders at the Effective Time, but shall instead be withheld in accordance with each Vested Equityholder's Pro Rata Share of such amount and deposited with PNC Bank, National Association ("*PNC*") , as escrow agent (the "*Escrow Agent*"), which Escrow Fund shall be governed by this Agreement and the escrow agreement in substantially the form attached hereto as *Exhibit I* (with such changes as Parent and the Holder Representative may agree in writing, the "*Escrow Agreement*"). Within ten (10) Business Days following the date that is 12 months after the Closing Date, Parent and the Holder Representative will jointly instruct the Escrow Agent to pay to the Payment Agent, the Surviving Corporation or other applicable Parent Entity, as applicable, by wire transfer of immediately available funds in accordance with wire transfer instructions provided by the Payment Agent or the applicable Parent Entity, an amount equal to the (i) the Escrow Fund <u>less</u> (ii) an amount sufficient to satisfy any pending Indemnification Claims made by any Indemnified Party that were made in accordance with <u>Section 4.6</u>, <u>7.4</u> or <u>7.5</u>, as applicable, in each case prior to the expiration of the Survival Period, for further distribution (and if by the Payment Agent, Parent shall cause the Payment Agent to distribute) to each Vested Equityholder in accordance with such Vested Equityholder's Pro Rata Share, subject to Parent's right to seek satisfaction for any indemnification obligations of Vested Equityholders pursuant to <u>Section 7.2(</u>b) directly against such Vested Equityholder. Promptly following the final resolution of, and full payment or credit in connection with, any such pending Indemnification Claims, Parent and the Holder Representative will jointly instruct the Escrow Agent to pay to the Payment Agent, the Surviving Corporation or other applicable Parent Entity, as applicable, for further distribution (and if by the Payment Agent, Parent shall cause the Payment Agent to distribute) to each Vested Equityholder, by wire transfer of immediately available funds in accordance with wire transfer instructions provided by the Payment Agent or the applicable Parent Entity (or in the case of payment attributed to Vested Company Options that were Employee Company Options, through Parent or Surviving Corporation's standard payroll procedures, at the discretion of Parent), each such Vested Equityholder's Pro Rata Share of any remaining portion of the Escrow Fund, subject to Parent's right to seek satisfaction for any indemnification obligations of Vested Equityholders pursuant to <u>Section 7.2(</u>b) directly against such Vested Equityholder. To the extent required by Applicable Law, a portion of any amounts released from the Escrow Fund shall be treated for U.S. federal income Tax purposes as imputed interest and shall be reported as such.

(b)    The rights of the Vested Equityholders to receive payment from the Escrow Fund is personal to such Vested Equityholder, and is not transferable or assignable, and any purported transfer or assignment shall be void.

(c)    Notwithstanding anything to the contrary herein, for the purposes of paying directly, or reimbursing the Holder Representative for, any third party expenses pursuant to this Agreement and the agreements ancillary hereto, an aggregate of $250,000 (the "*Expense Fund*") shall not be paid to the Vested Equityholders at the Effective Time, but instead shall be withheld in accordance with each Vested Equityholder's Pro Rata Share of such amount and be deposited by Parent at the Effective Time with the Holder Representative; *provided* further, in the case of Vested Company Options that were Employee Company Options, such contribution to the Expense Fund shall be calculated based on the Vested Equityholder's Pro Rata Share and be contributed to the Expense Fund after being subject to applicable payroll Tax withholding. The Vested Equityholders will not receive any interest or earnings on the Expense Fund and irrevocably transfer and assign to the Holder Representative any ownership right that they may otherwise have had in any such interest or earnings. The Holder Representative will not be liable for any loss of principal of the Expense Fund other than as a result of its gross negligence or willful misconduct. The Holder Representative will hold these funds separate from its corporate funds, will not use these funds for its operating expenses or any other corporate purposes and will not voluntarily make these funds available to its creditors in the event of bankruptcy. As soon as practicable following the completion of the Holder Representative's responsibilities, or earlier as directed by the advisory committee to the Holder Representative named in the engagement letter between the Holder Representative and the Company, the Holder Representative will deliver any remaining balance of the Expense Fund to the Payment Agent or the applicable Parent Entity for further distribution (and if by the Payment Agent, Parent shall cause the Payment Agent to distribute) to the Vested Equityholders in accordance with their respective Pro Rata Shares.

1.6.3    Dissenting Shares. Stockholders who have complied with all the requirements for perfecting appraisal rights, as required under the DGCL, shall be entitled to their appraisal rights under the DGCL with respect to such shares ("*Dissenting Shares*"). Notwithstanding anything to the contrary herein, (a) if any holder of Dissenting Shares shall effectively withdraw or lose (through failure to perfect or otherwise) such holder's appraisal rights, then, as of the later of the Effective Time and the occurrence of such event, such holder's shares shall automatically be converted into and represent only the right to receive the Merger Consideration to which such holder is then entitled under this Agreement, without interest thereon and upon surrender of the certificate representing such shares in accordance with this Agreement together with any other documents required under Section 1.6.4 and (b) any Dissenting Shares held by a Stockholder who has perfected such Stockholder's appraisal rights for such shares in accordance with the DGCL shall not be converted into the right to receive any portion of the Merger Consideration pursuant to Section 1.6.1 (including any portion of the Escrow Amount). In determining the value of Dissenting Shares, appropriate reductions and deferrals shall be applied to reflect the withholding by Parent of the Escrow Amount. The Company shall provide to Parent (i) prompt notice of any demands for appraisal or purchase received by the Company, withdrawals of such demands, and any other instruments related to such demands served in accordance with the DGCL and received by the Company and (ii) the right to participate in all negotiations and proceedings with respect to such demands under the DGCL. The Company shall not, except with the prior written consent of Parent, or as otherwise required under the DGCL, voluntarily make any payment with respect to, or settle or offer to settle, any Claim or demand in respect of any Dissenting Shares. Subject to Section 7.2, the payment of consideration under this Agreement to the Stockholders (other than in respect of Dissenting Shares), which shall be treated as provided in this Section 1.6.3 and under the DGCL) shall not be affected by the exercise or potential exercise of appraisal rights under the DGCL by any Stockholder.

1.6.4    <u>Exchange of Certificates and Payment</u>. Prior to the Effective Time, Parent shall (i) designate PNC to act as payment agent in the Merger (the "***Payment Agent***") and (ii) appoint the Escrow Agent as escrow agent to hold the Escrow Fund in accordance with this Agreement and the Escrow Agreement.

(a)    As soon as reasonably practicable (but no later than the next Business Day) following the Closing, Parent shall cause (i) an amount equal to the portion of the Merger Consideration payable at the Effective Time to the Vested Equityholders in respect of their shares of Capital Stock, Company Warrants and Non-Employee Company Options (and, for the avoidance of doubt, excluding the portion of the Merger Consideration that constitutes the Escrow Amount and the Expense Fund) to be deposited with the Payment Agent for payment to the Vested Equityholders in respect of their shares of Capital Stock, Company Warrants and Non-Employee Company Options as set forth in the Spreadsheet, (ii) an amount equal to the portion of the Merger Consideration payable at the Effective Time to the Vested Equityholders in respect of their Employee Company Options and Promised Options (and, for the avoidance of doubt, excluding the portion of the Merger Consideration that constitutes the Escrow Amount and the Expense Fund) to be deposited with the Surviving Corporation or other applicable Parent Entity for payment to the Vested Equityholders in respect of their Employee Company Options and Promised Options as set forth in the Spreadsheet, (iii) the Escrow Amount to be deposited with the Escrow Agent, which amount shall be held and disbursed by the Escrow Agent in accordance with this Agreement and the Escrow Agreement and (iv) the Expense Fund to be deposited with the Holder Representative, which amount shall be held and disbursed by the Holder Representative in accordance with this Agreement and the engagement letter between the Holder Representative and the Company.

(b)    As soon as reasonably practicable (but no later than the second Business Day) following the Closing, Parent shall cause the Payment Agent to provide to each Stockholder a letter of transmittal in the form attached hereto as ***Exhibit D*** (the "***Letter of Transmittal***"). Subject to <u>Section 1.6.2</u>, upon delivery of a duly executed Joinder Agreement or Letter of Transmittal (and any other documents reasonably required thereby, including applicable Tax forms), each Stockholder shall be entitled to receive in exchange therefor the portion of the Merger Consideration that such holder has the right to receive pursuant to <u>Section 1.6.1</u> and all book-entry shares in respect of such Preferred Stock or Common Stock shall be canceled. Notwithstanding anything to the contrary herein, the portion of the Merger Consideration payable to the Founder in respect of the Founder's Capital Stock that is held back pursuant to the Holdback Agreement (the "***Holdback Consideration***") shall not be payable by Parent or the Payment Agent at the Effective Time and shall instead be subject to the terms and conditions set forth in the Holdback Agreement as are in effect as of the Effective Time. If the Merger Consideration (or any portion thereof) is to be delivered to any Person other than the Person in whose name the shares of Capital Stock surrendered in exchange therefor is registered, it shall be a condition to such delivery that the Person requesting such delivery shall pay to Parent any transfer or other Taxes required solely by reason of the payment of the Merger Consideration (or any portion thereof) to a Person other than the registered holder of the shares of Capital Stock so surrendered, or shall establish to the satisfaction of Parent that such Tax has been paid or is not applicable.

(c)    Subject to <u>Section 1.6.2</u>, upon the delivery of a duly executed Warrant Termination Agreement to the Payment Agent (and any other documents required thereby, including applicable Tax forms), each holder of a Company Warrant shall be entitled to receive in exchange therefor the portion of the Merger Consideration that such holder has the right to receive at that time pursuant to <u>Section 1.6.1(e)</u>.

(d)    Subject to <u>Section 1.6.2</u>, upon the delivery of a duly executed Option Consent to the Payment Agent (and any other documents required thereby, including applicable Tax forms), each holder of a Non-Employee Company Option that are Vested Company Options shall be entitled to receive in exchange therefor the portion of the Merger Consideration that such holder has the right to receive at that time pursuant to

Section 1.6.1(c). Notwithstanding anything to the contrary herein, the portion of the Merger Consideration payable to any holder who continues in service with a Parent Entity immediately following the Effective Time and holds a Non-Employee Company Option that is an Unvested Company Option (the "**Unvested Non-Employee Option Consideration**") shall not be payable at the Effective Time and shall instead be subject to the same terms and conditions (including, if applicable, the vesting and vesting acceleration arrangements and other terms and conditions set forth in the Option Plan and the applicable stock option agreement) as are in effect immediately prior to the Effective Time. Subject to Payment Agent's receipt of an executed Option Consent with respect to such Non-Employee Company Options that are Unvested Company Options (together with any other documents reasonably required by Payment Agent), such Unvested Non-Employee Option Consideration shall be paid quarterly by Parent to the Payment Agent following the vesting dates applicable to such Unvested Non-Employee Option Consideration and Parent shall cause the Payment Agent to promptly pay such amounts to the applicable holder of such Non-Employee Company Options. No Unvested Non-Employee Option Consideration, or right thereto, may be pledged, encumbered, sold, assigned or transferred (including any transfer by operation of law), by any Person, or be taken or reached by any legal or equitable process in satisfaction of any liability of such Person, prior to the distribution to such Person of such Unvested Non-Employee Option Consideration in accordance with this Agreement. A holder of a Non-Employee Company Option that is an Unvested Company Option who does not continue in service with a Parent Entity immediately following the Effective Time will not receive any Unvested Non-Employee Option Consideration and such Unvested Company Option shall be cancelled and terminated for no consideration as of the Effective Time.

(e)    Subject to Section 1.6.2, as soon as practicable after the Closing (but no later than the next regular payroll cycle of the Surviving Corporation or the applicable Parent Entity), and after the receipt by Parent of such holder's executed Option Consent, the applicable Parent Entity shall pay to such holder of Employee Company Options that are Vested Company Options or vested Promised Options the portion of the Merger Consideration payable to such holder in accordance with Section 1.6.1(c). Such amounts payable in respect of Vested Company Options or vested Promised Options shall be paid in accordance with the applicable Parent Entity's normal or special payroll practices. The applicable Parent Entity shall, in accordance with Section 1.8, deduct and withhold any amounts that are required to be deducted and withheld under Applicable Law. Notwithstanding anything to the contrary herein, the portion of the Merger Consideration (i) payable in respect of Employee Company Options that are Unvested Company Options pursuant to Section 1.6.1(c) (the "**Unvested Employee Option Cash Consideration**") and (ii) payable in respect of any unvested Promised Options pursuant to Section 1.6.1(d)(i) (the "**Promised Option Cash Consideration**" and together with the Holdback Consideration, Unvested Non-Employee Option Consideration and Unvested Employee Option Cash Consideration, the "**Unvested Cash**") shall not be payable by Parent or an applicable Parent Entity at the Effective Time and shall instead be subject to the same terms and conditions (including, if applicable, the vesting and vesting acceleration arrangements and other terms and conditions set forth in the Option Plan and the applicable stock option agreement or, in the case of Promised Options, as set forth on Schedule 2.3(e) of the Disclosure Letter) as are in effect immediately prior to the Effective Time. In the case of Unvested Employee Option Cash Consideration and Promised Option Cash Consideration, subject to Parent's receipt of an executed Option Consent and/or Promised Option Waiver, as applicable, together with any other documents reasonably required by Parent, such consideration shall be paid quarterly following the vesting date applicable to such consideration in accordance with the applicable Parent Entity's normal or special payroll practices and subject to any amounts that are required to be deducted and withheld under Applicable Law. No Unvested Employee Option Cash Consideration and Promised Option Cash Consideration, or right thereto, may be pledged, encumbered, sold, assigned or transferred (including any transfer by operation of law), by any Person, other than Parent, or be taken or reached by any legal or equitable process in satisfaction of any liability of such Person, prior to the distribution to such Person of such Unvested Employee Option Cash Consideration and Promised Option

Cash Consideration in accordance with this Agreement. A holder of an Employee Company Option that is an Unvested Company Option or an unvested Promised Option who does not continue in service with a Parent Entity immediately following the Effective Time will not receive any Unvested Employee Option Cash Consideration or Promised Option Cash Consideration and such Unvested Company Option and unvested Promised Option shall be cancelled and terminated for no consideration as of the Effective Time.

(f)     Any cash deposited with the Payment Agent and not exchanged for certificates representing shares of Capital Stock, Company Warrants, or Non-Employee Company Options in accordance with this Section 1.6.4 within 12 months after such cash is deposited with the Payment Agent shall be redelivered or repaid by the Payment Agent to Parent. After such time, any Equityholder who has not theretofore surrendered shares of Capital Stock or delivered a Warrant Termination Agreement or an Option Consent, as applicable, and/or the other documents required to be executed and delivered by such Equityholder pursuant to this Section 1.6.4 to the Payment Agent, subject to Applicable Law, shall look as a general creditor only to Parent for payment of such holder's portion of the Merger Consideration. Notwithstanding anything to the contrary herein, neither Parent nor any other party hereto shall be liable to a holder of shares of Capital Stock, Company Warrants or Non-Employee Company Options for any Merger Consideration delivered to a public official pursuant to Applicable Law, including abandoned property, escheat, and similar Applicable Law.

1.6.5     No Further Transfers. After the Effective Time, there shall be no transfers of any shares of Capital Stock on the stock transfer books of the Company or the Surviving Corporation. If, after the Effective Time, book-entry shares formerly representing shares of Capital Stock are presented to the Surviving Corporation, such shares shall be forwarded to the Payment Agent and shall be canceled and exchanged in accordance with Section 1.6.4, subject, in the case of Dissenting Shares, to Section 1.6.3.

1.7     Company Options. Each Company Option shall be treated as set forth in Section 1.6.1(c), Section 1.6.4(d) and Section 1.6.4(e). The Company agrees that the board of directors of the Company (or, if appropriate, any committee administering the Company's 2016 Stock Incentive Plan (the "**Option Plan**")) and/or the Company Options) shall adopt such resolutions or take such other actions as may be reasonably required to (a) effect the treatment of the Company Options as set forth in Section 1.6.1(c) as of the Closing and (b) terminate the Option Plan and each Company Option and Promised Option as of the Closing.

1.8     Tax Withholding. Notwithstanding anything to the contrary herein, each applicable Parent Entity and the Payment Agent shall be entitled to deduct and withhold from the Merger Consideration and any other payments contemplated by this Agreement such amounts as are required to be deducted and withheld with respect to the making of such payment under the Code or other Applicable Law. To the extent that amounts are so deducted or withheld in accordance with Section 1.8 and remitted to or credited by the appropriate Tax Authority in accordance with Applicable Law, such amounts shall be treated for all purposes of this Agreement as having been paid to the Person in respect of whom such deduction and withholding were made. At or prior to the Closing, and at such time thereafter as reasonably requested by a Parent Entity or the Payment Agent, the Payment Agent or the applicable Parent Entity shall provide written notice to the Equityholders requesting that the Equityholders provide such Parent Entity or the Payment Agent, as applicable, any IRS Forms W-4, W-8, or W-9 and any other certificates or forms, as applicable, in order to allow each applicable Parent Entity or the Payment Agent to meet their respective withholding and information reporting obligations under Applicable Law. The parties shall cooperate to allow each Parent Entity or the Payment Agent, as applicable, to effectuate such withholding by means reasonably acceptable to Parent, including by paying the applicable portion of any consideration for which such withholding is required to the applicable Parent Entity or any of its Affiliates and causing such Person to withhold the applicable amounts through their respective payroll systems on or before the applicable Parent Entity's second regularly scheduled payroll occurring after such consideration becomes due and payable.

1.9   Tax Consequences. The parties hereto intend the Merger to be a taxable sale of shares of Capital Stock by the Equityholders. Except as provided in Section 4.6(f), Parent makes no representations or warranties to any of the Company or Equityholders regarding the Tax treatment of the Merger, or any of the Tax consequences to any of the Company or the Equityholders of this Agreement, the Merger or any of the other Transactions. The Company acknowledges that the Company and the Equityholders are relying solely on their own Tax advisors in connection with this Agreement, the Merger and the other Transactions. The Company understands that, except as otherwise provided in this Agreement, the Company (and not Parent) shall be responsible for the Company's Tax Liabilities that may arise from the Transactions.

## ARTICLE II
## REPRESENTATIONS AND WARRANTIES OF THE COMPANY

Except as disclosed in the corresponding schedules of the Disclosure Letter delivered by the Company to Parent prior to the execution of this Agreement (the "**Disclosure Letter**") (each of which disclosures, in order to be effective, shall clearly indicate the Section and, if applicable, the Subsection of this Article II to which it relates, unless and only to the extent the relevance to other representations and warranties is reasonably apparent from the actual text of the disclosures without any reference to extrinsic documentation or any independent knowledge on the part of the reader regarding the matter disclosed), in order to induce Parent and Merger Sub to enter into and perform this Agreement, the Company represents and warrants to Parent and Merger Sub as follows:

2.1   Organization and Good Standing; Books and Records; Subsidiaries.

(a)   The Company is a corporation duly organized, validly existing, and in good standing under the laws of the State of Delaware, and the Company and has all requisite power and authority to own, operate, and lease its properties and assets and to carry on its business as now conducted. The Company is duly qualified to do business and is in good standing in each of the jurisdictions specified on Schedule 2.1(a) to the Disclosure Letter, which are the only jurisdictions in which such qualification is necessary, except where the failure to be so qualified or in good standing, individually or in the aggregate, would not reasonably be expected to have materially adverse effect on the Company or its operations.

(b)   Schedule 2.1(b) to the Disclosure Letter sets forth an accurate and complete list of (i) the names of the members of the board of directors of the Company, (ii) the names of the members of each committee thereof, and (iii) the names and titles of the officers of the Company.

(c)   The Company has furnished to Parent accurate and complete copies of the certificate of incorporation of the Company, as amended to date (the "**Certificate of Incorporation**"), and bylaws of the Company, as amended to date (the "**Bylaws**"). The Company's books and records accurately reflect in all material respects all meetings of the Stockholders and the board of directors (including any committees thereof) of the Company and all actions taken by written consent of the Stockholders and the board of directors (including any committees thereof) of the Company, as applicable, since the inception of the Company through the Agreement Date. The minutes in the Company's minute books accurately reflect in all material respects the events of and actions taken at the meetings to which they relate; and the Company's stock ledger and stock transfer records accurately reflect all issuances, transfers, and cancellations of shares of Capital Stock.

(d)   The Company does not currently own or control, directly or indirectly, any interest in any other corporation, partnership, trust, joint venture, limited liability company, association, or other business entity. The Company is not a participant in any joint venture, partnership or similar arrangement.

2.2   <u>Authority and Enforceability.</u>

(a)   The Company has full power and authority to execute this Agreement and the other Operative Documents to which it is (or will be) a party and to perform its obligations hereunder and thereunder and, subject to the adoption this Agreement and approval of the Merger and the other Transactions by affirmative vote or written consent of the holders of at least (a) a majority of all shares of Common Stock and Preferred Stock (voting together as a single voting class on an as-converted to Common Stock basis), and (b) the holders of a majority of the outstanding shares of Series A Shares, Series B Shares and Series B-1 Shares (voting as a separate voting class on an as-converted to Common Stock basis) (collectively, the "***Stockholder Approval***"), to consummate the Merger and the other Transactions.

(b)   This Agreement and the other Operative Documents to which the Company is (or will be) a party have been (or will be) duly executed and delivered by the Company and, assuming the due authorization, execution, and delivery by each of the other parties hereto and thereto, represent valid and binding obligations of the Company, enforceable against the Company in accordance with their terms, except, in each case, to the extent such enforceability is subject to the effect of any applicable bankruptcy, insolvency, reorganization, moratorium, or other Applicable Law affecting or relating to creditors' rights generally or rules of Applicable Law governing specific performance, injunctive relief and other equitable remedies (the "***Bankruptcy and Equity Exception***"). The execution, delivery, and performance by the Company of this Agreement and the other Operative Documents to which the Company is (or will be) a party and the consummation by the Company of the Transactions do not and will not violate or conflict or result in a breach of or constitute a default under any provision of the Certificate of Incorporation or Bylaws.

(c)   The board of directors of the Company has unanimously (i) determined that this Agreement and the Transactions, including the Merger, are fair to, and in the best interests of, the Company and the Stockholders, (ii) approved and declared advisable the execution, delivery, and performance of this Agreement and the consummation of the Transactions, including the Merger, and (iii) resolved to recommend that the Stockholders adopt this Agreement and approve the Merger and the other Transactions. The only affirmative votes or written consents of the holders of any classes or series of Capital Stock necessary to adopt this Agreement and approve the Merger and the other Transactions are the votes that constitute the Stockholder Approval. All actions taken by the Company or its Representatives to solicit and obtain the Stockholder Approval with respect to this Agreement have been and will be taken in compliance with Applicable Law.

(d)   The Company is not subject to the requirements of subdivision (b) of Section 2115 of the General Corporation Law of the State of California pursuant to the terms of such Section 2115.

2.3   <u>Capitalization and Stock Rights; Consideration Spreadsheet.</u>

(a)   The authorized Capital Stock consists of 22,000,000 shares of Common Stock, and 11,018,822 shares of Preferred Stock, of which 3,560,832 shares of Preferred Stock are designated as Series Seed Shares, 2,474,931 shares of Preferred Stock are designated as Series A Shares, 2,298,151 shares of Preferred Stock are designated as Series B Shares and 2,684,908 shares of Preferred Stock are designated as Series B-1 Shares. As of the Agreement Date, the issued and outstanding Capital Stock consists of 7,976,220 shares of Common Stock, 3,560,832 Series Seed Shares, 2,474,931 Series A Shares, 2,298,151 Series B Shares and 2,684,908 Series B-1 Shares. Each share of Preferred Stock is convertible into shares of Common Stock on a one-for-one basis.

(b)   <u>Schedule 2.3(b)</u> to the Disclosure Letter sets forth, as of the Agreement Date, a true, correct and complete list of the Stockholders and the number and type of such shares so owned by such Stockholder.

No shares of Capital Stock are subject to any right of repurchase by the Company. All issued and outstanding shares of Capital Stock are duly authorized, validly issued, fully paid and non-assessable and are free of any Encumbrances (other than restrictions pursuant to federal or state securities Applicable Laws), outstanding subscriptions, preemptive rights or "put" or "call" rights created by statute, the Certificate of Incorporation, the Bylaws or any Contract to which the Company is a party or by which the Company or any of its assets is bound. The Company has never declared or paid any dividends on any shares of Capital Stock, any Equity Interests or any other securities of the Company, whether currently outstanding or that may subsequently be issued. To the Knowledge of the Company, no Stockholder that is a limited partnership has any limited partners who are employees of Parent.

(c)     As of the Agreement Date, the Company has reserved 2,0151,307 shares of Common Stock for issuance to employees, non-employee directors and consultants pursuant to the Option Plan, of which 900,066 shares are subject to outstanding and unexercised Company Options, and 973,197 shares remain available for issuance thereunder. Schedule 2.3(c) of the Disclosure Letter sets forth, as of the Agreement Date, a true, correct and complete list of all Optionholders, and each Company Option, whether or not granted under the Option Plan, including the number of shares of Capital Stock subject to each Company Option, the number of such shares that are vested or unvested, the "date of grant" of such Company Option (as defined under Treasury Regulation 1.409A-1(b)(5)(vi)(B)), the vesting commencement date, the vesting schedule (and the terms of any acceleration thereof), the exercise price per share, the Tax status of such Company Option under Section 422 of the Code (or any applicable foreign Tax law), the term of each Company Option, the plan from which such Company Option was granted (if any) and the country and state of residence of such Optionholder. All Company Options listed on Schedule 2.3(c) of the Disclosure Letter that are denoted as incentive stock options under Section 422 of the Code so qualify and will continue to so qualify as of immediately prior to the consummation of the Transactions. In addition, Schedule 2.3(c) of the Disclosure Letter indicates, as of the Agreement Date, which Optionholders are Persons that are not employees of the Company (including non-employee directors, consultants, advisory board members, vendors, service providers or other similar Persons), including a description of the relationship between each such Person and the Company. True, correct and complete copies of each Option Plan, and all standard form agreements and instruments relating to or issued under each Option Plan have been provided to Parent. All Company Options have been granted pursuant to such Option Plan and standard form agreements and instruments, other than differences with respect to vesting and acceleration terms, and such Option Plan and form agreements and instruments have not been amended, modified or supplemented since being provided to Parent, and there are no agreements, understandings or commitments to amend, modify or supplement such Option Plan or form agreements and instruments in any case from those provided to Parent. The terms of the Option Plan permit the treatment of Company Options as provided herein, without notice to, or the consent or approval of, the Optionholders, the Stockholders or otherwise and without any acceleration of the exercise schedule or vesting provisions in effect for such Company Options. No Company Option is early exercisable.

(d)     Schedule 2.3(d) of the Disclosure Letter sets forth, as of the Agreement Date, a true, correct and complete list of all Warrantholders, including the number of shares and type of Capital Stock subject to each Company Warrant, the date of grant, the exercise or vesting schedule (and the terms of any acceleration thereof), the exercise price per share and the term of each Company Warrant. True, correct and complete copies of each Company Warrant have been provided to Parent, and such Company Warrants have not been amended or supplemented since being provided to Parent, and there are no Contracts providing for the amendment or supplement of such Company Warrants.

(e)   <u>Schedule 2.3(e)</u> of the Disclosure Letter sets forth, as of the Agreement Date, a true, correct, and complete list of individuals (each individual, a "***Promised Optionee***") who may be entitled to receive Company Options (the "***Promised Options***") pursuant to an offer letter, Contract or other written or unwritten commitment from the Company (a "***Promised Option Agreement***"), but who have not been granted such Company Options, including the number of equity offered, the price at which the Company deems to be the fair market value at which such Company Options would have been granted (the "***Deemed Exercise Price***"), the vesting commencement date and vesting schedule described in the Promised Option Agreement for each such listed Promised Optionee. The Company has made available true, correct and complete copies of all Promised Option Agreements.

(f)   All issued and outstanding shares of Capital Stock and all Company Options and Company Warrants were issued in compliance with Applicable Law and all requirements set forth in the Certificate of Incorporation, the Bylaws and any applicable Contracts to which the Company is a party or by which the Company or any of its assets is bound. As of the Agreement Date, there are no authorized, issued or outstanding Equity Interests of the Company other than shares of Capital Stock, Company Options and Company Warrants. Other than as set forth on <u>Schedules 2.3(b)</u>, <u>2.3(c)</u>, <u>2.3(d)</u> and <u>2.3(e)</u> of the Disclosure Letter, as of the Agreement Date, no Person has any Equity Interests of the Company, stock appreciation rights, stock units, share schemes, calls or rights, or is party to any Contract of any character to which the Company is a party or by which it or its assets is bound, (i) obligating the Company to issue, deliver, sell, repurchase or redeem, or cause to be issued, delivered, sold, repurchased or redeemed, any Equity Interests of the Company or other rights to purchase or otherwise acquire any Equity Interests of the Company, whether vested or unvested, or (ii) obligating the Company to grant, extend, accelerate the vesting and/or repurchase rights of, change the price of, or otherwise amend or enter into any such Company Option, Company Warrant, call, right or Contract.

(g)   The Company has no outstanding Debt, the holder of which (i) has the right to vote (or that is convertible into securities that have the right to vote) with the Stockholders on any matter or (ii) is or will become entitled to any payment as a result of the Transactions. <u>Schedule 2.3(g)</u> to the Disclosure Letter sets forth an accurate and complete list of all Debt, including, for each item of Debt, the Contract governing such Debt and the interest rate, maturity date, and any prepayment or other penalties payable in connection with the repayment of such Debt at the Closing.

2.4   <u>No Approvals; No Conflicts.</u>  The execution, delivery, and performance by the Company of this Agreement and the other Operative Documents to which the Company is (or will be) a party and the consummation by the Company of the Transactions do not and will not (a) violate (with or without the giving of notice or lapse of time, or both) Applicable Law to which the Company is subject, (b) require any consent, approval, or authorization of, declaration, filing, or registration with, or notice to, any Governmental Body, other than (i) the Stockholder Approval, (ii) the filing of the Certificate of Merger, (iii) such filings and notifications as may be required to be made by the Company in connection with the Merger and the other Transactions under the HSR Act and the expiration or early termination of the applicable waiting period under the HSR Act and (iv) such other consents, approvals, authorizations, declarations, filings, registrations or notices that, if not obtained, made or delivered, would be reasonably be expected to materially adversely affect or delay the Company's ability to consummate the Transactions in accordance with this Agreement, (c) result in a default (with or without the giving of notice or lapse of time, or both) under, or acceleration or termination of, or the creation in any Person of the right to accelerate, terminate, modify, or cancel, any Material Contract, (d) result in the creation of any Encumbrance on any assets of the Company, (e) invalidate or adversely affect any Company Permit that is material to the Company or (f) materially impair the right of the Company as of the Effective Time to Exploit (in the manner Exploited by the Company prior to Closing) any Company Intellectual Property.

2.5   Financial Statements; No Undisclosed Liabilities.

(a)     Schedule 2.5(a) of the Disclosure Letter sets forth (i) the unaudited balance sheets and statements of income (loss) and cash flows of the Company at and for the three (3) fiscal years ended January 31, 2018, 2019, and 2020 and accompanying notes (the "*Annual Financial Statements*") and (ii) an unaudited balance sheet and statements of cash flows of the Company at and for the four (4) month period ended May 31, 2020 (the "*Interim Financial Statements*" and collectively with the Annual Financial Statements, the "*Financial Statements*"). The Financial Statements (i) are accurate, complete, and consistent with the books and records of the Company, (ii) have been prepared in conformity with GAAP on a basis consistent with prior accounting periods, except for the absence of footnotes, and (iii) fairly present, in all material respects, the financial position, results of operations, and changes in financial position of the Company as of the dates and for the periods indicated, subject, in the case of the Interim Financial Statements, solely to the type of normal recurring period end adjustments, none of which individually or in the aggregate are or will be material in amount. The balance sheet of the Company as of May 31, 2020 (the "*Company Balance Sheet Date*") is herein referred to as the "*Company Balance Sheet*."

(b)     The Company has no Liabilities of any nature other than (i) those set forth or adequately provided for in the Company Balance Sheet, (ii) those incurred in the conduct of the Company's business since the Company Balance Sheet Date in the ordinary course of business consistent with past practice and do not result from any breach of Contract, warranty, infringement, tort or violation of Applicable Law, (iii) those incurred by the Company in connection with the execution of this Agreement and the Operative Documents, and (iv) those arising under Contracts (other than as a result of a default or breach thereof) in accordance with their terms and which are readily apparent from the actual text of the Contracts. Except for Liabilities reflected in the Financial Statements, the Company has no off-balance sheet Liability of any nature to, or any financial interest in, any third parties or entities, the purpose or effect of which is to defer, postpone, reduce or otherwise avoid or adjust the recording of expenses incurred by the Company.

(c)     The Company is not a guarantor, indemnitor, surety, or other obligor of any indebtedness of any other Person. The Company has delivered to Parent accurate and complete copies of all management letters received from accountants of the Company relating to the Company's financial statements, accounting controls, and all related matters, if any. There has been no incidence of Fraud committed by any current or former Company Service Providers with respect to the preparation of the Financial Statements.

(d)     The Company maintains a system of internal accounting controls reasonably designed to provide that: (i) transactions are executed in accordance with management's general or specific authorization, (ii) transactions are recorded as necessary to permit preparation of financial statements in conformity with applicable GAAP, except the absence of footnotes, and to maintain accountability for assets, (iii) access to assets is permitted only in accordance with management's general or specific authorization, (iv) the recorded accountability for assets is done in accordance with GAAP, and (v) the obligations of the Company are satisfied in a timely manner and as required under the terms of each Contract to which the Company is a party or by which the Company is bound. The Company has no unremedied significant deficiencies or material weaknesses (as such terms are defined under GAAP) in the design or operation of internal control over financial reporting. There are no significant deficiencies or material weaknesses in the design or operation of the Company's internal controls that could adversely affect the Company's ability to record, process, summarize and report financial data. There has been no change in the Company accounting policies since the Company's inception, except as described in the Financial Statements.

(e)     The Company has not applied for or accepted either (i) any loan pursuant to the Paycheck Protection Program in Section 1102 and Section 1106 of the CARES Act, respectively, (ii) any funds pursuant

to the Economic Injury Disaster Loan program or an advance on an Economic Injury Disaster Loan pursuant to Section 1110 of the CARES Act, or (iii) any loan or funds from similar Applicable Laws enacted by Governmental Bodies in any state, local, or foreign jurisdictions in response to COVID-19.

2.6    Absence of Certain Changes or Events.

(a)    Except for Transactions, between January 1, 2020 and the Agreement Date: (i) the business of the Company has been conducted in the ordinary course of business and consistent with past practice, except for changes required by Applicable Law or taken pursuant to a Public Health Recommendation, (ii) there has not occurred any Material Adverse Effect, and (iii) except for actions that would require prior written consent of Parent pursuant to Sections 4.1(g)(i)(A) and (B), 4.1(h) and 4.1(i)(ii) and (iv), the Company has not done, caused, or permitted any action that if taken between the Agreement Date and the earlier of the Closing and the termination of this Agreement in accordance with Article VIII would require the prior written consent of Parent pursuant to Section 4.1.

(b)    Except as set forth on Schedule 2.6(b)-1 to the Disclosure Letter (the "**Spending Exceptions**"), during the period beginning May 15, 2020 and ending at Closing, the Company has used the proceeds of its Debt drawn since May 15, 2020 only as set forth on Schedule 2.6(b)-2 of the Disclosure Letter.

2.7    Property.

(a)    Schedule 2.7(a) to the Disclosure Letter contains an accurate and complete list of all real property leased or currently being used by the Company (the "**Real Property**"). The lease agreements with respect to the Real Property (the "**Leases**") are valid, binding, and enforceable against the Company in accordance with their terms and are in full force and effect, subject to the Bankruptcy and Equity Exception. The Company has performed all material obligations imposed on it under the Leases, and there is not any event that with notice or lapse of time, or both, would constitute a material default by the Company under any Lease, or, to the Knowledge of the Company, any other party thereto. There is not, and within the past 12 months there has not been, any material disagreement or dispute with any other party to any of the Leases, nor is there any pending written request for amendment of any of the Leases. The Company has not received any written notification that any party to any of the Leases intends to cancel, terminate, materially modify, refuse to perform, or refuse to renew any of the Leases. To the Knowledge of the Company, there is no Encumbrance applicable to the Real Property that could reasonably be expected to materially impair the use or the occupancy of the Real Property other than Permitted Encumbrances. The Company has provided to Parent accurate and complete copies of all Leases. The Company does not own and has never owned any real property.

(b)    All of the tangible assets and properties of the Company are in good condition and repair subject to normal wear and tear, in sufficient working order and have been properly maintained in all material respects, in each case, other than obsolete inventory. The Company has good title to, or valid leasehold or license interest in all of its real and personal properties, and interests in real and personal properties and tangible assets, reflected on the Company Balance Sheet or acquired after the Company Balance Sheet Date (except real and personal properties and tangible assets, or interests in real and personal properties and tangible assets, sold or otherwise disposed of since the Company Balance Sheet Date in the ordinary course of business consistent with past practice), or, with respect to leased or licensed real and personal properties and tangible assets, valid leasehold or license interests in such real and personal properties and tangible assets that afford the Company valid leasehold or licensed possession of the real and personal properties and

tangible assets that are the subject of such leases or licenses, in each case, free and clear of all Encumbrances, except Permitted Encumbrances.

(c)     The Company is not a party to, and is not liable under, any lease or hire, hire purchase, credit sale, or conditional sale agreement.

(d)     The tangible assets and properties owned, leased or licensed by the Company constitute all of the tangible assets and properties that are used in the conduct of the Business and, together with the Company Intellectual Property and other intangible assets owned, leased or licensed by the Company, are sufficient to operate the Business as it is currently conducted without (i) the need for Parent to acquire or license any other asset, property or intellectual property or (ii) the breach or violation of any Contract.

2.8     <u>Labor and Employment Matters; Nondisclosure and Non-Competition Agreements.</u>

(a)     <u>Schedule 2.8(a)</u> to the Disclosure Letter sets forth an accurate and complete list as of the Agreement Date of: (i) the names, titles, classification for purposes of all applicable overtime laws, part- or full-time status, permanent or temporary status, current base and variable compensation amounts or rates (whether salaried or otherwise) of all officers, employees (full-time and part-time, whether permanent or temporary) and directors of the Company, accrued paid time off, leave status (including reason for leave), national and local jurisdictions of service to the Company, work authorization status in such jurisdictions, and (ii) the names, current compensation packages, descriptions of services to the Company of all individual consultants and independent contractors of the Company, national and local jurisdictions of service to the Company, and permanent or temporary status. If the Company is a party to any Contract with a third-party entity that employs individuals who provide services to the Company as contractors or consultants ("***Third-Party Contractor Agreement***"), <u>Schedule 2.8(a)</u> to the Disclosure Letter also sets forth the name of the third-party entity, the date and term of such Third-Party Contractor Agreement, the names of each individual (including a description of services by such individual) who provides services to the Company under such Third-Party Contractor Agreement and the jurisdictions of service to the Company.

(b)     The Company has made available to Parent accurate and complete copies of each of the following: (i) all forms of offer letters and employment agreements pursuant to which any employees of the Company currently provide services to the Company, (ii) all forms of severance and change-in-control agreements of the Company currently in effect and binding upon the Company, (iii) all forms of service agreements and agreements with current consultants, contractors, and/or advisory board members of the Company (including all Third-Party Contractor Agreements), (iv) all forms of Company Intellectual Property Protection Agreements between current and former Company Service Providers and the Company at any time since its inception, and an accurate and complete list of any current or former Company Service Providers, and/or other Persons not subject thereto, (v) the most current management organization chart(s) of the Company, (vi) all forms of bonus or variable-compensation plans of the Company and all forms of award agreements thereunder, and (vii) a schedule of currently outstanding bonus, variable-compensation, severance, and change-in-control commitments of the Company. <u>Schedule 2.8(b)</u> to the Disclosure Letter sets forth a complete and accurate list of all the Company's offer letters, employment agreements, severance or change-in-control agreements, service agreements with non-employee service providers, and bonus or compensation agreements, in each case, that are currently in effect and differing in any material respect from the standard forms of such agreements made available to Parent.

(c)     Since the inception of the Company, the Company has not engaged in any unfair labor practice and has been in compliance in all material respects with Applicable Law respecting employment, including (without limitation) hiring, termination, harassment, discrimination, retaliation, accommodation,

wages, hours, child labor, terms and conditions of employment, and occupational safety and health. Since the inception of the Company, the Company has withheld all amounts required by Applicable Law or by Contract to be withheld from the salaries, wages, and other payments to its employees, including common law employees, and is not liable for any arrears of wages (including bonuses, commissions, or other compensation) or any Taxes or any penalty for failure to comply with any of the foregoing (or, if any arrears, penalty or interest was assessed against the Company regarding the foregoing, it has been fully satisfied). The Company is not liable for any payment to any Governmental Body or to any trust or other fund with respect to workers' compensation benefits, unemployment compensation benefits, social security, social benefits, or other benefits or obligations for employees (other than routine payments to be made in the ordinary course of business and consistent with past practice). There are no pending Claims against the Company under any workers compensation plan or policy or for long-term disability. There are no controversies pending or threatened in writing between the Company, on the one hand, and any current or former Company Service Providers, or any other Person, arising out of the Company's status as employer or purported employer, or as an entity that engages contractors or consultants, that have resulted, or could reasonably be expected to result, in a Claim before any Governmental Body, including (without limitation) Claims for wage and hour violations, compensation, severance benefits, vacation time or vacation pay or pension benefits, harassment, discrimination, retaliation, failure to accommodate, wrongful discharge, child labor or otherwise. Since the inception of the Company, the Company has obtained from all its former employees whose employment was involuntarily terminated general releases of all Claims (whether actual or potential, known or unknown) against the Company, and all such releases of employment Claims from such employees in favor of the Company obtained from former employees comply in all respects with Applicable Law and are effective and binding to release all employment Claims from such employees.

    (d)  (i) No allegations of sexual harassment, sexual discrimination, sexual assault, or misconduct in the course of being employed by, or providing services to, the Company have been made against (A) any Key Employee, or any current or former officer or director of the Company, or (B) any other Company Service Provider who, directly or indirectly, supervises any other Company Service Provider and (ii) the Company has not made any payment arising out of, or entered into any settlement agreement or conducted any investigation related to, allegations of sexual harassment, sexual discrimination, sexual assault or misconduct by or regarding any Company Service Provider or other representative of the Company. To the extent allegations of sexual harassment, sexual discrimination, sexual assault, or misconduct have been made, the Company has promptly, thoroughly and impartially investigated all such allegations and, where it was determined that such allegation had potential merit, the Company has taken prompt and appropriate action.

    (e)   No current or former Company Service Provider is or has been in violation of any provision or covenant of any Contract with any Person by virtue of such Company Service Provider's being employed by, performing services for, or serving on the board of directors of, the Company. All provisions and covenants of Contracts with the Company or with any other Person in respect of which the Company may have rights or Liability to which any current or former Company Service Provider is subject comply in all respects with Applicable Law. No current or former Company Service Provider is or has been in violation of any provision or covenant of any Contract with any Person by virtue of such Company Service Provider's being employed by, performing services for, or serving on the board of directors of, the Company. All provisions and covenants of Contracts with the Company or with any other Person in respect of which the Company may have rights or Liability under which any current or former Company Service Provider is subject comply in all respects with Applicable Law.

    (f)   The Company is not party to any labor, collective bargaining, or similar agreement, and there are currently no organizational campaigns, petitions, or other unionization activities seeking recognition of a collective bargaining unit that could affect the Company. None of the Transactions would reasonably

be expected to require approval or consent by any works council, labor collective group, or other similar third-party entity. No employees of the Company are, or in the past three (3) years have been, represented by any labor organization, or other collective representative entity, union, or organization. There is no labor dispute pending or, to the Knowledge of the Company, threatened against or affecting the Company, and the Company has not experienced any work stoppage since its inception. To the Knowledge of the Company, no employee, contractor, or consultant of the Company intends to terminate his or her employment or service relationship with the Company. All employees of the Company are employed on an "at will" basis, are eligible to work, and are lawfully employed in the United States. All individuals who have provided or are providing services of any kind to the Company are correctly classified as either being an employee or an independent contractor, and if classified as an employee are correctly classified as being exempt or non-exempt from overtime under Applicable Law.

2.9    <u>Employee Benefit Plans.</u>

(a)    <u>Schedule 2.9(a)</u> to the Disclosure Letter contains an accurate and complete list of all Employee Benefit Plans, <u>provided</u> that with respect to any employment agreements, offer letters or consulting agreements with any Company Service Providers that are on forms of agreements made available to Parent and that are terminable "at-will" without a notice period, severance, termination or change of control or similar types of payments or benefits, only the forms of such employment agreements, offer letters or consulting agreements shall be set forth on <u>Schedule 2.9(a)</u> to the Disclosure Letter. Subject to the Company's statutory and contractual obligations to pay earned and vested benefits or provide notice the, terms of each Employee Benefit Plan permit the Company to amend and terminate such Employee Benefit Plan at any time and for any reason without Liability (other than routine administrative costs in the ordinary course of business and consistent with past practice). The Company has no agreement, commitment, or other obligation to adopt, enter into or contribute to any other Employee Benefit Plan, or to modify or amend any existing Employee Benefit Plan (other than as contemplated under this Agreement or as required by Applicable Law).

(b)    The Company has made available to Parent a current, accurate, and complete copy of each Employee Benefit Plan (or, to the extent such plan is unwritten, an accurate description with all material terms), and, to the extent applicable: (i) any contractual obligations relating to any Employee Benefit Plan, including all trust agreements, insurance or annuity contracts, investment management agreements, record keeping agreements, and other documents or instruments related thereto, (ii) the most recent determination letter, opinion letter, or advisory letter, if applicable, (iii) any summary plan description and other written communications (or a description of any material oral communications) to the Company's employees regarding the benefits provided under each Employee Benefit Plan, (iv) for the three (3) most recent years and to the extent applicable (A) the Form 5500 and attached schedules, (B) reviewed financial statements, (C) actuarial valuation reports, and (D) non-discrimination testing results and other compliance testing results, if applicable, (v) a summary of any proposed amendments or revisions anticipated to be made to the Employee Benefit Plans at any time within the 12 months immediately following the Agreement Date, and (vi) all material written correspondence relating to any audit, investigation, or correction associated with any Employee Benefit Plan. Any Employee Benefit Plan intended to be qualified under Section 401(a) of the Code has been established under a standardized prototype plan for which an IRS opinion letter has been obtained by the plan sponsor and is valid as to the adopting employer or has either obtained from the IRS a favorable determination letter as to its qualified status under the Code, or has applied (or has time remaining in which to apply) to the IRS for such a determination letter prior to the expiration of the requisite period under applicable IRS regulations or pronouncements in which to apply for such determination letter, and to make any amendments necessary to obtain a favorable determination. Nothing has occurred since the issuance of a determination letter or opinion letter that would reasonably be expected to cause the loss of the tax-qualified status of any Employee Benefit Plan subject to <u>Section 401(a)</u> of the Code.

(c)    With respect to each Employee Benefit Plan: (i) such Employee Benefit Plan is, and has been, properly and legally established, and at all times has been, maintained, operated, administered, and funded in all material respects in accordance with its terms and in compliance with Applicable Law, (ii) all returns, reports, notices, statements, summary plan descriptions, and other disclosures with respect to such Employee Benefit Plan required to be filed with any Governmental Body or distributed to any participant therein have been properly and completely prepared and duly filed or distributed on or before their applicable due dates; and (iii) the Company and each other Person (including each fiduciary) have, at all times, properly performed all their material duties and obligations (whether arising by operation of law, by contract, or otherwise) under or with respect to such Employee Benefit Plan, including (without limitation) all reporting, disclosure, and notification obligations. The Company has not incurred, directly or indirectly, any Liability (except for routine contributions and benefit payments) under ERISA, the Code, or any other Applicable Law, or pursuant to any indemnification or similar agreement with respect to such Employee Benefit Plan.

(d)    Neither the Company nor any Employee Benefit Plan provides or has any obligation to provide (or contribute toward the cost of) post-employment or post-termination benefits of any kind with respect to any current or former Company Service Provider, including (without limitation) death and medical benefits, except for continuation coverage mandated by Sections 601 through 608 of ERISA and Section 4980B(f) of the Code or other Applicable Law.

(e)    The execution and delivery of this Agreement or any of the other Operative Documents or the consummation of the Transactions (either alone or upon the occurrence of any additional or subsequent event(s), including (without limitation) a termination of service) will not (i) entitle any individual to severance pay, unemployment compensation, change in control payment or benefit or any other compensation or benefit, (ii) result in any benefit or right becoming established or increased, or accelerate the time of payment or vesting of any benefit, under any Employee Benefit Plan, (iii) require the Company, Parent, or any of their respective Affiliates to transfer or set aside any assets to fund or otherwise provide for any benefits for any individual, (iv) impair or decrease any of the rights of the Company or any of its Affiliates with respect to any Employee Benefit Plan, (v) result in any loss of deduction for any reason, including pursuant to Section 280G or 162(m) of the Code, or (vi) result in the forgiveness in whole or in part of any outstanding loans made by the Company to any Person.

(f)    The Company has not received services from any individual (i) whom the Company treated as an independent contractor, but who should have been treated as a common law employee of the Company or (ii) who constituted a leased employee of the Company under Section 414(n) of the Code.

(g)    Neither the Company nor any ERISA Affiliate sponsors, maintains, or contributes to, or has ever sponsored, maintained, or contributed to (or been obligated to sponsor, maintain, or contribute to), (i) a "multiemployer plan," as defined in Section 3(37) or Section 4001(a)(3) of ERISA, (ii) a multiple employer plan within the meaning of Section 4063 or Section 4064 of ERISA or Section 413 of the Code, (iii) an employee benefit plan that is subject to Section 302 of ERISA, Title IV of ERISA, or Section 412 of the Code, or (iv) a "multiple employer welfare arrangement," as defined in Section 3(40) of ERISA. No Employee Benefit Plan is a defined benefit pension plan.

(h)    The Company does not sponsor, maintain, or contribute to, and has never sponsored, maintained, or contributed to (or been obligated to sponsor, maintain, or contribute to), any Employee Benefit Plan subject to the laws of any jurisdiction outside of the United States.

(i)    Each Employee Benefit Plan that is a medical plan is in compliance in all material respects with the Patient Protection and Affordable Care Act and the Health Care and Education Reconciliation Act

of 2010 (collectively, the "**2010 Health Care Law**"). The operation of each Employee Benefit Plan that is a medical plan has not resulted in the incurrence of any penalty to the Company pursuant to the 2010 Health Care Law. The Company has not reimbursed any employee in the United States for health insurance premiums, other than for a group health plan sponsored by the Company.

2.10    Intellectual Property.

2.10.1    Generally.

(a)    The Company (i) exclusively owns and has independently developed or acquired or (ii) has the valid right or license to Exploit (in the manner Exploited by the Company), all Company Intellectual Property. The Company Intellectual Property is sufficient for the conduct of the Company's business.

(b)    The Company owns and has good and exclusive right, title, and interest in and to each item of Company-Owned Intellectual Property and each of the Company Intellectual Property Registrations, free and clear of all Encumbrances and licenses other than the Outbound Licenses. To the Knowledge of the Company, the right, license, and interest of the Company in and to all Third-Party Intellectual Property are free and clear of all Encumbrances by or against the Company (other than restrictions contained in the applicable Company Intellectual Property Agreements).

(c)    Other than the Company Intellectual Property Agreements and Company Intellectual Property Protection Agreements, there are no Contracts to which the Company is a party governing any Company Intellectual Property. An accurate and complete list of all Company Intellectual Property Agreements, separately identified as Outbound Licenses and Inbound Licenses, is set forth on Schedule 2.10.1(c) to the Disclosure Letter, except that the Company shall not be required to list the following Company Intellectual Property Agreements on Schedule 2.10.1(c) to the Disclosure Letter: (i) non-exclusive Inbound Licenses (A) that are standard commercial end-user license or services agreements for off-the-shelf, uncustomized Software or Proprietary Information and Technology used by the Company for a cost not in excess of an aggregate of $25,000 per year, (B) that are Open Source Licenses, (C) that are non-disclosure Contracts, (D) that are Company Intellectual Property Protection Agreements on the Company's standard form of such agreements, a copy of which has been made available to Parent, or (E) with Suppliers that contain a license to ancillary Intellectual Property Rights that are not the primary purpose of the Inbound License, and (ii) non-exclusive Outbound Licenses (W) that conform in all material respects to the Company's standard form of customer agreement, a copy of which has been made available to Parent, (X) that are non-disclosure Contracts, or (Y) granted to Company's Suppliers solely for the purpose of providing services or goods to the Company. The Company has made available to Parent accurate and complete copies of all Company Intellectual Property Agreements.

(d)    The Company has not, directly or indirectly, (i) transferred ownership of, or granted any exclusive license in relation to, any Company Intellectual Property to, any Person or (ii) permitted the rights of the Company in any Company-Owned Intellectual Property to lapse or enter the public domain.

2.10.2    Intellectual Property Registrations.

(a)    All registrations and applications made by, on behalf of, or in the name of the Company (or under obligation of assignment to the Company) in any jurisdiction for any patents, copyrights, mask works, trademarks, service marks, domain names, and any other Company-Owned Intellectual Property (collectively, "**Company Intellectual Property Registrations**") are set forth on Schedule 2.10.2(a) to the Disclosure Letter. All of the Company Intellectual Property Registrations are valid (or in the case of applications, validly applied for), subsisting and, except for pending applications, enforceable. There are

no information, materials, facts, or circumstances, including any information or fact that would constitute prior art, that would render any of the issued Company Intellectual Property Registrations invalid or unenforceable, or would materially affect any pending application for any Company Intellectual Property Registration. There are no actions that must be taken by the Company or Parent within 120 days after the Agreement Date for the purpose of obtaining, maintaining, perfecting, preserving, or renewing any Company Intellectual Property Registration. All necessary registration, maintenance, and renewal fees due in connection with the Company Intellectual Property Registrations have been made and all necessary documents, recordations, and certificates in connection with the Company Intellectual Property Registrations that have been required to be filed have been so filed with the relevant patent, copyright, trademark, or other authorities for the purposes of prosecuting, perfecting, and maintaining the Company Intellectual Property Registrations. The Company has not misrepresented, or failed to disclose, any facts or circumstances in any application for any Company Intellectual Property Registrations that would constitute Fraud or a misrepresentation with respect to such application, or that would otherwise affect the validity or enforceability of any issued Company Intellectual Property Registration. The Company has not engaged in any action or any omission, conducted its business, or used or enforced or failed to use or enforce the Company-Owned Intellectual Property, in a manner that would result in the abandonment, cancellation, or unenforceability of any Company-Owned Intellectual Property or Company Intellectual Property Registration (other than the abandonment or cancellation of pending applications for Company Intellectual Property Registrations in the ordinary course of prosecution and in the exercise of the Company's reasonable business judgement), and the Company has not taken (and not failed to take) any action that would result in the forfeiture or relinquishment of any Company-Owned Intellectual Property or Company Intellectual Property Registration.

(b)    Schedule 2.10.2(b)(i) to the Disclosure Letter sets forth all material trademarks, trade names, service marks, logos, domain names, design rights, and other identifiers currently used by the Company on or in any Company Products but for which no registration has been sought, as well as a general description of any other material, unregistered Company-Owned Intellectual Property. Except as set forth on Schedule 2.10.2(b)(ii) to the Disclosure Letter, there have been no interferences, re-examinations, or oppositions brought or, to the Knowledge of the Company, threatened to be brought involving any of the Company-Owned Intellectual Property, nor, to the Knowledge of the Company, is there any basis for any such interference, re-examination, or opposition.

2.10.3    Payments. Except as set forth in the Inbound Licenses, no royalties, commissions, fees, or other payments are or will become payable by the Company to any Person by reason of the Exploitation of any Company Intellectual Property in the conduct of the Company's business.

2.10.4    No Infringement.

(a)    The operation of the business of the Company, including the Exploitation of the Company Intellectual Property and Company Products, (i) has not, does not and, if the Company Intellectual Property is Exploited following the Closing in a similar manner to the Company's Exploitation or proposed Exploitation of the Company Intellectual Property prior to the Closing Date, will not, infringe, violate, or misappropriate any right (including any Intellectual Property Right), title, or interest of any Person and (ii) has not, does not and, if the Company Intellectual Property is Exploited following the Closing in a similar manner to the Company's Exploitation or proposed Exploitation of the Company Intellectual Property prior to the Closing Date, will not, constitute unfair competition or unfair trade practices under Applicable Law. There is no pending, or to the Knowledge of the Company threatened, Claim that any of the Company-Owned Intellectual Property is invalid or contesting the ownership or right of the Company to Exploit any of the Company-Owned Intellectual Property, nor is there any legitimate basis for any such claim. To the Knowledge of the Company, there is no pending or threatened Claim that any of the Third-Party Intellectual

Property is invalid or contesting the ownership of the Third-Party Intellectual Property or the right of the Company to Exploit any of the Third-Party Intellectual Property, nor is there any legitimate basis for any such claim. Neither the Company nor any Equityholder has received any notice or Claim (whether written or oral) regarding any unsolicited offer to license any Third-Party Intellectual Property, or any infringement, misappropriation, violation, misuse, or abuse of any Third-Party Intellectual Property by the Company, the Company Intellectual Property, or any Company Products, or claiming that any other Person has any such Claim with respect thereto, nor is there any legitimate basis for any such claim. Neither the Company nor any Equityholder has received any written opinion of counsel relating to infringement, invalidity, or unenforceability of any Company Intellectual Property or any Company Products.

(b)    To the Knowledge of the Company, there is and has been no unauthorized use, unauthorized disclosure, infringement, violation, or misappropriation of any Company-Owned Intellectual Property by any Person. Neither the Company nor any Equityholder has received any notice (whether written or oral) that any Person is infringing, violating, or misappropriating any Company-Owned Intellectual Property or otherwise making any unauthorized use or disclosure of any Company-Owned Intellectual Property.

(c)    All Proprietary Information and Technology incorporated into or embodied in any Company-Owned Intellectual Property was developed solely by either (i) employees of the Company acting within the scope of their employment or (ii) by contractors, consultants, or other third parties who have validly and irrevocably assigned all of their rights, including all Intellectual Property Rights, therein to the Company. To the extent any such Proprietary Information and Technology relates to Company Intellectual Property Registrations, to the maximum extent provided for by, and in accordance with, Applicable Law, the Company has recorded each such assignment with the relevant Governmental Body.

2.10.5    Confidentiality; Source Code. The Company (a) has taken commercially reasonable steps to maintain the confidentiality of its confidential proprietary information and data, (b) has not disclosed such confidential proprietary information and data to any third-party other than under a written nondisclosure agreement, and (c) has not deposited, disclosed, licensed, or delivered to any third-party, or agreed to or permitted the deposit, disclosure, license, or delivery to any third-party, of any Source Code, other than disclosures to Company Service Providers subject to confidentiality obligations with respect thereto. No event has occurred, and no circumstances or conditions exist, that (with or without notice, lapse of time or both) will, or could reasonably be expected to, result in the disclosure or delivery to any third party of any Source Code, other than Company Service Providers subject to confidentiality obligations with respect thereto.

2.10.6    Invention Assignment and Confidentiality Agreements. Each current or former Company Service Provider or any other Person who has been involved in, or who contributed to, the creation or development of any Company-Owned Intellectual Property (any such Company Service Provider or Person, an "**Author**"), has executed and delivered to the Company a valid and enforceable written agreement providing for the (a) assignment of all rights, title, and interests that the Author may have, may have had or may hereafter acquire in or to such Company-Owned Intellectual Property and a valid and enforceable waiver of any and all non-assignable rights including moral rights that the Author may have therein and (b) nondisclosure of the Company's confidential proprietary information (the "**Company Intellectual Property Protection Agreements**"), and the Company has made available accurate and complete copies of all executed Company Intellectual Property Protection Agreements to Parent. Each Company Intellectual Property Protection Agreement is on the Company's standard form, which has been made available to Parent. No Author (i) has any right, license, Claim, moral right, or interest whatsoever in or with respect to any of the Company-Owned Intellectual Property, (ii) to the Knowledge of the Company, is in violation of any provision or covenant of any Contract with any Person by virtue of such Author's being employed by, performing

services for, or serving on the board of directors of, the Company, or (iii) has excluded any Intellectual Property Right that is related to the Company-Owned Intellectual Property or the Business from the assignment provisions of any Company Intellectual Property Protection Agreement.

2.10.7   Open Source. Schedule 2.10.7 to the Disclosure Letter lists all Open Source Materials (including release number, if any) included in or integrated with (including as a programming dependency) the Company Products, and (a) the Open Source License (including version number, if any) pursuant to which the Company uses such Open Source Materials, (b) whether such Open Source Material has been modified by or for the Company (including a description of such modifications), (c) whether such Open Source Material has been distributed by or for the Company, and (d) if such Open Source Material is Copyleft Material, how any such Copyleft Material is integrated with or interacts with the Company Products. The Company has not used any Copyleft Materials in a manner that requires any of the Company-Owned Intellectual Property, or any portion thereof, to be subject to any Copyleft License. The Company is in compliance with the terms of all relevant licenses for all Open Source Materials used by the Company, including all copyright notice and attribution requirements, and all requirements to offer access to source code.

2.10.8   Warranty against Defects. The Company Products are free from material defects and bugs, and substantially conform to the applicable specifications, documentation, and samples therefor. The Software included in the Company-Owned Intellectual Property, and to the Knowledge of the Company, any other Company Intellectual Property, does not contain (a) any clock, timer, counter, or other limiting or disabling code, design, or routine (other than with respect to standard "time outs"), or any viruses, trojan horses, or other disabling or disruptive codes or commands that would cause such Software to be erased, made inoperable, or otherwise rendered incapable of performing in accordance with its performance specifications and descriptions or otherwise limit or restrict the Company's or any Person's ability to use such Software, or (b) any undocumented back doors or other access mechanism allowing unauthorized access to, viewing, manipulation, modification, or other changes to, such Software.

2.10.9   Effect of Transaction on Company Intellectual Property Agreements.

(a)   Except as set forth on Schedule 2.10.9 to the Disclosure Letter, the consummation of the Transactions will neither violate nor result in the breach, modification, cancellation, termination, or suspension of, or acceleration of any payments with respect to, any Company Intellectual Property Agreement. as set forth on Schedule 2.10.9 to the Disclosure Letter, following the Closing, the Surviving Corporation will have the right to exercise all of its rights under all Company Intellectual Property Agreements, to the same extent the Company would have been able to had the Transactions not occurred and without being required to pay any additional amounts or consideration other than fees, royalties, or payments that the Company would otherwise be required to pay had the Transactions not occurred.

(b)   Neither this Agreement nor the Transactions will result in, pursuant to any Company Intellectual Property Agreement, (i) any third party being granted rights or access to, or the placement in or release from escrow of, Source Code, (ii) the granting by Parent or any of its Affiliates to any third party any Company Intellectual Property Right or any other proprietary right, (iii) Parent or any of its Affiliates being bound by or subject to, any non-competition, non-assertion of its rights, most-favored nation provisions, or other restriction on the operation or scope of its business, or (iv) Parent or any of its Affiliates being obligated to pay any royalties or other amounts to any third party in excess of those payable by Parent had the Transactions not occurred. Following the Closing, all Company-Owned Intellectual Property will be fully transferable, alienable, or licensable by the Surviving Corporation without restriction and without payment of any kind to any third party.

2.10.10    <u>Privacy and Security</u>.

(a)    The Company's data, privacy and security practices materially conform, and at all times have materially conformed, to all of the Company Privacy Commitments, Privacy Laws and Company Data Agreements. The Company has at all times: (A) had, to the extent required by Privacy Laws, the legal basis (including, to the extent required by Privacy Laws, providing adequate notice and obtaining any necessary consents from individuals) required for the Processing of Personal Data as conducted by or for the Company, (B) refrained from selling or sharing Personal Data with third parties for the third party's benefit except as allowed under Applicable Law, and (C) abided by any privacy choices (including opt-in and opt-out preferences, as required) of individuals relating to Personal Data (such privacy choices along with those obligations contained in Company Privacy Policies, collectively, "**Company Privacy Commitments**"). Neither the execution, delivery and performance of this Agreement nor the taking over by Parent or all of the Company Databases, Company Data and other information relating to the Company's end users, employees, vendors or clients, or any other category of individuals, will cause, constitute or result in a material breach or violation of any Privacy Laws, or a material breach of any Company Privacy Commitments or Company Data Agreements or any standard terms of service entered into by the Company with individuals the Personal Data of whom is Processed by the Company and its respective data processors. Copies of all current and prior Company Privacy Policies have been made available to Parent and such copies are true, correct and complete.

(b)    The Company has established and maintain appropriate technical, physical and organizational measures and security systems and technologies in material compliance with all data security requirements under Privacy Laws and Company Privacy Commitments that are designed to protect Company Data that is sensitive, confidential, and non-public or Personal Data against accidental or unlawful Processing in a manner appropriate to the risks represented by the Processing of such data by the Company and its data processors. The Company and its data processors have taken commercially reasonable steps to ensure the reliability of their employees and contractors who have access to Company Data, to train such employees on Company Privacy Commitments and to ensure that all employees with the authority and/or ability to access such data are under written obligations of confidentiality with respect to such data.

(c)    The Company has not received notice of and, to the Knowledge of the Company, there is no circumstance (including any circumstance arising as a result of an audit or inspection carried out by any Governmental Body) that would reasonably be expected to give rise to, any Legal Proceeding, Order, notice, communication, warrant, regulatory opinion, audit result or allegation from a Governmental Body or any other Person (including an end user): (A) alleging or confirming non-compliance with a relevant requirement of Privacy Laws or Company Privacy Commitments, (B) requiring or requesting the Company to amend, rectify, cease Processing, de-combine, permanently anonymize, block or delete any Company Data, (C) permitting or mandating relevant Governmental Bodies to investigate, requisition information from, or enter the premises of, the Company or (D) claiming compensation from the Company. There are no unsatisfied requests from individuals or other third parties to the Company seeking to exercise any data protection or privacy rights (such as rights to access, rectify, or delete Personal Data, to restrict or object to processing of Personal Data, or relating to data portability). The Company has not been involved in any Legal Proceedings involving non-compliance or alleged non-compliance with Privacy Laws or Company Privacy Commitments. The Company has made available to Parent true, correct and complete copies of all such Contracts. To the Knowledge of the Company, such data processors have not breached, any such Contracts pertaining to Personal Data Processed by such Persons on behalf of Company.

(d)   The Company does not Process the Personal Data of any natural Person under the age of thirteen (13).

(e)   Where the Company uses a data processor to Process Personal Data on the Company's behalf, the processor has entered into written Contracts containing obligations relating to Processing or Personal Data, confidentiality, and security measures and have agreed to comply with those obligations, consistent with Company's requirements under Privacy Laws and Company Privacy Commitments.

(f)   The Company has not transferred, or permitted the transfer of, registration Personal Data originating in the European Economic Area outside the European Economic Area.

(g)   No security incident, violation of any data security policy, breach, or unauthorized access in relation to Company Data, Company Databases, or any confidential or non-public information of the Company (including trade secrets) or provided by any third party to the Company (including Personal Data in the Company's possession, custody or control) has occurred or, to the Knowledge of the Company, is threatened, and there has been no unauthorized or illegal Processing of any of the foregoing. Neither the Company nor any Person acting on the Company's behalf or direction has: (A) paid any perpetrator of any data breach incident or cyber-attack or (B) paid any third party with actual or alleged information about a data breach incident or cyber-attack, pursuant to a request for payment from or on behalf of such perpetrator or other third Person. No data or security incident related to malware, ransomware or denial-of-service attack has occurred, to the Knowledge of the Company no security incident related to virus, or unauthorized intrusion of any kind has occurred nor, to the knowledge of the Company is any such incident threatened. To the Knowledge of the Company, no compromise of credentials or any other data or security incident has occurred or is threatened. No circumstance has arisen in which: (x) Applicable Laws (including Privacy Laws) would require the Company to notify a Governmental Body or an individual of a data breach or security incident or (y) applicable guidance or codes or practice promulgated under Applicable Laws (including Privacy Laws) would recommend the Company to notify a Governmental Body or an individual of a data breach or security incident.

(h)   The Company has never directly stated or indirectly implied that Company Products enhance the security of data (including Personal Data) accessed, provided or sent by end users.

(i)   Schedule 2.10.10(i) of the Disclosure Letter identifies and describes each distinct electronic or other repository or database containing (in whole or in part) Company Data maintained by or for the Company at any time (collectively, the "**Company Databases**") and the types of Company Data in each such database. The Company is the owner of all right, title and interest in and to each element of Company-Owned Data. The Company has the right to Process all Company-Owned Data without obtaining any additional permission or authorization of any Person.

2.10.11   No Assistance. No government funding, facilities of a university, college, or other educational institution or research center was used in the development of any Company-Owned Intellectual Property. No current or former Company Service Provider, who was involved in, or who contributed to, the creation or development of any Company-Owned Intellectual Property, has performed services for any government, university, college, or other educational institution or research center during a period of time during which such Company Service Provider was also performing services for the Company.

2.10.12   Standard Bodies. The Company is not and has never been a member of, a contributor to, or affiliated with, any industry standards organization, body, working group, or similar organization. Neither the Company, nor any Company-Owned Intellectual Property is subject to any licensing, assignment, contribution, disclosure, or other requirements or restrictions of any industry standards organization, body,

working group, or similar organization. The Company has provided Parent with accurate and complete copies of all governing documents and other Contracts (including charter, bylaws, and participation guidelines) relating to the Company's membership in, contribution to, or affiliation with any industry standards organization, body, working group, or similar organization.

2.10.13   <u>Information Technology</u>.

(a)   The arrangements relating to the ICT Infrastructure will not be adversely affected by the consummation of the Transactions, and the ICT Infrastructure will continue to be available for use by the Company immediately following the consummation of the Transactions on substantially the same terms and conditions as prevailed immediately before the Closing, without further action or payment by Parent other than actions and payments that the Company would otherwise be required to take or make had the Transactions not occurred. The (i) ICT Infrastructure is in good working order and functions in accordance with all applicable documentation and specifications, (ii) ICT Infrastructure controlled by the Company is maintained and supported in accordance with industry practice and is covered by sufficient maintenance and warranty provisions to remedy, or provide compensation for, any material defect, and (iii) ICT Infrastructure is protected by security and disaster recovery arrangements, including taking and storing back-up copies (both on- and off-site) of any critical data in the ICT Infrastructure and the Company follows its procedures designed for preventing the introduction of viruses to, and unauthorized access of, the ICT Infrastructure.

(b)   The Company has not experienced, and to the Knowledge of the Company no circumstances exist that are likely or expected to give rise to, any disruption in or to the operation of the Company's business as a result of (i) any substandard performance or defect in any part of the ICT Infrastructure whether caused by any viruses, bugs, worms, software bombs, lack of capacity, or otherwise or (ii) a breach of security in relation to any part of the ICT Infrastructure.

2.11   <u>Material Contracts.</u>

(a)   <u>Schedule 2.11(a)</u> to the Disclosure Letter contains an accurate and complete list (with each of such Contracts specifically identified under subsection(s) of such <u>Schedule 2.11(a)</u> that correspond to the Subsection or Subsections of this <u>Section 2.11(a)</u> applicable to such Contract) of the following Contracts to which the Company is a party or by which the Company is bound as of the Agreement Date (each such Contract whether in effect as of the Agreement Date, or if entered into between the Agreement Date and the Closing in compliance with <u>Article IV</u>, a "**Material Contract**"):

(i)   each Contract with a Material Supplier;

(ii)   each trust indenture, mortgage, promissory note, loan agreement or other Contract relating to Debt, the borrowing of money, any currency exchange, commodities or other hedging arrangement or any leasing transaction;

(iii)   each Company Intellectual Property Agreement, except that the Company shall not be required to list on <u>Schedule 2.11(a)</u> to the Disclosure Letter the Contracts that are not required to be listed under <u>Schedule 2.10.1(c)(i)</u> and <u>Schedule 2.10.1(c)(ii)</u> to the Disclosure Letter;

(iv)   each Contract with a third-party reseller, distributor, sales representative, referral partner or channel partner;

(v)   each Contract with a social media influencer or similar Person;

(vi)   each Contract to license or authorize any third party to manufacture any component of the Company Products or Company-Owned Intellectual Property;

(vii)   each Contract with a term of greater than one (1) year that cannot be canceled by the Company with no more than sixty (60) days' notice without Liability;

(viii)   each Contract with a right of first offer or notice, right of first refusal, non-competition, "most favored nations" pricing or exclusivity provision, or other provision that would (or that purports to) prevent, or restrict or limit the Company or, following the Closing, Parent or any of its Affiliates, from carrying on their respective businesses in any manner or in any geographic location;

(ix)   each Contract that is a pricing protection plan or that would (or would purport to) restrict or impose conditions on third-party pricing;

(x)   (A) any joint venture Contract, (B) any Contract that involves a sharing of revenues, profits, cash flows, expenses or losses with other Persons and (C) any Contract that involves the payment of royalties to any other Person;

(xi)   each Contract with any Governmental Body;

(xii)   each Contract pursuant to which the Company (A) agrees to provide indemnification that may result in Liability in excess of $25,000, other than Company Intellectual Property Agreements entered into in the ordinary course of business consistent with past practice, (B) agrees to indemnify any Person against any charge of infringement, misappropriation, violation, misuse, abuse, or other interference by the Company-Owned Intellectual Property or by the use of the Company-Owned Intellectual Property of or with any other intellectual property or proprietary right, (C) grants any Person the right to bring or control any infringement, invalidation, or other action with respect to, or otherwise to enforce any right in, any of the Company-Owned Intellectual Property, or (D) other than with respect to licenses, granted or is required to grant to any Person any covenant not to assert/sue, or other interest or immunity from suit under any Company Intellectual Property;

(xiii)   each Contract granting a power of attorney, agency, or similar authority to another Person;

(xiv)   each Contract pursuant to which the Company has acquired a business or entity, or assets of a business or entity, whether by way of merger, consolidation, purchase of stock, purchase of assets, license or otherwise, or any Contract pursuant to which it has any material ownership interest in any other Person;

(xv)   each Contract for the disposition of any significant portion of the assets or business of the Company;

(xvi)   each Contract pursuant to which the Company has any obligation to sell, deliver, or provide any products, services, or Company Intellectual Property to any Person, other than any Outbound License;

(xvii)   each Contract for or relating to the employment or service of any director, officer, employee, consultant or beneficial owner of more than five percent (5%) of the total

shares of Common Stock or any other type of Contract with any of its officers, employees, consultants or beneficial owners of more than five percent (5%) of the total shares of Common Stock, as the case may be; <u>provided</u> that with respect to any employment agreements, offer letters or consulting agreements with any Company Service Providers that are on forms of agreements made available to Parent and that are terminable "at-will" without severance or change of control payments or benefits, only the forms of such employment agreements, offer letters or consulting agreements shall be set forth on <u>Schedule 2.11(xviii)</u> to the Disclosure Letter;

(xviii)   each Contract with any labor union or any collective bargaining agreement or similar contract with its employees;

(xix)   [Reserved];

(xx)   each separation agreement or severance agreement with any current or former Company Service Provider pursuant to which the Company has any actual or potential Liability;

(xxi)   each current Employee Benefit Plan;

(xxii)   each confidentiality, secrecy, or non-disclosure Contract, other than any such Contract entered into by the Company in the ordinary course of business;

(xxiii)   each settlement agreement with respect to any Legal Proceeding, other than customary non-disclosure or confidentiality covenants;

(xxiv)   each Contract pursuant to which the Company is a lessor or lessee of any machinery, equipment, motor vehicles, office furniture, fixtures or other personal property requiring expenditures in excess of $25,000 per annum;

(xxv)   each sales promotion, market research, marketing, or advertising Contract with any third-party requiring expenditures in excess of $25,000 per annum;

(xxvi)   each Contract relating to interest rate, currency, or commodity derivatives or hedging transactions;

(xxvii)   each Contract that involves the payment of royalties to any other Person;

(xxviii)   each Contract requiring capital expenditures in excess of $100,000 in the aggregate; and

(xxix)   each other Contract pursuant to which the Company has made or received payments in excess of $100,000 for the twelve (12) months ended May 31, 2020.

(b)   All Material Contracts are in written form. All Material Contracts to which the Company is a party or by which the Company is bound are valid, binding, and enforceable in accordance with their terms and are in full force and effect. The Company has performed all material obligations imposed on it under such Material Contracts, and neither the Company, nor to the Knowledge of the Company any other party thereto, is in default thereunder, nor is there any event that with notice or lapse of time, or both, would constitute a default by the Company or, to the Knowledge of the Company, any other party thereunder. There

is not, and since the inception of the Company there has not been, any material disagreement or dispute with any other party to any Material Contract. The Company has not received any written (or to the Knowledge of the Company, any oral) notice, request or other communication regarding any actual or possible violation or breach of, default under, or intention to cancel or materially modify any Material Contract. The Company has made available to Parent accurate and complete copies of all Material Contracts.

2.12    Company Permits; Compliance with Laws.

(a)    The Company has obtained each material federal, state, county, local or foreign governmental consent, license, permit, grant or other authorization of a Governmental Body (i) pursuant to which the Company currently operates or holds any interest in any of its assets or properties or (ii) that is required for the conduct of the Business or the holding of any such interest (all of the foregoing consents, licenses, permits, grants and other authorizations, collectively, the "**Company Permits**"), and all of the Company Permits are in full force and effect. The Company is, and at all times has been, in compliance in all material respects with all Applicable Law and all Company Permits. None of the Company Permits will be terminated or impaired, or will become terminable, in whole or in part, as a result of the consummation of the Transactions.

(b)    The Company has complied with all Public Health Recommendations in all material respects in the states in which Company Service Providers are located. Schedule 2.12(b) to the Disclosure Letter lists all material measures that the Company has taken since January 1, 2020 with respect to COVID-19, whether required by Public Health Recommendation or otherwise.

(c)    The Company has not received any written notice or other written communication from any Governmental Body regarding (i) any actual or possible violation of any Company Permit or (ii) any actual or possible revocation, withdrawal, suspension, cancellation, termination or modification of any Company Permit, and to the Knowledge of the Company, no such notice or other communication is forthcoming. To the Knowledge of the Company, the Company has not been subject to any investigation or review by any Governmental Body.

(d)    There are no, and since the inception of the Company there have been no, material Claims pending or threatened in writing against the Company or, to the Knowledge of the Company, its Affiliates or any Company Service Provider in his, her or its capacity as such before any Governmental Body. No portion of the Company's business is currently operating under or subject to any Order. No petition under the federal bankruptcy or other similar Applicable Law or any state or foreign insolvency or other similar Applicable Law has been filed by or against the Company.

(e)    The Company is, and at all times has been, in compliance in all material respects with Applicable Law of the United States and other jurisdictions in which the Company operates or to which it is subject with respect to import and export control and economic sanctions, including the U.S. Export Administration Regulations, the U.S. International Traffic in Arms Regulations, and the economic sanctions regulations administered by the U.S. Department of the Treasury's Office of Foreign Assets Control. Without limiting the foregoing: (i) the Company has obtained all export and import licenses, and other approvals and authorizations with any Governmental Body required for (A) its export, import and re-export of products, services, software and technologies and (B) releases of technologies and software to foreign nationals located in the United States and abroad (collectively, "**Export Approvals**"), (ii) the Company is in compliance with the terms of all applicable Export Approvals, (iii) there are no pending or, to the Knowledge of the Company, threatened Claims against the Company with respect to such Export Approvals, (iv) there are no actions, conditions or circumstances pertaining to the Company's export transactions that would reasonably be

-28-

expected to give rise to any future Claims and (v) no Export Approvals for the transfer of export licenses to Parent or the Surviving Corporation are required, except for such Export Approvals that can be obtained expeditiously and without material cost.

(f)     Neither the Company nor any of its directors, employees, agents or representatives (in each case, acting in their capacities as such) has, since the inception of the Company, directly or indirectly through its representatives or any Person authorized to act on its behalf (including any distributor, agent, sales intermediary or other third party), (i) violated any Anti-Bribery Law or (ii) offered, given, promised to give or authorized the giving of money or anything of value, to any Government Official or to any other Person: (A) for the purpose of (I) corruptly or improperly influencing any act or decision of any Government Official in their official capacity, (II) inducing any Government Official to do or omit to do any act in violation of their lawful duties, (III) securing any improper advantage or (IV) inducing any Government Official to use his or her respective influence with a Governmental Body to affect any act or decision of such Governmental Body in order to, in each case of clauses (I) through (IV), assist the Company in obtaining or retaining business for or with, or directing business to, any Person or (B) in a manner that would violate Anti-Bribery Laws.

2.13    Environmental, Health and Safety Matters.

(a)     The Company is, and has at all times been, in compliance in all material respects with all Environmental, Health and Safety Requirements in connection with the ownership, use, maintenance or operation of its Business or assets or properties. The Company has not treated, stored, arranged for or knowingly permitted the disposal of, transported, handled, manufactured, distributed, released, or exposed any Person to, any Hazardous Materials, or owned or operated any property or facility that is or has been contaminated by any Hazardous Materials that would reasonably be expected to give rise to any current or future Liabilities. There is no pending, or to the Knowledge of the Company, threatened allegation by any Person that the properties or assets of the Company are not, or that its Business has not been conducted, in compliance with all Environmental, Health and Safety Requirements. The Company has not retained or assumed any Liability of any other Person under any Environmental, Health and Safety Requirements. To the Knowledge of the Company, there are no past or present facts, circumstances or conditions that would reasonably be expected to give rise to any material Liability of the Company with respect to Environmental, Health and Safety Requirements.

(b)     The Company has made available to Parent a copy of all studies, audits, assessments or investigations containing material information concerning compliance with, or Liability or obligations under, Environmental, Health and Safety Requirements affecting the Company that are in the possession or control of the Company, each of which is identified in Schedule 2.13(b) of the Disclosure Letter.

(c)     No Conflict Minerals are necessary to the functionality or production (in each case as contemplated by Section 13(p) of the Securities Exchange Act Securities Exchange Act of 1934, as amended, and the rules and regulations thereunder ), or are used in the production of, any Company Product or any product currently proposed to be manufactured by the Company or on its behalf in the future.

2.14    Taxes.

(a)     The Company has filed all income and other material Tax Returns required to be filed by it and has paid all material Taxes whether or not shown on any Tax Return. All such Tax Returns are true, accurate and complete in all material respects and have been prepared in material compliance with Applicable Law.

(b)     The Company Balance Sheet reflects all material Liabilities for unpaid Taxes of the Company for periods (or portion of periods) through the Company Balance Sheet Date. The Company has no material Liability for unpaid Taxes accruing after the Company Balance Sheet Date except for (i) Taxes arising in the ordinary course of business and consistent with past practice following the Company Balance Sheet Date, and (ii) Taxes attributable to the Transactions contemplated by this Agreement. The Company has no Liability for Taxes (whether outstanding, accrued for, contingent, or otherwise) as of the Company Balance Sheet Date that are not included in the Company Balance Sheet.

(c)     (i) There have never been (and to the Knowledge of the Company there are not currently pending or threatened) any Claims by any Governmental Body with respect to Taxes relating to the Company which have not been paid or fully settled, (ii) all Tax deficiencies claimed, proposed, or asserted or assessments made as a result of any examinations by any Governmental Body of the Tax Returns of, or with respect to, the Company have been fully paid or fully settled, and to the Knowledge of the Company there is no other procedure, proceeding, or contest of any refund or deficiency in respect of Taxes pending or on appeal with any Governmental Body, (iii) no extension or waiver of the limitation period applicable to any Tax Return of the Company is in effect or has been requested, and there is no agreement relating to any extension of time for filing any Tax Return that has not been filed, in each case, other than pursuant to customary extensions of the due date for filing a Tax Return obtained in the ordinary course of business of not more than six (6) months and (iv) the Company is not and will not be required to include any adjustment in Taxable income for any Tax period pursuant to Section 481 or 263A of the Code (or any corresponding or similar provision under Applicable Law with respect to Taxes) as a result of transactions or events occurring, or accounting methods employed, prior to the Closing.

(d)     The Company will not be required to include any item of income in, or exclude any item of deduction from, Taxable income for any Taxable period (or portion thereof) beginning after the Closing Date as a result of any (i) change in method of accounting made prior to the Closing Date for a Taxable period ending on or prior to the Closing Date, (ii) "closing agreement" as described in Section 7121 of the Code (or any corresponding or similar provision of other Applicable Law with respect to Taxes) executed on or before the Closing Date, (iii) deferred intercompany gain or any excess loss account described in Treasury Regulations under Section 1502 of the Code (or any corresponding or similar provision of other Applicable Law with respect to Taxes) in connection with a transaction consummated on or prior to the Closing Date, (iv) installment sale made or open transaction entered into prior to the Closing Date, (v) prepaid amount received or deferred revenue accrued on or prior to the Closing Date, or (vi) election under Section 108(i) of the Code made on or prior to the Closing Date.

(e)     Neither the Company nor any predecessor of the Company has ever been a member of any Affiliated Group that filed or was required to file a consolidated, combined, or unitary Tax Return (other than a group the common parent of which was the Company).

(f)     The Company is not and has never been a party to or bound by any Tax indemnity agreement, Tax sharing agreement, Tax allocation agreement, or similar Contract, other than any such agreement or Contract entered into in the ordinary course of business (such as a loan or a lease) the primary purpose of which is not Taxes, and the Company has no Liability or potential Liability to another Person under any such agreement.

(g)     The Company has no Liability for the Taxes of any Person (other than the Company) under Section 1.1502-6 of the Treasury Regulations (or any corresponding or similar provision of Applicable Law with respect to Taxes), as a transferee or successor, or by operation of Applicable Law as a result of actions or transactions taken prior to the Closing.

(h)    The Company has no nexus and has not taken any action that could result in the Company having taxable presence for any Tax purpose in any U.S. state or local taxing jurisdiction other than the U.S. states and local jurisdictions where the Company currently files Tax Returns and pays Taxes. The Company does not have and has never had a "permanent establishment" within the meaning of an applicable income Tax treaty or other taxable presence in any country other than the country in which the Company is formed or organized. The Company has not received any written notice from a taxing jurisdiction (whether within or without the United States) in which the Company has not filed a particular type of Tax Return or paid a particular type of Tax asserting that the Company is required to file such Tax Return or pay such type of Tax in such taxing jurisdiction.

(i)    The Company has not made any payment, is not obligated to make any payment, and is not a party to (or a participating employer in) any Contract that could reasonably be expected to obligate the Company or Parent to make any payment, in each case that constitutes or would constitute an "excess parachute payment," as defined in Section 280G of the Code (or any corresponding or similar provision of Applicable Law with respect to Taxes) in connection with the consummation of the Transactions. The Company is eligible to seek stockholder approval in a manner that complies with Section 280G(b)(5) of the Code. The Company has not made any payment, is not obligated to make any payment or payments, and is not a party to (or a participating employer in) any Contract that has resulted or could reasonably be expected to result in the imposition on the Company, any current or former Stockholder or Parent, or any employee of the Company of any additional Tax or interest under Section 409A of the Code (or any corresponding or similar provision of Applicable Law with respect to Taxes), or Section 457A of the Code.

(j)    None of the Company, Parent or any Affiliate of Parent will be obligated to pay or reimburse any Person for any Taxes imposed under Section 4999 of the Code (or any corresponding or similar provision of Applicable Law with respect to Taxes) as a result of any Contract currently in effect.

(k)    All Company Options or other rights issued by the Company that purport or otherwise were intended to be governed by Sections 421 or 422 of the Code (or any corresponding or similar provision of Applicable Law with respect to Taxes) satisfied at all relevant times the requirements for qualification or exemption under such sections (and, if applicable, such similar provisions) in all material respects. No Company Options or other rights were issued by the Company that purport or otherwise were intended to be governed by Section 423 of the Code.

(l)    No Company Option (i) has an exercise price that has been or may be less than the fair market value of a share of the underlying Capital Stock as of the date such Company Option was granted, as determined in accordance with Section 409A of the Code, (ii) has any feature for the deferral of compensation other than the deferral of recognition of income until the later of exercise or disposition of such Company Option (within the meaning of Section 409A of the Code and the Treasury Regulations thereunder), or (iii) has been granted with respect to any class of stock of the Company that is not "service recipient stock" (within the meaning of Section 409A of the Code and the Treasury Regulations thereunder).

(m)    Each Employee Benefit Plan that is a "nonqualified deferred compensation plan" within the meaning of Section 409A of the Code, including any Company Options, is, and at all times has been, maintained, administered, operated, and funded in all material respects in accordance with the applicable requirements of Section 409A of the Code. The Company is not a party to any agreement or arrangement with any Person that requires the Company to pay a tax gross-up for Taxes due under Section 409A of the Code.

(n)    To the Knowledge of the Company, no Stockholder holds shares of Capital Stock that are nontransferable and subject to a substantial risk of forfeiture within the meaning of Section 83 of the Code with respect to which a valid election under Section 83(b) of the Code has not been made. Accurate and complete copies of each election statement made under Section 83(b) of the Code by any Stockholder have been made available to Parent.

(o)    The Company is not and has not been, during the applicable period specified in Section 897(c)(1)(A)(ii) of the Code, a United States real property holding corporation within the meaning of Section 897(c)(2) of the Code.

(p)    The Company has delivered or made available to Parent correct and complete copies of all income Tax Returns and other material Tax Returns of the Company for which the statute of limitations has not expired, and all audit reports and statements of deficiencies assessed against or agreed to by the Company.

(q)    Within the past two (2) years, the Company has not distributed stock of another Person, nor had its stock distributed by another Person in a transaction that was purported or intended to be governed in whole or in part by Section 355 or Section 361 of the Code.

(r)    The Company has (i) complied with Applicable Law relating to the payment, reporting, collecting, and withholding of Taxes (including withholding of Taxes pursuant to Sections 1441, 1442, 1445, 1446, 1471, 1472, and 3406 of the Code or similar provisions under any foreign law), and (ii) deducted or withheld from employee wages or consulting compensation and paid over to the proper Governmental Body (or is properly holding for such payment) all amounts required to be so withheld and paid over under all Applicable Law, including federal and state income Taxes, Federal Insurance Contribution Act, Medicare, Federal Unemployment Tax Act, relevant state income and employment Tax withholding laws.

(s)    The Company has not deferred any Taxes pursuant to the CARES Act or any other corresponding or similar provision of other Applicable Law enacted in connection with COVID-19. The Company is entitled to and has properly claimed any Tax credits the Company has affirmatively applied for, filed for or otherwise claimed pursuant to the CARES Act or any other corresponding or similar provision of other Applicable Law enacted in connection with COVID-19. Schedule 2.14(s) to the Disclosure Letter is an accurate and complete listing of any Tax deferrals or Tax credits the Company has affirmatively applied for, filed for or otherwise claimed pursuant to the CARES Act or any other corresponding or similar provision of other Applicable Law enacted in connection with COVID-19.

(t)    The Company has never received or requested any private letter ruling from the IRS (or any comparable Tax ruling from any other Governmental Body).

(u)    To the Knowledge of the Company, no material election has been made with respect to Taxes of the Company, except such elections that were made on a Tax Return provided, or required under Section 2.14(p) to be provided, to the Parent or that have been otherwise disclosed in writing to Parent. There are (and immediately following the Closing there will be) no Encumbrances on the assets of the Company relating or attributable to Taxes other than Permitted Encumbrances.

(v)    The Company has not participated in (i) a "listed transaction" within the meaning of Section 1.6011-4(b)(2) of the Treasury Regulations or (ii) any transaction that would reasonably be likely to require the filing of an IRS Schedule UTP (determined without regard to any asset threshold that may avoid the requirement of filing such schedule).

(w)    The Company has disclosed on its Tax Returns any Tax reporting position taken in any Tax Return that could result in the imposition of penalties under Section 6662 of the Code or any corresponding or similar provision of Applicable Law with respect to Taxes.

(x)    The Company is not, nor has it ever been, party to or the beneficiary of any Tax exemption, Tax holiday, or other Tax reduction Contract or Order that was granted by a Governmental Body and is not generally available to Persons without specific application therefore. The Company has in its possession official foreign government receipts for any Taxes paid by it to any foreign Tax Authorities for which receipts have been provided or are customarily provided.

(y)    The Company does not own, directly or indirectly, an interest in a corporation, association, joint venture, partnership, limited liability company, or other "business entity" within the meaning of Treasury Regulation Section 301.7701-2(a).

(z)    The Company does not own, nor has it ever owned, directly or indirectly, stock or a warrant in any corporation that is (or was at any time during the course of such ownership) a passive foreign investment company (as defined in Section 1297 of the Code), a controlled foreign corporation (as defined in Section 957 of the Code), or other entity the income of which is required to be included in the income of the Company.

(aa)    The Company is not and has never been required to report, under Section 999 of the Code, operations in a country subject to an international boycott.

(bb)    The Company has offered all full-time employees (as defined in the 2010 Health Care Law) the ability to elect minimum essential coverage that provides minimum value for themselves and their dependents, such that there will not be any Liability or excise tax under Section 4980H(a) of the Code. There will not be any penalty or excise tax assessed against the Company under 4980H(b) of the Code. There is nothing that would create a reporting obligation or excise tax under 4980D of the Code. The Company shall satisfy its reporting obligations under Code sections 6055 and 6056, as applicable, for the year of the Closing through the Closing Date.

(cc)    Notwithstanding anything to the contrary in this Section 2.14, the Company makes no representations as to the amount of, or limitations on the use of, in any Taxable period (or portion thereof) after the Closing Date any net operating losses, capital losses, Tax credit carryforwards and other similar tax attributes of the Company.

2.15    Related Party Interests. None of the officers and directors of the Company and, to the Knowledge of the Company, none of the other employees of the Company and any Stockholders holding in excess of 1% of the Capital Stock, and none of the immediate family members of any of the foregoing, (i) has any direct or indirect ownership, participation, royalty or other interest in, or is an officer, director, employee of or consultant or contractor for any firm, partnership, entity or corporation that competes with, or does business with, or has any contractual arrangement with, the Company (except with respect to any interest in less than five percent (5%) of the stock of any corporation whose stock is publicly traded, or in the case of institutional and venture capital investors, with respect to interests in portfolio companies), (ii) is a party to, or to the Knowledge of the Company, otherwise directly or indirectly interested in, any Contract to which the Company is a party or by which the Company or any of its assets is bound, except for normal compensation for services as an officer, director or employee thereof or (iii) to the Knowledge of the Company, has any interest in any property, real or personal, tangible or intangible (including any intellectual property) that is used in, or that relates to, the Business, except for the rights of Stockholders under Applicable Law.

-33-

2.16    Insurance.

(a)    Schedule 2.16(a) to the Disclosure Letter sets forth an accurate and complete list of all insurance policies maintained by the Company as of the Agreement Date (the "**Policies**"), including the name of the insurer under each such policy and bond, the type of policy or bond, the coverage amount and any applicable deductible as well as all material Claims made or outstanding under such Policies. All premiums due and payable under all such Policies have been timely paid and the Company is otherwise in material compliance with the terms of such Policies. All Policies remain in full force and effect, and the Company has no Knowledge of any threatened termination of, or material premium increase with respect to, any of such Policies. The Company has not been refused any insurance, nor has its coverage been limited, by any insurance carrier. The Company maintains the Policies with a scope and amount if and to the extent required by Applicable Law or Material Contracts to which the Company is a party or by which the Company is bound.

(b)    As of the Agreement Date, there is no Claim pending under any of such Policies as to which coverage has been questioned, denied or disputed by the underwriters of such Policies. To the Knowledge of the Company, as of the Agreement Date, no fact or circumstance exists that would reasonably be expected to give rise to a Claim under any of the Policies. None of the insurers under any of the Policies has refused in writing or given any indication in writing that it intends to refuse, indemnity in whole or in part in respect of any Claims under the Policies.

2.17    Brokers or Finders. Except as set forth on Schedule 2.17 of the Disclosure Letter, no broker, finder, financial advisor, investment banker or similar Person is entitled to any brokerage, finder's or other fee or commission in connection with the origin, negotiation or execution of this Agreement or in connection with the Transactions on behalf of the Company.

2.18    Bank Accounts. Schedule 2.18 to the Disclosure Letter sets forth an accurate and complete list of (a) the names and locations of all banks, trust companies, securities brokers, online money transmitters, and other financial institutions at which the Company has an account or safe deposit box or maintains a banking, custodial or trading relationship, and (b) each such account, box and relationship, indicating in each case the account number and the names of the respective Company Service Providers or other similar representatives of the Company having signatory power with respect thereto.

2.19    Suppliers.

(a)    Schedule 2.19(a) to the Disclosure Letter sets forth an accurate and complete list of the Company's top 20 suppliers, vendors and other third-party service providers (including third-party providers of manufacturing services but excluding any Company Service Provider) (each, a "**Supplier**" and each Supplier required to be set forth on Schedule 2.19(a) to the Disclosure Letter, a "**Material Supplier**") by the amount of payments made to each such Material Supplier during the twelve (12) months ended May 31, 2020, showing the approximate total payments to each such Material Supplier during such twelve (12) month period. The Company does not have any outstanding material disputes concerning products and/or services provided by any Material Suppliers. The Company has not received any written notice of, and, to the Knowledge of the Company, no circumstance exists that would cause the Company to expect, any material modification to the Company's relationship with any Material Supplier.

(b)    The Company has made available to Parent a register of all written Claims received by the Company during the 12 months prior to the Agreement Date from any Material Supplier other than in respect of ordinary course delivery delays or product returns.

2.20    Company Products; Warranties; and Related Matters.

(a)    No Company Product or service related thereto is subject to any guaranty, warranty, right of return, right of credit, or other indemnity other than the applicable standard terms and conditions of sale, license, or lease of the Company, which are set forth in Schedule 2.20(a) to the Disclosure Letter. Schedule 2.20(a) to the Disclosure Letter sets forth the aggregate expenses incurred by the Company in fulfilling its obligations under such provisions during each of the fiscal years and the interim period covered by the Financial Statements, and, to the Knowledge of the Company, there exists no fact, circumstance, or condition that would reasonably be expected to result in such expenses materially increasing as a percentage of sales in the future.

(b)    The Company Products (including all documentation furnished in connection therewith) sold to any customer are free from material defects in workmanship and materials.

(c)    No Governmental Body regulating the manufacture, sale, distribution or use of any Company Products (including all documentation furnished in connection therewith) has requested that any such product be removed from the market, that substantial new product testing be undertaken as a condition to the continued manufacturing, selling, distribution or use of any such Company Product or that such Company Product be modified in any material respect.

(d)    There is no Legal Proceeding pending against the Company or, to the Knowledge of the Company, threatened against the Company alleging any breach of, any express or implied warranty, indemnity or guaranty provisions relating to any Company Product, and there have not been any such Legal Proceedings.

(e)    There are no Legal Proceedings pending against the Company or, to the Knowledge of the Company, threatened against the Company for or relating to injury to any Person or property as a result of the sale, distribution, delivery, development, manufacture or use of any Company Product by or on behalf of the Company, including any Claims arising out of the defective or unsafe nature of any Company Product or any other product liability Legal Proceeding, and there have not been any such Legal Proceedings. There have been no recalls of any Company Product, and there are not any pending requests for any recall of any Company Product nor any written investigation, written request for information or written customer complaint that would reasonably be expected to result in a recall with respect to any Company Product. The Company is not currently investigating or considering a recall, withdrawal or suspension from the market of any Company Product.

(f)    Except as set forth on Schedule 2.20(e) of the Disclosure Letter, there are no known defects in the designs, specifications or processes with respect to any Company Product that would be material and adverse to the Company.

(g)    The Company Products have been marketed in all material respects in compliance with Applicable Law.

**ARTICLE III**
**REPRESENTATIONS AND WARRANTIES OF PARENT AND MERGER SUB**

In order to induce the Company to enter into and perform this Agreement, Parent and Merger Sub represent and warrant to the Company as follows:

3.1    Organization and Good Standing. Each of Parent and Merger Sub is a corporation duly organized, validly existing, and in good standing under the laws of the State of Delaware.

3.2 <u>Authority and Enforceability</u>. Each of Parent and Merger Sub has full power and authority to execute this Agreement and the other Operative Documents to which it is (or will be) a party and to perform its obligations hereunder and thereunder and to consummate the Merger and the other Transactions. The execution and delivery of this Agreement and the consummation of the Transactions have been duly authorized by all necessary action on the part of Parent and Merger Sub. This Agreement and the other Operative Documents have been (or will be) duly executed and delivered by each of Parent and Merger Sub and, assuming the due authorization, execution, and delivery by each of the other parties hereunder and thereunder, represent valid and binding obligations of each of Parent and Merger Sub, enforceable against each of Parent and Merger Sub in accordance with their terms, except, in each case, to the extent such enforceability is subject to the Bankruptcy and Equity Exception.

3.3 <u>No Approvals; No Conflicts</u>. Other than such filings and notifications as may be required to be made by Parent in connection with the Merger and the other Transactions under the HSR Act, the expiration or early termination of the applicable waiting period under the HSR Act, the execution, delivery, and performance by each of Parent and Merger Sub of this Agreement and the other Operative Documents to which Parent or Merger Sub is (or will be) a party and the consummation by each of Parent and Merger Sub of the Transactions do not and will not (a) violate (with or without the giving of notice or lapse of time, or both) Applicable Law, (b) require any consent, approval or authorization of, declaration, filing, or registration with, or notice to, any Person, other than the filing of the Certificate of Merger, or (c) conflict with or result in a breach of or constitute a default under any provision of the governing documents of Parent or Merger Sub.

3.4 <u>Financing</u>. Parent has, or will have prior to the Closing, sufficient unrestricted cash on hand, available lines of credit or other sources of immediately available funds to enable it to pay, in cash, the Merger Consideration and all other amounts payable pursuant to this Agreement or otherwise necessary to consummate the Transactions (including all of its Transaction Costs and financing costs).

<u>**ARTICLE IV**</u>
**COVENANTS**

4.1 <u>Covenants of the Company Prior to the Effective Time</u>. During the period from the Agreement Date and continuing until the earlier of the termination of this Agreement and the Effective Time (the "**Pre-Closing Period**"), except for matters (w) set forth in <u>Section 4.1</u> of the Disclosure Letter, (x) required by Applicable Law or in accordance with any Public Health Recommendation, (y) expressly required or contemplated by this Agreement or (z) undertaken with the prior written consent of Parent: (1) the Company shall use commercially reasonable efforts to conduct the Business of the Company in the ordinary course of business, (2) the Company shall use commercially reasonable efforts to: (A) preserve intact in all material respects the business organization of the Company, (B) keep available the services of the other Company Service Providers (except as otherwise set forth in this Agreement), and (C) preserve in all material respects the current relationships of the Company with the Material Suppliers and other material business relationships of the Company (it being agreed that with respect to the matters specifically addressed by any provision of <u>Section 4.1(a)-(y)</u>, such specific provisions shall govern over the more general provisions of this paragraph), and (3) the Company shall not (and shall not permit any of its Representatives to):

(a)   cause, propose or permit any amendments to the Certificate of Incorporation or the Bylaws or equivalent organizational or governing documents;

(b)   (i) issue, sell, promise or contract to issue or sell, pledge, dispose of, grant, encumber, or authorize the issuance, sale, pledge, disposition, grant, or Encumbrance of any Capital Stock, Company

Options, warrants or other rights to purchase Capital Stock, or other ownership interest (including any phantom interest), of the Company, or any revenue or profit-sharing interest in respect of the Company (other than (i) the issuance of shares of Common Stock pursuant to the exercise of Company Options or Company Warrants that are outstanding as of the Agreement Date, (ii) the issuance of Common Stock upon conversion of Preferred Stock outstanding on the Agreement Date and (iii) the repurchase of any shares of Capital Stock from former employees, non-employee directors and consultants in accordance with Contracts providing for the repurchase of shares in connection with any termination of service), or (ii) approve, consent to or otherwise authorize the transfer of any shares of Capital Stock from an existing Stockholder to another Person, except to an Affiliate or trust or as a gift for tax planning purposes;

(c)     declare or pay any dividends on or make any other distributions (whether in cash, stock or other property) in respect of any of its Equity Interests, or split, combine or reclassify any of its Equity Interests or issue or authorize the issuance of any Equity Interests or other securities in respect of, in lieu of or in substitution for its Equity Interests, or repurchase or otherwise acquire, directly or indirectly, any of its Equity Interests except from former employees, non-employee directors and consultants in accordance with agreements providing for the repurchase of shares in connection with any termination of service;

(d)     acquire or agree to acquire by merging or consolidating with, or by purchasing a substantial portion of the assets of, or by any other manner, any business or any corporation, partnership, association or other business organization or division thereof, or otherwise acquire or agree to acquire any assets that are material, individually or in the aggregate, to the Company or the Business, or enter into any Contract with respect to a joint venture, strategic alliance or partnership;

(e)     sell, lease, license or otherwise dispose of or permit to lapse any of its tangible or intangible assets, other than sales of Company Products and nonexclusive licenses of Company-Owned Intellectual Property in the ordinary course of business consistent with past practice, or enter into any Contract with respect to the foregoing;

(f)     incur or repay, or amend any terms of, any indebtedness for borrowed money (other than trade payables or accruals in the ordinary course of business), or issue any debt securities or assume, guarantee, endorse, or otherwise become responsible for the obligations for borrowed money of any Person, or make any loans or advances, except for the incurrence of any debt under the Credit Facility;

(g)     (i) enter into, amend or modify any (A) Contract that would (if entered into, amended or modified prior to the Agreement Date) constitute a Material Contract, (B) other material Contract or (C) Contract requiring a novation or consent in connection with the Merger or the other Transactions, (ii) violate, terminate, amend or modify (including by entering into a new Contract with such party or otherwise) or waive any of the terms of any of its Material Contracts or of the Joinder Agreement or (iii) enter into, amend, modify or terminate any Contract or waive, release or assign any rights or claims thereunder, which if so entered into, modified, amended, terminated, waived, released or assigned would be reasonably likely to (A) adversely affect the Company (or, following consummation of the Merger, Parent or any of its Affiliates) in any material respect, (B) impair the ability of the Company or the Holder Representative to perform their respective obligations under this Agreement or the Joinder Agreement or (C) prevent or materially delay or impair the consummation of the Merger and the other Transactions;

(h)     authorize, make, or agree to any single capital expenditure that is not set forth on Schedule 4.1(b) of the Disclosure Letter;

(i)     other than pursuant to any Employee Benefit Plan or Contract in effect as of the Agreement Date: (i) increase, defer, or fail to pay the compensation or other amounts payable or to become payable to

its current, former, or prospective Company Service Providers, or grant any severance or termination pay to, any current, former, or prospective Company Service Provider, or establish, adopt, enter into, amend, terminate, or fail to renew any Employee Benefit Plan, collective bargaining, or other Contract, trust, fund, or policy for the benefit of any Company Service Provider, (ii) make any equity awards to any Company Service Provider, (iii) take any action to accelerate the vesting or payment, or fund or in any other way secure the payment, of compensation or benefits under any Employee Benefit Plan, (iv) hire or engage the services of any additional Company Service Provider except as set forth in Schedule 4.1(i) of the Disclosure Letter, or (v) terminate the employment or services, as applicable, of any Company Service Provider without cause;

(j)   (i) make any change with respect to accounting methods or practices or internal accounting control, inventory, investment, credit, allowance, or Tax procedures or practices, or (ii) increase or change any of the assumptions underlying, or methods of calculating, any bad debt, contingency, or other reserves;

(k)   (i) (1) make, revoke, or alter any Tax election, settle or compromise any Tax Liability or Tax Contest with a Governmental Body, (2) take any action that is reasonably likely to result in the Company having nexus or otherwise being subject to Tax or having any Tax Return filing obligation in any jurisdiction in which the Company has not filed Tax Returns as of the Agreement Date, (3) file any amended Tax Return, or (4) file any Tax Return in a manner that is not consistent with the Company's past practice or affirmatively surrender any right to Claim a Tax refund, offset, or other reduction in Tax Liability, (ii) extend any statute of limitations with respect to any Tax Return other than pursuant to customary extensions of the due date for filing a Tax Return obtained in the ordinary course of business of not more than six (6) months, (iii) enter into any Tax sharing or similar agreement or closing agreement other than any such agreement entered into in the ordinary course of business (such as a loan or a lease) the primary purpose of which is not Taxes, (iv) assume any Liability for the Taxes of any other Person (whether by Contract or otherwise other than any such Contract entered into in the ordinary course of business (such as a loan or a lease) the primary purpose of which is not Taxes), (v) consent to any extension or waiver of the limitation period applicable to any Claim or assessment in respect of Taxes other than pursuant to customary extensions of the due date for filing a Tax Return obtained in the ordinary course of business of not more than six (6) months, or (vi) with the exception of items occurring in connection with the Transactions, accelerate or move any Tax deduction, attribute, or benefit to the Pre-Closing Tax Period or defer any Tax detriment or taxable income to the Post-Closing Tax Period, other than in the ordinary course of business and consistent with past practice;

(l)   pay, discharge or satisfy (i) any Liability to any Person who is an officer, director or stockholder of the Company (other than compensation due for services as an officer or director) or (ii) any Claim or Liability arising other than in the ordinary course of business consistent with past practice, other than the payment, discharge or satisfaction of Liabilities reflected or reserved against in the Financial Statements and Transaction Costs, or defer payment of any accounts payable other than in the ordinary course of business consistent with past practice, or give any material discount, accommodation or other concession other than in the ordinary course of business consistent with past practice;

(m)   forgive, release, cancel, subordinate, write off, or defer any indebtedness or other obligations for borrowed money (including principal and accrued but unpaid interest thereon) owed to the Company, or waive any Claims or rights of material value;

(n)   purchase or sell, transfer, license, lease, or otherwise dispose of any material properties or assets (real, personal, or mixed, tangible or intangible), other than the purchase of inventory, sale of Company Products, and nonexclusive licenses of Company-Owned Intellectual Property in the ordinary course of business consistent with past practice;

(o)   terminate, or give notice to terminate, any lease, tenancy, or license for real property or agree to a new rent or fee payable under any lease, tenancy, or license for real property;

(p)   assign, forfeit, or permit to lapse, or instruct or consent to a future lapse of, any Company-Owned Intellectual Property Rights;

(q)   pay, loan, or advance any amount to, or sell, transfer, license, lease, or otherwise dispose of any properties or assets (real, personal, or mixed, tangible or intangible) to, any of the Company's current or former securityholders, debtholders, Company Service Providers, or any of their respective Affiliates, other than (i) cash compensation paid to Company Service Providers in accordance with the terms of Contracts existing on the date hereof and (ii) advances for travel and other business-related expenses made in the ordinary course of business and consistent with past practice;

(r)   take any action to induce or try to induce any Key Employee or Additional Employee to terminate or breach his or her Offer Letter or CIAA entered into with Parent or any Parent Entity, or take any action to induce or try to induce any Company Service Provider to terminate his or her employment or services with the Company prior to the Closing;

(s)   accelerate or delay the collection of, or discount, any accounts receivable, accelerate or delay the payment of accounts payable, accelerate or delay the incurrence of expenses, increase or decrease inventories, except in the ordinary course of business, or alter the manner in which the Company manages its working capital in the ordinary course of business;

(t)   incorporate a company, register a branch, or apply for any regulatory license in any jurisdiction (except for renewals of any Company Permit in force as of the Agreement Date in the ordinary course of business and consistent with past practice);

(u)   change accounting methods or practices (including any change in depreciation or amortization policies) or revalue any of its assets (including writing down the value of inventory or writing off notes or accounts receivable otherwise than in the ordinary course of business);

(v)   (i) commence a lawsuit other than (A) for the routine collection of bills, (B) in such cases where the Company in good faith determines that failure to commence suit would result in the material impairment of a valuable aspect of its business (provided that the Company consults with Parent prior to the filing of such a suit) or (C) for a breach of this Agreement or (ii) settle or agree to settle any pending or threatened lawsuit or other dispute;

(w)   materially change the manner in which it provides warranties, discounts or credits to customers;

(x)   materially change the amount of, or terminate, any insurance coverage; or

(y)   agree or commit to do any of the foregoing.

Notwithstanding anything to the contrary contained herein, if the Company desires to take an action or not take an action that would require Parent's consent pursuant to this any provision of Section 4.1(a)-(y), prior to taking such action the Company may, in lieu of providing formal notice under Section 9.2, request such written consent by sending an email to the individuals set forth on Exhibit L specifying, in reasonable detail, the action proposed to be taken (or omitted from being taken).

Notwithstanding anything to the contrary in this Section 4.1, Parent and the Company acknowledge and agree that (x) nothing in this Agreement shall give Parent, directly or indirectly, the right to control or direct the Company's operations for purposes of the HSR Act prior to the expiration or termination of any applicable waiting period pursuant to the HSR Act and (y) no consent of Parent shall be required with respect to any matter set forth in this Agreement to the extent the requirement of such consent would violate any Antitrust Laws.

    4.2    Third-Party Consents; Notices.

    (a)    Following consultation with Parent, during the Pre-Closing Period the Company shall use commercially reasonable efforts to obtain prior to the Closing, and deliver to Parent at or prior to the Closing, all consents, waivers and approvals under each Contract listed or described on Schedule 2.4(c) of the Disclosure Letter (and any Contract entered into after the Agreement Date that would have been required to be listed or described on Schedule 2.4(b) of the Disclosure Letter if entered into prior to the Agreement Date).

    (b)    The Company shall give all notices and other information required to be given to the employees of the Company, any collective bargaining unit representing any group of employees of the Company, and any applicable government authority under the WARN Act, the National Labor Relations Act, as amended, the Code, COBRA and other Applicable Law in connection with the Transactions.

    4.3    Further Action.

    (a)    The Company, each of the Equityholders, and Parent shall take any actions reasonably necessary or appropriate to consummate the Transactions and fulfill the conditions to the Closing set forth herein as promptly as practicable following the Agreement Date, including, with respect to the Company, (a) taking such actions as to encourage the Additional Employees to accept employment with Parent or its Affiliates and (b) delivering to Parent such certificates and other documents as required to satisfy each of the conditions set forth in Article V. For the avoidance of doubt, to the extent any condition to the Closing is that a document acceptable to or the satisfaction of Parent, this Section 4.3 shall not require Parent to waive such right or otherwise accept a document that is not acceptable or satisfactory to Parent. The Company, each of the Equityholders, and Parent shall take any further actions reasonably necessary to carry out the purposes of this Agreement or any other Operative Document as may be requested by the other parties hereto.

    (b)    In furtherance and not in limitation of the terms of Section 4.3(a), each of Parent and the Company shall, to the extent permitted under Applicable Law, (i) cooperate and coordinate, subject to all applicable privileges (including the attorney-client privilege), with the other in the making of any filings or submissions that are required to be made under any applicable Antitrust Laws or requested to be made by any Governmental Body in connection with the Transactions, (ii) supply the other or its outside counsel with any information that may be required or requested by any Governmental Body in connection with such filings or submissions, (iii) supply any additional information that may be required or requested by the Federal Trade Commission, the Department of Justice, or other Governmental Bodies in which any such filings or submissions are made under any applicable Antitrust Laws as promptly as practicable, and (iv) use their respective reasonable best efforts consistent with Applicable Law to cause the expiration or termination of the applicable waiting periods under any applicable Antitrust Laws as soon as reasonably practicable. Without limiting the generality of anything contained in this Section 4.3(b), Company and Parent shall promptly notify the other of any material oral or written communication it receives from any Governmental Body relating to the matters that are the subject of this Agreement, permit each other to review in advance, and consider any reasonable comments to, any communication proposed to be made by such party to any Governmental Body and provide the other with copies of all material correspondence, filings or other

communications between them or any of their Representatives, on the one hand, and any Governmental Body or members of its staff, on the other hand (subject to appropriate redactions to protect any privileged or commercially sensitive information); provided that Parent shall have the right to direct all matters with respect to thereof. No party to this Agreement shall agree to participate in any meeting or discussion with any Governmental Body in respect of any such filings, investigation or other inquiry unless it consults with the other in advance and, to the extent permitted by such Governmental Body, gives the other the opportunity to attend and participate at such meeting. The Company and Parent will coordinate and cooperate fully with each other in exchanging such information (subject to appropriate redactions to protect any privileged or commercially sensitive information) and providing such assistance as the other party may reasonably request in connection with the foregoing.

(c)    In furtherance of this Section 4.3 and subject to the limitations set forth in this Section 4.3(c), if any objections are asserted with respect to the Transactions under the HSR Act, any other applicable Antitrust Law or if any Legal Proceeding is instituted (or threatened to be instituted) by the Federal Trade Commission, the Department of Justice, or any other Governmental Body challenging the Transactions as violative of Antitrust Law, or that would otherwise prohibit or materially impair or delay the consummation of the Transactions, the Company and Parent shall use their respective reasonable best efforts to resolve any such objections or lawsuits or other proceedings (or threatened Legal Proceedings) so as to permit consummation of the Transactions prior to the Termination Date (as defined below). Notwithstanding anything to the contrary herein, neither Parent nor any of its Affiliates shall be required to (i) litigate or contest any Legal Proceeding challenging any of the Transactions as violative of any Antitrust Law, or (ii) (A) sell, lease, license, transfer, dispose of, divest or otherwise encumber, or hold separate pending any such action, or (B) propose, negotiate or offer to effect, or consent or commit to, any such sale, lease, license, transfer, disposal, divestiture of, or other Encumbrance on, or holding separate of, before or after the Effective Time, any assets, licenses, operations, rights, product lines, businesses, or interest therein of Parent, the Company, or the Surviving Corporation (or any of their respective subsidiaries or other Affiliates), (iii) take or agree to take any other action or agree or consent to any limitations or restrictions on freedom of actions with respect to, or its ability to retain, or make changes in, any such assets, licenses, operations, rights, product lines, businesses, or interest therein of Parent, the Company, or the Surviving Corporation (or any of their respective subsidiaries or other Affiliates), (iv) take or agree to take any other action or agree or consent to the holding separate of the shares of Capital Stock or any limitation or regulation on the ability of Parent or any of its Affiliates to exercise full rights of ownership of the shares of Capital Stock, or (v) take or agree to take any other action that is not conditioned on the consummation of the Transactions (any one (1) or more of the foregoing actions, an "*Antitrust Restraint*"). Parent may compel the Company to take any Antitrust Restraint (or agree to take such Antitrust Restraint) if such Antitrust Restraint is effective only after the Effective Time, and the Company may not take any Antitrust Restraint in connection with the matters contemplated by this Section 4.3(c) without the prior written consent of Parent.

4.4    Confidentiality.

(a)    The parties hereto acknowledge that Parent and the Company have previously executed the Confidentiality Agreement, which shall continue in full force and effect in accordance with its terms. Each party hereto agrees that it and its directors, officers, employees, equityholders (subject to exceptions included in the Joinder Agreement), Affiliates, financial advisors, attorneys, accountants, subsidiaries or other representatives (collectively, "*Representatives*") shall hold the terms of this Agreement, and the fact of this Agreement's existence, in strict confidence. At no time shall any party hereto disclose any non-public information about this Agreement or any party hereto to any other Person without the prior written consent of the party hereto about which such non-public information relates. Notwithstanding anything to the contrary in the foregoing, the Company and its Representatives and the Holder Representative shall be permitted to disclose terms that have already been publicly disclosed by Parent; this provision shall not prohibit disclosure

of any and all terms to a party's or its Representative's financial, tax, accounting and legal advisors (each of whom is subject to a similar obligation of confidentiality) or to any Governmental Body or administrative agency to the extent necessary or advisable in compliance with Applicable Law and the rules of Nasdaq and following Closing, the Holder Representative shall be permitted to disclose information (including relating to indemnification claims and any other matters related to this Agreement that the Holder Representative is handling on behalf of the Equityholders) on a need-to-know basis to the Equityholders (each of whom is subject to a similar obligation of confidentiality).

(b)    The parties hereto shall mutually agree to the form of the initial press releases, if any, announcing the execution of this Agreement. Subject to the foregoing, the Company shall not, and shall cause each of its Representatives not to, issue any press release or other public communications relating to the terms of this Agreement or the Transactions or use Parent's name or refer to Parent directly or indirectly in connection with Parent's relationship with the Company in any media interview, advertisement, news release, press release or professional or trade publication, or in any print media, whether or not in response to an inquiry, without the prior written approval of Parent, unless required by Applicable Law (as advised by legal counsel prior to any such disclosure) and except as reasonably necessary for the Company to obtain the Stockholder Approval and the other consents and approvals of the Stockholders and other third parties contemplated by this Agreement. Notwithstanding anything to the contrary contained herein or in the Confidentiality Agreement, after the Closing, Parent shall be permitted to make such public communications regarding this Agreement or the Transactions as Parent may determine is reasonable and appropriate or otherwise required by Applicable Law.

4.5    <u>Exclusivity.</u>

(a)    During the Pre-Closing Period, the Company will not, and the Company will not authorize or permit any of its Representatives to, directly or indirectly, (i) solicit, initiate, seek, entertain, knowingly encourage, facilitate, support or induce the making, submission or announcement of any inquiry, expression of interest, proposal or offer that constitutes, or could reasonably be expected to lead to, an Acquisition Proposal, (ii) enter into, participate in, maintain or continue any communications (except solely to provide written notice as to the existence of these provisions) or negotiations regarding, or deliver or make available to any Person any non-public information with respect to, or take any other action regarding, any inquiry, expression of interest, proposal or offer that constitutes, or could reasonably be expected to lead to, an Acquisition Proposal, (iii) agree to, accept, approve, endorse or recommend (or publicly propose or announce any intention or desire to agree to, accept, approve, endorse or recommend) any Acquisition Proposal, (iv) enter into any letter of intent or any other Contract contemplating or otherwise relating to any Acquisition Proposal, (v) submit any Acquisition Proposal to the vote of any Stockholders or (vi) enter into any other transaction or series of transactions not in the ordinary course of business consistent with past practice, the consummation of which would impede, interfere with, prevent or delay, or would reasonably be expected to impede, interfere with, prevent or delay, the consummation of the Merger or the other Transactions. The Company will, and will cause its Representatives to, (A) immediately cease and cause to be terminated any and all existing activities, discussions or negotiations with Persons conducted prior to or on the Agreement Date with respect to any Acquisition Proposal and (B) immediately revoke or withdraw access of any Person (other than Parent and its Representatives) to any data room (virtual or actual) containing any non-public information with respect to the Company in connection with an Acquisition Proposal and request from each Person (other than Parent and its Representatives) the prompt return or destruction of all non-public information with respect to the Company previously provided to such Person in connection with an Acquisition Proposal. If any of the Company's Representatives, whether in his, her or its capacity as such or in any other capacity, takes any action that the Company is obligated pursuant to this <u>Section 4.5</u> not to

authorize or permit such Representative to take, then the Company shall be deemed for all purposes of this Agreement to have breached this Section 4.5.

(b)     The Company shall immediately (but in any event, within thirty-six (36) hours) notify Parent orally and in writing after receipt by the Company (or, to the Knowledge of the Company, by any of the Company's Representatives), of (i) any Acquisition Proposal, (ii) any inquiry, expression of interest, proposal or offer that constitutes, or would reasonably be expected to lead to, an Acquisition Proposal, (iii) any other notice that any Person is considering making an Acquisition Proposal or (iv) any request for non-public information relating to the Company or for access to any of the properties, books or records of the Company by any Person or Persons other than Parent and its Representatives. Such notice shall describe, except to the extent prohibited by a confidentiality agreement entered into by the Company prior to the Agreement Date: (A) the material terms and conditions of such Acquisition Proposal, inquiry, expression of interest, proposal, offer, notice or request and (B) the identity of the Person or Group making any such Acquisition Proposal, inquiry, expression of interest, proposal, offer, notice or request. The Company shall keep Parent fully informed of the status and details of, and any modification to, any such inquiry, expression of interest, proposal or offer and any amendments, correspondence and communications related thereto and shall provide to Parent a true, correct and complete copy of such inquiry, expression of interest, proposal or offer and any amendments, correspondence and communications related thereto, if it is in writing, or a reasonable summary thereof, if it is not in writing. The Company shall provide Parent with forty-eight (48) hours prior notice (or such lesser prior notice as is provided to the members of the Company's board of directors) of any meeting of the Company's board of directors at which the board of directors is reasonably expected to discuss any Acquisition Proposal.

4.6     Tax Matters.

(a)     The Equityholders shall be liable for, and shall hold Parent and its Affiliates harmless against, any *Transfer Taxes* imposed in any Tax jurisdiction, including any state or local Tax jurisdiction, that become payable in connection with the Transactions. The Person(s) required to do so by Applicable Law will, at its own expense, file, or cause to be filed, in a timely manner all necessary documents (including all Tax Returns) with respect to all such Transfer Taxes if required by Applicable Law, and the filing party (if not Parent) shall provide Parent with evidence satisfactory to the Parent that such Transfer Taxes have been paid.

(b)     During the Pre-Closing Period the Company shall, and shall cause the Company Service Providers to, afford the Representatives of Parent reasonable access at all reasonable times to the Company Service Providers and properties, offices and other facilities, and books and records of the Company and shall furnish Parent with all financial, operating, and other data and information as Parent may reasonably request, except to the extent such access is not permitted by Applicable Law or not in accordance with any Public Health Recommendation (it being acknowledged that in no event shall the Company or Company Service Providers be required to provide physical access to any physical or tangible properties or books and records of the Company during any "shelter-in-place" or similar Public Health Recommendation, and provided that "reasonable access" to Company Service Providers shall not be deemed to include in-person access). Following the Closing, Parent and the Holder Representative shall provide each other with such assistance as may reasonably be requested in connection with the preparation of any financial statement, Tax Return, audit, or other Legal Proceeding by any Governmental Body, or any Legal Proceeding relating to Liabilities for Taxes. Such assistance shall include making employees available on a mutually convenient basis to provide additional information or explanation of material provided hereunder and shall include providing copies of relevant Tax Returns and supporting material. Parent and the Holder Representative will retain and provide each other with any records or information in their (or an Affiliate's) possession that may be relevant to such preparation, Legal Proceeding, or determination. Notwithstanding anything to the contrary herein, neither Parent nor any of its Affiliates (including the Surviving Corporation) shall be required

to provide any Tax information that it regards as privileged or confidential, including any Tax Return of Parent or its Affiliates (including the Surviving Corporation). Parent, the Surviving Corporation and the Holder Representative (to the extent in its possession) agree (i) to retain all books and records with respect to Tax matters pertinent to the Company relating to any taxable period beginning before the Closing Date until the expiration of the Vested Equityholders' indemnification obligations hereunder with respect to Tax matters, and to abide by all record retention agreements entered into with any Tax Authority, and (ii) until the expiration of the Vested Equityholders' indemnification obligations hereunder with respect to Tax matters, to give the Holder Representative reasonable written notice prior to destroying or discarding any such books and records and, if the Holder Representative so requests, Parent or the Surviving Corporation, as the case may be, will allow the Holder Representative to take possession of such books and records prior to destroying or discarding them.

(c)    In the case of any Straddle Period, the amount of any Taxes for Pre-Closing Tax Periods shall (i) in the case of any Taxes other than gross receipts, payroll, value added, sales or use Taxes and Taxes based upon or related to income or payments, be deemed to be the amount of such Tax for the entire Taxable period multiplied by a fraction the numerator of which is the number of days in the Taxable period ending on the Closing Date and the denominator of which is the number of days in the Straddle Period and (ii) in the case of any gross receipts, payroll, value added, sales or use Taxes and Taxes based upon or related to income or payments Tax, be deemed equal to the amount that would be payable if the relevant Taxable period ended on the Closing Date, except that exemptions, allowances, or deductions that are calculated on an annual basis (including depreciation and amortization deductions), other than with respect to property placed in service after the Closing, shall be allocated on a per diem basis.

(d)    For the avoidance of doubt, if Parent determines in good faith to correct a Tax practice of the Company (including one relating to the filing, reporting, withholding, or payment of any Tax) in respect of a Pre-Closing Tax Period, any out-of-pocket costs of correcting such practice shall be deemed to be a Pre-Closing Tax and any administrative (or other similar) proceedings associated with such correction shall be treated as a Tax Contest.

(e)    Parent shall prepare and file, or cause to be prepared and filed, all Tax Returns that are first required to be filed on or after the Closing Date by or with respect to the Company. All such Tax Returns for a Pre-Closing Tax Period shall be (A) prepared in accordance with the past practices of the Company unless otherwise required by Applicable Law, as determined by Parent in its good faith discretion, and (B) include all Transaction Deductions on the income Tax Return of the Company for the taxable period that includes the Closing Date to the extent permitted by Applicable Law. In the event that any item reflected on any such income or other material Tax Return could form the basis for a claim of indemnification against the Vested Equityholders or otherwise reduce the amount payable to the Vested Equityholders pursuant to the Transactions, no later than thirty (30) days before the due date of any such income or other material Tax Return, Parent shall provide each such Tax Return to the Holder Representative for review and shall consider in good faith any reasonable comments provided by the Holder Representative.

(f)    For all applicable Tax purposes, the parties agree to, and no party shall file any Tax Return or otherwise take any Tax reporting position inconsistent with, the following Tax treatment of the items specified below:

(i)    Except for amounts paid in respect of Company Options and Promised Options (which are addressed in Section 4.6(f)(ii)), the rights of the Vested Equityholders to the Escrow Fund are intended to be treated as deferred contingent purchase price eligible for installment treatment under Section 453 of the Code and any corresponding provision of foreign, state or local law, as

appropriate. In no event shall the aggregate Escrow Fund proceeds payable to Vested Equityholders in respect of shares of Capital Stock or Company Warrants exceed an amount equal to (1) the portion of the Escrow Amount to be deposited with respect to such Vested Equityholder's shares of Capital Stock or Company Warrants, as applicable, multiplied by (2) the greater of (x) one-hundred five percent (105%) or (y) one hundred percent (100%) plus five (5) times the "Federal mid-term rate" as defined in Section 1274(d)(1) of the Code (expressed as a percentage) in effect at the time the Escrow Amount is funded. For the avoidance of doubt, the limitation in the preceding sentence does not apply to any amounts released from the Escrow Amount payable in respect of Company Options or Promised Options.

(ii)     Any payments made in respect of Company Options or Promised Options pursuant to this Agreement (A) shall be treated as compensation paid by the Surviving Corporation or other applicable Parent Entity as and when payable to the holder thereof (which, for the avoidance of doubt, shall be the Closing Date with respect to the Expense Fund), including when released in respect of such Company Options and Promised Options in the case of amounts released from the Escrow Amount or the Unvested Cash, (B) shall in the case of payments in respect of Employee Company Options and Promised Options be net of any Taxes withheld pursuant to Section 1.8, and (C) shall, in the case of payments in respect of Employee Company Options and Promised Options be made through the Parent's, the Surviving Corporation's or other applicable Parent Entity's standard payroll procedures and in the case of payments in respect of Non-Employee Company Options be made through the Payment Agent. Any applicable withholding Taxes in respect of the portion of the Expense Fund borne by Vested Equityholders in respect of Company Options shall be withheld from their portion of the Merger Consideration paid at or in connection with Closing.

(iii)     The Expense Fund shall be treated as having been received and voluntarily set aside by the Vested Equityholders on the Closing Date any Tax withholding with respect to such deemed contribution by any Vested Equityholder shall be satisfied from such Vested Equityholder's share of other funds payable to such Vested Equityholder at such time and shall not reduce the Expense Fund and the parties hereto do not expect any Tax withholding or information reporting to be required in connection with the subsequent distribution of any portion of the Expense Fund to the Vested Equityholders.

(iv)     The entirety of the Merger Consideration, excluding any such amounts payable in respect of Company Options or Promised Options but including any amounts released from the Escrow Fund and including any Holdback Consideration, shall be treated as proceeds from the sale of Capital Stock or Company Warrants, as applicable, and none shall be allocated to any employment agreement, or noncompetition and nonsolicitation agreements or otherwise treated as compensation unless otherwise required (A) by a change in Applicable Law after the Agreement Date or (B) by a Tax Authority following a Tax Contest in which the foregoing Tax treatment was defended by the applicable taxpayer in good faith.

4.7     Employee Compensation Matters.

(a)     The Company shall cause its board of directors adopt resolutions to terminate each of the Employee Benefit Plans, or the Company's employer participation in each of the multiple employer Employee Benefit Plans, that are intended to be qualified within the meaning of Sections 401(a) and 401(k) of the Code (collectively, the "**401(k) Plan**") with such termination to be effective as of the day immediately prior to the Closing Date, unless Parent provides written notice to the Company no later than three (3) Business Days prior to the Closing Date that one (1) or more of such Employee Benefit Plans shall not be terminated. Such

resolutions will be subject to the prior review and approval of Parent, which shall not be unreasonably withheld, conditioned, or delayed. The Company also shall take other actions in furtherance of terminating such Employee Benefit Plans as Parent may reasonably require.

(b)    The Company shall use commercially reasonable efforts to cause each Optionholder to execute an Option Consent prior to the Closing.

(c)    Parent will issue restricted stock units to the persons set forth under the heading "New Retention Grants" on *Exhibit N* attached hereto in the amounts and subject to the terms set forth therein at the first regularly scheduled meeting of the compensation committee of Parent's board of directors to occur after the Closing, but in any event no later than September 30, 2020.

4.8    Notification of Certain Matters. The Company shall deliver prompt notice to Parent of:

(a)    The material breach of the representations and warranties contained in Article II (provided that the failure to deliver such prompt notice shall only be considered a breach of this covenant if the Company had actual Knowledge of such breach without any duty of inquiry);

(b)    any material failure by the Company to comply with or satisfy any covenant, condition, or agreement to be complied with or satisfied by it hereunder;

(c)    the occurrence or nonoccurrence of any event that would be reasonably likely to result in any of the conditions in Article V not being satisfied; and

(d)    (i) any Legal Proceeding initiated by or against it, or known by the Company to be threatened against the Company, or any Company Service Providers or current or former Stockholders in their capacity as such (a "*New Litigation Claim*") and (ii) ongoing material developments in any New Litigation Claim or any litigation Claim pending against the Company as of the Agreement Date.

(e)    The delivery of any notice pursuant to this Section 4.8 shall not limit or otherwise affect the remedies available to Parent hereunder. The Company will consult in good faith with Parent regarding the conduct of the defense of any New Litigation Claim.

4.9    Promised Options. Prior to the Closing, in consultation with Parent, the Company shall use reasonable best efforts to cause each Person who holds a Promised Option to execute a non-revocable waiver and consent in the form attached hereto as *Exhibit F* (a "*Promised Option Waiver*"). All agreements, notices, or other documents prepared by the Company in connection with the Promised Options shall be subject to the prior review, comment, and approval of Parent (which approval shall not be unreasonably withheld, conditioned, or delayed).

4.10    Section 280G Matters.

(a)    The Company shall obtain and deliver to Parent, prior to soliciting the vote of the Stockholders with respect to the 280G Proposal, an executed parachute payment waiver, in substantially the form attached hereto as *Exhibit K* (the "*Parachute Payment Waiver*") from each Person who is or reasonably could be, with respect to the Company, a "disqualified individual" (within the meaning of Section 280G of the Code), as determined immediately prior to the initiation of the Stockholder solicitation required by this Section 4.10, and who reasonably might otherwise receive, have received, or have the right or entitlement to receive an excess parachute payment under Section 280G of the Code.

-46-

(b)    The Company shall solicit the vote of the Stockholders in accordance with Section 280G(b)(5)(B) of the Code (the "*280G Proposal*") so as to tender, (i) if an affirmative vote is not obtained, the excess parachute payments that have been waived pursuant to the executed Parachute Payment Waivers will not be retained or received or (ii) if an affirmative vote is obtained, the parachute payment provisions of Section 280G of the Code inapplicable to any and all payments and benefits provided pursuant to Contracts that, in the absence of the executed Parachute Payment Waivers by the affected Persons under <u>Section 4.10(a)</u>, could otherwise reasonably result, individually or in the aggregate, in the payment of any amount or the provision of any benefit that would not be deductible by reason of Section 280G of the Code, with such Stockholder approval to be solicited in a manner that satisfies all applicable requirements of Section 280G(b)(5)(B) of the Code, including Q-7 of Section 1.280G-1 of the Treasury Regulations. The results of such vote shall be provided promptly to Parent prior to the Closing. The documentation constituting the 280G Proposal shall be subject to Parent's prior review and approval, which shall not be unreasonably withheld, conditioned or delayed.

(c)    In addition, the Company has received the offer letters and employment agreements provided to any "disqualified individual" by Parent or any Parent Entity or at the direction of Parent or any Parent Entity, in each case prior to or on the Closing Date and that could reasonably be expected to be taken into account in determining whether any payments and benefits constitute "parachute payment" pursuant to Section 280G of the Code with respect to any such Person in connection with the Transactions.

4.11    <u>Stockholder Approval Matters.</u>

(a)    The Company shall as promptly as practicable after the Stockholder Approval is obtained, and in any event within five (5) Business Days of the Agreement Date:

(i)    use its reasonable best efforts to cause each Stockholder whose consent was not obtained in connection with obtaining the Stockholder Approval to execute the Joinder Agreement;

(ii)    deliver notice to the Stockholders of the adoption of this Agreement and approval of the Merger and the other Transactions by the Stockholders, as required by and pursuant to and in accordance with the DGCL and Certificate of Incorporation and the Bylaws of the Company; and

(iii)    provide to each Stockholder whose consent was not obtained in connection with obtaining the Stockholder Approval a notice comprising (A) the notice contemplated by Section 228(e) of the DGCL of the taking of a corporate action without a meeting by less than a unanimous written consent, (B) the notice contemplated by Section 262(d)(2) of the DGCL, together with a copy of Section 262 of the DGCL, and (C) a copy of an information statement including information regarding the Company, the terms of the Merger, this Agreement, and the other Operative Documents, and the recommendation of the board of directors of the Company that all of the Stockholders adopt this Agreement and approve the Merger, the other Operative Documents and the Transactions, in a form reasonably satisfactory to Parent and satisfying all requirements of the DGCL (as amended or supplemented, the "*Information Statement*").

(b)    Any materials to be submitted to the Stockholders in connection with the solicitation of their adoption of this Agreement and approval of the Merger and the other Transactions, including any amendments or supplements to the Information Statement (the "*Soliciting Materials*"), shall be subject to review and written approval by Parent (which shall not be unreasonably conditioned, withheld or delayed), and shall

-47-

include information regarding the Company, the terms of the Merger, this Agreement, and the other Operative Documents, and the recommendation of the board of directors of the Company that all of the Stockholders adopt this Agreement and approve the Merger, the other Operative Documents and the Transactions. The Company will promptly advise Parent in writing if at any time prior to the Closing the Company obtains Knowledge of any facts that might make it necessary or appropriate to amend or supplement the Soliciting Materials in order to make the statements contained or incorporated by reference therein not misleading or to comply with Applicable Law.

4.12    R&W Policy. Parent has bound, concurrently with the execution of this Agreement, an insurance policy with respect to the representations and warranties of the Company under this Agreement, a true and correct copy of which has been provided to the Company (the "**R&W Policy**").

4.13    Certain Closing Deliverables.

(a)    The Company shall prepare and deliver to Parent a spreadsheet (the "**Spreadsheet**") in form and substance reasonably satisfactory to Parent, which spreadsheet shall be dated as of the Closing Date and shall set forth all of the following information (in addition to the other required data and information specified therein), as of immediately prior to the Closing:

(i)    the name, address, and email address (to the extent available) of each Equityholder, certificate numbers, and the number of shares of Capital Stock (by class of Capital Stock), Company Options, and the number of shares of Capital Stock subject to any Company Warrant held by such Equityholder, including the number of any such shares of Capital Stock that were acquired via exercise of an "incentive stock option" (within the meaning of Section 422 of the Code) and the number of any such shares of Capital Stock that were acquired via an "early exercise" to purchase unvested shares of Capital Stock, as well as each date of exercise as to each of the foregoing;

(ii)    a calculation of the portion of the Merger Consideration payable to each Equityholder at the Closing (without regard to Taxes);

(iii)    for each holder of a Substitution Option, a calculation of the number of shares of Parent Common Stock such holder will be entitled to receive (subject to the same vesting terms and conditions as the Substitution Option immediately prior to the Closing);

(iv)    a calculation of the portion of the Merger Consideration payable to each holder of a Promised Option that is not a Substitution Promised Option;

(v)    for each holder of a Substitution Promised Option, a calculation of the number of Parent RSUs that will settle into the number of shares of Parent Common Stock (which shall be subject to the vesting terms and conditions set forth on Schedule 2.3(e) and will be issued in accordance with the Parent Option Plan);

(vi)    for each Equityholder and Promised Optionee who may be entitled to a portion of the Unvested Cash following the Closing, a payment schedule for such Unvested Cash (assuming the satisfaction of all conditions for payment);

(vii)    each Vested Equityholder's Pro Rata Share (expressed as a percentage) and each Vested Equityholder's Pro Rata Share of the Escrow Amount;

(viii)   for each Equityholder, whether such Equityholder is a current or former employee of the Company;

(ix)   with respect to each share of Capital Stock that was acquired upon the exercise of an "incentive stock option" within the meaning of Section 422 of the Code, the grant date and exercise date thereof; and

(x)   a funds flow memorandum setting forth the wire instructions for payments to be made by Parent and the Payment Agent at the Closing to (A) the Payment Agent, (B) recipients of the Transaction Costs, and (C) recipients of Debt payments.

(b)   The Company shall prepare and deliver to Parent a draft of each of the Company Closing Financial Certificate and the Spreadsheet not later than four (4) Business Days prior to the Closing Date and a final version of the Company Closing Financial Certificate and the Spreadsheet to Parent not later than two (2) Business Days prior to the Closing Date. In the event that Parent notifies the Company that there are reasonably apparent errors in the drafts of the Company Closing Financial Certificate or the Spreadsheet delivered not later than four (4) Business Days prior to the Closing Date, Parent and the Company shall discuss such errors in good faith and the Company shall correct such errors prior to delivering the final versions of the same in accordance with this Section 4.13. Without limiting the foregoing, the Company shall provide to Parent, together with the Company Closing Financial Certificate and the Spreadsheet, such supporting documentation, information and calculations as are reasonably necessary for Parent to verify and determine the calculations, amounts and other matters set forth in the Company Closing Financial Certificate and the Spreadsheet.

4.14   Director and Officer Indemnification.

(a)   If the Merger is consummated, then until the sixth (6th) anniversary of the Closing Date, Parent will cause the Surviving Corporation to fulfill and honor in all respects the obligations of the Company to its present and former directors and officers determined as of immediately prior to the Effective Time (the "**Company Indemnified Parties**") pursuant to indemnification agreements with the Company in effect on the Agreement Date and set forth on Schedule 4.14 of the Disclosure Letter pursuant to the Certificate of Incorporation or the Bylaws, in each case, in effect on the Agreement Date (the "**Company Indemnification Provisions**"), with respect to Claims arising out of acts or omissions occurring at or prior to the Effective Time that are asserted after the Effective Time; provided that Parent's and the Surviving Corporation's obligations under this Section 4.14(a) shall not apply to (i) any Claim or matter that relates to a willful or intentional breach of a representation, warranty, covenant, agreement or obligation made by or of the Company in connection with this Agreement or the Transactions or (ii) any Claim based on a Claim for indemnification made by an Indemnified Party pursuant to Article VII. Notwithstanding anything to the contrary contained in the Company Indemnification Provisions, no Company Indemnified Party shall be entitled to coverage under any Parent director and officer insurance policy or errors and omission policy unless such Company Indemnified Party is separately eligible for coverage under such policy pursuant to Parent's policies and procedures and the terms of such insurance policy.

(b)   Prior to the Effective Time, the Company shall purchase a prepaid tail insurance coverage (the "**D&O Tail**") for the Company Indemnified Parties in a form reasonably satisfactory to the Parent, which shall provide the Company Indemnified Parties with coverage for six (6) years following the Closing Date in an amount not less than the existing coverage and that shall have other terms not materially less favorable to the insured persons than the directors' and officers' liability insurance coverage maintained by the Company as of the Agreement Date. Parent shall cause the Surviving Corporation to maintain the

-49-

D&O Tail in full force and effect and continue to honor the obligations thereunder until the sixth (6th) anniversary of the Closing Date.

**ARTICLE V**

**CONDITIONS PRECEDENT TO OBLIGATIONS OF PARENT AND MERGER SUB TO THE CLOSING**

The obligations of Parent and Merger Sub to perform and observe the covenants, agreements and conditions hereof to be performed and observed by Parent and Merger Sub at, or in connection with, the Closing shall be subject to the satisfaction (or waiver by Parent) of the following conditions:

5.1    Accuracy of Representations and Warranties.

(a)    Each of the representations and warranties of the Company contained in this Agreement (other than the Fundamental Representations) shall be (without giving effect to any qualifier such as "material", "materiality", "in all material respects", "Material Adverse Effect", "material and adverse" or any similar term or phrase) true and correct when made and of the Closing Date as if made on and as of such date (other than representations and warranties that address matters only as of a certain date which shall be true and correct as of such certain date), except for breaches and inaccuracies that would not reasonably be expected to, individually or in the aggregate, result in a Material Adverse Effect.

(b)    Each of the Fundamental Representations (other than in Section 2.2) that is not qualified by "material", "materiality", "in all material respects", "Material Adverse Effect", "material and adverse" or any similar term or phrase shall be true and correct in all material respects when made and shall be true and correct in all material respects as of the Closing Date as though made on the Closing Date (other than such Fundamental Representations that address matters only as of a certain date which shall be true and correct in all material respects as of such certain date). Each of the Fundamental Representations (other than in Section 2.2) that is qualified by "material", "materiality", "in all material respects", "Material Adverse Effect", "material and adverse" or any similar term or phrase shall be true and correct in all respects when made and shall be true and correct in all respects as of the Closing Date as though made on the Closing Date (other than such Fundamental Representations that address matters only as of a certain date which shall be true and correct in all respects as of such certain date).

(c)    Each of the Fundamental Representations set forth in Section 2.2 shall be true and correct in all respects when made and shall be true and correct in all respects as of the Closing Date as though made on the Closing Date.

5.2    Performance of Agreements. The Company shall have performed and complied in all material respects with each of the covenants and agreements under this Agreement that are to be performed or complied with prior to the Closing.

5.3    HSR Act; Governmental Orders.

(a)    The waiting period applicable to the consummation of the transactions contemplated hereby under the HSR Act shall have expired or been terminated.

(b)    No Order issued by any court of competent jurisdiction or other legal or regulatory restraint or prohibition limiting or restricting the consummation of the Transactions or Parent's ownership, conduct, or operation of the Company's Business following the Closing (other than any Public Health Recommendation) shall be in effect, including with respect to any Antitrust Restraint.

5.4    Legal Proceedings. There shall be no (i) Legal Proceeding of any kind or nature pending or overtly threatened in writing by any Governmental Body or (ii) material private Legal Proceeding pending, in either case against Parent or Merger Sub, or against the Company, preventing or challenging the consummation of the Merger or the other Transactions.

5.5    Employment Arrangements.

(a)    Each Key Employee Document shall remain in full force and effect, and none of the Key Employees shall be unable to commence employment under his or her Key Employee Offer Letter upon the Closing. None of the Key Employees shall have notified Parent or the Company that he or she is terminating (or expressed to Parent or the Company an intention to terminate) his or her employment with the Company, or shall have stated to Parent or the Company an intent to revoke, rescind, or repudiate any Key Employee Document.

(b)    At least five of the individuals listed on *Exhibit C-2* (the listed individuals, each an "*Additional Employee*" and together, the "*Additional Employees*") that have been provided offer letters and CIIAs by Parent shall have executed the following documents, which shall remain in full force and effect: (i) the offer letter provided by Parent to the Additional Employee (each, an "*Additional Employee Offer Letter*"), (ii) a CIIA, and (iii) if such individual holds a Company Option or Promised Option, an Option Consent or Promised Option Waiver, in each case effective as of the Closing (together, the "*Additional Employee Documents*"), and no less than five of individuals executing such Additional Employee Documents shall (x) be able to commence employment under his or her Additional Employee Offer Letter upon the Closing, (y) not have notified Parent or the Company that he or she is terminating (or expressed to Parent or the Company an intention to terminate) his or her employment with the Company and (z) not have stated to Parent or the Company an intent to revoke, rescind, or repudiate any Additional Employee Document.

5.6    Material Adverse Effect. Since the Agreement Date, the Company shall not have experienced a Material Adverse Effect that is continuing.

5.7    Section 280G Matters. Prior to the Closing, the Company shall have obtained valid Parachute Payment Waivers and solicited Stockholder votes (including at such time or times as requested by Parent) in respect of the 280G Proposal, in each case, in accordance with Section 280G of the Code and applicable rulings and regulations thereunder and Section 4.12. As of the Closing, there shall be no payments or benefits payable to any "disqualified individual" of the Company (determined in accordance with Section 280G of the Code and the regulations and authorities promulgated thereunder) that the Company, subject to Parent's reasonable approval, determines may constitute, individually or in the aggregate, "parachute payments" under Section 280G of the Code (including because such payments or benefits either (a) are exempt from the definition of "parachute payment" pursuant to valid Stockholder solicitation and approval of the 280G Proposal carried out in accordance in all applicable respects with Section 4.12 and Section 280G of the Code and applicable rulings and regulations thereunder or (b) are no longer payable pursuant to (i) valid and irrevocable Parachute Payment Waivers of such payments by such disqualified individuals (which waivers remain in effect as of immediately prior to the Closing) made in accordance in all applicable respects with Section 4.12 and Section 280G of the Code and applicable rulings and regulations thereunder and (ii) a failure to obtain a valid Stockholder Approval of the 280G Proposal).

5.8    Receipt of Closing Deliveries. The Company shall deliver to Parent, at or prior to the Closing:

(a)    a certificate executed by the Chief Executive Officer of the Company, dated as of the Closing Date, in a form reasonably satisfactory to Parent, certifying that the conditions set forth in Sections 5.1, 5.2 and 5.7 have been satisfied;

(b)    a certificate executed by the Secretary of the Company, dated as of the Closing Date, certifying (i) the Certificate of Incorporation in effect as of immediately prior to the Closing, (ii) the Bylaws in effect as of immediately prior to the Closing, and (iii) the resolutions of the board of directors of the Company unanimously (A) declaring this Agreement and the Transactions, including the Merger, upon the terms and subject to the conditions set forth herein, advisable, fair to and in the best interests of the Company and the Stockholders, (B) approving this Agreement in accordance with Applicable Law and (C) directing the adoption of this Agreement and approval of the principal terms of the Merger be submitted to the Stockholders for consideration and recommending all of the Stockholders adopt this Agreement and approve the Merger;

(c)    the Company Closing Financial Certificate;

(d)    the Spreadsheet, completed to include all of the information specified in Section 4.13(a) in a form reasonably satisfactory to Parent and a certificate executed by the Chief Executive Officer of the Company, dated as of the Closing Date, certifying on behalf of the Company that the Spreadsheet is true, correct and complete;

(e)    the written resignation of each director and officer of the Company (in their capacities as such) to be effective as of the Closing Date, in each case in a form reasonably satisfactory to Parent;

(f)    payoff letters or similar instruments in form and substance reasonably satisfactory to Parent with respect to all secured Debt, which letters provide for the release of all Encumbrances relating to the Debt following satisfaction of the terms contained in such payoff letters;

(g)    invoices or other written acknowledgments pursuant to which any Person that is entitled to any unpaid Transaction Costs as of the Closing lists or acknowledges the total amount of fees and expenses that have been incurred and remain payable to such Person at the Closing;

(h)    FIRPTA documentation, consisting of (A) a notice to the IRS, in accordance with the requirements of Treasury Regulation Section 1.897-2(h)(2), in substantially the form attached hereto as *Exhibit E-1*, dated as of the Closing Date and executed by the Company, and (B) a FIRPTA notification letter, in substantially the form attached hereto as *Exhibit E-2*, dated as of the Closing Date and executed by the Company, in each case, together with written authorization for Parent to deliver such notice and FIRPTA notification letter to the IRS on behalf of the Company after the Closing;

(i)    a Parachute Payment Waiver, executed by each Person required to execute such a waiver pursuant to Section 4.10(a);

(j)    written consents evidencing the Stockholder Approval and Joinder Agreements, in each case executed by each Consenting Stockholder, as well as any other Stockholders who executed such documents after the Agreement Date;

(k)    (i) a Warrant Termination Agreement executed by each holder of a Company Warrant acknowledging that at the Effective Time, such Company Warrant shall be cashed out and terminated in the manner set forth in Section 1.6.1(e);

(l)    an accurate and complete copy of resolutions adopted by the board of directors of the Company or any applicable committee thereof, certified by the Secretary of the Company, authorizing the termination of the 401(k) Plan (or the Company's employer participation therein, as applicable) in accordance with Section 4.7(g), and the termination of the Option Plan;

(m)    a certificate from the Delaware Secretary of State certifying that the Company is in good standing, dated within two (2) Business Days of the Closing Date;

(n)    the Certificate of Merger, executed by the Company; and

(o)    the Escrow Agreement, executed by the Holder Representative.

## ARTICLE VI
### CONDITIONS PRECEDENT TO OBLIGATIONS OF THE COMPANY TO THE CLOSING

The obligations of the Company to perform and observe the covenants, agreements, and conditions hereof to be performed and observed by it at, or in connection with, the Closing shall be subject to the satisfaction (or waiver by the Company) of the following conditions:

6.1    Accuracy of Representations and Warranties. The representations and warranties of Parent and Merger Sub contained herein and in the other Operative Documents shall have been true and correct in all material respects when made and shall be true and correct in all material respects as of the Closing Date as though made on the Closing Date.

6.2    Performance of Agreements. Parent and Merger Sub shall have performed and complied in all material respects with all covenants and agreements under this Agreement that are to be performed or complied with prior to the Closing.

6.3    HSR Act; Governmental Orders.

(a)    The waiting period applicable to the consummation of the transactions contemplated hereby under the HSR Act shall have expired or been terminated.

(b)    No Order issued by any court of competent jurisdiction or other legal or regulatory restraint or prohibition limiting or restricting the consummation of the Merger shall be in effect.

6.4    Escrow Agreement. The Escrow Agreement shall have been duly executed by Parent and the Escrow Agent and delivered to the Company.

## ARTICLE VII
### INDEMNIFICATION

7.1    Survival.

(a)    The representations and warranties of the Company contained in this Agreement or any other Operative Document or in any certificate delivered pursuant hereto shall survive for a period of twelve (12) months after the Closing Date (the "**General Survival Period**") (or, solely for purposes of Claims made under the R&W Policy and not against the Escrow Fund or the Vested Equityholders, such longer period as specified in the R&W Policy), except that any Indemnification Claim based on Fraud by or on behalf of the Company in making any representation or warranty under this Agreement shall survive for seven years after

-53-

the Closing Date. The expiration of any representation and warranty of the Company shall not affect any Indemnification Claim for breaches of representations or warranties of the Company with respect to the matters set forth in a corresponding written Claim Notice if a written Claim Notice with respect to such indemnification claim is delivered in accordance with <u>Section 7.4</u> below prior to the expiration date of such representation and warranty.

(b)    The representations and warranties of Parent and Merger Sub set forth in this Agreement shall terminate at the Effective Time.

(c)    The covenants and agreements contained in this Agreement or in any other Operative Documents will survive until performed in accordance with their terms, but no right to indemnification pursuant to this <u>Article VII</u> in respect of any Indemnification Claim based upon any breach of a covenant or agreement shall be affected by the expiration of such covenant or agreement.

7.2    <u>Indemnification by the Vested Equityholders.</u>

(a)    From and after the Closing and by virtue of the Merger, subject to the limitations set forth in this <u>Article VII</u>, the Vested Equityholders shall (i) jointly (to the extent of the funds then available in the Escrow Fund) and (ii) severally (based on their respective Pro Rata Share) as to any amounts exceeding the funds then available in the Escrow Fund, indemnify, defend, and hold Parent and its officers, directors, employees, agents, and Affiliates (each, an "***Indemnified Party***") harmless from and against, and shall reimburse the Indemnified Parties for, any and all Losses paid, incurred, suffered or sustained by the Indemnified Parties, or any of them directly or indirectly (whether or not involving a Third-Party Claim), arising out of, resulting from, or in connection with:

(i)    any breach of any representation, warranty, or certification made by or on behalf of the Company in this Agreement together with the Disclosure Letter or in any other Operative Document (A) as of the Agreement Date or (B) as of the Closing Date as though such representation, warranty, or certification were made as of the Closing Date (except to the extent that such representations, warranties, and certifications speak only as of an earlier date, in which case such representations, warranties, and certifications shall be true and correct as of such earlier date);

(ii)    any breach prior to the Closing by the Company of any covenant or other obligation in this Agreement or in any other Operative Document;

(iii)    any and all unpaid Pre-Closing Taxes if and to the extent not otherwise accounted for in Debt or Transaction Costs and included in the calculation of Merger Consideration;

(iv)    any inaccuracy in the Company Closing Financial Certificate (other than an inaccuracy that would not affect the calculation of the Merger Consideration) or the Spreadsheet;

(v)    any Transaction Litigation or Claims by any former holder (or purported holder) of any Equity Interests of the Company (including any predecessors), arising out of, resulting from or in connection with the allocation of the Merger Consideration or any portion thereof that differs from that specified on the Spreadsheet;

(vi)   any claims with respect to Dissenting Shares and any payments made with respect to Dissenting Shares to the extent that such payments exceed the amounts that otherwise would have been payable pursuant to Section 1.6.1 in respect of such Dissenting Shares if appraisal rights under Section 262 of the DGCL had not been exercised with respect thereto; or

(vii)   any Fraud committed by or on behalf of the Company in making any representation or warranty in this Agreement.

(b)   Subject to the limitations set forth in this Article VII, each Vested Equityholder shall, severally and not jointly, indemnify, defend, and hold the Indemnified Parties harmless from and against, and shall reimburse the Indemnified Parties for, any and all Losses, directly or indirectly, arising out of, resulting from, or in connection with:

(i)   any breach of any representation and warranty made by such Vested Equityholder in his, her, or its Joinder Agreement or Option Consent (A) as of the date of execution of such Joinder Agreement or Option Consent or (B) as of the Closing Date as though such representation and warranty were made as of the Closing Date;

(ii)   any breach of any representation, warranty, or certification made by such Vested Equityholder in his, her, or its Letter of Transmittal, Warrant Termination Agreement, or any other Operative Document;

(iii)   any breach by such Vested Equityholder of any covenant or other obligation in this Agreement or in any other Operative Document;

(iv)   any Released Claim (as defined in the applicable Joinder Agreement or Option Consent) of such Vested Equityholder; or

(v)   any Fraud committed by such Vested Equityholder in their personal capacity and not by or on behalf of the Company in making any representation or warranty in this Agreement or in the Operative Documents.

For the avoidance of doubt, no representation or warranty made in this Agreement is made by a Vested Equityholder in its personal capacity. The Indemnified Parties shall have the option of seeking satisfaction for any indemnification obligations of such Vested Equityholder pursuant to this Section 7.2(b) directly against such Vested Equityholder and/or out of such Vested Equityholder's Pro Rata Share of the Escrow Fund.

7.3   Limitations and Adjustments.

(a)   Except for Losses under Section 7.2(a)(vii) and Section 7.2(b)(v), the aggregate liability of the Vested Equityholders for all Indemnification Claims shall be limited to the Escrow Fund.

(b)   Notwithstanding anything to the contrary herein, no Indemnified Party shall be entitled to make an Indemnification Claim for Losses arising out of, resulting from or in connection with the matters listed in Section 7.2(a)(i), (other than for Fraud or any breach of any Fundamental Representation) unless and until a Claim Notice (together with any other delivered Claim Notices) describing Losses in an aggregate amount greater than $2,000,000 (the "**Deductible**") is delivered, in which case the Indemnified Party may

make Indemnification Claims and receive cash from the Escrow Fund for Losses solely to the extent in excess of the Deductible for such matters.

(c)     Each Vested Equityholder shall be liable only for such Vested Equityholder's Pro Rata Share of the Losses finally determined under this Agreement to be indemnifiable for such Indemnification Claim, and in no event shall the liability of any Vested Equityholder for any and all Indemnification Claims in the aggregate under Section 7.2 or otherwise arising under or relating to this Agreement and the Transactions exceed the amount of Merger Consideration received by such Vested Equityholder (including any funds from the Escrow Fund); provided that nothing in this Section 7.3(c) shall limit the liability of any Vested Equityholder for any and all Indemnification Claims under Section 7.2(a)(vii) and/or Section 7.2(b)(v) if the Vested Equityholder committed the Fraud underlying such Indemnification Claim.

(d)     For purposes of determining whether a breach has occurred and the amount of Losses under Section 7.2, all qualifications and limitations as to materiality, Material Adverse Effect, and words of similar import shall be disregarded; provided that in no event shall (x) "Material Contract" be read to mean "Contract," (y) "material" be read out of "all material respects" in Section 2.5(a), or (z) the term "Material Adverse Effect" be read out of Section 2.6(a).

(e)     The representations and warranties of the Company and the Vested Equityholders contained in this Agreement, any other Operative Document, or in any certificate delivered pursuant hereto shall not be deemed waived, modified, or otherwise affected, nor the survival of any such representations and warranties be deemed reduced, truncated, or otherwise limited, by any investigation made or any knowledge possessed or acquired by Parent or by any of its directors, officers, employees, consultants, or agents (or that could have been discovered by any of the foregoing, whether by any investigation made by or on behalf of Parent into the affairs of the Company or otherwise) prior to the Closing with respect to (i) the truth and accuracy of any such representations and warranties or (ii) any facts, matters, or circumstances that may give rise to an Indemnification Claim, and no Indemnification Claim made hereunder shall be limited on the basis thereof.

(f)     The amount of Losses related to any Indemnification Claim shall be paid to the applicable Indemnified Party in full, without any set off, counterclaim, restriction, or condition and without any deduction or withholding (except as may be required by Applicable Law or as otherwise agreed).

(g)     The amount of any Losses that are subject to indemnification under this Article VII shall be calculated net of the amount of any insurance proceeds, indemnification payments or reimbursements actually received by the Indemnified Parties from third parties (other than the Vested Equityholders) in respect of such Losses (net of any costs or expenses incurred in obtaining such insurance, indemnification or reimbursement, including any increases in insurance premiums or retro-premium adjustments resulting from such recovery, except with respect to the R&W Policy); provided that nothing in this Section 7.3(g) shall be construed as or give rise to an obligation to seek any such insurance, indemnification or reimbursement, including under the R&W Policy. If an Indemnified Party receives any amounts under applicable insurance policies or third party indemnification or reimbursement payments subsequent to its receipt of an indemnification payment by the Vested Equityholders (including via the Escrow Fund), then such Indemnified Party will, without duplication, promptly reimburse the Vested Equityholders (including via the Escrow Fund) for any payment made by such Vested Equityholders up to the amount received by the Indemnified Party.

(h)     If an Indemnification Claim may be properly characterized in multiple ways in accordance with this Article VII such that such Indemnification Claim may or may not be subject to different limitations

depending on such characterization, then the Indemnified Party shall have the right to characterize such Indemnification Claim in a manner that maximizes the recovery and time to assert such Indemnification Claim permitted in accordance with this Article VII. All Losses under this Agreement shall be determined without duplication of recovery due to the facts giving rise to such Losses constituting a breach of more than one (1) representation, warranty, covenant, agreement or other provision.

(i)    This Article VII shall be the sole and exclusive remedy of the Indemnified Parties against the Vested Equityholders from and after the Effective Time for any Claims arising in connection with the Transactions under this Agreement or under any Operative Document; provided that (i) this Section 7.3(i) shall not be deemed a waiver by any party of any right to specific performance or injunctive relief and (ii) nothing in this Agreement shall limit the liability of a Vested Equityholder (and this Article VII shall not be the sole and exclusive remedy for such Indemnified Party) for Fraud under Section 7.2(a)(vii) or Section 7.2(b)(v), if such Vested Equityholder committed such Fraud. The conditions and limitations set forth in this Article VII will apply even if (1) the R&W Policy is revoked, cancelled or modified in any manner after issuance or (2) Parent makes a claim under the R&W Policy and such claim is denied by the insurer.

7.4    Procedure for Indemnification.

(a)    Except as otherwise set forth in this Section 7.4, the period during which (i) Indemnification Claims may be made (except for Indemnification Claims under Section 7.2(a)(vii) or Section 7.2(b)(v)) shall be the General Survival Period, (ii) Indemnification Claims may be made under Section 7.2(b)(i)-(iv) shall be the date that is three years from the Closing Date and (iii) Indemnification Claims may be made under Section 7.2(a)(vii) and Section 7.2(b)(v) shall be seven (7) years from the Closing Date (together with the General Survival Period, the "**Survival Periods**" and each, a "**Survival Period**")).

(b)    An Indemnified Party shall, prior to the expiration of the applicable Survival Period with respect to an Indemnification Claim, give written notice (a "**Claim Notice**") of any Indemnification Claim by or on behalf of any Indemnified Party to the Holder Representative, reasonably promptly, but in any event if such Indemnification Claim relates to the assertion against an Indemnified Party of any Third-Party Claim, within fifteen (15) Business Days after receipt by such Indemnified Party of written notice of a Legal Proceeding relating to such Third-Party Claim, except that the failure to so notify the Holder Representative within such time period shall not relieve the Vested Equityholders of any obligation to indemnify the Indemnified Party under this Article VII, except to the extent that the ability of the Holder Representative to resolve such Indemnification Claim is materially and adversely affected by such delay or failure. Each Claim Notice shall (i) state that an Indemnified Party has paid, incurred, suffered or sustained, or reasonably anticipates that it may pay, incur, suffer or sustain Losses, (ii) describe (A) the amount of claimed Losses in reasonable detail (to the extent known and reasonably quantifiable by Parent), and (B) the basis for such anticipated Loss, and, if applicable, the nature of the misrepresentation, breach of warranty or covenant to which such item is related. Parent may update a Claim Notice from time to time to reflect any change in circumstances following the date thereof. Following the delivery of a Claim Notice, the Holder Representative and its representatives and agents shall be given all such access (including electronic access, to the extent available) to the books and records of the Surviving Corporation and reasonable access during normal business hours to such personnel or other representatives of the Surviving Corporation and Parent, in each case as they may reasonably require for the purposes of investigating or resolving any disputes relating to, or responding to, any matters or inquiries raised in the Claim Notice.

(c)    Unless the Holder Representative contests the Indemnification Claim in writing delivered to Parent within twenty (20) Business Days after receipt of a Claim Notice and describing in reasonable detail the basis for contesting the Indemnification Claim (an "**Indemnification Claim Objection Notice**"),

the Indemnified Party shall, subject to the other terms of this <u>Article VII</u>, be paid the amount of Losses related to such Indemnification Claim or the uncontested portion thereof. Any disputed Indemnification Claims shall be resolved either (i) in a written agreement signed by Parent and the Holder Representative or (ii) by the final, non-appealable decision of a court resolving such disputed Indemnification Claim (a "***Final Order***").

    (d)   In the event that the Holder Representative shall timely deliver an Indemnification Claim Objection Notice in accordance with <u>Section 7.4</u>(c), the Holder Representative and Parent shall attempt in good faith to agree upon the rights of the respective parties with respect to each of such claims for a period of at least sixty (60) days. If the Holder Representative and Parent should so agree, a memorandum setting forth such agreement shall be prepared and signed by both parties and, in the case of an Indemnification Claim to be recovered from the Escrow Fund, shall be furnished to the Escrow Agent (a "***Joint Memorandum***"). If Parent and the Holder Representative cannot reach such an agreement, then either party may pursue a claim subject to the limitations set forth in <u>Section 9.6</u> to obtain a Final Order. The Escrow Agent will not distribute any disputed amount except pursuant to a Joint Memorandum or Final Order; and the Escrow Agent shall be entitled to conclusively rely on any Joint Memorandum or Final Order and make distributions from the Escrow Fund in accordance with the terms thereof.

    7.5   <u>Third-Party Claims</u>. In the event that Parent becomes aware of a Third-Party Claim that Parent in good faith believes may result in a Claim for Losses by or on behalf of an Indemnified Party, Parent shall deliver a Claim Notice to the Holder Representative in accordance with <u>Section 7.4</u>(b) and shall provide a copy of any material written correspondence submitted by the third party making such Third-Party Claim, if any, within fifteen (15) Business Days of receipt of such material correspondence. Parent shall have the right in its sole discretion to determine and conduct the defense of such Third-Party Claim; provided, that the Holder Representative, at the expense of the Vested Equityholders, shall be entitled to participate in the defense of such Third-Party Claim and engage separate counsel, and Parent shall keep Holder Representative reasonably informed concerning the progress of such Third-Party Claim and shall consider in good faith recommendations made by the Holder Representative with respect to the defense of such Third-Party Claim. Parent shall have the right, in its sole discretion, to settle or otherwise resolve such Third-Party Claim and the costs and expenses incurred by Parent or its Affiliates in connection with defense, enforcement, settlement, or resolution (including reasonable documented out-of-pocket attorneys' fees, other professionals' and experts' fees, and court or arbitration costs) shall be included in the Losses for which Parent shall be entitled to receive indemnification pursuant to an Indemnification Claim made hereunder, and such costs and expenses shall constitute Losses subject to indemnification under <u>Section 7.2</u> (subject to the limitations under this Article VII) regardless of whether it is ultimately determined that such Third-Party Claim arose out of, resulted from, or was in connection with a matter listed under <u>Section 7.2</u>; <u>provided</u> that no settlement of any such Third-Party Claim with third party claimants shall be determinative of the amount of Losses with respect to such settlement unless (i) the Holder Representative consents to the amount of such settlement or (ii) unreasonably withholds, conditions or delays such consent. The Holder Representative shall have the right to receive copies of all pleadings, notices, and communications with respect to such Third-Party Claim to the extent that receipt of such documents does not affect any privilege relating to any Indemnified Party, subject to execution by the Holder Representative of a customary non-disclosure agreement with Parent (and, if required, such third party) to the extent that such materials contain confidential or propriety information except that, in the case of a Tax Contest, the Holder Representative shall only have the right to receive copies of any written correspondence from a Tax Authority and the failure to provide any such copies shall not relieve any Vested Equityholder of any obligation or liability to the Indemnified Party, except to the extent that the Holder Representative demonstrates that it or any such Vested Equityholder is materially and adversely affected thereby. In the event that the Holder Representative has consented in writing to the amount of any settlement or resolution by Parent of any such Claim (which consent shall not be unreasonably

withheld, conditioned or delayed and which consent shall be deemed to have been given unless the Holder Representative shall have objected within twenty (20) days after a written request therefor by Parent) or the Holder Representative has been determined to have unreasonably withheld, conditioned, or delayed its consent to the amount of any such settlement or resolution, neither the Holder Representative nor any Vested Equityholder shall have any power or authority to object under this Article VII to the amount of the Indemnification Claim by or on behalf of any Indemnified Party against the Escrow Fund for indemnity with respect to such settlement or resolution.

7.6    Holder Representative.

(a)    By the approval of the Merger by the Stockholder Approval, or by execution of a Joinder Agreement, an Option Consent, or a Warrant Termination Agreement, or by participating in the Merger and receiving the benefits thereof, including the right to receive the consideration payable in connection with the Merger, each Vested Equityholder shall have irrevocably (except as set forth in Section 7.6(b)) authorized and appointed Shareholder Representative Services LLC (together with any replacement representative appointed pursuant to Section 7.6(a), (the "**Holder Representative**")), with full power of substitution, as such Vested Equityholder's representative and attorney-in-fact and agent to act for such Vested Equityholder with respect to all matters arising in connection with this Agreement and the Operative Documents (other than such Vested Equityholder's Offer Letter and CIIA, if any), including full power and authority, exercisable in the sole discretion of the Holder Representative, to: (i) take any action contemplated to be taken by the Vested Equityholders under this Agreement or any other Operative Document, (ii) negotiate, determine, defend, and settle any disputes that may arise under or in connection with this Agreement or any other Operative Document, and (iii) make, execute, acknowledge, and deliver any releases, assurances, receipts, requests, instructions, notices, agreements, certificates, and any other instruments, and generally do any and all things and take any and all actions that the Holder Representative may deem necessary or advisable in connection with this Agreement or any other Operative Document.

(b)    The Holder Representative may be removed by written agreement among Parent and Vested Equityholders representing a majority in interest of the Vested Equityholders calculated with reference to each Vested Equityholder's Pro Rata Share. The Holder Representative may resign at any time upon giving twenty (20) days' prior written notice of such resignation to Parent and the Vested Equityholder advisory committee established under the Holder Representative's engagement letter, but shall be entitled to exercise all of the powers enumerated in Section 7.6(a) until the effective date of such resignation. In the event of such removal or resignation, or upon the death or disability of, the Holder Representative, Vested Equityholders representing a majority in interest of the Vested Equityholders calculated with reference to each Vested Equityholder's Pro Rata Share shall promptly agree upon a replacement Holder Representative and shall notify Parent thereof. Any Survival Period set forth in Section 7.1 any period in which any Indemnified Party is required to provide notice to the Holder Representative with respect to any Indemnification Claim or action to be taken in connection with this Agreement shall be deemed to be extended by the number of calendar days that elapses between the Holder Representative's resignation, removal, death, or disability and the appointment of a replacement Holder Representative pursuant to the preceding sentence (the "**Gap Period**"), if such Survival Period would otherwise expire or such notice would otherwise be required to be provided or such action to be taken during the Gap Period.

(c)    At least two (2) Business Days prior to the Closing Date, the Company shall deliver to Parent a payment spreadsheet (a "**Payment Spreadsheet**"), in form and substance acceptable to Parent and the Payment Agent, setting forth (in each case to the extent applicable) payees, certificate numbers, share classes or series and quantities, payment amounts, email (where available) and physical addresses, together with any additional information requested by the Payment Agent. Following the Closing Date, the Holder

Representative agrees to deliver a revised Payment Spreadsheet to Parent in connection with any subsequent distributions to the Vested Equityholders pursuant to this Agreement.

(d)    The Holder Representative will incur no liability of any kind with respect to any action or omission by the Holder Representative in connection with its services pursuant to this Agreement and any agreements ancillary hereto, except in the event of liability directly resulting from the Holder Representative's gross negligence or willful misconduct. The Holder Representative shall not be liable for any action or omission pursuant to the advice of counsel. The Vested Equityholders shall severally based on their respective Pro Rata Shares (provided, that in all cases the indemnity coverage provided to the Holder Representative shall sum to one hundred percent (100%)) indemnify, defend and hold harmless the Holder Representative from and against any and all losses, liabilities, damages, claims, penalties, fines, forfeitures, actions, fees, costs and expenses (including the fees and expenses of counsel and experts and their staffs and all expense of document location, duplication and shipment) (collectively, "**Representative Losses**") arising out of or in connection with the Holder Representative's execution and performance of this Agreement and any agreements ancillary hereto, in each case as such Representative Loss is suffered or incurred; provided, that in the event that any such Representative Loss is finally adjudicated to have been directly caused by the gross negligence or willful misconduct of the Holder Representative, the Holder Representative will reimburse the Vested Equityholders the amount of such indemnified Representative Loss to the extent attributable to such gross negligence or willful misconduct. If not paid directly to the Holder Representative by the Vested Equityholders, any such Representative Losses may be recovered by the Holder Representative from (i) the funds in the Expense Fund and (ii) any other funds that become payable to the Vested Equityholders under this Agreement at such time as such amounts would otherwise be distributable to the Vested Equityholders; provided that while this section allows the Holder Representative to be paid from the aforementioned sources of funds, this does not relieve the Vested Equityholders from their obligation to promptly pay such Representative Losses as they are suffered or incurred, nor does it prevent the Holder Representative from seeking any remedies available to it at law or otherwise. In no event will the Holder Representative be required to advance its own funds on behalf of the Vested Equityholders or otherwise. Notwithstanding anything in this Agreement to the contrary, any restrictions or limitations on liability or indemnification obligations of, or provisions limiting the recourse against non-parties otherwise applicable to, the Vested Equityholders set forth elsewhere in this Agreement are not intended to be applicable to the indemnities provided to the Holder Representative under this section. The foregoing indemnities will survive the Closing, the resignation or removal of the Holder Representative or the termination of this Agreement.

7.7    <u>Adjustment to Purchase Price</u>. All payments made by a Vested Equityholder to an Indemnified Party in respect of any Indemnification Claim shall be treated as adjustments to the Purchase Price for Tax purposes to the maximum extent permitted by Applicable Law.

7.8    <u>Payment</u>. If uncontested, or once resolved either by agreement or receipt of an Order of a court of competent jurisdiction in accordance with <u>Section 9.6</u>, the amount of Losses (subject to the limitations set forth in <u>Section 7.3</u>) related to any Indemnification Claim shall be disbursed, and Parent and the Holder Representative shall jointly instruct the Escrow Agent to so disburse, from the Escrow Fund to the respective Indemnified Party or shall be paid to the respective Indemnified Party by the Vested Equityholder by wire transfer of immediately available funds within three (3) Business Days.

7.9    <u>No Other Representations; Non-Reliance.</u> Each of Parent and Merger Sub acknowledges that except for the representations and warranties set forth in Article II, neither the Company nor any of its Affiliates, nor any other Person, made or shall be deemed to have made (and Parent and Merger Sub have not relied on and shall not rely on) any representation or warranty to Parent or Merger Sub, express or implied, at Applicable Law or in equity, on behalf of the Company. Any claims Parent or Merger Sub

may have for breach of representation or warranty shall be based solely on the representations and warranties of the Company expressly set forth in this Agreement (including the Disclosure Letter, schedules and exhibits to this Agreement) and the certificates and other documents contemplated hereby.

**ARTICLE VIII**

**TERMINATION**

8.1     Termination. This Agreement may be terminated at any time prior to the Closing:

(a)     by the mutual written consent of Parent and the Company;

(b)     by Parent or the Company if the Closing has not occurred on or before the date that is forty-five (45) calendar days after the Agreement Date (the "**Termination Date**"); provided that if the Closing shall not have occurred prior to such date and all the conditions to Closing, other than the conditions set forth in Section 5.3 (as it relates to the HSR Act), shall have been satisfied or shall be capable of being satisfied at such time, the Termination Date may be extended on one occasion by either Parent or the Company for a period of thirty (30) calendar days by written notice to the other, and such date, as so extended, shall be the Termination Date; provided, further, that if either Parent, on the one hand, or the Company or any Equityholder, on the other hand, is then in breach of this Agreement or any Operative Document, and such breach shall have been the cause of the failure of the Closing to occur by such date, then Parent, in the case of such a breach by Parent, or the Company, in the case of such a breach by the Company or any Equityholder, may not terminate this Agreement pursuant to this Section 8.1(b);

(c)     by Parent, by written notice to the Company, if there shall have been an inaccuracy in any representation or warranty made by, or a breach of any covenant, agreement or obligation of, the Company herein and such inaccuracy or breach shall not have been cured within thirty (30) days after receipt by the Company of written notice of such inaccuracy or breach and, if not cured within such period and at or prior to the Closing, such inaccuracy or breach would result in the failure of any of the conditions set forth in Article V to be satisfied; provided that no such cure period shall be available or applicable to any such inaccuracy or breach that by its nature cannot be cured;

(d)     by the Company, by written notice to Parent, if there shall have been an inaccuracy in any representation or warranty made by, or a breach of any covenant, agreement or obligation of, Parent herein and such inaccuracy or breach shall not have been cured within thirty (30) days after receipt by Parent of written notice of such inaccuracy or breach and, if not cured within such period and at or prior to the Closing, such inaccuracy or breach would result in the failure of any of the conditions set forth in Article VI to be satisfied; provided that no such cure period shall be available or applicable to any such inaccuracy or breach that by its nature cannot be cured; or

(e)     by Parent, if the Company has not obtained the Stockholder Approval by written consent complying with all of the provisions of the DGCL and the Certificate of Incorporation and the Bylaws at or prior to the time that is eight (8) hours following the execution and delivery of this Agreement by all of the parties hereto.

8.2     Effect of Termination. In the event of termination of this Agreement pursuant to Section 8.1, written notice thereof shall forthwith be given by the terminating party to the other parties, and this Agreement shall thereupon terminate and become void and have no further force or effect, and the Transactions shall be abandoned without further action by the parties hereto. Notwithstanding anything to the contrary herein, Section 7.6(d), this Section 8.2 and Article IX shall survive indefinitely, and nothing herein shall relieve any party hereto of any Liability for Fraud or any willful breach of this Agreement occurring prior to such termination.

**ARTICLE IX**
**GENERAL**

9.1     Expenses. Except as otherwise set forth herein, whether or not the Merger is consummated, each party shall pay its own Transaction Costs.

9.2     Notices. Any notice, request, or demand desired or required to be given hereunder shall be in writing and shall be given by personal delivery, email delivery, or overnight courier service, in each case addressed as respectively set forth below or to such other address as any party shall have previously designated by such a notice. The effective date of any notice, request, or demand shall be the date of personal delivery, the date on which email is sent (provided that the sender of such email does not receive a written notification of delivery failure), or one (1) day after it is delivered to a reputable overnight courier service, as the case may be, in each case properly addressed as provided herein and with all charges prepaid. After the Closing, notice given to the Holder Representative shall constitute notice given to each Equityholder.

| TO PARENT OR MERGER SUB (AND FOLLOWING THE EFFECTIVE TIME, THE SURVIVING CORPORATION): | TO THE COMPANY (PRIOR TO THE EFFECTIVE TIME): | TO THE HOLDER REPRESENTATIVE: |
|---|---|---|
| lululemon athletica inc.<br>1818 Cornwall Avenue<br>Vancouver, British Columbia V6J 1C7<br>Attention: General Counsel<br>Email: legalnotices@lululemon.com | Curiouser Products Inc.<br>1261 Broadway #208<br>New York, NY 10001<br>Attention: Brynn Putnam<br>Email: brynn@mirror.co | Shareholder Representative Services LLC<br>950 17th Street, Suite 1400<br>Denver, CO 80202<br>Attention: Managing Director<br>Email: deals@srsacquiom.com<br>Telephone: (303) 648-4085 |
| with a copy to:<br><br>Blake, Cassels & Graydon LLP<br>595 Burrard Street, Suite 2600 Vancouver BC V7X 1L3<br>Attention: Troy Lehman<br>Email: troy.lehman@blakes.com<br><br>Fenwick & West LLP<br>801 California Street<br>Mountain View, CA 94041<br>Attention: Kris Withrow<br>        Chris Gorman<br><br>Email: kwithrow@fenwick.com<br>        cgorman@fenwick.com | with a copy to:<br><br>Cooley LLP<br>101 California Street<br>5th Floor<br>San Francisco, CA 94111<br>Attention: Jamie Leigh<br>        Anne Lieberman<br>        Giselle Rivers<br>Email: jleigh@cooley.com<br>        alieberman@cooley.com<br>        grivers@cooley.com | |

9.3     Severability. If any term or other provision of this Agreement is invalid, illegal, or incapable of being enforced by any rule of law, or public policy, all other conditions and provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the Transactions is not affected in any manner adverse to any party hereto. Upon such determination that any term or other

provision is invalid, illegal, or incapable of being enforced, the parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties to the fullest extent possible.

9.4     <u>Entire Agreement</u>. This Agreement (including the Disclosure Letter and all other Exhibits and Schedules hereto), the other Operative Documents, and the Confidentiality Agreement constitute the entire agreement the parties with respect to the subject matter hereof and thereof and supersede all prior (but not concurrent) agreements and undertakings, both written and oral, among the parties, or any of them, with respect to the subject matter hereof and thereof, except that nothing herein shall supersede any provision of any Offer Letter, CIAA, or other employment agreement between any Parent Entity and any Employee Equityholder.

9.5     <u>Assignment; Parties in Interest</u>. This Agreement shall not be assigned by operation of law or otherwise, and any such assignment shall be null and void, except that any or all rights and obligations of Parent and Merger Sub may be assigned to one (1) or more Parent Entities, so long as such assignment does not relieve Parent and Merger Sub of any of its obligations hereunder. Subject to the foregoing, this Agreement shall be binding on and inure solely to the benefit of the parties hereto and their respective successors, heirs, legal representatives and permitted assigns, and nothing in this Agreement, express or implied, is intended to or shall confer upon any other Person any right, benefit or remedy of any nature whatsoever under or by reason of this Agreement (except that (x) <u>Article VII</u> is intended to benefit the Indemnified Parties and (y) <u>Section 4.14</u> is intended to benefit the Company Indemnified Parties).

9.6     <u>Governing Law; Jurisdiction; Waiver of Jury Trial</u>. This Agreement shall be governed by, and construed in accordance with, the laws of the State of Delaware, without giving effect to any choice or conflict of law, provision, or rule that would cause the application of laws of any other jurisdiction. In any action among or between any of the parties arising out of or relating to this Agreement, including any action seeking equitable relief, each of the parties irrevocably and unconditionally consents and submits to the exclusive jurisdiction and venue of the state and federal courts located in Wilmington, Delaware. Each party hereby irrevocably waives all right to trial by jury in any Legal Proceeding (whether based on Contract, tort, or otherwise) arising out of or relating to this Agreement and the other Operative Documents, the Transactions, or the actions of such parties in the negotiation, administration, performance, and enforcement hereof and thereof.

9.7     <u>Headings; Construction</u>. The table of contents and headings contained in this Agreement are included for convenience of reference only and shall not affect in any way the meaning or interpretation of this Agreement. The parties have participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties, and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any of the provisions of this Agreement. Any reference to any federal, state, local, or foreign statute or Applicable Law shall be deemed also to refer to all rules and regulations promulgated thereunder, unless the context requires otherwise. For purposes of <u>Article II</u>, any reference to the "Company" shall include any predecessor entity. The word "including" shall mean including without limitation. The word "or" is disjunctive, but not necessarily exclusive. The words "hereof," "herein," "hereunder," and similar terms in this Agreement refer to this Agreement as a whole, including exhibits and schedules hereto, and not to any particular provision of this Agreement. When a reference is made in this Agreement to Annexes, Articles, Exhibits, Sections, or Schedules, such reference shall be to an Annex, Article, Exhibit, Section, or Schedule to this Agreement unless otherwise indicated. For purposes of <u>Article II</u>, the words "provide," "deliver," "made available," "furnish," and similar terms in this Agreement shall mean provide in that certain virtual data room titled "Project Snowflake" on datasite.com at least one (1) Business Day prior to the Agreement Date (or, solely for those documents listed on Schedule B to the

Disclosure Letter, prior to the execution of this Agreement on the Agreement Date) and not removed from such virtual data room prior to the Closing Date. Pronouns in the masculine, feminine, and neuter genders shall be construed to include any other gender, and words in the singular form shall be construed to include the plural and vice versa, unless the context otherwise requires. If any party has breached any representation, warranty, or covenant contained herein in any respect, the fact that there exists another representation, warranty, or covenant relating to the same subject matter (regardless of the relative levels of specificity) that the party has not breached shall not detract from or mitigate the fact that the party is in breach of the first representation, warranty, or covenant. All accounting terms used herein and not expressly defined herein shall, except as otherwise noted, have the meanings assigned to such terms in accordance with GAAP. References to clauses without a cross-reference to a Section or subsection are references to clauses with the same Section or, if more specific, subsection. The symbol "$" refers to United States Dollars. All references to "days" shall be to calendar days unless otherwise indicated as a "Business Day." Any action otherwise required to be taken on a day that is not a Business Day shall instead be taken on the next succeeding Business Day, and if the last day of such period is a non-Business Day, the period in question shall end on the next succeeding Business Day. Unless indicated otherwise, all mathematical calculations contemplated by this Agreement shall be rounded to the tenth decimal place, except in respect of payments, which shall be rounded to the nearest whole United States cent.

9.8     <u>Counterparts</u>. This Agreement may be executed and delivered in one (1) or more counterparts, either manually or electronically (including by PDF and electronic mail), each of which shall be deemed to be an original but all of which together shall constitute one (1) and the same agreement. No counterpart shall be effective unless and until each party has executed at least one (1) counterpart.

9.9     <u>Remedies</u>. Each of Parent, the Company and the Holder Representative acknowledges and agrees that the other would be damaged irreparably if any provision of this Agreement is not performed in accordance with its specific terms or otherwise is breached. Accordingly, each of Parent, the Company and the Holder Representative agrees that the other such parties shall be entitled to an injunction to prevent breaches of any provision of this Agreement and to enforce specifically this Agreement and the terms and provisions hereof, in addition to any other remedy available at law or in equity.

9.10     <u>Amendment</u>. This Agreement may be amended, modified, or supplemented at any time, but only pursuant to an instrument in writing signed by Parent and (a) prior to the Closing, the Company or (b) following the Closing, the Holder Representative, and any such amendment shall be binding on all parties hereto and the Equityholders.

9.11     <u>Waiver</u>. Parent may (a) extend the time for the performance of any obligation of the Company, any Equityholder, or the Holder Representative under this Agreement or any other Operative Document, (b) waive any inaccuracy in the representations and warranties of the Company or any Equityholder contained in this Agreement or any other Operative Document (which waiver will not in any manner affect the rights of the Indemnified Parties under <u>Article VII</u>), or (c) waive compliance by the Company, any Equityholder, or the Holder Representative with any agreement or condition contained in this Agreement or any other Operative Document (which waiver will not in any manner affect the rights of the Indemnified Parties under <u>Article VII</u>). The Holder Representative (if after the Closing) or the Company (if prior to the Closing) may (i) extend the time for the performance of any obligation of Parent or Merger Sub under this Agreement or any other Operative Document, (ii) waive any inaccuracy in the representations and warranties of Parent or Merger Sub contained in this Agreement or any other Operative Document, or (iii) waive compliance by Parent or Merger Sub with any agreement or condition contained in this Agreement or any other Operative Document. Any extension or waiver contemplated in this <u>Section 9.11</u> shall be valid only if set forth in an instrument in writing signed by Parent or the Holder Representative (or, prior to the

Closing, the Company), as applicable, and shall apply only as set forth in such instrument and shall not operate as a waiver of, or estoppel with respect to, any failure to comply with any other obligation, covenant, agreement or condition contained herein. Any extension or waiver by the Holder Representative (or, prior to the Closing, the Company) shall be binding on the Company, each Equityholder, and the Holder Representative.

9.12    <u>Waiver of Conflicts; Privilege</u>. If the Holder Representative so desires, acting on behalf of the Vested Equityholders and without the need for any consent or waiver by Company, Parent, or Merger Sub, Cooley LLP ("*Cooley*") shall be permitted to represent the Vested Equityholders (through the Holder Representative) after the Closing in connection with any dispute relating to this Agreement and/or any of the transactions contemplated hereunder. Parent, Merger Sub and the Company further agree that, as to all communications among Cooley and the Holder Representative and the Vested Equityholders and their respective Affiliates (individually and collectively, the "*Seller Group*") that relate to Cooley's representation of the Company in the transactions contemplated hereunder (but not representations prior to engagement for or separate from such transactions), the attorney-client privilege and the exception of client confidence belongs solely to the Seller Group and may be controlled only by the Seller Group and shall not pass to or be claimed, or deemed waived, by Parent, Merger Sub and the Company. This right to the attorney client privilege shall exist even if such communications may exist on Company's computer system or in documents in Company's possession. Notwithstanding the foregoing, in the event that a dispute arises between Parent and its subsidiaries (including the Surviving Corporation), and a Person other than a party to this Agreement after the Closing, Parent and its subsidiaries (including the Surviving Corporation), may access such materials and assert (but not waive) the attorney-client privilege.

[*Signature Pages Follow*]

IN WITNESS WHEREOF, the parties hereto have entered into and signed this Agreement as of the date and year first above written.

**LULULEMON ATHLETICA INC.**

By: /s/ CALVIN MCDONALD

Name: Calvin McDonald

Its: Chief Executive Officer

**SNOWFLAKE ACQUISITION CORP.**

By: /s/ CELESTE BURGOYNE

Name: Celeste Burgoyne

Its: President

[SIGNATURE PAGE TO AGREEMENT AND PLAN OF MERGER]

IN WITNESS WHEREOF, the parties hereto have entered into and signed this Agreement as of the date and year first above written.

**CURIOUSER PRODUCTS INC.**

By: /s/ BRYNN PUTNAM

Name: Brynn Putnam

Its: Chief Executive Officer

**SHAREHOLDER REPRESENTATIVE SERVICES LLC**, solely in its capacity as the Holder Representative

By: /s/ SAM RIFFE

Name: Sam Riffe

Its: Managing Director

<div align="center">

**ANNEX A**
**DEFINITIONS**

</div>

"***Acquisition Proposal***" means, with respect to the Company, any agreement, offer, proposal or *bona fide* indication of interest (other than this Agreement or any other offer, proposal or indication of interest by Parent), or any public announcement of intention to enter into any such agreement or of (or intention to make) any offer, proposal or *bona fide* indication of interest, relating to, or involving: (i) the purchase, issuance, grant, or disposition of any Capital Stock or other securities of the Company, or of all or any material assets of the Company (excluding upon the exercise of Company Options, transfers of Capital Stock from existing Equityholders to Affiliates or to trusts or as gifts for tax-planning purposes, and excluding sales of Company Products in the ordinary course of business, and excluding actions pursuant to the terms of Contracts disclosed on the Disclosure Letter) or (ii) any merger, consolidation, business combination or similar transaction involving the Company, in each case other than with Parent or its Affiliates.

"***Affiliate***" means, with respect to a Person, any other Person that, directly or indirectly, controls or is controlled by or is under common control with the first Person.

"***Affiliated Group***" means any affiliated, consolidated, combined, unitary, or similar group, including any arrangement for group or consortium relief or similar arrangement.

"***Aggregate Exercise Price***" means the sum of (i) the exercise prices of all Company Options and Company Warrants plus (ii) the Deemed Exercise Price of all Promised Options, in each case, that have an exercise price less than the Per Share Merger Consideration.

<div align="center">

[SIGNATURE PAGE TO AGREEMENT AND PLAN OF MERGER]

</div>

"**Anti-Bribery Laws**" means the U.S. Foreign Corrupt Practices Act 1977, as amended, any rules and regulations thereunder, any legislation implementing the OECD Convention on Bribery of Foreign Public Officials in International Business Transactions and any similar anti-corruption laws to the extent that they are applicable to the Company.

"**Antitrust Laws**" means the Sherman Antitrust Act, the Clayton Antitrust Act of 1914, the HSR Act, the Federal Trade Commission Act of 1914, and all other Applicable Laws that are designed or intended to prohibit, restrict or regulate actions having the purpose or effect of monopolization or restraint of trade or significant impediments to or lessening of competition or the creation or strengthening of a dominant position through merger or acquisition, in any case that are applicable to the Transactions.

"**Applicable Law**" means, with respect to any Person, any federal, state, foreign, local, municipal, or other law, statute, constitution, legislation, principle of common law, resolution, ordinance, code, edict, decree, regulation, rule, directive, license, permit, or requirement issued, enacted, adopted, promulgated, implemented, or otherwise put into effect by or under the authority of any Governmental Body, and any Orders applicable to such Person or such Person's Affiliates, or to any of their respective employees, assets, properties, or businesses.

"**Business**" means the business of the Company as currently conducted.

"**Business Day**" means any day, other than a Saturday, a Sunday, or any other day on which commercial banks in Vancouver, Canada are authorized or required by Applicable Law to be closed.

"**Capital Stock**" means, collectively, Common Stock and Preferred Stock.

"**CARES Act**" shall mean the Coronavirus Aid, Relief, and Economic Security Act.

"**Claim**" means any claim, demand, complaint, suit, proceeding, arbitration, audit, hearing or investigation (whether formal or informal, civil, criminal, or administrative).

"**Code**" means the Internal Revenue Code of 1986, as amended, and all rules and regulations promulgated thereunder, as in effect from time to time.

"**Common Stock**" means shares of common stock, $0.0001 par value per share, of the Company (whether or not subject to a right of repurchase).

"**Common Stock Equivalents**" means the sum of (i) shares of Common Stock, (ii) shares of Common Stock issuable upon the exercise of the Company Options and Company Warrants, (iii) shares of Common Stock that would be issuable upon the exercise of any Promised Options assuming all such Promised Options have been granted and (iv) shares of Common Stock issuable upon conversion of the Preferred Stock, in each case that are issued and outstanding (or in the case of Promised Options, promised orally or in writing) whether vested or unvested immediately prior to the Effective Time.

"**Company Closing Financial Certificate**" means a certificate executed by the Chief Financial Officer of the Company dated as of the Closing Date, certifying, as of the Closing, the amount of (i) Working Capital (including an itemized list of each element of the Current Assets and an itemized list of each element of the Current Liabilities, prepared in accordance with GAAP and based on Exhibit M), (ii) an itemized list of all Debt that is unpaid as of the Closing with a description of the nature of such Debt and the Person to whom such Debt is owed, (iii) an itemized list of any Spending Exceptions, (iv) an itemized list of all

Transaction Costs and (v) a calculation of the Merger Consideration, the Per Share Merger Consideration and each element thereof.

"***Company Data***" means all data collected, generated, or received in connection with the marketing, delivery, or use of any Company Product, including Company-Licensed Data, Company-Owned Data and Personal Data.

"***Company Data Agreement***" means any Contract involving Company Data to which the Company is a party or is bound by, except for the standard terms of service entered into by users of the Company Products (copies of which have been made available to Parent).

"***Company Intellectual Property***" means all Company Technology and Company Intellectual Property Rights.

"***Company Intellectual Property Agreements***" means all Inbound Licenses and Outbound Licenses.

"***Company Intellectual Property Rights***" means all Intellectual Property Rights owned (or purported to be owned), applied for, used, licensed (whether as licensor or licensee) by, or under obligation of assignment to, the Company.

"***Company-Licensed Data***" means all data owned, or purported to be owned by third parties that is Processed by the Company.

"***Company-Owned Data***" means each element of data collected, generated, or received that (i) is used or held for use in the Business that is not Personal Data or Company-Licensed Data and (ii) the Company owns or purports to own.

"***Company-Owned Intellectual Property***" means all Company Intellectual Property owned (or purported to be owned) by the Company.

"***Company Option***" means an option to purchase a share of Common Stock (or portion thereof, as applicable) that is outstanding and unexercised, whether vested or unvested, as of immediately prior to the Closing.

"***Company Privacy Policies***" means, collectively, any and all (A) of the Company's data privacy and security policies, whether applicable internally, or published on Company Websites or otherwise made available by the Company to any Person, (B) public representations (including representations on Company Websites) and (C) Contracts with third parties relating to the Processing of Company Data.

"***Company Products***" means all products or services, either complete or under development, (a) that are currently or were historically produced, marketed, licensed, sold, or distributed by or on behalf of the Company, or which are scheduled to be produced, marketed, licensed, sold, or distributed by or on behalf of the Company, or (b) from which the Company has derived, is currently deriving, or is scheduled to derive, revenue from the sale, license, subscription, provision, maintenance, or support thereof; in each case together with any and all supplements, modifications, updates, corrections, and enhancements to such products or services, shipping versions of such products or services, any English and foreign language versions of such products or services; and any and all documentation relating to the foregoing.

"***Company Service Providers***" means directors, officers, employees, agents, consultants, or independent contractors of the Company

A-4

"*Company Technology*" means all Proprietary Information and Technology owned (or purported to be owned), used, or licensed (whether as licensor or licensee) by the Company.

"*Company Warrant*" means warrants to purchase shares of Capital Stock.

"*Company Websites*" means all web sites owned, operated or hosted by the Company or through which the Company conducts the Business (including those web sites operated using the domain names listed in Schedule 2.10(c) of the Disclosure Letter), and the underlying platforms for such web sites.

"*Confidentiality Agreement*" means the Mutual Nondisclosure Agreement effective as of March 27, 2020, between Parent and the Company.

"*Conflict Minerals*" means (a) columbite-tantalite (coltan), cassiterite, gold, wolframite, or their derivatives, which are limited to tantalum, tin, and tungsten, unless the Secretary of State of the United States determines that additional derivatives are financing conflict in the Democratic Republic of the Congo or a country that shares an internationally recognized border with the Democratic Republic of the Congo; and (b) any other mineral or its derivatives determined by the Secretary of State of the United States to be financing conflict in the Democratic Republic of the Congo or a country that shares an internationally recognized border with the Democratic Republic of the Congo.

"*Contract*" means any contract, agreement, permission, consent, lease, license, release, covenant not to sue or commitment, oral or written.

"*Copyleft License*" means any license of Software or content that requires, as a condition of use, that any Software or content subject to such license that is distributed with, modified by, interacted with through a network (including making available to third parties as a service) (or any other Software or content incorporated into, derived from, used by, or distributed with any such licensed Software or content): (i) in the case of Software, be made available to any third-party recipient in a form other than binary form (e.g., source code form), (ii) be made available to any third-party recipient under terms that allow preparation of derivative works, (iii) in the case of Software, be made available to any third-party recipient under terms that allow Software or interfaces therefor to be reverse engineered, reverse assembled, or disassembled (other than to the extent any contrary restriction would be unenforceable under Applicable Law), or (iv) be made available to any third-party recipient at no license fee. Copyleft Licenses include the GNU General Public License, the GNU Lesser/Library General Public License, the GNU Affero General Public License, the Mozilla Public License, the Common Development and Distribution License, the Eclipse Public License, the European Union Public Licence, the Server Side Public License, and all Creative Commons "sharealike" licenses.

"*Copyleft Materials*" means any Software or content subject to a Copyleft License.

"*COVID-19*" means the novel coronavirus disease 2019, known as COVID-19.

"*Credit Facility*" means that certain Loan and Security Agreement between the Company and Pacific Western Bank, dated as of November 26, 2018, as amended pursuant to that certain First Amendment to Loan and Security Agreement dated as of January 9, 2019 and that certain Second Amendment to Loan and Security Agreement dated September 27, 2019.

"*Current Assets*" means the current assets of the Company as of such date or time in accordance with GAAP, excluding (i) cash and cash equivalents, (ii) any assets resulting from any Debt drawn down

since May 15, 2020, (iii) deferred Tax assets, (iv) income Tax assets, and (v) prepaid Taxes, in each case prepared in accordance with Exhibit M.

"*Current Liabilities*" means the current liabilities of the Company as of such date or time in accordance with GAAP, excluding (i) deferred revenue, (ii) Debt, (iii) Taxes and (iv) Transaction Costs, in each case prepared in accordance with Exhibit M.

"*Debt*" means, without duplication, (a) all obligations (including the principal amount thereof and the amount of accrued and unpaid interest thereon) of the Company, whether or not represented by bonds, debentures, notes or other securities (whether or not convertible into any other security), for the repayment of money borrowed, whether owing to banks, financial institutions, on equipment leases or otherwise (including, for the avoidance of doubt, any outstanding obligations under the Company's credit card accounts), (b) all outstanding reimbursement obligations of the Company with respect to letters of credit, bankers' acceptances or similar facilities issued for the account of the Company, (c) all premiums, penalties, fees, expenses, breakage costs and change of control payments required to be paid or offered in respect of any of the foregoing on prepayment (regardless if any of such are actually paid), as a result of the consummation of the Transactions, or in connection with any lender consent and (d) all unpaid Pre-Closing Taxes (including any employer payroll taxes for Pre-Closing Tax Periods that have been deferred pursuant to the CARES Act or any other corresponding or similar provision of other Applicable Law enacted in connection with COVID-19, but excluding any Pre-Closing Taxes otherwise included in Transaction Costs).

"*DGCL*" means the Delaware General Corporation Law.

"*Employee Benefit Plan*" means any retirement, group health, severance, other welfare, change of control, retention, equity purchase, equity option, restricted equity, phantom equity, equity appreciation rights, bonus, incentive, fringe benefit or other employee benefit, or compensatory plan, program, policy, practice, Contract, or fund (including any "employee benefit plan," as defined in Section 3(3) of ERISA), or any employment, consulting or personal services contract, or letter, whether written or oral, funded or unfunded or domestic or foreign, (a) sponsored, maintained or contributed to by the Company or to which the Company is a party, or (b) with respect to which the Company or any of its subsidiaries has had, has or could have any actual or contingent present or future obligation or Liability (including with respect to former service providers of the Company, any ERISA Affiliate or dependent or beneficiary of any such individual).

"*Employee Company Option*" means each Company Option granted to the holder in the holder's capacity as, or had vesting tied to the holder's performance of services as, an employee of the Company.

"*Employee Equityholder*" means an Equityholder of the Company who is also an employee of the Company as of the Agreement Date or as of the Closing.

"*Encumbrance*" means liens, mortgages, pledges, deeds of trust, security interests, charges, easements, covenants, restrictions, encumbrances, and other adverse Claims or interests of any kind.

"*Environmental, Health and Safety Requirements*" means all Applicable Law concerning or relating to worker/occupational health and safety, or pollution or protection of the environment, including those relating to the presence, use, manufacturing, refining, production, generation, handling, transportation, treatment, recycling, transfer, storage, disposal, distribution, importing, labeling, testing, processing, discharge, release, threatened release, control or other action or failure to act involving cleanup of any Hazardous Materials, each as amended and as now in effect.

"*Equityholders*" means, collectively, the Stockholders, holders of Company Options, and holders of Company Warrants.

"*Equity Interests*" means, with respect to any Person, any capital stock of, or other ownership, membership, partnership, joint venture or equity interest in, such Person or any indebtedness, securities, options, warrants, call, subscription or other rights or entitlements of, or granted by, such Person or any of its Affiliates that are convertible into, or are exercisable or exchangeable for, or giving any Person any right or entitlement to acquire any such capital stock or other ownership, partnership, joint venture or equity interest, in all cases, whether vested or unvested.

"*ERISA*" means the Employee Retirement Income Security Act of 1974, and all rules and regulations promulgated thereunder, all as in effect from time to time.

"*ERISA Affiliate*" means any Person that, together with the Company, is treated as a single employer under Section 414(b), (c), (m), or (o) of the Code.

"*Exchange Ratio*" means the ratio obtained by dividing (i) the Per Share Merger Consideration by (b) the Parent Stock Price.

"*Exploit*" or "*Exploited*" or "*Exploitation*" means to, as applicable under the circumstances, use, possess, reproduce, modify, display, market, perform, publish, transmit, broadcast, sell, offer to sell, license, distribute, design, develop, manufacture, import, provide, or otherwise exploit.

"*Fraud*" means Delaware common law fraud with the element of scienter.

"*Fundamental Representations*" means the representations and warranties contained in Sections 2.1(a), 2.2, 2.3, 2.14 and 2.17.

"*GAAP*" means generally accepted accounting principles in the United States.

"*Government Official*" means (i) any official, employee, agent or representative of, or any Person acting in an official capacity for or on behalf of, any Governmental Body, or (ii) any official, employee, agent or representative of, or any Person acting in an official capacity for or on behalf of, a company, business, enterprise or other entity owned, in whole or in part, or controlled by any Governmental Body.

"*Governmental Body*" means any government or any agency, bureau, board, commission, court, department, official, political subdivision, tribunal, or other instrumentality of any government, whether supranational, federal, state or local, domestic or foreign.

"*Group*" has the meaning ascribed to such term under Section 13(d) of the Securities Exchange Act of 1934, as amended, the rules and regulations thereunder and related case law.

"*Hazardous Materials*" means any petroleum products or byproducts, radioactive or explosive materials, asbestos or asbestos-containing material, radon gas, urea formaldehyde, toxic mold or fungi, or polychlorinated biphenyls, pesticides, pollutants, contaminants, noise or radiation, and any other chemicals, substances, waste, or materials that are considered or deemed to be, or regulated as, hazardous, toxic, infectious, or dangerous under applicable Environmental, Health and Safety Requirements or for which Liability or standards of conduct may be imposed pursuant to any Environmental, Health and Safety Requirements.

"*HSR Act*" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended.

"*ICT Infrastructure*" means the information and communications technology infrastructure and systems (including software, hardware, firmware, networks, and Company Websites) that are currently being used by or for the Company in the conduct of the Business.

"*Inbound License*" means any Contract to which the Company is a party or by which the Company is bound or to which any assets of the Company are subject, and pursuant to which the Company has the right to Exploit any Company Intellectual Property for which the Company does not own all right, title, and interest.

"*Indemnification Claim*" means any Claim for indemnification under Article VII.

"*Intellectual Property Rights*" means all intellectual property and proprietary rights worldwide, including any and all foreign and domestic trade names, trademarks, service marks, domain names, logos, copyrights, design rights, mask works, rights in databases, moral rights, trade secrets, trade dress, patents, and all associated rights and all registrations, applications, renewals, extensions, and continuations (in whole or in part) of any of the foregoing, together with all goodwill associated therewith and all rights and causes of action for infringement, misappropriation, violation, misuse, dilution, unfair trade practice or otherwise associated therewith.

"*IRS*" means the United States Internal Revenue Service.

"*Knowledge*" means with respect to the Company, the knowledge of any of the Persons set forth on *Exhibit J*, in each case after reasonable investigation or inquiry by such Person, including inquiry of such other individuals of the Company who are his or her direct reports.

"*Legal Proceeding*" means any private, governmental, or administrative action, inquiry, Claim, counterclaim, proceeding, suit, hearing, litigation, audit, examination or investigation, in each case whether civil, criminal, administrative, judicial or investigative, or any appeal therefrom.

"*Liability*" means any and all debts, liabilities, Taxes, penalties, expenses, and obligations of any nature whatsoever, whether accrued or fixed, absolute or contingent, mature or unmatured or determined or indeterminable, including those arising under Applicable Law and those arising under any Contract.

"*Loss*" and "*Losses*" shall mean any debts, obligations, Taxes and other Liabilities (whether absolute or contingent, liquidated or unliquidated, due or to become due, accrued or not accrued), losses, damages, deficiencies, judgments, assessments, fines, fees, penalties, expenses (including amounts paid in settlement, interest, court costs, costs of investigators, fees and expenses of attorneys, accountants, financial advisors, consultants and other experts, and other expenses of litigation), punitive damages only to the extent payable to third parties, and incidental or consequential damages, in each case that may be imposed or otherwise incurred or suffered.

"*Material Adverse Effect*" means (a) any change, event, condition, fact, violation, inaccuracy, circumstance or effect (each, an "*Effect*") that, individually or taken together with all other Effects, and regardless of whether such Effect constitutes a breach of any representations or warranties made by, or a breach of the covenants, agreements, or obligations of, the Company, is, or would reasonably be likely to be or become a material adverse effect on the business, operations, assets, liabilities (absolute, accrued, contingent, or otherwise), or condition (financial or other) of the Company; provided that none of the following shall be deemed to constitute, and none of the following shall be taken into account in determining whether there has been, a Material Adverse Effect: (i) changes in general economic conditions in the United States, (ii) changes affecting the industry generally in which the Company operates, (iii) the outbreak or

<center>A-8</center>

escalation of war, hostilities, or terrorist activities, either in the United States or any other jurisdiction in which the Company operates, (iv) earthquakes, hurricanes, tornadoes, floods, epidemics/pandemics or other natural disasters, including Effects resulting from COVID-19; (v) changes in Applicable Law, Public Health Recommendations or GAAP after the Agreement Date; (vi) the announcement of this Agreement or the Transactions contemplated hereby; (vii) any failure by the Company to meet any projections, forecasts or estimates in and of itself (*provided*, however, that any facts or occurrences giving rise to or contributing to such failure to meet any projections, forecasts or estimates shall not be excluded under this clause (vii)); (viii) the taking of any specific action, or refraining from taking any specific action, in each case at the specific written request of Parent; unless, in the case of each of the foregoing clauses (i) through (v) only, such changes disproportionately affect the Company as compared to other Persons or businesses that operate in the industry in which the Company operates, or (b) any effect or circumstance that would reasonably be expected to materially impair or materially delay the Company's ability to perform its obligations under this Agreement or the other Operative Documents.

"***Merger Consideration***" means an amount in cash equal to (a) the Purchase Price, plus (b) the Aggregate Exercise Price, less (c) the sum of (i) all Transaction Costs plus (ii) all outstanding Debt in excess of $25,000,000 plus (iii) the Working Capital Shortfall (if any) plus (iv) the aggregate amount of any Spending Exceptions or use of Debt proceeds after the Agreement Date and prior to the Closing not in accordance with the permitted uses described in Schedule 2.6(b) of the Disclosure Letter, in each case to be set forth on the Company Closing Financial Certificate.

"***Non-Employee Company Option***" means each Company Option which is not an Employee Company Option.

"***Open Source License***" means any license meeting the Open Source Definition (as promulgated by the Open Source Initiative) or the Free Software Definition (as promulgated by the Free Software Foundation), or any substantially similar license, including any license approved by the Open Source Initiative, or any Creative Commons License, and including any adaptation or modification (e.g., adding the Commons Clause) of or exception to any such license. For the avoidance of doubt, Open Source Licenses include Copyleft Licenses.

"***Open Source Materials***" means any Software or content subject to an Open Source License.

"***Operative Document***" and collectively "***Operative Documents***" means each of this Agreement, the Joinder Agreements, the Option Consents, the Letters of Transmittal, the Warrant Termination Agreement, and the Escrow Agreement.

"***Option Consent***" means an option consent agreement signed by a holder of Company Options, in the form attached hereto as *Exhibit H*, pursuant to which such holder, effective upon the Closing, (a) agrees to be bound by the indemnification provisions of Article VII of this Agreement, (b) agrees to the treatment of Company Options set forth in Section 1.6.1(c), (c) appoints the Holder Representative in accordance with Section 7.6 as such holder's representative and attorney-in-fact and (d) agrees to a general release of Claims as set forth in the Option Consent.

"***Optionholder***" means a holder of Company Option.

"***Order***" means any judgment, writ, decree, stipulation, determination, decision, award, rule, preliminary or permanent injunction, temporary restraining order, or other order.

A-9

"**_Outbound License_**" means any Contract to which the Company is a party or by which the Company is bound, and pursuant to which any third-party is authorized to Exploit any Company-Owned Intellectual Property.

"**_Parent_**" has the meaning set forth in the first paragraph of this Agreement.

"**_Parent Common Stock_**" means the Common Stock of Parent, par value $0.005 per share.

"**_Parent Entity_**" means any of Parent, an Affiliate of Parent that is not an individual, a successor of Parent, or another Person designated by one of the foregoing (including the Surviving Corporation).

"**_Parent Option Plan_**" means Parent's 2014 Equity Incentive Plan.

"**_Parent Stock Price_**" means the average closing price per share of Parent Common Stock over the five trading days immediately prior to (and not including) the date of this Agreement.

"**_Per Share Merger Consideration_**" means the quotient expressed as a dollar amount obtained by dividing (a) the Merger Consideration by (b) the total number of Common Stock Equivalents as of immediately prior to the Effective Time.

"**_Permitted Encumbrances_**" means (a) conditional sales or similar security interests granted in connection with the purchase of equipment or supplies in the ordinary course of business, (b) assessments for current Taxes (1) not yet due and payable, or (2) being contested through appropriate proceedings and for which adequate reserves are reflected on the Financial Statements in accordance with GAAP, (c) statutory liens securing indebtedness owed by the Company that is in the aggregate less than $10,000, which was incurred in the ordinary course of business and is not yet due and payable.

"**_Person_**" means any individual, corporation, partnership, trust, joint venture, limited liability company, association, organization, other entity, Governmental Body, or regulatory authority.

"**_Personal Data_**" means any information considered personally identifiable information, sensitive data, special categories of personal data or personal information under Applicable Law.

"**_Post-Closing Tax Periods_**" means collectively, all Taxable periods beginning after the Closing Date and the portion beginning after the Closing Date for all Straddle Periods.

"**_Pre-Closing Tax Periods_**" means collectively, all Taxable periods ending on or prior to the Closing Date and the portion through the end of the Closing Date for all Straddle Periods.

"**_Pre-Closing Taxes_**" means any and all Taxes and Claims for Taxes (a) for which the Company is liable attributable to all Pre-Closing Tax Periods (in the case of any Straddle Period, as determined in accordance with Section 4.6(c)) and, for the avoidance of doubt, shall include any such Taxes that were deferred pursuant to the CARES Act or any other corresponding or similar provision of other Applicable Law enacted in connection with COVID-19, (b) of the Company, the Equityholders, or their respective Affiliates for which the Company or any Indemnified Party is liable, whether by reason of any requirement to withhold or otherwise, in connection with the Transactions, (c) of any member of an Affiliated Group of which the Company (or any predecessor thereof) is or was a member on or prior to the Closing, including pursuant to Treasury Regulations Section 1.1502-6 (or any predecessor successor thereof or any analogous or similar state, local or foreign law), (d) of any Person for which the Company is liable as a transferee or successor, by Contract or pursuant to Applicable Law, rule or regulation, for any Pre-Closing Tax Period,

A-10

in each case, which such Taxes relate to an event or transaction occurring on or before the Closing, or (b) which are Transfer Taxes for which the Vested Equityholders are responsible pursuant to <u>Section 4.6</u>(a). Notwithstanding the foregoing, Pre-Closing Taxes shall not include (1) any Tax amounts otherwise included in the calculation of Merger Consideration, (2) any portion of the Transaction Payroll Taxes borne by Parent or another Parent Entity (including the Surviving Corporation), (3) any Taxes resulting from an election under Section 338 or 336 of the Code with respect to the Transactions, (4) any Taxes resulting from any transactions occurring on the Closing Date after the Closing outside the ordinary course of business of the Company and (5) any Taxes imposed in connection with income, if any, recognized by the Company upon the settlement, cancellation, conversion, repayment, capitalization or other satisfaction of the Convertible Promissory Note between the Company and Parent dated June 1, 2020. For the avoidance of doubt, Pre-Closing Taxes that are income Taxes shall be computed taking into account all Transaction Deductions in the taxable period that includes the Closing Date to the maximum extent permitted by Applicable Law. Notwithstanding anything to the contrary herein, Pre-Closing Taxes shall be computed without regard to any net operating losses or credits attributable to a Post-Closing Tax Period and available as a carryback to any Pre-Closing Tax Period.

"***Preferred Stock***" means shares of preferred stock, $0.0001 par value per share, of the Company.

"***Privacy Laws***" means each (A) Applicable Law relating to Personal Data, including Applicable Laws relating to direct marketing and advertising, profiling, tracking, e-mail, messaging and/or telemarketing, biometric, accessibility, the Payment Card Industry Data Security Standards, the General Data Protection Regulation (EU) 2016/679 and (B) applicable guidance issued by a Governmental Body that pertains to any Applicable Law.

"***Process***" or "***Processed***" or "***Processing***" means, with respect to data, any operation or set of operations such as collection, recording, organization, structuring, storage, adaptation, enhancement, enrichment or alteration, retrieval, consultation, analysis, use, disclosure by transmission, dissemination or otherwise making available, alignment or combination, restriction, erasure or destruction.

"***Proprietary Information and Technology***" means all products, tools, devices, mask works, computer programs, software, source code, object code, development tools, techniques, concepts, know-how, algorithms, methods, processes, procedures, formulae, designs, drawings, customer lists, supplier lists, databases, data collections, information, specifications, brands, logos, marketing materials, user interfaces, websites, specifications, programmer notes, specifications, packaging, trade dress, content, graphics, artwork, audiovisual works, images, photographs, literary works, performances, music, sounds, content, user interfaces, "look and feel," inventions (whether or not patentable), invention disclosures, discoveries, works of authorship (whether or not copyrightable), designs, and other technology.

"***Pro Rata Share***" means, with respect to a particular Vested Equityholder, a fraction, the numerator of which is aggregate number of (i) shares of outstanding Common Stock and Preferred Stock (on an as-converted to Common Stock basis) and (ii) shares of Common Stock issuable upon the exercise of Vested Company Options, the vested portion of Promised Options, and shares of Preferred Stock (on an as-converted to Common Stock basis) issuable upon exercise of Company Warrants held by such Vested Equityholder immediately prior to the Effective Time and the denominator of which is the aggregate number of (x) shares of outstanding Common Stock and Preferred Stock (on an as-converted to Common Stock basis) and (y) shares of Common Stock issuable upon the exercise of Vested Company Options, the vested portion of Promised Options, and shares of Preferred Stock (on an as-converted to Common stock basis) issuable upon exercise of Company Warrants held by all Vested Equityholders immediately prior to the Effective Time.

"*Public Health Recommendation*" means applicable public health measures, advisories or guidance implemented or otherwise announced by applicable Governmental Bodies to address COVID-19.

"*Purchase Price*" means $500,000,000.

"*Series A Shares*" means the shares of Preferred Stock designated as Series A Preferred Stock in the Certificate of Incorporation.

"*Series B Shares*" means the shares of Preferred Stock designated as Series B Preferred Stock in the Certificate of Incorporation.

"*Series B-1 Shares*" means the shares of Preferred Stock designated as Series B-1 Preferred Stock in the Certificate of Incorporation.

"*Series Seed Shares*" means the shares of Preferred Stock designated as Series Seed Preferred Stock in the Certificate of Incorporation.

"*Software*" means any and all computer programs, software source code, object code, development tools, programmer notes, specifications, user interfaces, and "look and feel."

"*Source Code*" means the human readable source code for any Software that is part of the Company-Owned Intellectual Property.

"*Stockholder*" means a holder of shares of Capital Stock.

"*Straddle Period*" means each Taxable period beginning on or before and ending after the Closing Date.

"*Substitution Option*" means the unvested portion of any issued and outstanding Company Option held by an employee listed under the heading "Employees Holding Substitution Options" on *Exhibit N*.

"*Substitution Promised Option*" means the unvested portion of any Promised Option held by an employee listed under the heading "Employees Holding Substitution Promised Options" on *Exhibit N*.

"*Tax*" (and, correlative meaning, "*Taxes*" or "*Taxable*") means any and all (a) domestic or foreign, federal, state, or local taxes, charges, fees, levies, imposts, escheat for unclaimed property, duties and governmental fees, or other like assessments or charges in the nature of a tax, including income taxes (whether imposed on or measured by net income, gross income, income as specially defined, earnings, profits, or selected items of income, earnings, or profits), capital taxes, gross receipts taxes, estimated taxes, environmental taxes, sales taxes, use taxes, value added taxes, goods and services taxes, Transfer Taxes, franchise taxes, license taxes, withholding taxes or other withholding obligations, payroll taxes, employment taxes, unemployment taxes, excise taxes, severance taxes, social security premiums, workers' compensation premiums, employment insurance or compensation premiums, stamp taxes, occupation taxes, premium taxes, ad valorem taxes, property taxes, windfall profits taxes, alternative or add-on minimum taxes, and customs duties, (b) interest, penalties, fines, additions to tax, or additional amounts imposed by any Tax Authority in connection with (i) any item described in clause (a) or (ii) the failure to comply with any requirement imposed with respect to any Tax Returns, (c) any liability in respect of any items described in clause (a) or clause (b) that is incurred by reason of being (or ceasing to be) a member of an affiliated, consolidated, combined, unitary, or aggregate group for any Taxable period, and (d) liabilities in respect of any items described in

A-12

clause (a) or clause (b) payable by reason of Contract, assumption, transferee liability, or otherwise by operation of law.

"*Tax Authority*" means any Governmental Body having jurisdiction with respect to any Tax.

"*Tax Contest*" means any inquiry, audit, examination, hearing, trial, appeal, or other administrative or judicial proceeding with respect to any Taxes or Tax Return of the Company, and any correction of a tax practice (including one relating to the filing, reporting, withholding, or payment of any Tax) in respect of a Pre-Closing Tax Period.

"*Tax Return*" means any report, return, statement or other written information (including estimated and withholding Tax returns and reports), and, including any schedules or attachments thereto and any amendment thereof, supplied or required to be supplied to a Tax Authority in connection with Taxes.

"*Third-Party Claim*" means any Claim by a third party, including a Governmental Body, or a Tax Contest.

"*Third-Party Intellectual Property*" means any Intellectual Property Rights and Proprietary Information and Technology owned by a third-party that has been used or is being used by the Company.

"*Transaction Costs*" means all fees, costs, and expenses incident to the negotiation, preparation, and execution of this Agreement and the other Operative Documents, and the consummation of the Transactions, whether or not paid or payable, including, in the case of the Company, (a) any change-in-control costs, success fees, bonuses, compensation, severance, or other payments to the Company Service Providers or Affiliates triggered or accelerated by the Transactions, regardless of whether such payments are made prior to, at, or following the Closing, (b) fifty percent (50%) of any Transaction Payroll Taxes, (c) any fees and expenses of the Company's attorneys, accountants, financial advisors, and other advisors, (d) any costs related to the procurement of consents, waivers or approvals under each Contract listed or described on Schedule 2.4(b) of the Disclosure Letter (including any fee payable upon the termination of the Credit Facility), (e) the fee paid by the Company upon the filing of the Notification and Report Form pursuant to the HSR Act and (f) fifty percent (50%) of any costs (but not to exceed $2,000,000) related to obtaining the R&W Policy, including the total premium, underwriting costs, brokerage commissions, and other fees and expenses related to the R&W Policy. For the avoidance of doubt, Transaction Costs shall not include any Taxes other than the Taxes referred to in clause (b).

"*Transaction Deductions*" means all income tax deductions for (i) any and all payments in respect of Company Options made prior to or substantially contemporaneously with the Closing as contemplated by this Agreement, (ii) the exercise of any Company Options at or prior to the Closing in connection with the Merger, (iii) any and all payments in respect of Common Stock made at or substantially contemporaneously with the Closing as contemplated by this Agreement that result in a deduction, if any, to the Company pursuant to Section 421(b) of the Code, and (iv) any and all payments of Transaction Costs and Debt. For purposes of this Agreement, the parties agree that seventy percent (70%) of any success-based fees paid by the Company in connection with the transactions contemplated by this Agreement shall be deductible under Rev. Proc. 2011-29 and that, in the case of such fees that are Transaction Costs, the deductible amount shall be a Transaction Deduction.

"*Transaction Litigation*" means any Claim commenced or threatened in writing based upon any alleged breach of fiduciary duty, usurping corporate opportunity or similar breach of care, loyalty, or comparable Claims by or against any of the Company or its directors or officers in connection with this Agreement, any of the other Operative Documents, or any of the Transactions.

"***Transaction Payroll Taxes***" means any employer-side payroll or other employment Taxes incurred in connection with payments in respect of Vested Company Options or the vested portion of Promised Options, exercises of Company Options, any change-in-control costs, success fees, bonuses, compensation, severance, or other compensatory payments made pursuant to the Merger.

"***Transactions***" means the Merger and the other transactions contemplated by this Agreement and the Operative Documents.

"***Transfer Taxes***" means any and all transfer, documentary, sales, use, stamp, registration, value added, recording, and other similar Taxes and fees arising in connection with the Transactions (including any penalties and interest), together with any costs or expenses incurred in preparing and filing any related Tax Returns or documents.

"***Unvested Company Option***" means a Company Option that is unvested immediately prior to the Closing.

"***Vested Company Option***" means a Company Option that is vested immediately prior to the Closing. For purposes of clarification, for any outstanding awards of Company Options that are partially vested, only the vested portion of such grants shall be considered Vested Company Options, and the unvested portions of such grants shall be considered Unvested Company Options.

"***Vested Equityholders***" means, collectively, any holders of Preferred Stock, Common Stock, Vested Company Options, the vested portion of Promised Options, and Company Warrants.

"***Warrantholder***" means a holder of a Company Warrant.

"***Warrant Termination Agreement***" means a Warrant Termination Agreement signed by the holders of the Company Warrants, in the form attached hereto as ***Exhibit G***.

"***Working Capital***" means, with respect to a particular date or time, (a) the Current Assets of the Company <u>less</u> (b) the Current Liabilities of the Company, in each case prepared in accordance with GAAP.

"***Working Capital Shortfall***" means the amount, if any, by which the Working Capital, as set forth in the Closing Company Financial Certificate, is less than the Working Capital Target.

"***Working Capital Target***" means $4,000,000.

For reference purposes only, the table below sets forth other capitalized terms used in the Merger Agreement but not defined in this <u>**ANNEX A**</u>:

| | |
|---|---|
| *2010 Health Care Law* | *2.9(i)* |
| *280G Proposal* | *4.10(b)* |
| *401(k) Plan* | *4.7(a)* |
| *Agreement* | *Preamble* |
| *Agreement Date* | *Preamble* |
| *Annual Financial Statements* | *2.5(a)* |
| *Antitrust Restraint* | *4.3(c)* |
| *Author* | *2.10.6* |

| | |
|---|---|
| *Bylaws* | *2.1(c)* |
| *Certificate of Incorporation* | *2.1(c)* |
| *Certificate of Merger* | *1* |
| *CIAA* | *Preamble* |
| *Claim Notice* | *7.4(b)* |
| *Closing* | *1* |
| *Closing Date* | *1* |
| *Company* | *Preamble* |
| *Company Balance Sheet* | *2.5(a)* |
| *Company Balance Sheet Date* | *2.5(a)* |
| *Company Databases* | *2.10.10(i)* |
| *Company Indemnification Provisions* | *4.14(a)* |
| *Company Indemnified Parties* | *4.14(a)* |
| *Company Intellectual Property Protection Agreements* | *2.10.6* |
| *Company Intellectual Property Registrations* | *2.10.2(a)* |
| *Company Permits* | *2.12(a)* |
| *Company Privacy Commitments* | *2.10.10(a)* |
| *Consenting Stockholder* | *Preamble* |
| *Cooley* | *9* |
| *D&O Tail* | *4.14(b)* |
| *Deductible* | *7.3(b)* |
| *Deemed Exercise Price* | *2.3(e)* |
| *Delaware Secretary of State* | *1* |
| *Disclosure Letter* | *Article II* |
| *Dissenting Shares* | *1.6.3* |
| *Effective Time* | *1* |
| *Escrow Agent* | *1.6.2(a)* |
| *Escrow Agreement* | *1.6.2(a)* |
| *Escrow Amount* | *1.6.2(a)* |
| *Escrow Fund* | *1.6.2(a)* |
| *Expense Fund* | *1.6.2(c)* |
| *Export Approvals* | *2.12(e)* |
| *Final Order* | *7.4(c)* |
| *Financial Statements* | *2.5(a)* |
| *Founder* | *Preamble* |
| *Gap Period* | *7.6(b)* |
| *General Survival Period* | *7.1(a)* |
| *Holdback Agreement* | *Preamble* |
| *Holdback Consideration* | *1.6.4(b)* |
| *Holder Representative* | *7.6(a)* |

| Term | Reference |
|---|---|
| *Indemnification Claim Objection Notice* | *7.4(c)* |
| *Indemnified Party* | *7.2(a)* |
| *Information Statement* | *4.11(a)(iii)* |
| *Interim Financial Statements* | *2.5(a)* |
| *Joinder Agreement* | *Preamble* |
| *Joint Memorandum* | *7.4(d)* |
| *Key Employee* | *Preamble* |
| *Key Employee Documents* | *Preamble* |
| *Key Employee Offer Letter* | *Preamble* |
| *Leases* | *2.7(a)* |
| *Letter of Transmittal* | *1.6.4(c)* |
| *Material Contract* | *2.11(a)* |
| *Material Supplier* | *2.19(a)* |
| *Merger* | *1* |
| *Merger Sub* | *Preamble* |
| *New Litigation Claim* | *4.8(d)* |
| *Option Plan* | *2* |
| *Parachute Payment Waiver* | *4.10(a)* |
| *Parent* | *Preamble* |
| *Parent Option* | *1.6.1(c)(ii)* |
| *Parent RSUs* | *1.6.1(d)(ii)* |
| *Payment Agent* | *1.6.4(a)* |
| *Payment Spreadsheet* | *7.6(c)* |
| *PNC* | *1.6.2(a)* |
| *Policies* | *2.16(a)* |
| *Pre-Closing Period* | *4* |
| *Promised Option Agreement* | *2.3(e)* |
| *Promised Option Cash Consideration* | *1.6.4(e)* |
| *Promised Option Waiver* | *5* |
| *Promised Optionee* | *2.3(e)* |
| *Promised Options* | *2.3(e)* |
| *R&W Policy* | *4* |
| *Real Property* | *2.7(a)* |
| *Representative Losses* | *7.6(d)* |
| *Representatives* | *4.4(a)* |
| *Seller Group* | *9* |
| *Soliciting Materials* | *4.11(b)* |
| *Spending Exceptions* | *2.6(b)* |
| *Spread Value* | *1.6.1(d)(i)* |
| *Spreadsheet* | *4.13(a)* |

| | |
|---|---|
| *Stockholder Approval* | *2.2(a)* |
| *Supplier* | *2.19(a)* |
| *Survival Period* | *7.4(a)* |
| *Surviving Corporation* | *1* |
| *Termination Date* | *8.1(b)* |
| *Third-Party Contractor Agreement* | *2.8(a)* |
| *Unvested Cash* | *1.6.4(e)* |
| *Unvested Employee Option Cash Consideration* | *1.6.4(e)* |
| *Unvested Non-Employee Option Consideration* | *1.6.4(d)* |

A-17

Exhibit 10.1

EXECUTION COPY

Published CUSIP Number:

Deal: 55002EAC5
Revolver: 55002EAD3

**364-DAY CREDIT AGREEMENT**

Dated as of June 29, 2020

among

**LULULEMON ATHLETICA INC.,**
**LULULEMON ATHLETICA CANADA INC.,**
**LULU CANADIAN HOLDING, INC.,**
and
**LULULEMON USA INC.,**
as Borrowers and as Guarantors,

**BANK OF AMERICA, N.A.,**
as Administrative Agent and Swing Line Lender,

**BARCLAYS BANK PLC**
and
**HSBC BANK CANADA,**
as Syndication Agents,
and

The Other Lenders Party Hereto

**BOFA SECURITIES, INC.,**
**BARCLAYS BANK PLC**
and
**HSBC BANK CANADA,**
as Joint Lead Arrangers and Joint Bookrunners

**TABLE OF CONTENTS**

Section

Page

ARTICLE I. DEFINITIONS AND ACCOUNTING TERMS

2

| | | |
|---|---|---|
| 1.01 | Defined Terms | 2 |
| 1.02 | Other Interpretive Provisions | 27 |
| 1.03 | Accounting Terms | 28 |
| 1.04 | Rounding | 28 |
| 1.05 | Exchange Rates; Currency Equivalents | 28 |
| 1.06 | Additional Alternative Currencies | 29 |
| 1.07 | Change of Currency | 30 |
| 1.08 | Times of Day | 30 |
| 1.09 | Reserved | 30 |
| 1.10 | Currency Generally | 30 |
| 1.11 | Timing of Payment and of Performance | 31 |
| 1.12 | Divisions | 31 |

Article II. the COMMITMENTS and Credit Extensions

31

| | | |
|---|---|---|
| 2.01 | Committed Loans | 31 |
| 2.02 | Borrowings, Conversions and Continuations of Committed Loans | 31 |
| 2.03 | [Reserved] | 33 |
| 2.04 | Swing Line Loans | 33 |
| 2.05 | Prepayments | 36 |
| 2.06 | Termination or Reduction of Commitments | 37 |
| 2.07 | Repayment of Loans | 38 |
| 2.08 | Interest | 38 |
| 2.09 | Fees | 39 |
| 2.10 | Computation of Interest and Fees; Retroactive Adjustments of Applicable Rate | 40 |
| 2.11 | Evidence of Debt | 40 |
| 2.12 | Payments Generally; Administrative Agent's Clawback | 41 |
| 2.13 | Sharing of Payments by Lenders | 43 |
| 2.14 | Company Appointment and Authorization | 44 |
| 2.15 | Defaulting Lenders | 44 |
| 2.16 | Section 956 Interpretive Provision | 46 |

Article III. TAXES, YIELD PROTECTION AND ILLEGALITY

46

| | | |
|---|---|---|
| 3.01 | Taxes | 46 |
| 3.02 | Illegality | 51 |
| 3.03 | Inability to Determine Rates | 52 |
| 3.04 | Increased Costs; Reserves on Eurocurrency Rate Loans | 54 |
| 3.05 | Compensation for Losses | 56 |
| 3.06 | Mitigation Obligations; Replacement of Lenders | 57 |
| 3.07 | Survival | 57 |

Article IV. CONDITIONS PRECEDENT TO Credit Extensions

57

**TABLE OF CONTENTS (continued)**

Section                                                                                                Page

4.01        Conditions of Initial Credit Extension                                                      58
4.02        Conditions to all Credit Extensions                                                         59

Article V. REPRESENTATIONS AND WARRANTIES                                                               60

5.01        Existence and Power                                                                          60
5.02        Authority and Execution; No Contravention                                                   60
5.03        Governmental Authorization; Other Consents                                                  60
5.04        Binding Effect                                                                              60
5.05        Financial Statements; No Material Adverse Effect                                            61
5.06        Litigation                                                                                  61
5.07        No Default                                                                                  61
5.08        Ownership of Property; Liens                                                                61
5.09        Insurance                                                                                   61
5.10        Plans                                                                                       61
5.11        Government Regulations                                                                      62
5.12        No Misrepresentation                                                                        62
5.13        Compliance with Applicable Laws                                                             62
5.14        Intellectual Property; Licenses, Etc.                                                       63
5.15        Sanctions and Anti-Corruption Laws                                                          63
5.16        Representations as to Non-U.S. Obligors                                                     63
5.17        Affected Financial Institutions                                                             64

Article VI. AFFIRMATIVE COVENANTS                                                                       64

6.01        Financial Statements                                                                        64
6.02        Certificates; Other Information                                                             65
6.03        Notices                                                                                     66
6.04        Payment of Obligations                                                                      67
6.05        Preservation of Existence, Etc.                                                             67
6.06        Maintenance of Properties                                                                   67
6.07        Maintenance of Insurance                                                                    67
6.08        Compliance with Laws                                                                        67
6.09        Books and Records; Inspection Rights                                                        68
6.10        Use of Proceeds                                                                             68
6.11        Approvals and Authorizations                                                                68

Article VII. NEGATIVE COVENANTS                                                                         68

7.01        Liens                                                                                       68
7.02        Subsidiary Indebtedness                                                                     70
7.03        Fundamental Changes                                                                         71
7.04        Dispositions                                                                                71
7.05        Change in Nature of Business                                                                71
7.06        Burdensome Agreements                                                                       71
7.07        Use of Proceeds                                                                             72
7.08        Financial Covenants                                                                         72

Article VIII. EVENTS OF DEFAULT AND REMEDIES                                                            72

TABLE OF CONTENTS (continued)

| Section | | | Page |
|---|---|---|---|
| | 8.01 | Events of Default | 72 |
| | 8.02 | Remedies Upon Event of Default | 74 |
| | 8.03 | Application of Funds | 75 |
| Article IX. ADMINISTRATIVE AGENT | | | 76 |
| | 9.01 | Appointment and Authority | 76 |
| | 9.02 | Rights as a Lender | 76 |
| | 9.03 | Exculpatory Provisions | 76 |
| | 9.04 | Reliance by Administrative Agent | 77 |
| | 9.05 | Delegation of Duties | 77 |
| | 9.06 | Resignation of Administrative Agent | 78 |
| | 9.07 | Non-Reliance on Administrative Agent and Other Lenders | 79 |
| | 9.08 | No Other Duties, Etc. | 79 |
| | 9.09 | Guaranty Matters | 80 |
| | 9.10 | Lender ERISA Matters | 80 |
| Article X. GUARANTY | | | 82 |
| | 10.01 | Unconditional Guaranty | 82 |
| | 10.02 | Guaranty Absolute | 83 |
| | 10.03 | Waivers and Acknowledgments | 84 |
| | 10.04 | Subrogation | 85 |
| | 10.05 | Subordination | 86 |
| | 10.06 | Continuing Guaranty; Assignments | 87 |
| Article XI. MISCELLANEOUS | | | 87 |
| | 11.01 | Amendments, Etc. | 87 |
| | 11.02 | Notices; Effectiveness; Electronic Communication | 88 |
| | 11.03 | No Waiver; Cumulative Remedies; Enforcement | 91 |
| | 11.04 | Expenses; Indemnity; Damage Waiver | 91 |
| | 11.05 | Payments Set Aside | 94 |
| | 11.06 | Successors and Assigns | 94 |
| | 11.07 | Treatment of Certain Information; Confidentiality | 99 |
| | 11.08 | Right of Setoff | 100 |
| | 11.09 | Interest Rate Limitation | 100 |
| | 11.10 | Counterparts; Integration; Effectiveness | 101 |
| | 11.11 | Survival of Representations and Warranties | 101 |
| | 11.12 | Severability | 101 |
| | 11.13 | Replacement of Lenders | 101 |
| | 11.14 | Governing Law; Jurisdiction; Etc. | 102 |
| | 11.15 | Waiver of Jury Trial | 103 |
| | 11.16 | No Advisory or Fiduciary Responsibility | 104 |
| | 11.17 | Electronic Execution of Assignments and Certain Other Documents | 104 |
| | 11.18 | USA PATRIOT Act | 105 |

**TABLE OF CONTENTS (continued)**

| Section | | | Page |
|---|---|---|---|
| | 11.19 | Judgment Currency | 105 |
| | 11.20 | ENTIRE AGREEMENT | 105 |
| | 11.21 | Acknowledgement and Consent to Bail-In of Affected Financial Institutions | 105 |
| SIGNATURES | | | S-1 |

iv
Lululemon Credit Agreement

**SCHEDULES**

2.01   Commitments and Applicable Percentages
5.06   Litigation
7.01   Existing Liens
7.02   Existing Indebtedness
7.06   Burdensome Agreements
11.02   Administrative Agent's Office; Certain Addresses for Notices

**EXHIBITS**

A   Form of Committed Loan Notice
B   Form of Swing Line Loan Notice
C   Form of Note
D   Form of Compliance Certificate
E-1   Form of Assignment and Assumption
E-2   Form of Administrative Questionnaire
F   Form of U.S. Tax Compliance Certificate

**364-DAY CREDIT AGREEMENT**

This 364-DAY CREDIT AGREEMENT (this "Agreement") is entered into as of June 29, 2020, among LULULEMON ATHLETICA INC., a Delaware corporation (the "Company"), LULULEMON ATHLETICA CANADA INC., a corporation organized under the laws of British Columbia ("LACI"), LULU CANADIAN HOLDING, INC., a corporation organized under the laws of British Columbia ("LCHI"), and LULULEMON USA INC., a Nevada corporation ("LUSA" and, together with the Company, LACI and LCHI, the "Borrowers" and, each a "Borrower"), each lender from time to time party hereto (collectively, the "Lenders" and individually, a "Lender"), and BANK OF AMERICA, N.A., as Administrative Agent and Swing Line Lender.

The Company has requested that the Lenders provide a revolving credit facility (the "Facility"), and the Lenders are willing to do so on the terms and conditions set forth herein.

In consideration of the mutual covenants and agreements herein contained, the parties hereto covenant and agree as follows:

1

Lululemon Credit Agreement

DEFINITIONS AND ACCOUNTING TERMS

Article I.

**1.01** **Defined Terms**. As used in this Agreement, the following terms shall have the meanings set forth below:

"Accountants" means PricewaterhouseCoopers LLP (or any successor thereto), or such other firm of certified public accountants of recognized national standing selected by the Company.

"Acquisition" means with respect to any Person, the purchase or other acquisition by such Person, by any means whatsoever (including through a merger, dividend or otherwise and whether in a single transaction or in a series of related transactions), of (i) any Capital Stock of, or other equity securities of, any other Person if, immediately thereafter, such other Person would be either a Subsidiary of such Person or otherwise under the control of such Person, (ii) any Operating Entity, or (iii) any Property of (A) any other Person or (B) any Operating Entity, in either case other than in the ordinary course of business, provided, however, that an acquisition of all or substantially all of the assets of such other Person or Operating Entity shall not be deemed to be in the ordinary course of business. For purposes of this definition, "control" shall mean the ownership of 50% or more of any class or type of the Capital Stock of any Person.

"Administrative Agent" means Bank of America or any of its designated branch offices or affiliates in its capacity as administrative agent under any of the Loan Documents, or any successor administrative agent.

"Administrative Agent's Office" means, with respect to any currency, the Administrative Agent's address and, as appropriate, account as set forth on Schedule 11.02 with respect to such currency, or such other address or account with respect to such currency as the Administrative Agent may from time to time notify to the Company and the Lenders.

"Administrative Questionnaire" means an Administrative Questionnaire in substantially the form of Exhibit E-2 or any other form approved by the Administrative Agent.

"Affected Financial Institution" means (a) any EEA Financial Institution or (b) any UK Financial Institution.

"Affiliate" means, as to any Person, any other Person which, directly or indirectly, is in control of, is controlled by, or is under common control with, such Person. For purposes of this definition, control of a Person shall mean the power, direct or indirect, (i) to vote 10% or more of the securities or other interests having ordinary voting power for the election of directors or other managing Persons thereof or (ii) to direct or cause the direction of the management and policies of such Person, whether by contract or otherwise.

"Aggregate Commitments" means the Commitments of all the Lenders.

"Agreement" means this 364-Day Credit Agreement.

"<u>Alternative Currency</u>" means each of the following currencies: Euro and Canadian Dollars, together with each other currency (other than Dollars) that is approved in accordance with Section 1.06.

"<u>Alternative Currency Equivalent</u>" means, at any time, with respect to any amount denominated in Dollars, the equivalent amount thereof in the applicable Alternative Currency as determined by the Administrative Agent, at such time on the basis of the Spot Rate (determined in respect of the most recent Revaluation Date) for the purchase of such Alternative Currency with Dollars.

"<u>Anti-Corruption Laws</u>" means the U.S. Foreign Corrupt Practices Act of 1977, the Canadian Corruption of Foreign Public Officials Act of 1998, and other similar anti-corruption legislation in other jurisdictions applicable to the Borrowers and their Subsidiaries from time to time.

"<u>Applicable Currency</u>" means Dollars or any Alternative Currency that bears interest at a rate based on an Applicable Reference Rate, as applicable.

"<u>Applicable Percentage</u>" means with respect to any Lender at any time, the percentage (carried out to the ninth decimal place) of the Aggregate Commitments represented by such Lender's Commitment at such time, subject to adjustment as provided in <u>Section 2.15</u>. If the commitment of each Lender to make Loans has been terminated pursuant to <u>Section 8.02</u> or if the Aggregate Commitments have expired, then the Applicable Percentage of each Lender shall be determined based on the Applicable Percentage of such Lender most recently in effect, giving effect to any subsequent assignments. The initial Applicable Percentage of each Lender is set forth opposite the name of such Lender on <u>Schedule 2.01</u> or in the Assignment and Assumption pursuant to which such Lender becomes a party hereto, as applicable.

"<u>Applicable Rate</u>" means the following percentages per annum, based upon the Consolidated Rent-Adjusted Leverage Ratio as set forth in the most recent Compliance Certificate received by the Administrative Agent pursuant to <u>Section 6.02(b)</u>:

**Applicable Rate**

| Pricing Level | Consolidated Rent-Adjusted Leverage Ratio | Commitment Fee | Eurocurrency Rate | Base Rate + Canadian Prime Rate + |
|---|---|---|---|---|
| 1 | ≤1.00:1 | 0.250% | 1.500% | 0.500% |
| 2 | >1.00:1 but ≤2.00:1 | 0.350% | 1.750% | 0.750% |
| 3 | >2.00:1 but ≤3.00:1 | 0.450% | 2.000% | 1.000% |
| 4 | >3.00:1 | 0.550% | 2.250% | 1.250% |

Any increase or decrease in the Applicable Rate resulting from a change in the Consolidated Rent-Adjusted Leverage Ratio shall become effective as of the first Business Day immediately following the date a Compliance Certificate is delivered pursuant to <u>Section 6.02(b)</u>; <u>provided</u>, <u>however</u>, that if a Compliance Certificate is not delivered when due in accordance with such Section, then, upon the request of the Required Lenders, Pricing Level 4 shall apply as of the first Business

Day after the date on which such Compliance Certificate was required to have been delivered and shall remain in effect until the date on which such Compliance Certificate is delivered. The Applicable Rate in effect from the Closing Date through the date a Compliance Certificate is delivered pursuant to Section 6.02(b) shall be determined based upon Pricing Level 2.

Notwithstanding anything to the contrary contained in this definition, the determination of the Applicable Rate for any period shall be subject to the provisions of Section 2.10(b).

"Applicable Reference Rate" means, for any Eurocurrency Rate Loan denominated in any LIBOR Quoted Currency, LIBOR and for any Eurocurrency Rate Loan denominated in Canadian Dollars, the CDOR Rate, as applicable.

"Applicable Time" means, with respect to any borrowings and payments in any Alternative Currency, the local time in the place of settlement for such Alternative Currency as may be reasonably determined by the Administrative Agent and notified to the Company at the time such Loan is made to be necessary for timely settlement on the relevant date in accordance with normal banking procedures in the place of payment.

"Approved Fund" means any Fund that is administered or managed by (a) a Lender, (b) an Affiliate of a Lender or (c) an entity or an Affiliate of an entity that administers or manages a Lender.

"Arrangers" means BofA Securities, Inc., Barclays Bank PLC and HSBC Bank Canada, each in its capacity as joint lead arranger and joint bookrunner.

"Assignment and Assumption" means an assignment and assumption entered into by a Lender and an Eligible Assignee (with the consent of any party whose consent is required by Section 11.06(b)), and accepted by the Administrative Agent, in substantially the form of Exhibit E-1 or any other form (including electronic documentation generated by use of an electronic platform) approved by the Administrative Agent.

"Attributable Indebtedness" means, on any date, in respect of any Capital Lease of any Person, the capitalized amount thereof that would appear on a balance sheet of such Person prepared as of such date in accordance with GAAP.

"Audited Financial Statements" means the audited consolidated balance sheet of the Company and its Subsidiaries for the fiscal year ended February 2, 2020, and the related consolidated statements of income or operations, shareholders' equity and cash flows for such fiscal year of the Company and its Subsidiaries, including the notes thereto.

"Availability Period" means, with respect to any Lender, the period from and including the Closing Date to the earliest of (a) the Maturity Date, (b) the date of termination of the Aggregate Commitments pursuant to Section 2.06, and (c) the date of termination of the commitment of each Lender to make Loans pursuant to Section 8.02.

"Bail-In Action" means the exercise of any Write-Down and Conversion Powers by the applicable Resolution Authority in respect of any liability of an Affected Financial Institution.

"<u>Bail-In Legislation</u>" means (a) with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law, regulation rule or requirement for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule and (b) with respect to the United Kingdom, Part I of the United Kingdom Banking Act 2009 (as amended from time to time) and any other law, regulation or rule applicable in the United Kingdom relating to the resolution of unsound or failing banks, investment firms or other financial institutions or their affiliates (other than through liquidation, administration or other insolvency proceedings).

"<u>Bank of America</u>" means Bank of America, N.A. and its successors.

"<u>Base Rate</u>" means for any day a fluctuating rate per annum equal to the highest of (a) the Federal Funds Rate plus 1/2 of 1%, (b) the rate of interest in effect for such day as publicly announced from time to time by Bank of America as its "prime rate," and (c) the Eurocurrency Rate in effect for such day plus 1.00%. The "prime rate" is a rate set by Bank of America based upon various factors including Bank of America's costs and desired return, general economic conditions and other factors, and is used as a reference point for pricing some loans, which may be priced at, above, or below such announced rate. Any change in such prime rate announced by Bank of America shall take effect at the opening of business on the day specified in the public announcement of such change.

"<u>Base Rate Committed Loan</u>" means a Committed Loan that is a Base Rate Loan.

"<u>Base Rate Loan</u>" means a Loan that bears interest based on the Base Rate. All Base Rate Loans shall be denominated in Dollars.

"<u>Beneficial Ownership Certification</u>" means a certification regarding beneficial ownership required by the Beneficial Ownership Regulation.

"<u>Beneficial Ownership Regulation</u>" means 31 C.F.R. § 1010.230.

"<u>Benefit Plan</u>" means any of (a) an "employee benefit plan" (as defined in ERISA) that is subject to Title I of ERISA, (b) a "plan" as defined in Section 4975 of the Code or (c) any Person whose assets include (for purposes of ERISA Section 3(42) or otherwise for purposes of Title I of ERISA or Section 4975 of the Code) the assets of any such "employee benefit plan" or "plan".

"<u>Borrower</u>" and "<u>Borrowers</u>" each has the meaning specified in the introductory paragraph hereto.

"<u>Borrower Materials</u>" has the meaning specified in <u>Section 6.02</u>.

"<u>Borrowing</u>" means a Committed Borrowing or a Swing Line Borrowing, as the context may require.

"<u>Business Day</u>" means any day other than a Saturday, Sunday or other day on which commercial banks are authorized to close under the Laws of, or are in fact closed in, Vancouver, British Columbia, Montreal, Quebec and New York City, New York, and:

(a)    if such day relates to any interest rate settings as to a Eurocurrency Rate Loan denominated in Dollars, any fundings, disbursements, settlements and payments in Dollars in respect of any such Eurocurrency Rate Loan, or any other dealings in Dollars to be carried out pursuant to this Agreement in respect of any such Eurocurrency Rate Loan, means any such day that is also a London Banking Day; and

(b)    if such day relates to any interest rate settings as to a Eurocurrency Rate Loan denominated in Euro, any fundings, disbursements, settlements and payments in Euro in respect of any such Eurocurrency Rate Loan, or any other dealings in Euro to be carried out pursuant to this Agreement in respect of any such Eurocurrency Rate Loan, means a TARGET Day;

(c)    if such day relates to any interest rate settings as to a Eurocurrency Rate Loan denominated in a currency other than Dollars or Euro, means any such day on which dealings in deposits in the relevant currency are conducted by and between banks in the London or other applicable offshore interbank market for such currency;

(d)    if such day relates to (i) any interest rate settings as to a Loan denominated in Canadian Dollars, (ii) any fundings, disbursements settlements and payments in Canadian Dollars or in respect of a Loan denominated in Canadian Dollars, or (iii) any other dealings in Canadian Dollars to be carried out pursuant to this Agreement in respect of any such Loan, means any day of the year, other than a Saturday, Sunday or other day on which banks are required or authorized to close in Toronto, Ontario; and

(e)    if such day relates to any fundings, disbursements, settlements and payments in a currency other than Dollars or Euro in respect of a Eurocurrency Rate Loan denominated in a currency other than Dollars or Euro, or any other dealings in any currency other than Dollars or Euro to be carried out pursuant to this Agreement in respect of any such Eurocurrency Rate Loan (other than any interest rate settings), means any such day on which banks are open for foreign exchange business in the principal financial center of the country of such currency.

"Canadian Agent" means Bank of America, N.A., Canada Branch.

"Canadian Dollar" means the lawful currency of Canada.

"Canadian Prime Rate" means a fluctuating interest rate per annum in effect from time to time, which rate per annum shall at all times be equal to the higher of:

(a)    the rate which the principal office of Bank of America Canada in Toronto, Ontario announces publicly from time to time as its prime rate for determining rates of interest on commercial loans in Canadian Dollars made by it in Canada; and

(b)    1/2 of 1% per annum above the rate for Eurocurrency Rate Loans with a one month interest period that appears on the Bloomberg Screen CDOR Page (or any replacement page) as of 10:00 a.m. (Toronto, Ontario time) on the date of determination;

provided that, if the Canadian Prime Rate shall be less than 0.75%, such rate shall be deemed 0.75% for purposes of this Agreement.

"Canadian Prime Rate Loan" means a Loan that bears interest based on the Canadian Prime Rate. All Canadian Prime Rate Loans shall be denominated in Canadian Dollars.

"Capital Lease" means, subject to the last sentence of Section 1.03(b), a lease the obligations in respect of which are required to be capitalized by the lessee thereunder for financial reporting purposes in accordance with GAAP.

"Capital Stock" means, as to any Person, all shares, interests, partnership interests, limited liability company interests, participations, rights in or other equivalents (however designated) of such Person's equity (however designated) and any rights, warrants or options exchangeable for or convertible into such shares, interests, participations, rights or other equity.

"CDOR" has the meaning specified in the definition of "Eurocurrency Rate".

"Change in Law" means the occurrence, after the date of this Agreement, of any of the following: (a) the adoption or taking effect of any law, rule, regulation or treaty, (b) any change in any law, rule, regulation or treaty or in the administration, interpretation, implementation or application thereof by any Governmental Authority or (c) the making or issuance of any request, rule, guideline or directive (whether or not having the force of law) by any Governmental Authority; provided that notwithstanding anything herein to the contrary, (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (y) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "Change in Law", regardless of the date enacted, adopted or issued.

"Change of Control" means an event or series of events by which:

(a)    any "person" or "group" (within the meaning of Sections 13(d) and 14(d)(2) of the Exchange Act) shall have become the "beneficial owner" (as defined in Rule 13d 3 under the Exchange Act) of Voting Shares entitled to exercise more than 50% of the total power of all outstanding Voting Shares of the Company (including any Voting Shares which are not then outstanding of which such person or group is deemed the beneficial owner); or

(b)    a change in the composition of the board of directors of the Company shall have occurred in which the individuals who constituted the board of directors of the Company at the beginning of the one year period immediately preceding such change (together with any other individual whose election by the directors of the Company or whose nomination for election by the shareholders of the Company was approved by a vote of at least two thirds of the members of such board of directors then in office who either were members of such board of directors at the beginning of such period or whose election or nomination for

election was previously so approved) cease for any reason to constitute a majority of the members of such board of directors then in office; or

(c)    any of LACI, LCHI or LUSA shall cease to be a wholly-owned Subsidiary of the Company, unless it has merged into the Company or into another wholly-owned Subsidiary of the Company.

For purposes of this definition, the term "Voting Shares" shall mean all outstanding shares of any class or classes (however designated) of Capital Stock of the Company entitled to vote generally in the election of members of the board of directors thereof.

"Closing Date" means June 29, 2020.

"Code" means the Internal Revenue Code of 1986.

"Commitment" means, as to each Lender, its obligation to(a)  make separate Committed Loans to each of the Borrowers pursuant to Section 2.01 and (b) purchase participations in Swing Line Loans, in an aggregate principal amount at any one time outstanding not to exceed the Dollar amount set forth opposite such Lender's name on Schedule 2.01 or in the Assignment and Assumption pursuant to which such Lender becomes a party hereto, as applicable, as such amount may be adjusted from time to time in accordance with this Agreement.

"Committed Borrowing" means a borrowing consisting of simultaneous Committed Loans of the same Type, in the same currency and, in the case of Eurocurrency Rate Loans, having the same Interest Period made by each of the Lenders pursuant to Section 2.01.

"Committed Loan" has the meaning specified in Section 2.01.

"Committed Loan Notice" means a notice of (a) a Committed Borrowing, (b) a conversion of Committed Loans from one Type to the other, or (c) a continuation of Eurocurrency Rate Loans, pursuant to Section 2.02(a), which shall be substantially in the form of Exhibit A or such other form as may be approved by the Administrative Agent (including any form on an electronic platform or electronic transmission system as shall be approved by the Administrative Agent), appropriately completed and signed by a Responsible Officer of a Borrower.

"Company" has the meaning specified in the introductory paragraph hereto.

"Compliance Certificate" means a certificate substantially in the form of Exhibit D.

"Connection Income Taxes" means Other Connection Taxes that are imposed on or measured by net income (however denominated) or that are franchise Taxes or branch profits Taxes.

"Consolidated" means the Company and its Subsidiaries on a consolidated basis in accordance with GAAP.

"Consolidated Covenant Indebtedness" means, as of any date of determination, (a) the aggregate principal amount of Indebtedness of the Company and its Subsidiaries outstanding on

such date, in an amount that would be reflected on a balance sheet prepared as of such date on a consolidated basis in accordance with GAAP (but excluding the effects of any discounting of Indebtedness resulting from the application of acquisition accounting in connection with any acquisition) consisting of Indebtedness for borrowed money, Attributable Indebtedness, and debt obligations evidenced by promissory notes or similar instruments (including purchase money debt) and all guarantees of Indebtedness of such type that is owed by a Person that is not the Company or a Subsidiary, plus (b) an amount equal to the product of six multiplied by Rent for the Test Period then ended as of such date.

"Consolidated EBITDAR" means for any period, (A) an amount equal to net income for such period, plus (a) the following to the extent deducted in calculating such net income: (i) interest charges for such period, (ii) the provision for income taxes (foreign and domestic) for such period, (iii) depreciation and amortization expense, (iv) capital losses from the Disposition of fixed assets for such period, (v) the amount of non-cash extraordinary or unusual losses (including all fees and expenses relating thereto) expenses or charges for such period and, subject to a cap of $25,000,000 in aggregate for such period, cash extraordinary or unusual losses, and (vi) other expenses reducing such net income which do not represent a cash item in such period or any future period and minus (b) the following to the extent included in calculating such net income: (i) all non-cash items increasing net income for such period, (ii) capital gains from the Disposition of fixed assets for such period and (iii) the amount of extraordinary gains and unusual or non-recurring gains (less all fees and expenses relating thereto) for such period, plus (B) Rent during such period; provided that if the Company or its Subsidiaries have entered into a Specified Transaction during such period, Consolidated EBITDAR shall be adjusted as provided in Section 1.03.

"Consolidated Fixed Charge Ratio" means, with respect to any Test Period, the ratio of (a) Consolidated EBITDAR for such Test Period to (b) Consolidated Interest Charges plus Rent for such Test Period.

"Consolidated Interest Charges" means for any period the aggregate of interest or fees paid, accrued or scheduled to be paid or accrued in respect of any Indebtedness, after the elimination of inter-company items, (including the interest portion of rentals under Capital Leases) and all but the principal component of payments in respect of conditional sales, equipment trust or other title retention agreements paid, accrued or scheduled to be paid or accrued by the Company and its Subsidiaries on a Consolidated basis during such period, net of interest income, determined in accordance with GAAP.

"Consolidated Rent-Adjusted Leverage Ratio" means, with respect to any Test Period, the ratio of (a) Consolidated Covenant Indebtedness as of the last day of such Test Period to (b) Consolidated EBITDAR for such Test Period.

"Consolidated Tangible Net Worth" means, as of the last day of any Test Period, the following determined on a Consolidated basis as of the fiscal quarter end occurring on such date (or, if such date shall not be a fiscal quarter end, as of the fiscal quarter end immediately preceding such date): (a) the excess if any of total assets over total liabilities, in each case determined on a Consolidated basis minus (b) intangible assets of the Company and its Subsidiaries on a Consolidated basis, consisting of goodwill, patents, trademarks, service marks, trade names, copyrights, organizational

or developmental expenses, and similar categories of assets that may arise in the future, determined by reference to the financial information most recently delivered to the Administrative Agent in accordance with Section 6.01(a) or (b).

"Contractual Obligation" means, as to any Person, any provision of any security issued by such Person or of any agreement, instrument or other undertaking to which such Person is a party or by which it or any of its property is bound.

"Credit Extension" means a Borrowing.

"Debtor Relief Laws" means the Bankruptcy Code of the United States, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief Laws of the United States or other applicable jurisdictions from time to time in effect.

"Default" means any event or condition that constitutes an Event of Default or that, with the giving of any notice, the passage of time, or both, would be an Event of Default.

"Default Rate" means, with respect to Obligations, an interest rate equal to (i) the Base Rate plus (ii) the Applicable Rate, if any, applicable to Base Rate Loans plus (iii) 2% per annum; provided, however, that with respect to a Canadian Prime Rate Loan or a Eurocurrency Rate Loan, the Default Rate shall be an interest rate equal to the interest rate (including any Applicable Rate) otherwise applicable to such Loan plus 2% per annum.

"Defaulting Lender" means, subject to Section 2.15(b), any Lender that (a) has failed to (i) fund all or any portion of its Loans within two Business Days of the date such Loans were required to be funded hereunder unless such Lender notifies the Administrative Agent and the Company in writing that such failure is the result of such Lender's good faith determination that one or more conditions precedent to funding (each of which conditions precedent, together with any applicable default, shall be specifically identified in such writing) has not been satisfied, or (ii) pay to the Administrative Agent, the Swing Line Lender or any other Lender any other amount required to be paid by it hereunder (including in respect of its participation in Swing Line Loans) within two Business Days of the date when due, (b) has notified the Company, the Administrative Agent or the Swing Line Lender in writing that it does not intend to comply with its funding obligations hereunder, or has made a public statement to that effect (unless such writing or public statement relates to such Lender's obligation to fund a Loan hereunder and states that such position is based on such Lender's good faith determination that a condition precedent to funding (which condition precedent, together with any applicable default, shall be specifically identified in writing or public statement) cannot be satisfied), (c) has failed, within three Business Days after written request by the Administrative Agent or the Company, to confirm in writing to the Administrative Agent and the Company that it will comply with its prospective funding obligations hereunder (provided that such Lender shall cease to be a Defaulting Lender pursuant to this clause (c) upon receipt of such written confirmation by the Administrative Agent and the Company), or (d) has, or has a direct or indirect parent company that has, (i) become the subject of a proceeding under any Debtor Relief Law, (ii) had appointed for it a receiver, custodian, conservator, trustee, administrator, assignee for the benefit of creditors or similar Person charged with reorganization or

liquidation of its business or assets, including the Federal Deposit Insurance Corporation or any other state or federal regulatory authority acting in such a capacity or (iii) become the subject of a Bail-In Action; <u>provided</u> that a Lender shall not be a Defaulting Lender solely by virtue of the ownership or acquisition of any equity interest in that Lender or any direct or indirect parent company thereof by a Governmental Authority so long as such ownership interest does not result in or provide such Lender with immunity from the jurisdiction of courts within the United States or from the enforcement of judgments or writs of attachment on its assets or permit such Lender (or such Governmental Authority) to reject, repudiate, disavow or disaffirm any contracts or agreements made with such Lender. Any determination by the Administrative Agent that a Lender is a Defaulting Lender under any one or more of <u>clauses (a)</u> through (d) above, and of the effective date of such status, shall be conclusive and binding absent manifest error, and such Lender shall be deemed to be a Defaulting Lender (subject to <u>Section 2.15(b)</u>) as of the date established therefor by the Administrative Agent in a written notice of such determination, which shall be delivered by the Administrative Agent to the Company, the Swing Line Lender and each other Lender promptly following such determination.

"<u>Disposition</u>" means with respect to any Person, any sale, assignment, transfer or other disposition by such Person, by any means, of (a) the Capital Stock of any other Person, (b) any business, going concern or division or segment thereof, or (c) any other Property of such Person, other than in the ordinary course of business.

"<u>Dollar</u>" and "<u>$</u>" mean lawful money of the United States.

"<u>Dollar Equivalent</u>" means, at any time, (a) with respect to any amount denominated in Dollars, such amount, and (b) with respect to any amount denominated in any Alternative Currency, the equivalent amount thereof in Dollars as determined by the Administrative Agent at such time on the basis of the Spot Rate (determined in respect of the most recent Revaluation Date) for the purchase of Dollars with such Alternative Currency.

"<u>EEA Financial Institution</u>" means (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any financial institution established in an EEA Member Country which is a Subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision with its parent.

"<u>EEA Member Country</u>" means any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"<u>EEA Resolution Authority</u>" means any public administrative authority or any Person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"<u>Eligible Assignee</u>" means any Person that meets the requirements to be an assignee under <u>Section 11.06(b)(iii)</u> and (v) (subject to such consents, if any, as may be required under <u>Section 11.06(b)(iii)</u>).

"<u>Employee Benefit Plan</u>" means an employee benefit plan within the meaning of Section 3(3) of ERISA maintained, sponsored or contributed to by the Company or any ERISA Affiliate.

"<u>Environmental Laws</u>" means any and all Federal, state, local, and foreign statutes, laws, regulations, ordinances, rules, judgments, orders, decrees, permits, concessions, grants, franchises, licenses, agreements or governmental restrictions relating to pollution and the protection of the environment or the release of any materials into the environment, including those related to hazardous substances or wastes, air emissions and discharges to waste or public systems.

"<u>Environmental Liability</u>" means any liability, contingent or otherwise (including any liability for damages, costs of environmental remediation, fines, penalties or indemnities), of the Company, any other Loan Party or any of their respective Subsidiaries directly or indirectly resulting from or based upon (a) violation of any Environmental Law, (b) the generation, use, handling, transportation, storage, treatment or disposal of any Hazardous Materials, (c) exposure to any Hazardous Materials, (d) the release or threatened release of any Hazardous Materials into the environment or (e) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"<u>ERISA</u>" means the Employee Retirement Income Security Act of 1974.

"<u>ERISA Affiliate</u>" means any trade or business (whether or not incorporated) under common control with the Company within the meaning of Section 414(b) or (c) of the Code (and Sections 414(m) and (o) of the Code for purposes of provisions relating to Section 412 of the Code).

"<u>EU Bail-In Legislation Schedule</u>" means the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor person), as in effect from time to time.

"<u>Euro</u>" and "<u>€</u>" mean the single currency of the Participating Member States.

"<u>Eurocurrency Rate</u>" means:

    (a)   with respect to any Credit Extension:

        (i)   denominated in a LIBOR Quoted Currency, the rate per annum equal to the London Interbank Offered Rate ("<u>LIBOR</u>") or a comparable or successor rate which rate is approved by the Administrative Agent, as published on the applicable Bloomberg screen page (or such other commercially available source providing such quotations as may be designated by the Administrative Agent from time to time) at approximately 11:00 a.m., London time, two Business Days prior to the commencement of such Interest Period, for deposits in the relevant currency (for delivery on the first day of such Interest Period) with a term equivalent to such Interest Period;

        (ii)   denominated in Canadian Dollars, the rate per annum equal to the Canadian Dollar Offered Rate ("<u>CDOR</u>"), or a comparable or successor rate which rate is approved by the Administrative Agent, as published on the applicable

Bloomberg screen page (or such other commercially available source providing such quotations as may be designated by the Administrative Agent from time to time) at or about 10:00 a.m. (Toronto, Ontario time) on the first day of such Interest Period (or such other day as is generally treated as the rate fixing day by market practice in such interbank market, as determined by the Administrative Agent) (or if such day is not a Business Day, then on the immediately preceding Business Day with a term equivalent to such Interest Period; and

(iii)    denominated in any other Non-LIBOR Quoted Currency, the rate per annum as designated with respect to such Alternative Currency at the time such Alternative Currency is approved by the Administrative Agent and the Lenders pursuant to Section 1.06(a); and

(b)    for any interest rate calculation with respect to a Base Rate Loan on any date, the rate per annum equal to LIBOR, at or about 11:00 a.m., London time determined two Business Days prior to such date for U.S. Dollar deposits with a term of one month commencing that day;

provided that (subject to Section 3.03), to the extent a comparable or successor rate is approved by the Administrative Agent in connection with any rate set forth in this definition, the approved rate shall be applied in a manner consistent with market practice; provided, further that to the extent such market practice is not administratively feasible for the Administrative Agent, such approved rate shall be applied in a manner as otherwise reasonably determined by the Administrative Agent; provided further that if the Eurocurrency Rate shall be less than 0.75%, such rate shall be deemed 0.75% for purposes of this Agreement.

"Eurocurrency Rate Loan" means a Committed Loan that bears interest at a rate based on clause (a) of the definition of "Eurocurrency Rate". Eurocurrency Rate Loans may be denominated in Dollars or in an Alternative Currency. All Committed Loans denominated in an Alternative Currency (other than Canadian Prime Rate Loans) must be Eurocurrency Rate Loans.

"Event of Default" has the meaning specified in Section 8.01.

"Exchange Act" means the Securities Exchange Act of 1934.

"Excluded Taxes" means any of the following Taxes imposed on or with respect to any Recipient or required to be withheld or deducted from a payment to a Recipient, (a) Taxes imposed on or measured by net income (however denominated), franchise Taxes, and branch profits Taxes, including any backup withholding of such taxes, in each case, (i) imposed as a result of such Recipient being organized under the laws of, or having its principal office or, in the case of any Lender, its Lending Office located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (ii) that are Other Connection Taxes, (b) in the case of a Lender, U.S. federal withholding Taxes imposed on amounts payable to or for the account of such Lender with respect to an applicable interest in a Loan or Commitment pursuant to a law in effect on the date on which (i) such Lender acquires such interest in the Loan or Commitment (other than pursuant to an assignment request by the Company under Section 11.13) or (ii) such Lender changes its Lending Office, except in

each case to the extent that, pursuant to Section 3.01(a)(ii) or (iii), amounts with respect to such Taxes were payable either to such Lender's assignor immediately before such Lender became a party hereto or to such Lender immediately before it changed its Lending Office, (c) Taxes attributable to such Recipient's failure to comply with Section 3.01(e) and (d) any U.S. federal or Canadian withholding Taxes imposed pursuant to FATCA.

"FATCA" means Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof and any agreements entered into pursuant thereto, including any intergovernmental agreements and any rules or guidance implementing such intergovernmental agreements.

"Federal Funds Rate" means, for any day, the rate per annum equal to the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System, as published by the Federal Reserve Bank of New York on the Business Day next succeeding such day; provided that (a) if such day is not a Business Day, the Federal Funds Rate for such day shall be such rate on such transactions on the next preceding Business Day as so published on the next succeeding Business Day, and (b) if no such rate is so published on such next succeeding Business Day, the Federal Funds Rate for such day shall be the average rate (rounded upward, if necessary, to a whole multiple of 1/100 of 1%) charged to Bank of America on such day on such transactions as determined by the Administrative Agent; provided, that, if the Federal Funds Rate shall be less than zero, such rate shall be deemed zero for purposes of this Agreement.

"Fee Letter" means the letter agreement, dated June 8, 2020, among the Company, Bank of America, N.A. and BofA Securities, Inc.

"FRB" means the Board of Governors of the Federal Reserve System of the United States.

"Fronting Exposure" means, at any time there is a Defaulting Lender, with respect to the Swing Line Lender, such Defaulting Lender's Applicable Percentage of Swing Line Loans other than Swing Line Loans as to which such Defaulting Lender's participation obligation has been reallocated to other Lenders in accordance with the terms hereof.

"Fund" means any Person (other than a natural Person) that is (or will be) engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course of its activities.

"GAAP" means generally accepted accounting principles as in effect from time to time in the United States set forth in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board or such other principles as may be approved by a significant segment of the accounting profession in the United States, that are applicable to the circumstances as of the date of determination, consistently applied.

"Governmental Authority" means the government of the United States, Canada or any other nation, or of any political subdivision thereof, whether state, provincial or local, and any agency,

authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supra-national bodies such as the European Union or the European Central Bank).

"Guarantee" means, with respect to any Person, (i) any agreement, written undertaking or contractual arrangement by which such Person assumes, guarantees, endorses (other than the endorsement of instruments for deposit or collection in the ordinary course of business), contingently agrees to purchase or provide funds for the payment of, or otherwise becomes or is contingently liable upon, the financial or monetary obligation or financial or monetary liability of any other Person (excluding customary indemnification obligations arising from a purchase and sale agreement negotiated at arm's length and typical for transactions of a similar nature), or agrees in writing to maintain the net worth or working capital or other financial condition of any other Person, or otherwise assures any creditor of such other Person in writing against loss, including, without limitation, any operating agreement, take-or-pay contract or application for a reimbursement agreement with respect to a letter of credit, and (ii) any obligation in respect of the liabilities of any partnership in which such Person is a general partner, except to the extent that such liabilities of such partnership are nonrecourse to such Person and its separate Property. The amount of any Guarantee of a Person shall be deemed to be an amount equal to the stated or determinable amount of a primary obligation in respect of which such Guarantee is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof as determined by such Person in good faith. The term "Guarantee" as a verb has a corresponding meaning.

"Guarantors" means the U.S Guarantors and the Non-U.S. Guarantors.

"Guaranty" means the Guaranty made by the Guarantors in favor of the Administrative Agent and the Lenders in Article X.

"Hazardous Materials" means all explosive or radioactive substances or wastes and all hazardous or toxic substances, wastes or other pollutants, including petroleum or petroleum distillates, asbestos or asbestos-containing materials, polychlorinated biphenyls, radon gas, infectious or medical wastes and all other substances or wastes of any nature regulated pursuant to any Environmental Law.

"IFRS" means international accounting standards as promulgated by the International Accounting Standards Board.

"Impermissible Qualification" means, relative to any opinion by the Accountants as to any financial statement delivered pursuant hereto, any qualification or exception to such opinion: (a) which is of a "going concern" or a similar nature with respect to the Company or any Significant Subsidiary (except as may be required as the result of (i) a prospective Event of Default with respect to Section 7.08 or (ii) the impending maturity of the Facility), (b) which relates to the limited scope of examination of matters relevant to such financial statement (other than scope limitations included in the standard form of opinion utilized by the Accountants or with respect to Persons other than the Company or such Significant Subsidiary), or (c) which relates to the treatment or classification of any item in such financial statement and which, as a condition to its removal, would require an

15
Lululemon Credit Agreement

adjustment to such item the effect of which would be to cause the Company to be in default of any of its obligations under Section 7.08.

"Indebtedness" means, as to any Person, at a particular time, all items (other than any indebtedness or obligations of such Person to the extent owed only to (A) any Subsidiary of such Person, or (B) any other Person (or any Subsidiary thereof) of which such Person is a Subsidiary) which constitute, without duplication,

(i)    indebtedness for borrowed money,

(ii)    indebtedness in respect of the deferred purchase price of Property (other than (a) trade payables incurred in the ordinary course of business, (b) any bona fide earn-out or similar obligation, unless such obligation has not been paid after becoming due and payable in accordance with its terms and (c) accruals for payroll and other liabilities accrued in the ordinary course of business),

(iii)    indebtedness evidenced by notes, bonds, debentures or similar instruments,

(iv)    obligations with respect to any conditional sale or title retention agreement,

(v)    indebtedness arising under acceptance facilities and the amount available to be drawn under all letters of credit issued for the account of such Person and, without duplication, all drafts drawn thereunder to the extent such Person shall not have reimbursed the issuer in respect of the issuer's payment thereof,

(vi)    Attributable Indebtedness,

(vii)    net obligations under Swap Contracts,

(viii)    all obligations of such Person in respect of Capital Stock subject to mandatory redemption or redemption at the option of the holder thereof, in whole or in part, and

(ix)    all obligations of any other Person in respect of any of the foregoing that are secured by (or for which any obligee of any such obligation has an existing right, contingent or otherwise, to be secured by) any Lien on any Property owned or acquired by such Person whether or not the obligation secured thereby has been assumed, and

(x)    to the extent not otherwise included above, Guarantees of such Person in respect of any of the foregoing.

For all purposes hereof, the Indebtedness of any Person shall include the Indebtedness of any partnership or joint venture (other than a joint venture that is itself a corporation or limited liability company) in which such Person is a general partner or a joint venturer, unless such Indebtedness is expressly made non-recourse to such Person. The amount of any net obligation under any Swap Contract on any date shall be deemed to be the Swap Termination Value thereof as of such date. The amount of Indebtedness of any Person for purposes of clause (ix) (unless such Indebtedness has been assumed by such Person or is otherwise recourse to such Person) shall be

deemed to be equal to the lesser of (i) the aggregate unpaid amount of such Indebtedness and (ii) the fair market value of the property encumbered thereby. The amount of Indebtedness shall be determined based on the outstanding principal amount of the Indebtedness that is the subject of the Guarantees in the case of Guarantees under clause (x).

"<u>Indemnified Taxes</u>" means (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of any Loan Party under any Loan Document and (b) to the extent not otherwise described in <u>clause (a)</u>, Other Taxes.

"<u>Indemnitee</u>" has the meaning specified in <u>Section 11.04(b)</u>.

"<u>Information</u>" has the meaning specified in <u>Section 11.07</u>.

"<u>Interest Payment Date</u>" means, (a) as to any Loan other than a Base Rate Loan or a Canadian Prime Rate Loan, the last day of each Interest Period applicable to such Loan and the Maturity Date; <u>provided</u>, <u>however</u>, that if any Interest Period for a Eurocurrency Rate Loan exceeds three months, the respective dates that fall every three months after the beginning of such Interest Period shall also be Interest Payment Dates; and (b) as to any Base Rate Loan (including a Swing Line Loan) and any Canadian Prime Rate Loan, the last Business Day of each March, June, September and December and the Maturity Date.

"<u>Interest Period</u>" means as to each Eurocurrency Rate Loan, the period commencing on the date such Eurocurrency Rate Loan is disbursed or converted to or continued as a Eurocurrency Rate Loan and ending on the date one, two, three or six months thereafter, as selected by the Company in its Committed Loan Notice, or such other period that is twelve months or less requested by the Company and consented to by all the Lenders; <u>provided</u> that:

    (i)    any Interest Period that would otherwise end on a day that is not a Business Day shall be extended to the next succeeding Business Day unless, in the case of a Eurocurrency Rate Loan, such Business Day falls in another calendar month, in which case such Interest Period shall end on the immediately preceding Business Day;

    (ii)    any Interest Period pertaining to a Eurocurrency Rate Loan that begins on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period) shall end on the last Business Day of the calendar month at the end of such Interest Period; and

    (iii)    no Interest Period shall extend beyond the Maturity Date.

"<u>IP Rights</u>" has the meaning specified in <u>Section 5.14</u>.

"<u>IRS</u>" means the United States Internal Revenue Service.

"<u>Laws</u>" means, collectively, all international, foreign, Federal, state, provincial and local statutes, treaties, rules, guidelines, regulations, ordinances, codes and administrative or judicial precedents or authorities, including the interpretation or administration thereof by any Governmental Authority charged with the enforcement, interpretation or administration thereof, and all applicable

administrative orders, directed duties, requests, licenses, authorizations and permits of, and agreements with, any Governmental Authority, in each case whether or not having the force of law.

"Lender" has the meaning specified in the introductory paragraph hereto and, unless the context requires otherwise, includes the Swing Line Lender.

"Lending Office" means, as to any Lender, the office or offices of such Lender described as such in such Lender's Administrative Questionnaire, or such other office or offices as a Lender may from time to time notify the Company and the Administrative Agent which office may include any Affiliate of such Lender or any domestic or foreign branch of such Lender or such Affiliate. Unless the context otherwise requires each reference to a Lender shall include its applicable Lending Office.

"LIBOR" has the meaning specified in the definition of Eurocurrency Rate.

"LIBOR Quoted Currency" means each of the following currencies: Dollars; and Euro; in each case as long as there is a published LIBOR rate with respect thereto.

"Lien" any mortgage, deed of trust, pledge, hypothecation, assignment, encumbrance, lien (statutory or other), or other security agreement or security interest of any kind or nature whatsoever, including, without limitation, any conditional sale or other title retention agreement and any capital or financing lease having substantially the same economic effect as any of the foregoing.

"Loan" means an extension of credit by a Lender to a Borrower under Article II in the form of a Committed Loan or a Swing Line Loan.

"Loan Documents" means this Agreement, each Note, the Fee Letter, and each amendment to any of the foregoing.

"Loan Parties" means, collectively, the Company, each other Borrower and each other Guarantor.

"London Banking Day" means any day on which dealings in Dollar deposits are conducted by and between banks in the London interbank eurodollar market.

"Margin Stock" means any "margin stock", as defined in Regulation U of the Board of Governors of the Federal Reserve System.

"Material Adverse Change" means a material adverse change in the operations, business, assets, properties, liabilities (actual or contingent), condition (financial or otherwise) or prospects of the Company and its Subsidiaries, taken as a whole.

"Material Adverse Effect" means (a) a material adverse change in, or a material adverse effect on, the operations, business, assets, properties, liabilities (actual or contingent), condition (financial or otherwise) or prospects of the Company and its subsidiaries, taken as a whole; (b) a material impairment of the rights and remedies of the Administrative Agent or any Lender under any Loan Document, or of the ability of the Company or any other Loan Party to perform its

obligations under any Loan Document to which it is a party; or (c) a material adverse effect upon the legality, validity, binding effect or enforceability against the Company or any other Loan Party of any Loan Document to which it is a party.

"Material Obligations" means, as of any date, Indebtedness (other than Indebtedness under the Loan Documents) of the Company or its Subsidiaries in an aggregate principal amount exceeding $50,000,000. For purposes of determining Material Obligations, the "principal amount" of Indebtedness at such date shall be the maximum aggregate amount (giving effect to any netting agreements) that the Company or such Subsidiary, as applicable, would be required to pay if such Indebtedness and such obligations became due and payable on such date.

"Maturity Date" means June 28, 2021.

"Mirror Acquisition" means the purchase of the capital stock of Curiouser Products Inc. by by Snowflake Acquisition Corp pursuant to the agreement and plan of merger dated as of June 26, 2020 among lululemon athletica inc., Snowflake Acquisition Corp. and Curiouser Products Inc.

"Multiemployer Plan" a Pension Plan which is a multiemployer plan as defined in Section 4001(a)(3) of ERISA.

"Non-Consenting Lender" means any Lender that does not approve any consent, waiver or amendment that (i) requires the approval of all Lenders or all affected (or all directly and adversely affected) Lenders in accordance with the terms of Section 11.01 and (ii) has been approved by the Required Lenders.

"Non-Defaulting Lender" means, at any time, each Lender that is not a Defaulting Lender at such time.

"Non-LIBOR Quoted Currency" means any currency other than a LIBOR Quoted Currency.

"Non-U.S. Borrowers" means LACI and LCHI.

"Non-U.S. Guarantors" means LACI and LCHI.

"Non-U.S. Lender" means a Lender that is not a U.S. Person.

"Non-U.S. Obligor" means a Loan Party that is organized under the laws of a jurisdiction other than the United States, a State thereof or the District of Columbia.

"Note" means a promissory note made by a Borrower in favor of a Lender evidencing Loans made by such Lender to such Borrower, substantially in the form of Exhibit C.

"Obligations" means all advances to, and debts, liabilities, obligations, covenants and duties of, any Loan Party arising under any Loan Document or otherwise with respect to any Loan, whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising and including interest and fees that accrue after the commencement by or against any Loan Party or any affiliate thereof of any proceeding under any

Debtor Relief Laws naming such Person as the debtor in such proceeding, regardless of whether such interest and fees are allowed claims in such proceeding.

"OFAC" means the Office of Foreign Assets Control of the United States Department of the Treasury.

"Operating Entity" means any Person or any business or operating unit of a Person which is, or could be, operated separate and apart from (i) the other businesses and operations of such Person, or (ii) any other line of business or business segment.

"Organizational Documents" means, as to any Person which is (i) a corporation, the certificate or articles of incorporation and bylaws of such Person, (ii) a limited liability company, the limited liability company agreement or similar agreement of such Person, (iii) a partnership, the partnership agreement or similar agreement of such Person, or (iv) any other form of entity or organization, the organizational documents analogous to the foregoing.

"Other Connection Taxes" means, with respect to any Recipient, Taxes imposed as a result of a present or former connection between such Recipient and the jurisdiction imposing such Tax (other than connections arising from such Recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Loan Document, or sold or assigned an interest in any Loan or Loan Document).

"Other Taxes" means all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Loan Document, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment or grant of participation (other than an assignment or grant of participation made pursuant to Section 3.06).

"Outstanding Amount" means (i) with respect to Committed Loans on any date, the Dollar Equivalent amount of the aggregate outstanding principal amount thereof after giving effect to any borrowings and prepayments or repayments of such Committed Loans occurring on such date; and (ii) with respect to Swing Line Loans on any date, the aggregate outstanding principal amount thereof after giving effect to any borrowings and prepayments or repayments of such Swing Line Loans occurring on such date.

"Overnight Rate" means, for any day, (a) with respect to any amount denominated in Dollars, the greater of (i) the Federal Funds Rate and (ii) an overnight rate determined by the Administrative Agent or the Swing Line Lender, as the case may be, in accordance with banking industry rules on interbank compensation, and (b) with respect to any amount denominated in an Alternative Currency, the rate of interest per annum at which overnight deposits in the applicable Alternative Currency, in an amount approximately equal to the amount with respect to which such rate is being determined, would be offered for such day by a branch or Affiliate of Bank of America in the applicable offshore interbank market for such currency to major banks in such interbank market.

"Participant" has the meaning specified in Section 11.06(d).

"Participant Register" has the meaning specified in Section 11.06(d).

"Participating Member State" means any member state of the European Union that has the Euro as its lawful currency in accordance with legislation of the European Union relating to Economic and Monetary Union.

"PBGC" means the Pension Benefit Guaranty Corporation established pursuant to Subtitle A of Title IV of ERISA, or any Governmental Authority succeeding to the functions thereof.

"Pension Act" means the Pension Protection Act of 2006.

"Pension Funding Rules" means the rules of the Code and ERISA regarding minimum required contributions (including any installment payment thereof) to Pension Plans and set forth in, with respect to plan years ending prior to the effective date of the Pension Act, Section 412 of the Code and Section 302 of ERISA, each as in effect prior to the Pension Act and, thereafter, Section 412, 430, 431, 432 and 436 of the Code and Sections 302, 303, 304 and 305 of ERISA.

"Pension Plan" means, at any date of determination, any Employee Benefit Plan (including a Multiemployer Plan), that is subject to the Pension Funding Rules, or at any time within the six years immediately preceding such date, was sponsored, maintained, contributed to or required to be contributed to by the Company or any ERISA Affiliate.

"Person" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

"Platform" has the meaning specified in Section 6.02.

"Pro Forma Basis" and "pro forma basis," mean, in connection with any Specified Transaction by the Company or any Subsidiary of the Company during the applicable Test Period, the *pro forma* calculation of compliance with Section 7.08 made as if the assets, business or Person acquired or disposed of, as applicable, in connection with such Specified Transaction were acquired or disposed of, as applicable, on the first day of the applicable Test Period and all Indebtedness created, incurred, issued, assumed, repaid, discharged, satisfied, redeemed or defeased during the applicable Test Period in connection with such Specified Transaction had been created, incurred, issued, assumed, repaid, discharged, satisfied, redeemed or defeased on the first day of the applicable Test Period.

"Property" means all types of real, personal, tangible, intangible or mixed property.

"PTE" means a prohibited transaction class exemption issued by the U.S. Department of Labor, as any such exemption may be amended from time to time.

"Public Lender" has the meaning specified in Section 6.02.

"<u>Recipient</u>" means the Administrative Agent, any Lender or any other recipient of any payment to be made by or on account of any obligation of any Loan Party hereunder.

"<u>Register</u>" has the meaning specified in <u>Section 11.06</u>(c).

"<u>Related Parties</u>" means, with respect to any Person, such Person's Affiliates and the partners, directors, officers, employees, agents, trustees, administrators, managers, advisors and representatives of such Person and of such Person's Affiliates.

"<u>Relevant Governmental Body</u>" means the Federal Reserve Board and/or the Federal Reserve Bank of New York, or a committee officially endorsed or convened by the Federal Reserve Board and/or the Federal Reserve Bank of New York for the purpose of recommending a benchmark rate to replace LIBOR in loan agreements similar to this Agreement.

"<u>Rent</u>" means, with respect to any period, Consolidated contractual rent expense (and not incentive based rate) of the Company and its Subsidiaries under all leases (other than Capital Leases) of real or personal property in accordance with GAAP.

"<u>Reportable Event</u>" means with respect to any Pension Plan, (i) any event set forth in Sections 4043(c) (other than a Reportable Event as to which the 30 day notice requirement is waived by the PBGC under applicable regulations), 4062(e) or 4063(a) of ERISA or the regulations thereunder, or (ii) any amendment that would be prohibited under Section 436(c) of the Code.

"<u>Request for Credit Extension</u>" means (a) with respect to a Borrowing, conversion or continuation of Committed Loans, a Committed Loan Notice and (b) with respect to a Swing Line Loan, a Swing Line Loan Notice.

"<u>Required Lenders</u>" means, at any time, Lenders having Total Credit Exposures representing more than 50% of the Total Credit Exposures of all Lenders. The Total Credit Exposure of any Defaulting Lender shall be disregarded in determining Required Lenders at any time; <u>provided</u> that, the amount of any participation in any Swing Line Loan that such Defaulting Lender has failed to fund that have not been reallocated to and funded by another Lender shall be deemed to be held by the Lender that is the Swing Line Lender in making such determination; <u>provided</u>, <u>further</u>, that, if Total Credit Exposures are held by more than one Lender (other than Defaulting Lenders), "Required Lenders" shall require not less than two Lenders (other than Defaulting Lenders).

"<u>Resolution Authority</u>" means an EEA Resolution Authority or, with respect to any UK Financial Institution, a UK Resolution Authority.

"<u>Responsible Officer</u>" means the chief executive officer, president, chief financial officer, chief operating officer, treasurer or controller of a Loan Party, solely for purposes of the delivery of incumbency certificates pursuant to <u>Section 4.01</u>, the secretary or any assistant secretary of a Loan Party and, solely for purposes of notices given pursuant to <u>Article II</u>, any other officer of the applicable Loan Party so designated by any of the foregoing officers in a notice to the Administrative Agent or any other officer or employee of the applicable Loan Party designated in or pursuant to an agreement between the applicable Loan Party and the Administrative Agent. Any document

delivered hereunder that is signed by a Responsible Officer of a Loan Party shall be conclusively presumed to have been authorized by all necessary corporate, partnership and/or other action on the part of such Loan Party and such Responsible Officer shall be conclusively presumed to have acted on behalf of such Loan Party.

"Revaluation Date" means each of the following: (i) each date of a Borrowing of a Canadian Prime Rate Loan or a Eurocurrency Rate Loan denominated in an Alternative Currency, (ii) each date of a continuation of a Eurocurrency Rate Loan denominated in an Alternative Currency pursuant to Section 2.02, and (iii) such additional dates as the Administrative Agent shall determine or the Required Lenders shall require.

"Revolving Credit Exposure" means, as to any Lender at any time, the aggregate Outstanding Amount at such time of its Committed Loans and the aggregate Outstanding Amount of such Lender's participation in Swing Line Loans at such time.

"Same Day Funds" means (a) with respect to disbursements and payments in Dollars, immediately available funds, and (b) with respect to disbursements and payments in an Alternative Currency, same day or other funds as may be determined by the Administrative Agent to be customary in the place of disbursement or payment for the settlement of international banking transactions in the relevant Alternative Currency.

"Sanction(s)" means economic or financial sanctions or trade embargoes imposed, administered or enforced from time to time by the United States Government (including without limitation, OFAC), the United Nations Security Council, the European Union or Her Majesty's Treasury ("HMT").

"Sanctioned Person" means an individual or entity that is (i) included on OFAC's List of Specially Designated Nationals and HMT's Consolidated List of Financial Sanctions Targets and the Investment Ban List, (ii) located or resident in, or organized under the laws of, a country or territory subject to comprehensive Sanctions or (iii) majority-owned or controlled by any of the foregoing.

"Screen Rate" means the Applicable Reference Rate quote for an Applicable Currency on the applicable screen page the Administrative Agent designates to determine such Applicable Reference Rate for such Applicable Currency (or such other commercially available source providing such quotations for such Applicable Currency as may be designated by the Administrative Agent from time to time).

"SEC" means the Securities and Exchange Commission, or any Governmental Authority succeeding to any of its principal functions.

"Significant Subsidiary" means each "Significant Subsidiary" of the Company within the meaning of Regulation S X of the SEC as in effect from time to time.

"SOFR" with respect to any day means the secured overnight financing rate published for such day by the Federal Reserve Bank of New York, as the administrator of the benchmark (or a successor administrator) on the Federal Reserve Bank of New York's website (or any successor

source) and, in each case, that has been selected or recommended by the Relevant Governmental Body.

"SOFR-Based Rate" means SOFR or Term SOFR.

"Special Notice Currency" means at any time an Alternative Currency, other than the currency of a country that is a member of the Organization for Economic Cooperation and Development at such time located in North America or Europe.

"Specified Transaction" means any Acquisition or Disposition of any Person, business or assets constituting a business by the Company or any Subsidiary of the Company.

"Spot Rate" for a currency means the rate determined by the Administrative Agent to be the rate quoted by the Person acting in such capacity as the spot rate for the purchase by such Person of such currency with another currency through its principal foreign exchange trading office at approximately 11:00 a.m. on the date two Business Days prior to the date as of which the foreign exchange computation is made; provided that the Administrative Agent may obtain such spot rate from another financial institution designated by the Administrative Agent if the Person acting in such capacity does not have as of the date of determination a spot buying rate for any such currency.

"Subsidiary" means as to any Person, any corporation, association, partnership, limited liability company, joint venture or other business entity (i) of which such Person or any Subsidiary of such Person, directly or indirectly, owns or controls a majority of the shares of securities or other Capital Stock having ordinary voting power to elect a majority of the board of directors or other governing body thereof (other than securities or interests having such power only by reason of the happening of a contingency) are at the time beneficially owned by such Person or (ii) the management of which is otherwise controlled, directly or indirectly, through one or more intermediaries, by such Person, to the extent such entity's financial results are required to be included in such Person's consolidated financial statements under GAAP. Unless otherwise provided, "Subsidiary" shall refer to a Subsidiary of the Company.

"Successor Rate" has the meaning specified in Section 3.03(c).

"Successor Rate Conforming Changes" means, with respect to any Successor Rate for an Applicable Currency, any conforming changes to the definition of Base Rate, Interest Period, timing and frequency of determining rates and making payments of interest and other technical, administrative or operational matters as may be appropriate, in the discretion of the Administrative Agent, to reflect the adoption and implementation of such Successor Rate and to permit the administration thereof by the Administrative Agent in a manner substantially consistent with market practice for such Applicable Currency (or, if the Administrative Agent determines that adoption of any portion of such market practice for such Applicable Currency is not administratively feasible or that no market practice for the administration of such Successor Rate for such Applicable Currency exists, in such other manner of administration as the Administrative Agent determines is reasonably necessary in connection with the administration of this Agreement).

"<u>Swap Contract</u>" means (a) any and all rate swap transactions, basis swaps, credit derivative transactions, forward rate transactions, commodity swaps, commodity options, forward commodity contracts, equity or equity index swaps or options, bond or bond price or bond index swaps or options or forward bond or forward bond price or forward bond index transactions, interest rate options, forward foreign exchange transactions, cap transactions, floor transactions, collar transactions, currency swap transactions, cross-currency rate swap transactions, currency options, spot contracts, or any other similar transactions or any combination of any of the foregoing (including any options to enter into any of the foregoing), whether or not any such transaction is governed by or subject to any master agreement, and (b) any and all transactions of any kind, and the related confirmations, which are subject to the terms and conditions of, or governed by, any form of master agreement published by the International Swaps and Derivatives Association, Inc., any International Foreign Exchange Master Agreement, or any other master agreement (any such master agreement, together with any related schedules, a "<u>Master Agreement</u>"), including any such obligations or liabilities under any Master Agreement.

"<u>Swap Termination Value</u>" means, in respect of any one or more Swap Contracts, after taking into account the effect of any legally enforceable netting agreement relating to such Swap Contracts, (a) for any date on or after the date such Swap Contracts have been closed out and termination value(s) determined in accordance therewith, such termination value(s), and (b) for any date prior to the date referenced in clause (a), the amount(s) determined as the mark-to-market value(s) for such Swap Contracts, as determined based upon one or more mid-market or other readily available quotations provided by any recognized dealer in such Swap Contracts (which may include a Lender or any Affiliate of a Lender).

"<u>Swing Line Borrowing</u>" means a borrowing of a Swing Line Loan pursuant to <u>Section 2.04</u>.

"<u>Swing Line Lender</u>" means Bank of America in its capacity as provider of Swing Line Loans, or any successor swing line lender hereunder.

"<u>Swing Line Loan</u>" has the meaning specified in <u>Section 2.04(a)</u>.

"<u>Swing Line Loan Notice</u>" means a notice of a Swing Line Borrowing pursuant to <u>Section 2.04(b)</u>, which shall be substantially in the form of <u>Exhibit B</u> or such other form as approved by the Administrative Agent (including any form on an electronic platform or electronic transmission system as shall be approve by the Administrative Agent), appropriately completed and signed by a Responsible Officer of a Borrower.

"<u>Swing Line Sublimit</u>" means an amount equal to the lesser of (a) **$**20,000,000 and (b) the Aggregate Commitments. The Swing Line Sublimit is part of, and not in addition to, the Aggregate Commitments.

"<u>TARGET2</u>" means the Trans-European Automated Real-time Gross Settlement Express Transfer payment system which utilizes a single shared platform and which was launched on November 19, 2007.

"<u>TARGET Day</u>" means any day on which TARGET2 (or, if such payment system ceases to be operative, such other payment system, if any, determined by the Administrative Agent to be a suitable replacement) is open for the settlement of payments in Euro.

"<u>Taxes</u>" means all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"<u>Term SOFR</u>" means the forward-looking term rate for any period that is approximately (as determined by the Administrative Agent) as long as any of the Interest Period options set forth in the definition of "Interest Period" and that is based on SOFR and that has been selected or recommended by the Relevant Governmental Body, in each case as published on an information service as selected by the Administrative Agent from time to time in its reasonable discretion.

"<u>Termination Event</u>" means, with respect to any Pension Plan, (i) a Reportable Event, (ii) the termination of a Pension Plan, or the filing of a notice of intent to terminate a Pension Plan, or the treatment of a Pension Plan amendment as a termination under Section 4041 or 4041A of ERISA, (iii) the institution of proceedings to terminate a Pension Plan under Section 4042 of ERISA or (iv) the appointment of a trustee to administer any Pension Plan under Section 4042 of ERISA.

"<u>Test Period</u>" means, for any date of determination under this Agreement, the four (4) consecutive fiscal quarters of the Company most recently ended as of such date of determination.

"<u>Total Credit Exposure</u>" means, as to any Lender at any time, the unused Commitments and Revolving Credit Exposure of such Lender at such time.

"<u>Total Outstandings</u>" means the aggregate Outstanding Amount of all Loans.

"<u>Type</u>" means, with respect to a Committed Loan, its character as a Base Rate Loan, a Canadian Prime Rate Loan or a Eurocurrency Rate Loan.

"<u>UK Financial Institution</u>" means any BRRD Undertaking (as such term is defined under the PRA Rulebook (as amended from time to time) promulgated by the United Kingdom Prudential Regulation Authority) or any person falling within IFPRU 11.6 of the FCA Handbook (as amended from time to time) promulgated by the United Kingdom Financial Conduct Authority, which includes certain credit institutions and investment firms, and certain affiliates of such credit institutions or investment firms.

"<u>UK Resolution Authority</u>" means the Bank of England or any other public administrative authority having responsibility for the resolution of any UK Financial Institution.

"<u>United States</u>" and "<u>U.S.</u>" mean the United States of America.

"<u>U.S. Guarantors</u>" means the Company and LUSA.

"<u>U.S. Person</u>" means any Person that is a "United States Person" as defined in Section 7701(a)(30) of the Code.

"U.S. Subsidiary," means any Subsidiary that is organized under the laws of any political subdivision of the United States.

"U.S. Tax Compliance Certificate," has the meaning specified in Section 3.01(e)(ii)(B)(III).

"Write-Down and Conversion Powers," means, (a) with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule, and (b) with respect to the United Kingdom, any powers of the applicable Resolution Authority under the Bail-In Legislation to cancel, reduce, modify or change the form of a liability of any UK Financial Institution or any contract or instrument under which that liability arises, to convert all or part of that liability into shares, securities or obligations of that Person or any other Person, to provide that any such contract or instrument is to have effect as if a right had been exercised under it or to suspend any obligation in respect of that liability or any of the powers under that Bail-In Legislation that are related to or ancillary to any of those powers.

1.02    **Other Interpretive Provisions**. With reference to this Agreement and each other Loan Document, unless otherwise specified herein or in such other Loan Document:

(a)    The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation." The word "will" shall be construed to have the same meaning and effect as the word "shall." Unless the context requires otherwise, (i) any definition of or reference to any agreement, instrument or other document (including any Organizational Document) shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein or in any other Loan Document), (ii) any reference herein to any Person shall be construed to include such Person's successors and assigns, (iii) the words "hereto," "herein," "hereof" and "hereunder," and words of similar import when used in any Loan Document, shall be construed to refer to such Loan Document in its entirety and not to any particular provision thereof, (iv) all references in a Loan Document to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, the Loan Document in which such references appear, (v) any reference to any law shall include all statutory and regulatory provisions consolidating, amending, replacing or interpreting such law and any reference to any law or regulation shall, unless otherwise specified, refer to such law or regulation as amended, modified or supplemented from time to time, and (vi) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

(b)    In the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including"; the words "to" and "until" each mean "to but excluding"; and the word "through" means "to and including."

(c)   Section headings herein and in the other Loan Documents are included for convenience of reference only and shall not affect the interpretation of this Agreement or any other Loan Document.

**1.03    Accounting Terms**. (a) <u>Generally</u>. All accounting terms not specifically or completely defined herein shall be construed in conformity with, and all financial data (including financial ratios and other financial calculations) required to be submitted pursuant to this Agreement shall be prepared in conformity with, GAAP applied on a consistent basis, as in effect from time to time, applied in a manner consistent with that used in preparing the Audited Financial Statements, <u>except</u> as otherwise specifically prescribed herein. Notwithstanding the foregoing, for purposes of determining compliance with any covenant (including the computation of any financial covenant) contained herein, Indebtedness of the Company and its Subsidiaries shall be deemed to be carried at 100% of the outstanding principal amount thereof, and the effects of Accounting Standards Codification of the Financial Accounting Standards Board 825 on financial liabilities shall be disregarded.

(b)   <u>Changes in GAAP</u>. If at any time any change in GAAP or in the application thereof (including the adoption of IFRS) would affect the computation of any financial ratio or requirement set forth in any Loan Document, and either the Company or the Required Lenders shall so request, the Administrative Agent, the Lenders and the Company shall negotiate in good faith to amend such ratio or requirement to preserve the original intent thereof in light of such change in GAAP (subject to the approval of the Required Lenders); <u>provided</u> that, until so amended, (A) such ratio or requirement shall continue to be computed in accordance with GAAP prior to such change therein and (B) the Company shall provide to the Administrative Agent and the Lenders financial statements and other documents required under this Agreement or as reasonably requested hereunder setting forth a reconciliation between calculations of such ratio or requirement made before and after giving effect to such change in GAAP or in the application thereof. Without limiting the foregoing, leases shall continue to be classified and accounted for on a basis consistent with that reflected in the Audited Financial Statements for all purposes of this Agreement, notwithstanding any change in GAAP relating thereto, unless the parties hereto shall enter into a mutually acceptable amendment addressing such changes, as provided for above.

(c)   <u>Pro Forma Adjustments</u>. For purposes of determining compliance with <u>Section 7.08</u> with respect to any Test Period during which any Specified Transaction occurs, the Consolidated Fixed Charge Ratio and the Consolidated Rent-Adjusted Leverage Ratio shall be calculated with respect to such Test Period and such Specified Transaction on a Pro Forma Basis.

**1.04    Rounding**. Any financial ratios required to be maintained by the Company pursuant to this Agreement shall be calculated by dividing the appropriate component by the other component, carrying the result to one place more than the number of places by which such ratio is expressed herein and rounding the result up or down to the nearest number (with a rounding-up if there is no nearest number).

**1.05    Exchange Rates; Currency Equivalents**. (a) The Administrative Agent shall determine the Spot Rates as of each Revaluation Date to be used for calculating Dollar Equivalent amounts of Credit Extensions and Outstanding Amounts denominated in Alternative Currencies.

Such Spot Rates shall become effective as of such Revaluation Date and shall be the Spot Rates employed in converting any amounts between the applicable currencies until the next Revaluation Date to occur. The Administrative Agent shall promptly advise the Company of each redetermination of the Spot Rate applicable to Loans. Except for purposes of financial statements delivered by Loan Parties hereunder or calculating financial covenants hereunder or except as otherwise provided herein, the applicable amount of any currency (other than Dollars) for purposes of the Loan Documents shall be such Dollar Equivalent amount as so determined by the Administrative Agent.

(b)    Wherever in this Agreement in connection with a Committed Borrowing, conversion, continuation or prepayment of a Eurocurrency Rate Loan, an amount, such as a required minimum or multiple amount, is expressed in Dollars, but such Committed Borrowing, Eurocurrency Rate Loan is denominated in an Alternative Currency, such amount shall be the relevant Alternative Currency Equivalent of such Dollar amount (rounded to the nearest unit of such Alternative Currency, with 0.5 of a unit being rounded upward), as determined by the Administrative Agent.

(c)    The Administrative Agent does not warrant, nor accept responsibility, nor shall the Administrative Agent have any liability with respect to the administration, submission or any other matter related to the rates in the definition of "Eurocurrency Rate" or with respect to any rate that is an alternative or replacement for or successor to any of such rate (including, without limitation, any Successor Rate) or the effect of any of the foregoing, or of any Successor Rate Conforming Changes.

**1.06    Additional Alternative Currencies**. (a) The Company may from time to time request that Eurocurrency Rate Loans be made in a currency other than those specifically listed in the definition of "Alternative Currency"; provided that such requested currency is a lawful currency (other than Dollars) that is readily available and freely transferable and convertible into Dollars. In the case of any such request with respect to the making of Eurocurrency Rate Loans, such request shall be subject to the approval of the Administrative Agent and the Lenders.

(b)    Any such request shall be made to the Administrative Agent not later than 1:00 p.m., 20 Business Days prior to the date of the desired Credit Extension (or such later time or date as may be agreed by the Administrative Agent in its sole discretion). In the case of any such request pertaining to Eurocurrency Rate Loans, the Administrative Agent shall promptly notify each Lender thereof. Each Lender (in the case of any such request pertaining to Eurocurrency Rate Loans) shall notify the Administrative Agent, not later than 1:00 p.m., ten Business Days after receipt of such request whether it consents, in its sole discretion, to the making of Eurocurrency Rate Loans in such requested currency.

(c)    Any failure by a Lender to respond to such request within the time period specified in the preceding sentence shall be deemed to be a refusal by such Lender to permit Eurocurrency Rate Loans to be made in such requested currency. If the Administrative Agent and all the Lenders consent to making Eurocurrency Rate Loans in such requested currency, the Administrative Agent shall so notify the Company and such currency shall thereupon be deemed for all purposes to be an Alternative Currency hereunder for purposes of any Committed Borrowings of Eurocurrency Rate Loans. If the Administrative Agent shall fail to obtain consent to any request

for an additional currency under this Section 1.06, the Administrative Agent shall promptly so notify the Company.

**1.07**   **Change of Currency**. (a) Each obligation of the Borrowers to make a payment denominated in the national currency unit of any member state of the European Union that adopts the Euro as its lawful currency after the date hereof shall be redenominated into Euro at the time of such adoption. If, in relation to the currency of any such member state, the basis of accrual of interest expressed in this Agreement in respect of that currency shall be inconsistent with any convention or practice in the London interbank market for the basis of accrual of interest in respect of the Euro, such expressed basis shall be replaced by such convention or practice with effect from the date on which such member state adopts the Euro as its lawful currency; *provided* that if any Committed Borrowing in the currency of such member state is outstanding immediately prior to such date, such replacement shall take effect, with respect to such Committed Borrowing, at the end of the then current Interest Period.

(b)   Each provision of this Agreement shall be subject to such reasonable changes of construction as the Administrative Agent and the Company may from time to time mutually agree to be appropriate to reflect the adoption of the Euro by any member state of the European Union and any relevant market conventions or practices relating to the Euro.

(c)   Each provision of this Agreement also shall be subject to such reasonable changes of construction as the Administrative Agent and the Company may from time to time mutually agree to be appropriate to reflect a change in currency of any other country and any relevant market conventions or practices relating to the change in currency.

**1.08**   **Times of Day**. Unless otherwise specified, all references herein to times of day shall be references to Eastern time (daylight or standard, as applicable).

**1.09**   **Reserved**.

**1.10**   **Currency Generally**.

(a)   For purposes of determining compliance with Sections 7.01 and 7.02 with respect to any amount of Indebtedness in a currency other than Dollars, no Default shall be deemed to have occurred solely as a result of changes in rates of currency exchange occurring after the time such Indebtedness is incurred (so long as such Indebtedness, at the time incurred, was permitted hereunder).

(b)   For purposes of calculating the Consolidated Rent-Adjusted Leverage Ratio or Consolidated Fixed Charge Ratio on any date of determination, amounts denominated in a currency other than Dollars will be translated into Dollars at the currency exchange rates used in the Company's latest financial statements delivered pursuant to Section 6.01(a) or (b), and will, in the case of Indebtedness, reflect the currency translation effects, determined in accordance with GAAP, of Swap Contracts permitted hereunder for currency exchange risks with respect to the applicable currency in effect on the date of determination of the Dollar Equivalent of such Indebtedness.

**1.11**   **Timing of Payment and of Performance**.

When the payment of any obligation or the performance of any covenant, duty or obligation is stated to be due or performance required on a day which is not a Business Day, the date of such payment (other than as described in the definition of "Interest Period") or performance shall extend to the immediately succeeding Business Day and such extension shall be reflected in the computation of interest or fees, as the case may be.

**1.12**   **Divisions**.

For all purposes under the Loan Documents, in connection with any division or plan of division under Delaware law (or any comparable event under a different jurisdiction's laws): (a) if any asset, right, obligation or liability of any Person becomes the asset, right, obligation or liability of a different Person, then it shall be deemed to have been transferred from the original Person to the subsequent Person, and (b) if any new Person comes into existence, such new Person shall be deemed to have been organized on the first date of its existence by the holders of its equity interests at such time.

## ARTICLE II.
### THE COMMITMENTS AND CREDIT EXTENSIONS

**2.01**   **Committed Loans**. Subject to the terms and conditions set forth herein, each Lender severally agrees to make loans (each such loan, a "Committed Loan") to any Borrower in Dollars or in one or more Alternative Currencies from time to time, on any Business Day during the Availability Period applicable to such Lender, in an aggregate amount not to exceed at any time outstanding the amount of such Lender's Commitment; provided, however, that after giving effect to any Committed Borrowing, (i) the Total Outstandings shall not exceed the Aggregate Commitments, and (ii) the Revolving Credit Exposure of any Lender shall not exceed such Lender's Commitment. Within the limits of each Lender's Commitment, and subject to the other terms and conditions hereof, each Borrower may borrow under this Section 2.01, prepay its respective Committed Borrowings under Section 2.05, and reborrow under this Section 2.01. Committed Loans may be Base Rate Loans, Canadian Prime Rate Loans or Eurocurrency Rate Loans, as further provided herein.

**2.02**   **Borrowings, Conversions and Continuations of Committed Loans**.

(a)   Each Committed Borrowing, each conversion of Committed Loans from one Type to the other, and each continuation of Eurocurrency Rate Loans shall be made upon the irrevocable notice of the applicable Borrower to the Administrative Agent (and, in the case of Committed Borrowing to be denominated in Canadian Dollars, to the Canadian Agent), which may be given by (A) telephone or (B) a Committed Loan Notice; provided that any telephonic notice must be confirmed immediately by delivery to the Administrative Agent of a Committed Loan Notice. Each such Committed Loan Notice must be received by the Administrative Agent not later than 1:00 p.m. (i) three Business Days prior to the requested date of any Borrowing of, conversion to or continuation of Eurocurrency Rate Loans denominated in Dollars or of any conversion of Eurocurrency Rate Loans denominated in Dollars to Base Rate Committed Loans, (ii) four Business

Days (or five Business Days in the case of a Special Notice Currency) prior to the requested date of any Borrowing or continuation of Eurocurrency Rate Loans denominated in Alternative Currencies, and (iii) on the requested date of any Borrowing of Base Rate Committed Loans or Canadian Prime Rate Loans; provided, however, that if the applicable Borrower wishes to request Eurocurrency Rate Loans having an Interest Period other than one, two, three or six months in duration as provided in the definition of "Interest Period," the applicable notice must be received by the Administrative Agent not later than 1:00 p.m. (i) four Business Days prior to the requested date of such Borrowing, conversion or continuation of Eurocurrency Rate Loans denominated in Dollars, or (ii) five Business Days (or six Business days in the case of a Special Notice Currency) prior to the requested date of such Borrowing, conversion or continuation of Eurocurrency Rate Loans denominated in Alternative Currencies, whereupon the Administrative Agent shall give prompt notice to the Lenders of such request and determine whether the requested Interest Period is acceptable to all of them. Not later than 1:00 p.m., (i) three Business Days before the requested date of such Borrowing, conversion or continuation of Eurocurrency Rate Loans denominated in Dollars, or (ii) four Business Days (or five Business days in the case of a Special Notice Currency) prior to the requested date of such Borrowing, conversion or continuation of Eurocurrency Rate Loans denominated in Alternative Currencies, the Administrative Agent shall notify such Borrower (which notice may be by telephone) whether or not the requested Interest Period has been consented to by all the Lenders. Except as provided in Section 2.04(c), each Committed Borrowing of or conversion to Committed Loans shall be in a principal amount of $1,000,000 or a whole multiple of $100,000 in excess thereof. Each Committed Loan Notice shall specify (i) whether the Borrower giving such notice is requesting a Committed Borrowing, a conversion of Committed Loans from one Type to the other, or a continuation of Eurocurrency Rate Loans, (ii) the requested date of the Borrowing, conversion or continuation, as the case may be (which shall be a Business Day), (iii) the principal amount of Committed Loans to be borrowed, converted or continued, (iv) the Type of Committed Loan to be borrowed or to which existing Committed Loans are to be converted, (v) if applicable, the duration of the Interest Period with respect thereto and (vi) the currency of the Committed Loans to be borrowed. If a Borrower fails to specify a currency in a Committed Loan Notice requesting a Borrowing, then the Committed Loans so requested shall be made in Dollars. If a Borrower fails to specify a Type of Committed Loan in a Committed Loan Notice or if such Borrower fails to give a timely notice requesting a conversion or continuation, then the applicable Committed Loans shall be made as, or converted to, Base Rate Loans; provided, however, that in the case of a failure to timely request a continuation of Committed Loans denominated in an Alternative Currency, such Loans shall be continued as Eurocurrency Rate Loans in their original currency with an Interest Period of one month. Any automatic conversion to Base Rate Loans shall be effective as of the last day of the Interest Period then in effect with respect to the applicable Eurocurrency Rate Loans. If a Borrower requests a Borrowing of, conversion to, or continuation of Eurocurrency Rate Loans in any such Committed Loan Notice, but fails to specify an Interest Period, it will be deemed to have specified an Interest Period of one month. No Committed Loan may be converted into or continued as a Committed Loan denominated in a different currency, but instead must be prepaid in the original currency of such Committed Loan and reborrowed in the other currency.

(b)    Following receipt of a Committed Loan Notice, the Administrative Agent shall promptly notify each Lender of the amount (and currency) of its Applicable Percentage of the

applicable Committed Loans, and if no timely notice of a conversion or continuation is provided by the Company, the Administrative Agent shall notify each Lender of the details of any automatic conversion to Base Rate Loans or continuation of Committed Loans denominated in a currency other than Dollars, in each case as described in the preceding subsection. In the case of any Committed Borrowing, each Lender shall make the amount of its Committed Loan available to the Administrative Agent in Same Day Funds at the Administrative Agent's Office for the applicable currency not later than 3:00 p.m., in the case of any Committed Loan denominated in Dollars, and not later than the Applicable Time specified by the Administrative Agent in the case of any Committed Loan in an Alternative Currency, in each case on the Business Day specified in the applicable Committed Loan Notice. Upon satisfaction of the applicable conditions set forth in Section 4.02 (and, if such Borrowing is the initial Credit Extension, Section 4.01), the Administrative Agent shall make all funds so received available to the Company or the other applicable Borrower in like funds as received by the Administrative Agent either by (i) crediting the account of such Borrower on the books of Bank of America with the amount of such funds or (ii) wire transfer of such funds, in each case in accordance with instructions provided to (and reasonably acceptable to) the Administrative Agent by the Company.

(c)     Except as otherwise provided herein, a Eurocurrency Rate Loan may be continued or converted only on the last day of an Interest Period for such Eurocurrency Rate Loan. During the continuance of an Event of Default, no Loans may be requested as, converted to, or continued as, Eurocurrency Rate Loans (whether in Dollars or any Alternative Currency) without the consent of the Required Lenders, and the Required Lenders may demand that any or all of the then outstanding Eurocurrency Rate Loans denominated in an Alternative Currency be prepaid, or redenominated into Dollars in the amount of the Dollar Equivalent thereof, on the last day of the then current Interest Period with respect thereto.

(d)     The Administrative Agent shall promptly notify the Company and the Lenders of the interest rate applicable to any Interest Period for Eurocurrency Rate Loans upon determination of such interest rate.

(e)     After giving effect to all Committed Borrowings, all conversions of Committed Loans from one Type to the other, and all continuations of Committed Loans as the same Type, there shall not be more than ten Interest Periods in effect with respect to Committed Loans.

(f)     Notwithstanding anything to the contrary in this Agreement, any Lender may exchange, continue or rollover all of the portion of its Loans in connection with any refinancing, extension, loan modification or similar transaction permitted by the terms of this Agreement, pursuant to a cashless settlement mechanism approved by the Company, the Administrative Agent, and such Lender.

2.03    **[Reserved]**.

2.04    **Swing Line Loans**.

(a)  The Swing Line. Subject to the terms and conditions set forth herein, the Swing Line Lender, in reliance upon the agreements of the other Lenders set forth in this Section 2.04, agrees to make loans in Dollars (each such loan, a "Swing Line Loan") to the Company from time to time on any Business Day during the Availability Period applicable to the Swing Line Lender in an aggregate amount not to exceed at any time outstanding the amount of the Swing Line Sublimit, notwithstanding the fact that such Swing Line Loans, when aggregated with the Applicable Percentage of the Outstanding Amount of Committed Loans of the Lender acting as Swing Line Lender, may exceed the amount of such Lender's Commitment; provided, however, that (x) after giving effect to any Swing Line Loan, (i) the Total Outstandings shall not exceed the Aggregate Commitments, and (ii) the Revolving Credit Exposure of any Lender shall not exceed such Lender's Commitment, (y) the Company shall not use the proceeds of any Swing Line Loan to refinance any outstanding Swing Line Loan, and (z) the Swing Line Lender shall not be under any obligation to make any Swing Line Loan if it shall determine (which determination shall be conclusive and binding absent manifest error) that it has, or such Credit Extension may have, Fronting Exposure. Within the foregoing limits, and subject to the other terms and conditions hereof, the Company may borrow under this Section 2.04, prepay under Section 2.05, and reborrow under this Section 2.04. Each Swing Line Loan shall be a Base Rate Loan. Immediately upon the making of a Swing Line Loan, each Lender shall be deemed to, and hereby irrevocably and unconditionally agrees to, purchase from the Swing Line Lender a risk participation in such Swing Line Loan in an amount equal to the product of such Lender's Applicable Percentage times the amount of such Swing Line Loan.

(b)  Borrowing Procedures. Each Swing Line Borrowing shall be made upon the Company's irrevocable notice to the Swing Line Lender and the Administrative Agent, which may be given by (A) telephone or (B) by a Swing Line Loan Notice; provided that any telephonic notice must be confirmed promptly by delivery to the Swing Line Lender and the Administrative Agent of a Swing Line Loan Notice. Each such Swing Line Loan Notice must be received by the Swing Line Lender and the Administrative Agent not later than 1:00 p.m. on the requested borrowing date, and shall specify (i) the amount to be borrowed, which shall be a minimum of $1,000,000, and (ii) the requested borrowing date, which shall be a Business Day. Promptly after receipt by the Swing Line Lender of any telephonic Swing Line Loan Notice, the Swing Line Lender will confirm with the Administrative Agent (by telephone or in writing) that the Administrative Agent has also received such Swing Line Loan Notice and, if not, the Swing Line Lender will notify the Administrative Agent of the contents thereof. Unless the Swing Line Lender has received notice (by telephone or in writing) from the Administrative Agent (including at the request of any Lender) prior to 3:00 p.m. on the date of the proposed Swing Line Borrowing (A) directing the Swing Line Lender not to make such Swing Line Loan as a result of the limitations set forth in the first proviso to the first sentence of Section 2.04(a), or (B) that one or more of the applicable conditions specified in Article IV is not then satisfied, then, subject to the terms and conditions hereof, the Swing Line Lender will, not later than 3:00 p.m. on the borrowing date specified in such Swing Line Loan Notice, make the amount of its Swing Line Loan available to the Company at its office by crediting the account of the Company on the books of the Swing Line Lender in Same Day Funds.

(c)  Refinancing of Swing Line Loans.

(i)     The Swing Line Lender at any time in its sole discretion may request, on behalf of the Company (which hereby irrevocably authorizes the Swing Line Lender to so request on its behalf), that each Lender make a Base Rate Committed Loan to the Company in an amount equal to such Lender's Applicable Percentage of the amount of Swing Line Loans then outstanding. Such request shall be made in writing (which written request shall be deemed to be a Committed Loan Notice for purposes hereof) and in accordance with the requirements of Section 2.02, without regard to the minimum and multiples specified for the principal amount of Base Rate Loans, but subject to the unutilized portion of the Aggregate Commitments and the conditions set forth in Section 4.02. The Swing Line Lender shall furnish the Company with a copy of the applicable Committed Loan Notice promptly after delivering such notice to the Administrative Agent. Each Lender shall make an amount equal to its Applicable Percentage of the amount specified in such Committed Loan Notice available to the Administrative Agent in Same Day Funds for the account of the Swing Line Lender at the Administrative Agent's Office for Dollar-denominated payments not later than 1:00 p.m. on the day specified in such Committed Loan Notice, whereupon, subject to Section 2.04(c)(ii), each Lender that so makes funds available shall be deemed to have made a Base Rate Committed Loan to the Company in such amount. The Administrative Agent shall remit the funds so received to the Swing Line Lender.

(ii)     If for any reason any Swing Line Loan cannot be refinanced by such a Committed Borrowing in accordance with Section 2.04(c), the request for Base Rate Committed Loans submitted by the Swing Line Lender as set forth herein shall be deemed to be a request by the Swing Line Lender that each of the Lenders fund its risk participation in the relevant Swing Line Loan and each Lender's payment to the Administrative Agent for the account of the Swing Line Lender pursuant to Section 2.04(c)(i) shall be deemed payment in respect of such participation.

(iii)     If any Lender fails to make available to the Administrative Agent for the account of the Swing Line Lender any amount required to be paid by such Lender pursuant to the foregoing provisions of this Section 2.04(c) by the time specified in Section 2.04(c)(i), the Swing Line Lender shall be entitled to recover from such Lender (acting through the Administrative Agent), on demand, such amount with interest thereon for the period from the date such payment is required to the date on which such payment is immediately available to the Swing Line Lender at a rate per annum equal to the applicable Overnight Rate from time to time in effect, plus any administrative, processing or similar fees customarily charged by the Swing Line Lender in connection with the foregoing. If such Lender pays such amount (with interest and fees as aforesaid), the amount so paid shall constitute such Lender's Committed Loan included in the relevant Committed Borrowing or funded participation in the relevant Swing Line Loan, as the case may be. A certificate of the Swing Line Lender submitted to any Lender (through the Administrative Agent) with respect to any amounts owing under this clause (iii) shall be conclusive absent manifest error.

(iv)     Each Lender's obligation to make Committed Loans or to purchase and fund risk participations in Swing Line Loans pursuant to this Section 2.04(c) shall be

absolute and unconditional and shall not be affected by any circumstance, including (A) any setoff, counterclaim, recoupment, defense or other right which such Lender may have against the Swing Line Lender, the Company or any other Person for any reason whatsoever, (B) the occurrence or continuance of a Default, or (C) any other occurrence, event or condition, whether or not similar to any of the foregoing; <u>provided</u>, <u>however</u>, that each Lender's obligation to make Committed Loans pursuant to this <u>Section 2.04(c)</u> is subject to the conditions set forth in <u>Section 4.02</u>. No such funding of risk participations shall relieve or otherwise impair the obligation of the Company to repay Swing Line Loans, together with interest as provided herein.

(d)     <u>Repayment of Participations</u>.

(i)     At any time after any Lender has purchased and funded a risk participation in a Swing Line Loan, if the Swing Line Lender receives any payment on account of such Swing Line Loan, the Swing Line Lender will distribute to such Lender its Applicable Percentage thereof in the same funds as those received by the Swing Line Lender.

(ii)     If any payment received by the Swing Line Lender in respect of principal or interest on any Swing Line Loan is required to be returned by the Swing Line Lender under any of the circumstances described in <u>Section 11.05</u> (including pursuant to any settlement entered into by the Swing Line Lender in its discretion), each Lender shall pay to the Swing Line Lender its Applicable Percentage thereof on demand of the Administrative Agent, plus interest thereon from the date of such demand to the date such amount is returned, at a rate per annum equal to the applicable Overnight Rate. The Administrative Agent will make such demand upon the request of the Swing Line Lender. The obligations of the Lenders under this clause shall survive the payment in full of the Obligations and the termination of this Agreement.

(e)     <u>Interest for Account of Swing Line Lender</u>. The Swing Line Lender shall be responsible for invoicing the Company for interest on the Swing Line Loans. Until each Lender funds its Base Rate Committed Loan or risk participation pursuant to this <u>Section 2.04</u> to refinance such Lender's Applicable Percentage of any Swing Line Loan, interest in respect of such Applicable Percentage shall be solely for the account of the Swing Line Lender.

(f)     <u>Payments Directly to Swing Line Lender</u>. The Company shall make all payments of principal and interest in respect of the Swing Line Loans directly to the Swing Line Lender.

**2.05     Prepayments.** (a) Each Borrower may, upon notice from the Company to the Administrative Agent, at any time or from time to time voluntarily prepay Committed Loans made to such Borrower in whole or in part without premium or penalty; <u>provided</u> that (i) such notice must be in a form acceptable to the Administrative Agent and be received by the Administrative Agent not later than 1:00 p.m. (A) three Business Days prior to any date of prepayment of Eurocurrency Rate Loans denominated in Dollars, (B) four Business Days (or five, in the case of prepayment of Loans denominated in Special Notice Currencies) prior to any date of prepayment of Eurocurrency Rate Loans denominated in Alternative Currencies, and (C) on the date of prepayment of Base Rate Loans denominated in Special Notice Currencies) prior to any date of prepayment of Eurocurrency Rate Loans denominated in Alternative Currencies, and (C) on the date of prepayment of Base Rate

Committed Loans or Canadian Prime Rate Loans; and (ii) any prepayment of Committed Loans shall be in a principal amount of $1,000,000 or a whole multiple of $100,000 in excess thereof or, if less, the entire principal amount thereof then outstanding. Each such notice shall specify the date and amount of such prepayment and the Type(s) of Committed Loans to be prepaid and, if Eurocurrency Rate Loans are to be prepaid, the Interest Period(s) of such Loans. The Administrative Agent will promptly notify each Lender of its receipt of each such notice, and of the amount of such Lender's Applicable Percentage of such prepayment. If such notice is given by the Company, the applicable Borrower shall make such prepayment of its respective Committed Loans and the payment amount specified in such notice shall be due and payable on the date specified therein. Any prepayment of a Eurocurrency Rate Loan shall be accompanied by all accrued interest on the amount prepaid, together with any additional amounts required pursuant to Section 3.05. Subject to Section 2.15, each such prepayment shall be applied to the Committed Loans of the Lenders in accordance with their respective Applicable Percentages.

(b)   The Company may, upon notice to the Swing Line Lender (with a copy to the Administrative Agent), at any time or from time to time, voluntarily prepay Swing Line Loans in whole or in part without premium or penalty; provided that (i) such notice must be received by the Swing Line Lender and the Administrative Agent not later than 1:00 p.m. on the date of the prepayment, and (ii) any such prepayment shall be in a minimum principal amount of $500,000. Each such notice shall specify the date and amount of such prepayment. If such notice is given by the Company, the Company shall make such prepayment and the payment amount specified in such notice shall be due and payable on the date specified therein.

(c)   Subject, for the avoidance of doubt, to Section 2.16, if the Administrative Agent notifies the Company at any time that the Total Outstandings at such time exceed an amount equal to 105% of the Aggregate Commitments then in effect, then, within two Business Days after receipt of such notice, each Borrower shall prepay such Borrower's respective Loans in an aggregate amount at least equal to such excess.

**2.06     Termination or Reduction of Commitments**. (a) The Company may, upon notice to the Administrative Agent, terminate the Aggregate Commitments, or from time to time permanently reduce the Aggregate Commitments; provided that (i) any such notice shall be received by the Administrative Agent not later than 1:00 p.m. five Business Days prior to the date of termination or reduction, (ii) any such partial reduction shall be in an aggregate amount of $10,000,000 or any whole multiple of $1,000,000 in excess thereof, (iii) the Company shall not terminate or reduce the Aggregate Commitments if, after giving effect thereto and to any concurrent prepayments hereunder, the Total Outstandings would exceed the Aggregate Commitments and (iv) if, after giving effect to any reduction of the Aggregate Commitments, the Swing Line Sublimit exceeds the amount of the Aggregate Commitments, such Sublimit shall be automatically reduced by the amount of such excess. The Administrative Agent will promptly notify the Lenders of any such notice of termination or reduction of the Aggregate Commitments. Any reduction of the Aggregate Commitments shall be applied to the Commitment of each Lender according to its Applicable Percentage. All fees accrued until the effective date of any termination of the Aggregate Commitments shall be paid on the effective date of such termination. The Company may rescind or postpone any notice of termination of any Commitments if such termination would have resulted

from a refinancing of all of the applicable Commitments or other conditional event, which refinancing or other conditional event shall not be consummated or shall otherwise be delayed.

(b)    If the Mirror Acquisition shall not have been consummated on or before July 31, 2020, the Aggregate Commitments shall terminate on July 31, 2020.

**2.07    Repayment of Loans.** (a) Each Borrower shall repay to Administrative Agent for the ratable account of each Lender on the Maturity Date the aggregate principal amount of Committed Loans made by such Lender to such Borrower outstanding on such date.

(b)    The Company shall repay each Swing Line Loan on the earlier to occur of (i) the date ten Business Days after such Loan is made and (ii) the Maturity Date.

**2.08    Interest.** (a) Subject to the provisions of subsection (b) below, (i) each Eurocurrency Rate Loan shall bear interest on the outstanding principal amount thereof for each Interest Period at a rate per annum equal to the Eurocurrency Rate for such Interest Period plus the Applicable Rate; (ii) each Base Rate Committed Loan shall bear interest on the outstanding principal amount thereof from the applicable borrowing date at a rate per annum equal to the Base Rate plus the Applicable Rate; (iii) each Canadian Prime Rate Loan shall bear interest on the outstanding principal amount thereof from the applicable borrowing date at a rate per annum equal to the Canadian Prime Rate plus the Applicable Rate; and (iv) each Swing Line Loan shall bear interest on the outstanding principal amount thereof from the applicable borrowing date at a rate per annum equal to the Base Rate plus the Applicable Rate.

(b)    (i)    If any amount of principal of any Loan is not paid when due, whether at stated maturity, by acceleration or otherwise, such amount shall thereafter bear interest at a fluctuating interest rate per annum at all times equal to the Default Rate to the fullest extent permitted by applicable Laws.

(ii)    If any amount (other than principal of any Loan) payable by any Borrower under any Loan Document is not paid when due (without regard to any applicable grace periods), whether at stated maturity, by acceleration or otherwise, then upon the request of the Required Lenders, such amount shall thereafter bear interest at a fluctuating interest rate per annum at all times equal to the Default Rate to the fullest extent permitted by applicable Laws.

(iii)    Accrued and unpaid interest on past due amounts (including interest on past due interest) shall be due and payable upon demand.

(c)    Interest on each Loan shall be due and payable in arrears on each Interest Payment Date applicable thereto and at such other times as may be specified herein. Interest hereunder shall be due and payable in accordance with the terms hereof before and after judgment, and before and after the commencement of any proceeding under any Debtor Relief Law.

(d)    For the purposes of the Interest Act (Canada) and disclosure thereunder, (i) whenever a rate of interest or fee rate hereunder is calculated on the basis of a year (the "deemed

year") that contains fewer days than the actual number of days in the calendar year of calculation, such rate of interest or fee shall be expressed as a yearly rate by multiplying such rate of interest or fee rate by the actual number of days in the calendar year of calculation and dividing it by the number of days in the deemed year, (ii) the principle of deemed reinvestment of interest shall not apply to any interest calculation hereunder and (iii) the rates of interest stipulated herein are intended to be nominal rates and not effective rates or yields.

(e)     Interest Paid by Canadian Borrowers. Notwithstanding anything contained herein to the contrary, any Borrower organized under the laws of Canada will not be obliged to make any payment of interest or other amounts payable to the Lenders hereunder in excess of the amount or rate that would be permitted by law or would result in the receipt by the Lenders of interest at a criminal rate (as such term is construed under the *Criminal Code* (Canada)). If the making of any payment by any Borrower organized under the laws of Canada would result in a payment being made that is in excess of such amount or rate, the Lenders will determine the payment or payments that are to be reduced or refunded, as the case may be, so that such result does not occur. For the purposes of this Agreement, any interest or other amounts payable to the Lenders shall be determined in accordance with generally accepted actuarial practices and principles and, in the event of a dispute, a certificate of a Fellow of the Canadian Institute of Actuaries appointed by the Lenders will be prima facie evidence for purposes of such determination.

**2.09     Fees.**

(a)     Commitment Fee. The Company shall pay to the Administrative Agent for the account of each Lender in accordance with its Applicable Percentage, a commitment fee in Dollars equal to the Applicable Rate *times* the actual daily amount by which the Aggregate Commitments exceed the Outstanding Amount of Committed Loans, subject to adjustment as provided in Section 2.18. For the avoidance of doubt, the Outstanding Amount of Swing Line Loans shall not be counted towards or considered usage of the Aggregate Commitments for purposes of determining the commitment fee. The commitment fee payable to each Lender shall accrue at all times during the Availability Period applicable to such Lender including at any time during which one or more of the conditions in Article IV is not met, and shall be due and payable quarterly in arrears on the last Business Day of each March, June, September and December, commencing with the first such date to occur during the first full fiscal quarter after the Closing Date, and on the last day of the Availability Period. The commitment fee shall be calculated quarterly in arrears, and if there is any change in the Applicable Rate during any quarter, the actual daily amount shall be computed and multiplied by the Applicable Rate separately for each period during such quarter that such Applicable Rate was in effect.

(b)     Other Fees. (i) The Company shall pay to BofA Securities, Inc., and Bank of America, N.A., as the Administrative Agent, for their own respective accounts, in Dollars, fees in the amounts and at the times specified in the Fee Letter. Such fees shall be fully earned when paid and shall not be refundable for any reason whatsoever.

(ii)     The Company shall pay to the Lenders, in Dollars, such fees as shall have been separately agreed upon in writing in the amounts and at the times so specified.

Such fees shall be fully earned when paid and shall not be refundable for any reason whatsoever.

**2.10    Computation of Interest and Fees; Retroactive Adjustments of Applicable Rate**. (a) All computations of interest for Base Rate Loans (including Base Rate Loans determined by reference to the Eurocurrency Rate), Canadian Prime Rate Loans and Eurocurrency Rate Loans denominated in Canadian Dollars shall be made on the basis of a year of 365 or 366 days, as the case may be, and actual days elapsed. All other computations of fees and interest shall be made on the basis of a 360-day year and actual days elapsed (which results in more fees or interest, as applicable, being paid than if computed on the basis of a 365-day year), or, in the case of interest in respect of Committed Loans denominated in Alternative Currencies as to which market practice differs from the foregoing, in accordance with such market practice. Interest shall accrue on each Loan for the day on which the Loan is made, and shall not accrue on a Loan, or any portion thereof, for the day on which the Loan or such portion is paid, provided that any Loan that is repaid on the same day on which it is made shall, subject to Section 2.12(a), bear interest for one day. Each determination by the Administrative Agent of an interest rate or fee hereunder shall be conclusive and binding for all purposes, absent manifest error. With respect to all Non-LIBOR Quoted Currencies, the calculation of the applicable interest rate shall be determined in accordance with market practice.

(b)   If, at any time prior to the termination of the Commitments of all of the Lenders and the repayment of all other Obligations hereunder (other than contingent indemnification obligations as to which no claim has been asserted), as a result of any restatement of or other adjustment to the financial statements of the Company or for any other reason, the Company or the Lenders determine that (i) the Consolidated Rent-Adjusted Leverage Ratio as calculated by the Company as of any applicable date was inaccurate and (ii) a proper calculation of the Consolidated Rent-Adjusted Leverage Ratio would have resulted in higher pricing for such period, each Borrower shall immediately and retroactively be obligated to pay to the Administrative Agent for the account of the applicable Lenders, within three Business Days after notice by the Administrative Agent (or, after the occurrence of an actual or deemed entry of an order for relief with respect to any Borrower under the Bankruptcy Code of the United States, automatically and without further action by the Administrative Agent or any Lender), an amount equal to the excess of the amount of interest and fees that should have been paid for such period over the amount of interest and fees actually paid for such period. During such three Business Day period and thereafter, if the preceding sentence is complied with, the failure to previously pay such shortfall in interest and fees and the delivery of such inaccurate certificate shall not in and of themselves constitute a Default or Event of Default and no amounts shall be payable at the Default Rate in respect of any such interest or fees. This paragraph shall not limit the rights of the Administrative Agent or any Lender, under Section 2.08(b) or under Article VIII. The Company's obligations under this paragraph shall survive the termination of the Aggregate Commitments in the case of an Event of Default under Section 6.01(f) or (g) but shall otherwise terminate upon the repayment of all other Obligations hereunder.

**2.11    Evidence of Debt**. (a) The Credit Extensions made by each Lender shall be evidenced by one or more accounts or records maintained by such Lender and by the Administrative Agent in the ordinary course of business. Subject to Section 11.06(c), the accounts or records

maintained by the Administrative Agent and each Lender shall be conclusive absent manifest error of the amount of the Credit Extensions made by the Lenders to each Borrower and the interest and payments thereon. Any failure to so record or any error in doing so shall not, however, limit or otherwise affect the obligation of any Borrower hereunder to pay any amount owing with respect to its respective Obligations. In the event of any conflict between the accounts and records maintained by any Lender and the accounts and records of the Administrative Agent in respect of such matters, the accounts and records of the Administrative Agent shall control in the absence of manifest error. Upon the request of any Lender to a Borrower made through the Administrative Agent, such Borrower shall execute and deliver to such Lender (through the Administrative Agent) a Note, which shall evidence such Lender's Loans to such Borrower in addition to such accounts or records. Each Lender may attach schedules to a Note and endorse thereon the date, Type (if applicable), amount, currency and maturity of its Loans and payments with respect thereto.

(b)    In addition to the accounts and records referred to in <u>subsection (a)</u> above, each Lender and the Administrative Agent shall maintain in accordance with its usual practice accounts or records evidencing the purchases and sales by such Lender of participations in Swing Line Loans. In the event of any conflict between the accounts and records maintained by any Lender and the accounts and records of the Administrative Agent in respect of such matters, the accounts and records of the Administrative Agent shall control in the absence of manifest error.

**2.12    Payments Generally; Administrative Agent's Clawback.** (a) <u>General</u>. All payments to be made by the Borrowers shall be made free and clear of and without condition or deduction for any counterclaim, defense, recoupment or setoff. Except as otherwise expressly provided herein and except with respect to principal of and interest on Loans denominated in an Alternative Currency, all payments by the Borrowers hereunder shall be made to the Administrative Agent, for the account of the respective Lenders to which such payment is owed, at the applicable Administrative Agent's Office in Dollars and in Same Day Funds not later than 3:00 p.m. on the date specified herein. Except as otherwise expressly provided herein, all payments by the Borrowers hereunder with respect to principal and interest on Loans denominated in an Alternative Currency shall be made to the Administrative Agent (or, in the case of Loans denominated in Canadian Dollars, to the Canadian Agent), for the account of the respective Lenders to which such payment is owed, at the applicable Administrative Agent's Office in such Alternative Currency and in Same Day Funds not later than the Applicable Time specified by the Administrative Agent on the dates specified herein. Without limiting the generality of the foregoing, the Administrative Agent may require that any payments due under this Agreement be made in the United States. If, for any reason, any Borrower is prohibited by any Law from making any required payment hereunder in an Alternative Currency, such Borrower shall make such payment in Dollars in the Dollar Equivalent of the Alternative Currency payment amount. The Administrative Agent will promptly distribute to each Lender its Applicable Percentage (or other applicable share as provided herein) of such payment in like funds as received by wire transfer to such Lender's Lending Office. All payments received by the Administrative Agent (i) after 3:00 p.m., in the case of payments in Dollars, or (ii) after the Applicable Time specified by the Administrative Agent in the case of payments in an Alternative Currency, shall in each case be deemed received on the next succeeding Business Day and any applicable interest or fee shall continue to accrue.

(b)   (i)   <u>Funding by Lenders; Presumption by Administrative Agent</u>. Unless the Administrative Agent shall have received notice from a Lender prior to the proposed date of any Committed Borrowing of Eurocurrency Rate Loans (or, in the case of any Committed Borrowing of Base Rate Loans, prior to 2:00 p.m. on the date of such Committed Borrowing) that such Lender will not make available to the Administrative Agent such Lender's share of such Committed Borrowing, the Administrative Agent may assume that such Lender has made such share available on such date in accordance with <u>Section 2.02</u> (or, in the case of a Committed Borrowing of Base Rate Loans or Canadian Prime Rate Loans, that such Lender has made such share available in accordance with and at the time required by <u>Section 2.02</u>) and may, in reliance upon such assumption, make available to the applicable Borrower a corresponding amount. In such event, if a Lender has not in fact made its share of the applicable Committed Borrowing available to the Administrative Agent, then the applicable Lender and the applicable Borrower severally agree to pay to the Administrative Agent forthwith on demand such corresponding amount in Same Day Funds with interest thereon, for each day from and including the date such amount is made available to such Borrower to but excluding the date of payment to the Administrative Agent, at (A) in the case of a payment to be made by such Lender, the Overnight Rate, plus any administrative, processing or similar fees customarily charged by the Administrative Agent in connection with the foregoing, and (B) in the case of a payment to be made by such Borrower, the interest rate applicable to Base Rate Loans. If such Borrower and such Lender shall pay such interest to the Administrative Agent for the same or an overlapping period, the Administrative Agent shall promptly remit to such Borrower the amount of such interest paid by such Borrower for such period. If such Lender pays its share of the applicable Committed Borrowing to the Administrative Agent, then the amount so paid shall constitute such Lender's Committed Loan included in such Committed Borrowing. Any payment by such Borrower shall be without prejudice to any claim such Borrower may have against a Lender that shall have failed to make such payment to the Administrative Agent.

(ii)   <u>Payments by Borrowers; Presumptions by Administrative Agent</u>. Unless the Administrative Agent shall have received notice from a Borrower prior to the date on which any payment is due to the Administrative Agent for the account of the Lenders hereunder that such Borrower will not make such payment, the Administrative Agent may assume that such Borrower has made such payment on such date in accordance herewith and may, in reliance upon such assumption, distribute to the Lenders the amount due. In such event, if such Borrower has not in fact made such payment, then each of the Lenders, severally agrees to repay to the Administrative Agent forthwith on demand the amount so distributed to such Lender, in Same Day Funds with interest thereon, for each day from and including the date such amount is distributed to it to but excluding the date of payment to the Administrative Agent, at the Overnight Rate.

A notice of the Administrative Agent to any Lender or Borrower with respect to any amount owing under this <u>subsection (b)</u> shall be conclusive, absent manifest error.

(c)   <u>Failure to Satisfy Conditions Precedent</u>. If any Lender makes available to the Administrative Agent funds for any Loan to be made by such Lender to any Borrower as provided in the foregoing provisions of this <u>Article II</u>, and such funds are not made available to such Borrower by the Administrative Agent because the conditions to the applicable Credit Extension set forth in

Article IV are not satisfied or waived in accordance with the terms hereof, the Administrative Agent shall return such funds (in like funds as received from such Lender) to such Lender, without interest.

(d)    Obligations of Lenders Several. The obligations of the Lenders hereunder to make Committed Loans, to fund participations in Swing Line Loans and to make payments pursuant to Section 11.04(c) are several and not joint. The failure of any Lender to make any Committed Loan, to fund any such participation or to make any payment under Section 11.04(c) on any date required hereunder shall not relieve any other Lender of its corresponding obligation to do so on such date, and no Lender shall be responsible for the failure of any other Lender to make its Committed Loan, to purchase its participation or to make its payment under Section 11.04(c).

(e)    Funding Source. Nothing herein shall be deemed to obligate any Lender to obtain the funds for any Loan in any particular place or manner or to constitute a representation by any Lender that it has obtained or will obtain the funds for any Loan in any particular place or manner.

2.13    **Sharing of Payments by Lenders**. Subject, for the avoidance of doubt, to Section 2.19, if any Lender shall, by exercising any right of setoff or counterclaim or otherwise, obtain payment in respect of any principal of or interest on any of the Committed Loans made by it to a Borrower, or the participations in Swing Line Loans to a Borrower held by it resulting in such Lender's receiving payment of a proportion of the aggregate amount of such Committed Loans or participations with regard to such Borrower and accrued interest thereon greater than its pro rata share thereof as provided herein, then the Lender receiving such greater proportion shall (a) notify the Administrative Agent of such fact, and (b) purchase (for cash at face value) participations in the relevant Committed Loans and subparticipations in Swing Line Loans of the other Lenders, or make such other adjustments as shall be equitable, so that the benefit of all such payments shall be shared by the Lenders ratably in accordance with the aggregate amount of principal of and accrued interest on their respective Committed Loans and other amounts owing them, provided that:

(i)    if any such participations or subparticipations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations or subparticipations shall be rescinded and the purchase price restored to the extent of such recovery, without interest; and

(ii)    the provisions of this Section shall not be construed to apply to (x) any payment made by or on behalf of any Borrower pursuant to and in accordance with the express terms of this Agreement (including the application of funds arising from the existence of a Defaulting Lender) or (y) any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Committed Loans or subparticipations in Swing Line Loans to any assignee or participant.

Each Loan Party consents to the foregoing and agrees, to the extent it may effectively do so under applicable law, that any Lender acquiring a participation pursuant to the foregoing arrangements may exercise against such Loan Party rights of setoff and counterclaim with respect

to such participation as fully as if such Lender were a direct creditor of such Loan Party in the amount of such participation.

2.14    **Company Appointment and Authorization**. Each Subsidiary of the Company that is a Loan Party hereby irrevocably appoints the Company as its agent for all purposes relevant to this Agreement and each of the other Loan Documents, including (i) the giving and receipt of notices, (ii) the execution and delivery of all documents, instruments and certificates contemplated herein and all modifications hereto, and (iii) the receipt of the proceeds of any Loans made by the Lenders to any such Borrower hereunder. Any acknowledgment, consent, direction, certification or other action which might otherwise be valid or effective only if given or taken by all Borrowers, or by each Borrower acting singly, shall be valid and effective if given or taken only by the Company, whether or not any such other Borrower joins therein. Any notice, demand, consent, acknowledgement, direction, certification or other communication delivered to the Company in accordance with the terms of this Agreement shall be deemed to have been delivered to each Borrower.

2.15    **Defaulting Lenders**.

(a)    <u>Adjustments</u>. Notwithstanding anything to the contrary contained in this Agreement, if any Lender becomes a Defaulting Lender, then, until such time as that Lender is no longer a Defaulting Lender, to the extent permitted by applicable Law:

(i)    <u>Waivers and Amendments</u>. Such Defaulting Lender's right to approve or disapprove any amendment, waiver or consent with respect to this Agreement shall be restricted as set forth in the definition of "Required Lenders" and Section 11.01.

(ii)    <u>Defaulting Lender Waterfall</u>. Any payment of principal, interest, fees or other amounts received by the Administrative Agent for the account of such Defaulting Lender (whether voluntary or mandatory, at maturity, pursuant to Article VIII or otherwise) or received by the Administrative Agent from a Defaulting Lender pursuant to Section 11.08 shall be applied at such time or times as may be determined by the Administrative Agent as follows: first, to the payment of any amounts owing by such Defaulting Lender to the Administrative Agent hereunder; second, to the payment on a pro rata basis of any amounts owing by such Defaulting Lender to the Swing Line Lender hereunder; third, as the Company may request (so long as no Default exists), to the funding of any Loan in respect of which such Defaulting Lender has failed to fund its portion thereof as required by this Agreement, as determined by the Administrative Agent; fourth, if so determined by the Administrative Agent and the Company, to be held in a deposit account and released pro rata in order to satisfy such Defaulting Lender's potential future funding obligations with respect to Loans under this Agreement; fifth, to the payment of any amounts owing to the Lenders or the Swing Line Lender as a result of any judgment of a court of competent jurisdiction obtained by any Lender or the Swing Line Lender against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement; sixth, so long as no Default exists, to the payment of any amounts owing to the Company as a result of any judgment of a court of competent jurisdiction obtained by the Company against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under

this Agreement; and seventh, to such Defaulting Lender or as otherwise directed by a court of competent jurisdiction; provided that if (x) such payment is a payment of the principal amount of any Loans in respect of which such Defaulting Lender has not fully funded its appropriate share, and (y) such Loans were made at a time when the conditions set forth in Section 4.02 were satisfied or waived, such payment shall be applied solely to pay the Loans of all Non-Defaulting Lenders on a pro rata basis prior to being applied to the payment of any Loans of such Defaulting Lender until such time as all Loans and funded and unfunded participations Swing Line Loans are held by the Lenders pro rata in accordance with the Commitments hereunder without giving effect to Section 2.18(a)(iv). Any payments, prepayments or other amounts paid or payable to a Defaulting Lender that are applied (or held) to pay amounts owed by a Defaulting Lender shall be deemed paid to and redirected by such Defaulting Lender, and each Lender irrevocably consents hereto.

(iii)    Certain Fees.  No Defaulting Lender shall be entitled to receive any fee payable under Section 2.09(a) for any period during which that Lender is a Defaulting Lender (and the applicable Borrower or the Company, as the case may be, shall not be required to pay any such fee that otherwise would have been required to have been paid to that Defaulting Lender).

(iv)    Reallocation of Applicable Percentages to Reduce Fronting Exposure.  All or any part of such Defaulting Lender's participation in Swing Line Loans shall be reallocated among the Non-Defaulting Lenders in accordance with their respective Applicable Percentages (calculated without regard to such Defaulting Lender's Commitment) but only to the extent that such reallocation does not cause the aggregate Revolving Credit Exposure of any Non-Defaulting Lender to exceed such Non-Defaulting Lender's Commitment. Subject to Section 11.21, no reallocation hereunder shall constitute a waiver or release of any claim of any party hereunder against a Defaulting Lender arising from that Lender having become a Defaulting Lender, including any claim of a Non-Defaulting Lender as a result of such Non-Defaulting Lender's increased exposure following such reallocation.

(v)    Repayment of Swing Line Loans.  If the reallocation described in clause (a)(iv) above cannot, or can only partially, be effected, the Company shall, without prejudice to any right or remedy available to it hereunder or under applicable Law, prepay Swing Line Loans in an amount equal to the Swing Line Lenders' Fronting Exposure.

(b)    Defaulting Lender Cure.  If the Company, the Administrative Agent and the Swing Line Lender agree in writing that a Lender is no longer a Defaulting Lender, the Administrative Agent will so notify the parties hereto, whereupon as of the effective date specified in such notice and subject to any conditions set forth therein, that Lender will, to the extent applicable, purchase at par that portion of outstanding Loans of the other Lenders or take such other actions as the Administrative Agent may determine to be necessary to cause the Committed Loans and funded and unfunded participations in Swing Line Loans to be held on a pro rata basis by the Lenders in accordance with their Applicable Percentages (without giving effect to Section 2.18(a)(iv)), whereupon such Lender will cease to be a Defaulting Lender; provided that no adjustments will be

made retroactively with respect to fees accrued or payments made by or on behalf of the Company while that Lender was a Defaulting Lender; and <u>provided</u>, <u>further</u>, that except to the extent otherwise expressly agreed by the affected parties, no change hereunder from Defaulting Lender to Lender will constitute a waiver or release of any claim of any party hereunder arising from that Lender's having been a Defaulting Lender.

    2.16   **Section 956 Interpretive Provision**.

    Notwithstanding any provision of this Agreement or in any other Loan Document, express or implied, in no event shall LACI or LCHI be obligated to make any payments in respect of an Obligation of the Company, LUSA or a Loan Party that is a U.S. person, it being the intention of the parties hereto to avoid adverse tax consequences due to the application of Section 956 of the Code.

    All provisions in this Agreement and any Loan Document shall be interpreted and applied consistently with this <u>Section 2.16</u> and where other provisions of this Agreement or any other Loan Document conflict with the provisions of this <u>Section 2.16</u>, the provisions of this <u>Section 2.16</u> shall control.

<div align="center">

**ARTICLE III.**
**TAXES, YIELD PROTECTION AND ILLEGALITY**

</div>

    3.01   **Taxes**.

    (a)   <u>Payments Free of Taxes; Obligation to Withhold; Payments on Account of Taxes</u>. (i) Any and all payments by or on account of any obligation of any Loan Party under any Loan Document shall be made without deduction or withholding for any Taxes, except as required by applicable Laws. If any applicable Laws (as determined in the good faith discretion of the Administrative Agent or Loan Party, as the case may be) require the deduction or withholding of any Tax from any such payment by the Administrative Agent or a Loan Party, then the Administrative Agent or such Loan Party shall be entitled to make such deduction or withholding, upon the basis of the information and documentation to be delivered pursuant to <u>subsection (e)</u> below.

    (i)   If any Loan Party or the Administrative Agent shall be required by the Code to withhold or deduct any Taxes, including both United States Federal backup withholding and withholding taxes, from any payment, then (A) the Administrative Agent shall withhold or make such deductions as are determined by the Administrative Agent to be required based upon the information and documentation it has received pursuant to <u>subsection (e)</u> below, (B) the Administrative Agent shall timely pay the full amount withheld or deducted to the relevant Governmental Authority in accordance with the Code, and (C) to the extent that the withholding or deduction is made on account of Indemnified Taxes, the sum payable by the applicable Loan Party shall be increased as necessary so that after any required withholding or the making of all required deductions (including deductions applicable to additional sums payable under this <u>Section 3.01</u>) the applicable Recipient receives an amount equal to the sum it would have received had no such withholding or deduction been made.

<div align="center">

46
Lululemon Credit Agreement

</div>

(ii)   If any Loan Party or the Administrative Agent shall be required by any applicable Laws other than the Code to withhold or deduct any Taxes from any payment, then (A) such Loan Party or the Administrative Agent, as required by such Laws, shall withhold or make such deductions as are determined by it to be required based upon the information and documentation it has received pursuant to subsection (e) below, (B) such Loan Party or the Administrative Agent, to the extent required by such Laws, shall timely pay the full amount withheld or deducted to the relevant Governmental Authority in accordance with such Laws, and (C) to the extent that the withholding or deduction is made on account of Indemnified Taxes, the sum payable by the applicable Loan Party shall be increased as necessary so that after any required withholding or the making of all required deductions (including deductions applicable to additional sums payable under this Section 3.01) the applicable Recipient receives an amount equal to the sum it would have received had no such withholding or deduction been made.

(b)    Payment of Other Taxes by the Loan Parties. Without limiting the provisions of subsection (a) above, the applicable Loan Party shall timely pay to the relevant Governmental Authority in accordance with applicable law, or at the option of the Administrative Agent timely reimburse it for the payment of, any Other Taxes.

(c)    Tax Indemnifications. (i) Each of (x) the Company and LUSA shall, jointly and severally with respect to all Obligations and (y) LACI and LCHI shall, with respect to their respective Obligations, indemnify each Recipient, and shall make payment in respect thereof within 10 days after demand therefor, for the full amount of any Indemnified Taxes (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this Section 3.01) payable or paid by such Recipient or required to be withheld or deducted from a payment to such Recipient, and any penalties, interest and reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to the Company by a Lender (with a copy to the Administrative Agent), or by the Administrative Agent on its own behalf or on behalf of a Lender, shall be conclusive absent manifest error. Each of (x) the Company and LUSA shall, jointly and severally with respect to all Obligations and (y) LACI and LCHI shall, with respect to their own respective Obligations, indemnify the Administrative Agent, and shall make payment in respect thereof within 10 days after demand therefor, for any amount which a Lender for any reason fails to pay indefeasibly to the Administrative Agent as required pursuant to Section 3.01(c)(ii) below.

(i)    Each Lender shall, and does hereby, severally indemnify, and shall make payment in respect thereof within 10 days after demand therefor, (x) the Administrative Agent against any Indemnified Taxes attributable to such Lender (but only to the extent that any Loan Party has not already indemnified the Administrative Agent for such Indemnified Taxes and without limiting the obligation of the Loan Party to do so), (y) the Administrative Agent and the Loan Party, as applicable, against any Taxes attributable to such Lender's failure to comply with the provisions of Section 11.06(d) relating to the maintenance of a Participant Register and (z) the Administrative Agent and the Loan Party, as applicable, against any Excluded Taxes attributable to such Lender that are payable or paid by the

Administrative Agent or a Loan Party in connection with any Loan Document, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error. Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under this Agreement or any other Loan Document against any amount due to the Administrative Agent under this clause (ii).

(d)    Evidence of Payments. As soon as practicable after any payment of Taxes by any Loan Party to a Governmental Authority as provided in this Section 3.01, the Company shall deliver to the Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of any return required by Laws to report such payment or other evidence of such payment reasonably satisfactory to the Administrative Agent.

(e)    Status of Lenders; Tax Documentation. (i) Any Lender that is entitled to an exemption from or reduction of withholding Tax with respect to payments made under any Loan Document shall deliver to the Company and the Administrative Agent, at the time or times reasonably requested by the Company or the Administrative Agent, such properly completed and executed documentation prescribed by applicable law or the taxing authorities of a jurisdiction pursuant to such applicable law or reasonably requested by the Company or the Administrative Agent as will permit such payments to be made without withholding or at a reduced rate of withholding. In addition, any Lender, if reasonably requested by the Company or the Administrative Agent, shall deliver such other documentation prescribed by applicable law or reasonably requested by the Company or the Administrative Agent as will enable the Company or the Administrative Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements. Notwithstanding anything to the contrary in the preceding two sentences, the completion, execution and submission of such documentation (other than such documentation either (A) set forth in Section 3.01(e)(ii)(A), (ii)(B) and (ii)(D) below or (B) required by applicable law other than the Code or the taxing authorities of the jurisdiction pursuant to such applicable law to comply with the requirements for exemption or reduction of withholding tax in that jurisdiction) shall not be required if in the Lender's reasonable judgment such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender.

(i)    Without limiting the generality of the foregoing, in the event that a Borrower is a U.S. Person,

(A)    any Lender that is a U.S. Person shall deliver to the Company and the Administrative Agent on or prior to the date on which such Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Company or the Administrative Agent), executed copies of IRS Form W-9 certifying that such Lender is exempt from U.S. federal backup withholding tax;

(B)   any Non-U.S. Lender shall, to the extent it is legally entitled to do so, deliver to the Company and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Non-U.S. Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Company or the Administrative Agent), whichever of the following is applicable:

(I)   in the case of a Non-U.S. Lender claiming the benefits of an income tax treaty to which the United States is a party (x) with respect to payments of interest under any Loan Document, executed copies of IRS Form W-8BEN-E (or W-8BEN, as applicable) establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "interest" article of such tax treaty and (y) with respect to any other applicable payments under any Loan Document, IRS Form W-8BEN-E (or W-8BEN, as applicable) establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "business profits" or "other income" article of such tax treaty;

(II)   executed copies of IRS Form W-8ECI;

(III)   in the case of a Non-U.S. Lender claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Code, (x) a certificate substantially in the form of Exhibit F-1 to the effect that such Non-U.S. Lender is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, a "10 percent shareholder" of the Company within the meaning of Section 881(c)(3)(B) of the Code, or a "controlled foreign corporation" described in Section 881(c)(3)(C) of the Code (a "U.S. Tax Compliance Certificate") and (y) executed copies of IRS Form W-8BEN-E (or W-8BEN, as applicable); or

(IV)   to the extent a Non-U.S. Lender is not the beneficial owner, executed copies of IRS Form W-8IMY, accompanied by IRS Form W-8ECI, IRS Form W-8BEN-E (or W-8BEN, as applicable), a U.S. Tax Compliance Certificate substantially in the form of Exhibit F-2 or Exhibit F-3, IRS Form W-9, and/or other certification documents from each beneficial owner, as applicable; provided that if the Non-U.S. Lender is a partnership and one or more direct or indirect partners of such Non-U.S. Lender are claiming the portfolio interest exemption, such Non-U.S. Lender may provide a U.S. Tax Compliance Certificate substantially in the form of Exhibit F-4 on behalf of each such direct and indirect partner;

(C)   any Non-U.S. Lender shall, to the extent it is legally entitled to do so, deliver to the Company and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Non-U.S. Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Company or the Administrative Agent),

executed copies of any other form prescribed by applicable law as a basis for claiming exemption from or a reduction in U.S. federal withholding Tax, duly completed, together with such supplementary documentation as may be prescribed by applicable law to permit the Company or the Administrative Agent to determine the withholding or deduction required to be made; and

(D)     if a payment made to a Lender under any Loan Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to the Company and the Administrative Agent at the time or times prescribed by law and at such time or times reasonably requested by the Company or the Administrative Agent such documentation prescribed by applicable Law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Company or the Administrative Agent as may be necessary for the Company and the Administrative Agent to comply with their obligations under FATCA and to determine that such Lender has complied with such Lender's obligations under FATCA or to determine the amount to deduct and withhold from such payment. Solely for purposes of this <u>clause (D)</u>, "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

(iii)     Each Lender agrees that if any form or certification it previously delivered pursuant to this <u>Section 3.01</u> expires or becomes obsolete or inaccurate in any respect, it shall update such form or certification and/or provide such successor form, promptly notify the Company and the Administrative Agent in writing of its legal inability to do so.

(f)     <u>Treatment of Certain Refunds</u>. Unless required by applicable Laws, at no time shall the Administrative Agent have any obligation to file for or otherwise pursue on behalf of a Lender, or have any obligation to pay to any Lender, any refund of Taxes withheld or deducted from funds paid for the account of such Lender. If any Recipient determines, in its sole discretion exercised in good faith, that it has received a refund of any Taxes as to which it has been indemnified by any Loan Party or with respect to which any Loan Party has paid additional amounts pursuant to this <u>Section 3.01</u>, it shall pay to such Loan Party an amount equal to such refund (but only to the extent of indemnity payments made, or additional amounts paid, by a Loan Party under this <u>Section 3.01</u> with respect to the Taxes giving rise to such refund), net of all out-of-pocket expenses (including Taxes) incurred by such Recipient, and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund), <u>provided</u> that each Loan Party, upon the request of the Recipient, agrees to repay the amount paid over to such Loan Party (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to the Recipient in the event the Recipient is required to repay such refund to such Governmental Authority. Notwithstanding anything to the contrary in this subsection, in no event will the applicable Recipient be required to pay any amount to such Loan Party pursuant to this subsection the payment of which would place the Recipient in a less favorable net after-Tax position than such Recipient would have

been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid. This subsection shall not be construed to require any Recipient to make available its tax returns (or any other information relating to its taxes that it deems confidential) to any Loan Party or any other Person.

      (g)    <u>Survival</u>. Each party's obligations under this <u>Section 3.01</u> shall survive the resignation or replacement of the Administrative Agent or any assignment of rights by, or the replacement of, a Lender, the termination of the Commitments and the repayment, satisfaction or discharge of all other Obligations.

     **3.02**    **Illegality**. If any Lender reasonably determines that any Law has made it unlawful, or that any Governmental Authority has asserted that it is unlawful, for any Lender or its applicable Lending Office to perform any of its obligations hereunder or make, maintain or fund or charge interest with respect to any Credit Extension or to determine or charge interest rates based upon the Eurocurrency Rate, or any Governmental Authority has imposed material restrictions on the authority of such Lender to purchase or sell, or to take deposits of, Dollars or any Alternative Currency in the applicable interbank market, then, on notice thereof by such Lender to the Company through the Administrative Agent, (i) any obligation of such Lender to issue, make, maintain, fund or charge interest with respect to any such Credit Extension or to make or continue Eurocurrency Rate Loans in the affected currency or currencies or, in the case of Eurocurrency Rate Loans in Dollars, to convert Base Rate Committed Loans to Eurocurrency Rate Loans, shall be suspended, and (ii) if such notice asserts the illegality of such Lender making or maintaining Base Rate Loans the interest rate on which is determined by reference to the Eurocurrency Rate component of the Base Rate, the interest rate on which Base Rate Loans of such Lender shall, if necessary to avoid such illegality, be determined by the Administrative Agent without reference to the Eurocurrency Rate component of the Base Rate, in each case until such Lender notifies the Administrative Agent and the Company that the circumstances giving rise to such determination no longer exist. Upon receipt of such notice, (x) the Borrowers shall, upon demand from such Lender (with a copy to the Administrative Agent), prepay or, if applicable and such Loans are denominated in Dollars, convert all their respective Eurocurrency Rate Loans of such Lender to Base Rate Loans (the interest rate on which Base Rate Loans of such Lender shall, if necessary to avoid such illegality, be determined by the Administrative Agent without reference to the Eurocurrency Rate component of the Base Rate), either on the last day of the Interest Period thereof, if such Lender may lawfully continue to maintain such Eurocurrency Rate Loans to such day, or immediately, if such Lender may not lawfully continue to maintain such Eurocurrency Rate Loans and (y) if such notice asserts the illegality of such Lender determining or charging interest rates based upon the Eurocurrency Rate, the Administrative Agent shall during the period of such suspension compute the Base Rate applicable to such Lender without reference to the Eurocurrency Rate component thereof until the Administrative Agent is advised in writing by such Lender that it is no longer illegal for such Lender to determine or charge interest rates based upon the Eurocurrency Rate. Upon any such prepayment or conversion, each applicable Borrower shall also pay accrued interest on the amounts so prepaid or converted.

**3.03  Inability to Determine Rates**. If in connection with any request for a Eurocurrency Rate Loan or a conversion to or continuation thereof:

(a)    (i) the Administrative Agent reasonably determines that deposits (whether in Dollars or an Alternative Currency) are not being offered to banks in the applicable offshore interbank market for such currency for the applicable amount and Interest Period of such Eurocurrency Rate Loan, or (ii) adequate and reasonable means do not exist for determining the Eurocurrency Rate for any requested Interest Period with respect to a proposed Eurocurrency Rate Loan (whether denominated in Dollars or an Alternative Currency) or in connection with an existing or proposed Base Rate Loan (in each case with respect to clause (a) above, "Impacted Loans"), or (b) the Administrative Agent or the Required Lenders determine that for any reason the Eurocurrency Rate for any requested Interest Period with respect to a proposed Eurocurrency Rate Loan does not adequately and fairly reflect the cost to such Lenders of funding such Eurocurrency Rate Loan, the Administrative Agent will promptly so notify the Company and each Lender. Thereafter, (x) the obligation of the Lenders to make or maintain Eurocurrency Rate Loans in the affected currency or currencies shall be suspended, (to the extent of the affected Eurocurrency Rate Loans or Interest Periods), and (y) in the event of a determination described in the preceding sentence with respect to the Eurocurrency Rate component of the Base Rate, the utilization of the Eurocurrency Rate component in determining the Base Rate shall be suspended, in each case until the Administrative Agent (upon the instruction of the Required Lenders) revokes such notice. Upon receipt of such notice, the Company may revoke any pending request for a Borrowing of, conversion to or continuation of Eurocurrency Rate Loans in the affected currency or currencies (to the extent of the affected Eurocurrency Rate Loans or Interest Periods) or, failing that, will be deemed to have converted such request into a request for a Committed Borrowing of Base Rate Loans in the amount specified therein.

(b)    Notwithstanding the foregoing, if the Administrative Agent has made the reasonable determination described in this section, the Administrative Agent, in consultation with the Company and the Required Lenders, may establish an alternative interest rate for the Impacted Loans, in which case, such alternative rate of interest shall apply with respect to the Impacted Loans until (1) the Administrative Agent revokes the notice delivered with respect to the Impacted Loans under clause (a) of the first sentence of this section, (2) the Administrative Agent or the Required Lenders notify the Administrative Agent and the Company that such alternative interest rate does not adequately and fairly reflect the cost to such Lenders of funding the Impacted Loans, or (3) any Lender reasonably determines that any Law has made it unlawful, or that any Governmental Authority has asserted that it is unlawful, for such Lender or its applicable Lending Office to make, maintain or fund Loans whose interest is determined by reference to such alternative rate of interest or to determine or charge interest rates based upon such rate or any Governmental Authority has imposed material restrictions on the authority of such Lender to do any of the foregoing and provides the Administrative Agent and the Company written notice thereof.

(c)    Notwithstanding anything to the contrary in this Agreement or any other Loan Documents, if the Administrative Agent determines (which determination shall be conclusive absent manifest error), or the Company or Required Lenders notify the Administrative Agent (with,

in the case of the Required Lenders, a copy to the Company) that the Company or Required Lenders (as applicable) have determined, that:

(i)     adequate and reasonable means do not exist for ascertaining the Applicable Reference Rate for an Applicable Currency for any requested Interest Period, including, without limitation, because the Screen Rate for such Applicable Currency is not available or published on a current basis and such circumstances are unlikely to be temporary; or

(ii)     the administrator of the Screen Rate for an Applicable Currency or a Governmental Authority having jurisdiction over the Administrative Agent has made a public statement identifying a specific date after which the Applicable Reference Rate for an Applicable Currency or the Screen Rate for an Applicable Currency shall no longer be made available, or used for determining the interest rate of loans denominated in such Applicable Currency, provided that, in each case, at the time of such statement, there is no successor administrator that is satisfactory to the Administrative Agent, that will continue to provide the Applicable Reference Rate for such Applicable Currency after such specific date (such specific date, the "Scheduled Unavailability Date"); or

(iii)     syndicated loans currently being executed, or that include language similar to that contained in this Section 3.03, are being executed or amended (as applicable) to incorporate or adopt a new benchmark interest rate to replace the Applicable Reference Rate for an Applicable Currency,

then, reasonably promptly after such determination by the Administrative Agent or receipt by the Administrative Agent of such notice, as applicable, the Administrative Agent and the Company may amend this Agreement solely for the purpose of replacing the Applicable Reference Rate for the Applicable Currency in accordance with this Section 3.03 with (x) in the case of Dollars, one or more SOFR-Based Rates or (y) another alternate benchmark rate giving due consideration to any evolving or then existing convention for similar syndicated credit facilities syndicated in the U.S. and denominated in the Applicable Currency for such alternative benchmarks and, in each case, including any mathematical or other adjustments to such benchmark giving due consideration to any evolving or then existing convention for similar syndicated credit facilities syndicated in the U.S. and denominated in the Applicable Currency for such benchmarks, each of which adjustments or methods for calculating such adjustments shall be published on one or more information services as selected by the Administrative Agent from time to time in its reasonable discretion and may be periodically updated (each, an "Adjustment;" and any such proposed rate, a "Successor Rate"), and any such amendment shall become effective at 5:00 p.m. on the fifth Business Day after the Administrative Agent shall have posted such proposed amendment to all Lenders and the Company unless, prior to such time, Lenders comprising the Required Lenders have delivered to the Administrative Agent written notice that such Required Lenders (A) in the case of an amendment to replace the Applicable Reference Rate with respect to Eurocurrency Rate Loans denominated in Dollars with a rate described in clause (x), object to any Adjustment; or (B) in the case of an amendment to replace the Applicable Reference Rate with respect to Eurocurrency Rate Loans denominated in the Applicable Currency with a rate described in clause (y), object to such amendment; provided that for the avoidance of doubt, in the case of clause (A), the Required Lenders shall not be entitled to object to any SOFR-Based Rate contained in any such amendment. Such

Successor Rate for the Applicable Currency shall be applied in a manner consistent with market practice; provided that to the extent such market practice is not administratively feasible for the Administrative Agent, such Successor Rate for such Applicable Currency shall be applied in a manner as otherwise reasonably determined by the Administrative Agent.

If no Successor Rate has been determined for the Applicable Currency and the circumstances under clause (i) above exist or the Scheduled Unavailability Date has occurred (as applicable), the Administrative Agent will promptly so notify the Company and each Lender.  Thereafter, (x) the obligation of the Lenders to make or maintain Eurocurrency Rate Loans in each such Applicable Currency shall be suspended, (to the extent of the affected Eurocurrency Rate Loans or Interest Periods), and (y) the Eurocurrency Rate component shall no longer be utilized in determining the Base Rate.  Upon receipt of such notice, (i) the Borrowers may revoke any pending request for a Borrowing of, conversion to or continuation of Eurocurrency Rate Loans in each such affected Applicable Currency (to the extent of the affected Eurocurrency Rate Loans or Interest Periods) or, failing that, will be deemed to have converted each such request into a request for a Committed Borrowing of Base Rate Loans denominated in Dollars in the Dollar Equivalent of the amount specified therein and (ii) (A) any outstanding affected Eurocurrency Rate Loans denominated in Dollars will be deemed to have been converted into Base Rate Loans at the end of the applicable Interest Period and (B) any outstanding affected Eurocurrency Rate Loans denominated in an Alternative Currency, at the Company's election, shall either (1) be converted into a Committed Borrowing of Base Rate Loans denominated in Dollars in the Dollar Equivalent of the amount of such outstanding Eurocurrency Rate Loan at the end of the applicable Interest Period or (2) be prepaid at the end of the applicable Interest Period in full; provided that if no election is made by the Company by the earlier of (x) the date that is three Business Days after receipt by the Company of such notice and (y) the last day of the current Interest Period for the applicable Eurocurrency Rate Loan, the Company shall be deemed to have elected clause (1) above.

Notwithstanding anything else herein, any definition of a Successor Rate for any currency shall provide that in no event shall such Successor Rate be less than 0.75% for purposes of this Agreement.

In connection with the implementation of a Successor Rate for any currency, the Administrative Agent will have the right to make Successor Rate Conforming Changes with respect to such currency from time to time and, notwithstanding anything to the contrary herein or in any other Loan Document, any amendments implementing such Successor Rate Conforming Changes will become effective without any further action or consent of any other party to this Agreement; provided that, with respect to any such amendment effected, the Administrative Agent shall post each such amendment implementing such Successor Conforming Changes for the Applicable Currency to the Lenders reasonably promptly after such amendment becomes effective.

    **3.04**   **Increased Costs; Reserves on Eurocurrency Rate Loans**.

      (a)   <u>Increased Costs Generally</u>.  If any Change in Law shall:

          (i)   impose, modify or deem applicable any reserve, special deposit, compulsory loan, insurance charge or similar requirement against assets of, deposits with

or for the account of, or credit extended or participated in by, any Lender (except any reserve requirement contemplated by <u>Section 3.04(e)</u>), other than as set forth below);

(ii)    subject any Recipient to any Taxes (other than (A) Indemnified Taxes, (B) Taxes described in <u>clauses (b)</u> through (d) of the definition of Excluded Taxes and (C) Connection Income Taxes) on its loans, loan principal, letters of credit, commitments, or other obligations, or its deposits, reserves, other liabilities or capital attributable thereto; or

(iii)    impose on any Lender or the London interbank market any other condition, cost or expense affecting this Agreement or Eurocurrency Rate Loans made by such Lender;

and the result of any of the foregoing shall be to increase the cost to such Lender of making, converting to, continuing or maintaining any Loan (or of maintaining its obligation to make any such Loan), or to reduce the amount of any sum received or receivable by such Lender hereunder (whether of principal, interest or any other amount) then, upon request of such Lender, the applicable Borrower will pay to such Lender such additional amount or amounts as will compensate such Lender for such additional costs incurred or reduction suffered.

(b)    <u>Capital Requirements</u>. If any Lender determines that any Change in Law affecting such Lender or any Lending Office of such Lender or such Lender's holding company, if any, regarding capital or liquidity requirements has or would have the effect of reducing the rate of return on such Lender's capital or on the capital of such Lender's holding company, if any, as a consequence of this Agreement, the Commitments of such Lender or the Loans made by, or participations in Swing Line Loans held by, such Lender, to a level below that which such Lender or such Lender's holding company could have achieved but for such Change in Law (taking into consideration such Lender's policies and the policies of such Lender's holding company with respect to capital adequacy), then from time to time the applicable Borrower will pay to such Lender such additional amount or amounts as will compensate such Lender or such Lender's holding company for any such reduction suffered.

(c)    <u>Certificates for Reimbursement</u>. A certificate of a Lender setting forth in reasonable detail the amount or amounts necessary to compensate such Lender or its holding company, as the case may be, as specified in <u>subsection (a)</u> or (<u>b</u>) of this Section and delivered to the Company shall be conclusive absent manifest error. The applicable Borrower shall pay such Lender the amount shown as due on any such certificate within 10 days after receipt thereof; <u>provided</u>, that a Lender shall be entitled to compensation with respect to any of the foregoing <u>subsection (a)</u> or (<u>b</u>) of this Section only if it is the applicable Lender's general policy or practice to demand compensation in similar circumstances under comparable provisions of financing agreements.

(d)    <u>Delay in Requests</u>. Failure or delay on the part of any Lender to demand compensation pursuant to the foregoing provisions of this <u>Section 3.04</u> shall not constitute a waiver of such Lender's right to demand such compensation, <u>provided</u> that no Borrower shall be required to compensate a Lender pursuant to the foregoing provisions of this Section for any increased costs

incurred or reductions suffered more than six months prior to the date that such Lender, notifies the Company of the Change in Law giving rise to such increased costs or reductions and of such Lender's intention to claim compensation therefor (except that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the six-month period referred to above shall be extended to include the period of retroactive effect thereof).

(e)    <u>Additional Reserve Requirements</u>. Each applicable Borrower shall pay to each Lender, (i) as long as such Lender shall be required to maintain reserves with respect to liabilities or assets consisting of or including Eurocurrency funds or deposits (currently known as "Eurocurrency liabilities"), additional interest on the unpaid principal amount of each Eurocurrency Rate Loan made to such Borrower equal to the actual costs of such reserves allocated to such Loan by such Lender (as determined by such Lender in good faith, which determination shall be conclusive), and (ii) as long as such Lender shall be required to comply with any reserve ratio requirement or analogous requirement of any other central banking or financial regulatory authority imposed in respect of the maintenance of the Commitments or the funding of the Eurocurrency Rate Loans, such additional costs (expressed as a percentage per annum and rounded upwards, if necessary, to the nearest five decimal places) equal to the actual costs allocated to such Commitment or Loan by such Lender (as determined by such Lender in good faith, which determination shall be conclusive), which in each case shall be due and payable on each date on which interest is payable on such Loan, <u>provided</u> the Company shall have received at least 10 days' prior notice (with a copy to the Administrative Agent) of such additional interest or costs from such Lender. If a Lender fails to give notice 10 days prior to the relevant Interest Payment Date, such additional interest or costs shall be due and payable 10 days from receipt of such notice.

**3.05    Compensation for Losses.** Subject, for the avoidance of doubt, to <u>Section 2.16</u>, upon written demand of any Lender (with a copy to the Administrative Agent) from time to time which demand shall set forth in reasonable detail the basis for requesting such amount, the applicable Borrower shall promptly compensate such Lender for and hold such Lender harmless from any loss, cost or expense incurred by it as a result of:

(a)    any continuation, conversion, payment or prepayment of any Loan made to such Borrower other than a Base Rate Loan on a day other than the last day of the Interest Period for such Loan (whether voluntary, mandatory, automatic, by reason of acceleration, or otherwise);

(b)    any failure by such Borrower (for a reason other than the failure of such Lender to make a Loan) to prepay, borrow, continue or convert any Loan other than a Base Rate Loan on the date or in the amount notified by such Borrower;

(c)    any failure by such Borrower to make payment of any Loan (or interest due thereon) denominated in an Alternative Currency on its scheduled due date or any payment thereof in a different currency; or

(d)    any assignment of a Eurocurrency Rate Loan on a day other than the last day of the Interest Period therefor as a result of a request by the Company pursuant to <u>Section 11.13</u>;

56
Lululemon Credit Agreement

including any loss of anticipated profits, any foreign exchange losses and any loss or expense arising from the liquidation or reemployment of funds obtained by it to maintain such Loan, from fees payable to terminate the deposits from which such funds were obtained or from the termination of any foreign exchange contract. Each Borrower shall also pay any customary administrative fees charged by such Lender in respect of its respective Obligations in connection with the foregoing. A certificate of a Lender setting forth in reasonable detail the amount or amounts necessary to compensate such Lender as specified in this Section and delivered to the Borrowers shall be conclusive absent manifest error.

For purposes of calculating amounts payable by the applicable Borrower to the relevant Lender under this Section 3.05, each Lender shall be deemed to have funded each Eurocurrency Rate Loan made by it at the Eurocurrency Rate for such Loan by a matching deposit or other borrowing in the offshore interbank market for such currency for a comparable amount and for a comparable period, whether or not such Eurocurrency Rate Loan was in fact so funded.

  **3.06** **Mitigation Obligations; Replacement of Lenders**.

   (a) Designation of a Different Lending Office. Each Lender may make any Credit Extension through any Lending Office, provided that the exercise of this option shall not affect the obligation of the applicable Borrower to repay the Credit Extension in accordance with the terms of this Agreement. If any Lender requests compensation under Section 3.04, or requires any Borrower to pay any Indemnified Taxes or additional amounts to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 3.01, or if any Lender gives a notice pursuant to Section 3.02, then at the request of the Company such Lender shall, as applicable, use reasonable efforts to designate a different Lending Office for funding or booking its Loans hereunder or to assign its rights and obligations hereunder to another of its offices, branches or affiliates, if, in the judgment of such Lender, such designation or assignment (i) would eliminate or reduce amounts payable pursuant to Section 3.01 or 3.04, as the case may be, in the future, or eliminate the need for the notice pursuant to Section 3.02, as applicable, and (ii) in each case, would not subject such Lender to any unreimbursed cost or expense and would not otherwise be disadvantageous to such Lender. The Company hereby agrees to pay all reasonable costs and expenses incurred by any Lender in connection with any such designation or assignment.

   (b) Replacement of Lenders. If any Lender requests compensation under Section 3.04, or if any Borrower is required to pay any Indemnified Taxes or additional amounts to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 3.01 and, in each case, such Lender has declined or is unable to designate a different lending office in accordance with Section 3.06(a), the Company may replace such Lender in accordance with Section 11.13.

  **3.07** **Survival**. All obligations of the Loan Parties under this Article III shall survive termination of the Aggregate Commitments, repayment of all other Obligations hereunder, and resignation of the Administrative Agent.

<div align="center">

**ARTICLE IV.**
**CONDITIONS PRECEDENT TO CREDIT EXTENSIONS**

</div>

<div align="center">

57
Lululemon Credit Agreement

</div>

**4.01   Conditions of Initial Credit Extension**. The obligation of each Lender to make its Initial Credit Extension hereunder is subject to satisfaction (or waiver in accordance with Section 11.01) of the following conditions precedent:

(a)   The Administrative Agent's receipt of the following, each of which shall be originals or telecopies (followed promptly by originals) unless otherwise specified, each properly executed by a Responsible Officer of the signing Loan Party, each dated the Closing Date (or, in the case of certificates of governmental officials, a recent date before the Closing Date) and each in form and substance reasonably satisfactory to the Administrative Agent and each of the Lenders:

(i)   executed counterparts of this Agreement, sufficient in number for distribution to the Administrative Agent, each Lender and the Company;

(ii)   Notes, if requested by a Lender at least three Business Days prior to the Closing Date, executed by each Borrower in favor of such Lender;

(iii)   such certificates of resolutions or other action, incumbency certificates and/or other certificates of Responsible Officers of each Loan Party as the Administrative Agent may reasonably require evidencing the identity, authority and capacity of each Responsible Officer thereof authorized to act as a Responsible Officer in connection with this Agreement and the other Loan Documents to which such Loan Party is a party;

(iv)   such documents and certifications as the Administrative Agent may reasonably require to evidence that each Loan Party is duly organized or formed, and that each of the Loan Parties is validly existing, in good standing and qualified to engage in business in the jurisdiction of its organization;

(v)   a favorable opinion of (A) Blake, Cassels & Graydon LLP, special Canadian counsel to the Company and LACI and LCHI and (B) DLA Piper LLP (US), special New York, Delaware and Nevada counsel to the Loan Parties, each addressed to the Administrative Agent and each Lender, as to such matters concerning the Loan Parties and the Loan Documents as the Required Lenders may reasonably request;

(vi)   a certificate signed by a Responsible Officer of the Company certifying (A) that the conditions specified in <u>Sections 4.02(</u>a) and (b) have been satisfied and (B) that there has been no event or circumstance since February 2, 2020 that has had or could be reasonably expected to have, either individually or in the aggregate, a Material Adverse Effect; and

(vii)   such other information as has been reasonably requested in writing at least 10 days prior to the Closing Date by the Administrative Agent or the Lenders that they reasonably determine is required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations.

(b)   Any fees required to be paid on or before the Closing Date shall have been paid.

(c)   Unless waived by the Administrative Agent, the Company shall have paid all fees, charges and disbursements of counsel to the Administrative Agent (directly to such counsel if requested by the Administrative Agent) to the extent invoiced at least three Business Days prior to or on the Closing Date.

(d)   Each Lender that so requests shall have received, at least three Business Days prior to the Closing Date, a Beneficial Ownership Certification in relation to each of the Borrowers that qualifies as a "legal entity customer" under the Beneficial Ownership Regulation to the extent requested not less than five Business Days prior to the Closing Date.

Without limiting the generality of the provisions of the last paragraph of <u>Section 9.03</u>, for purposes of determining compliance with the conditions specified in this <u>Section 4.01</u>, each Lender that has signed this Agreement shall be deemed to have consented to, approved or accepted or to be satisfied with, each document or other matter required thereunder to be consented to or approved by or acceptable or reasonably satisfactory to a Lender unless the Administrative Agent shall have received notice from such Lender prior to the proposed Closing Date specifying its objection thereto.

**4.02    Conditions to all Credit Extensions**. The obligation of each Lender to honor any Request for Credit Extension (other than a Committed Loan Notice requesting only a conversion of Committed Loans to the other Type, or a continuation of Eurocurrency Rate Loans) is subject to the following conditions precedent:

(a)   The representations and warranties of (i) each Borrower contained in <u>Article V</u> and (ii) each Loan Party contained in each other Loan Document, or which are contained in any document furnished at any time under or in connection herewith or therewith, shall be true and correct in all material respects on and as of the date of such Credit Extension, except to the extent that such representations and warranties specifically refer to an earlier date, in which case they shall be true and correct in all material respects as of such earlier date (<u>provided</u> that any representation or warranty qualified by materiality or material adverse effect shall be true and correct in all respects).

(b)   No Default shall exist, or would result from such proposed Credit Extension or from the application of the proceeds thereof.

(c)   The Administrative Agent and, if applicable, the Swing Line Lender shall have received a Request for Credit Extension in accordance with the requirements hereof.

(d)   In the case of a Credit Extension to be denominated in an Alternative Currency, there shall not have occurred any change in national or international financial, political or economic conditions or currency exchange rates or exchange controls which in the reasonable opinion of the Administrative Agent or the Required Lenders (in the case of any Loans to be denominated in an Alternative Currency) would make it impracticable for such Credit Extension to be denominated in the relevant Alternative Currency.

(e)   In the case of the initial Credit Extension, all of the conditions precedent to the consummation of the Mirror Acquisition (other than payment of the purchase price with the proceeds of such Credit Extension) shall have been satisfied or waived.

59

Lululemon Credit Agreement

Each Request for Credit Extension (other than a Committed Loan Notice requesting only a conversion of Committed Loans to the other Type or a continuation of Eurocurrency Rate Loans) submitted by the Company shall be deemed to be a representation and warranty that the conditions specified in <u>Sections 4.02</u>(a) and (b) have been satisfied on and as of the date of the applicable Credit Extension.

## ARTICLE V.
## REPRESENTATIONS AND WARRANTIES

Each Borrower represents and warrants to the Administrative Agent and the Lenders that:

**5.01    Existence and Power**. Each Loan Party and each Significant Subsidiary (a) is duly organized and is validly existing in good standing under the laws of the jurisdiction of its incorporation or formation, (b) has all requisite power and authority to own its Property and to carry on its business as now conducted and (c) is in good standing and authorized to do business in each jurisdiction in which the nature of the business conducted therein or the Property owned by it therein makes such qualification necessary; except, in each case referred to in clause (a) (other than with respect to the Borrowers), (b) or (c), to the extent that failure to do so could not reasonably be expected to have a Material Adverse Effect.

**5.02    Authority and Execution; No Contravention**. The execution, delivery and performance by each Loan Party of each Loan Document to which such Person is party, have been duly authorized by all necessary corporate or other organizational action, and do not and will not (a) contravene the terms of any of such Person's Organizational Documents, (b) constitute a default under or result in a breach of or require the mandatory repayment of or other acceleration of payment under or pursuant to the terms of, any mortgage, indenture, contract or agreement or (c) violate any Law; except with respect to any breach, contravention or violation referred to in clauses (b) and (c) above, to the extent that such breach, contravention or violation would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

**5.03    Governmental Authorization; Other Consents**. No approval, consent, exemption, authorization, or other action by, or notice to, or filing with, any Governmental Authority or any other Person is necessary or required in connection with the execution, delivery or performance by, or enforcement against, any Loan Party of this Agreement or any other Loan Document, except for (i) the approvals, consents, exemptions, authorizations, actions, notices and filings that have been duly obtained, taken, given or made and are in full force and (ii) those approvals, consents, exemptions, authorizations or other actions, notices or filings, the failure of which to obtain or make would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

**5.04    Binding Effect**. This Agreement has been, and each other Loan Document, when delivered hereunder, will have been, duly executed and delivered by each Loan Party that is party thereto. This Agreement constitutes, and each other Loan Document when so delivered will constitute, a legal, valid and binding obligation of such Loan Party, enforceable against each Loan Party that is party thereto in accordance with its terms, except as such enforceability may be limited

by applicable bankruptcy, insolvency, reorganization moratorium or other similar laws affecting the enforcement of creditors' rights generally and by general equitable principles.

**5.05   Financial Statements; No Material Adverse Effect.**

The Company has heretofore delivered to the Administrative Agent and the Lenders copies of the Audited Financial Statements. The Audited Financial Statements fairly present in all material respects the Consolidated financial condition and results of the operations of the Company and its Subsidiaries as of the dates and for the periods indicated therein and have been prepared in conformity with GAAP. Since February 2, 2020, there has been no Material Adverse Change.

**5.06   Litigation.** There are no actions, suits or proceedings at law or in equity or by or before any Governmental Authority (whether purportedly on behalf of the Company or any of its Subsidiaries) pending or, to the knowledge of the Company, threatened against the Company or any of its Subsidiaries or maintained by the Company or any of its Subsidiaries or which may affect the Property of the Company or any of its Subsidiaries or any of their respective Properties or rights (a) except as set forth on <u>Schedule 5.06</u>, which would not reasonably be expected to have a Material Adverse Effect or (b) purport to adversely affect the legality, validity or enforceability this Agreement or any other Loan Document, or any of the transactions contemplated hereby.

**5.07   No Default.** Neither any Loan Party nor any Subsidiary thereof is in default under or with respect to any Contractual Obligation that could, either individually or in the aggregate, reasonably be expected to have a Material Adverse Effect. No Default has occurred and is continuing or would result from the consummation of the transactions contemplated by this Agreement or any other Loan Document.

**5.08   Ownership of Property; Liens**. Each of the Company and each Subsidiary has good record and marketable title in fee simple to, or valid leasehold interests in, all real property necessary or used in the ordinary conduct of its business, except for such defects in title or other interest as could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect. The property of the Company and its Subsidiaries is subject to no Liens, other than Liens permitted by <u>Section 7.01</u>.

**5.09   Insurance.** The properties of the Company and its Subsidiaries are insured with insurance companies that the Company reasonably believes to be financially sound and reputable insurance companies not Affiliates of the Company, in such amounts, with such deductibles and covering such risks (after giving effect to any self-insurance reasonable and customary for similarly situated Persons engaged in the same or similar businesses as the Company and its Subsidiaries) as are customarily carried by companies engaged in similar businesses and owning similar properties in localities where the Company or the applicable Subsidiary operates.

**5.10   Plans**.

No Pension Plans are in effect as of the Closing Date. Each Employee Benefit Plan is in compliance with ERISA and the Code, and other applicable federal and state laws, where applicable, except to the extent a violation thereof would not reasonably be expected to have a Material Adverse

Effect. No Termination Event has occurred, or is reasonably expected to occur, except to the extent that such Termination Event neither individually nor in the aggregate would reasonably be expected to have a Material Adverse Effect. The Company and its ERISA Affiliates have, as of the Closing Date, made all contributions or payments to or under each such Pension Plan required by law (including, without limitation, the Pension Funding Rules) or the terms of such Pension Plan or any contract or agreement with respect thereto, which failure has not been corrected within 60 days following the final due dates for all required contributions or payments for the applicable plan year, except to the extent that the failure to make such contribution or payment would not reasonably be expected to have a Material Adverse Effect. No liability to the PBGC has been, or is expected by the Company or any ERISA Affiliate to be, incurred by the Company or any ERISA Affiliate, except to the extent that such liability would not reasonably be expected to have a Material Adverse Effect.

**5.11    Government Regulations.**

Neither the Company nor any of its Subsidiaries nor any Person controlled by, controlling, or under common control with, the Company or any of its Subsidiaries, is subject to regulation under the Investment Company Act of 1940, as amended. Neither the Company nor any of its Subsidiaries is engaged principally, or as one of its important activities, in the business of extending credit for the purpose of purchasing or carrying any Margin Stock. No part of the proceeds of any Loan will be used, directly or indirectly, for a purpose which violates any law, rule or regulation of any Governmental Authority, including, without limitation, the provisions of Regulations T, U or X of the Board of Governors of the Federal Reserve System, as amended.

**5.12    No Misrepresentation.**

(a) No representation or warranty contained in any Loan Document and no certificate or report from time to time furnished by the Company or any of its Subsidiaries in connection with the transactions contemplated thereby (other than projected financial information, *pro forma* financial information and information of a general economic or industry nature), when taken as a whole contains any material misstatement of fact or omits to state any material fact necessary to make the statements therein (when taken as a whole), in the light of the circumstances under which they were made, not materially misleading. With respect to projected financial information and *pro forma* financial information, the Borrowers represent that such information was prepared in good faith based upon assumptions believed to be reasonable at the time of preparation; it being understood that such projections may vary from actual results and that such variances may be material.

(b) As of the Closing Date, the information included in each Beneficial Ownership Certification is true and correct in all respects.

**5.13    Compliance with Applicable Laws.** Neither the Company nor any of its Subsidiaries is in default under any judgment, order, writ, injunction, decree or decision of any Governmental Authority or any mortgage, indenture, contract or agreement to which it is a party or by which it or any of its Property is bound, except in such instances in which (i) such is being contested in good faith by appropriate proceedings diligently conducted or (ii) the effect of which

default, either individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect.

5.14    **Intellectual Property; Licenses, Etc.** The Company and its Subsidiaries own, license or possess the right to use all of the trademarks, service marks, trade names, copyrights, patents, patent rights, franchises, licenses and other intellectual property rights (collectively, "IP Rights") that are reasonably necessary for the operation of their respective businesses, as currently conducted, without conflict with the rights of any other Person, except to the extent the absence of such IP Rights or the existence of such conflicts, either individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect. To the best knowledge of the Company, no slogan or other advertising device, product, process, method, substance, part or other material now employed, or now contemplated to be employed, by the Company or any Subsidiary infringes upon any rights held by any other Person, except for such infringements, individually or in the aggregate, which would not reasonably be expected to result in a Material Adverse Effect. No claim or litigation regarding any of the foregoing is pending or, to the best knowledge of the Company, threatened, which, either individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

5.15    **Sanctions and Anti-Corruption Laws.** Each Loan Party is in compliance, in all material respects, with (i) applicable Sanctions and (ii) Anti-Corruption Laws. Neither the Company, nor any of its Subsidiaries, nor, to the knowledge of the Company and its Subsidiaries, any director, officer, employee, agent, affiliate or representative thereof, is an individual or entity that is a Sanctioned Person.

5.16    **Representations as to Non-U.S. Obligors.** Each Non-U.S. Obligor represents and warrants to the Administrative Agent and the Lenders that:

(a)    Such Non-U.S. Obligor is subject to civil and commercial Laws with respect to its obligations under this Agreement and the other Loan Documents to which it is a party (collectively as to such Non-U.S. Obligor, the "Applicable Non-U.S. Obligor Documents"), and the execution, delivery and performance by such Non-U.S. Obligor of the Applicable Non-U.S. Obligor Documents constitute and will constitute private and commercial acts and not public or governmental acts. Neither such Non-U.S. Obligor nor any of its property has any immunity from jurisdiction of any court or from any legal process (whether through service or notice, attachment prior to judgment, attachment in aid of execution, execution or otherwise) under the laws of the jurisdiction in which such Non-U.S. Obligor is organized and existing in respect of its obligations under the Applicable Non-U.S. Obligor Documents.

(b)    The Applicable Non-U.S. Obligor Documents are in proper legal form under the Laws of the jurisdiction in which such Non-U.S. Obligor is organized and existing for the enforcement thereof against such Non-U.S. Obligor under the Laws of such jurisdiction, and to ensure the legality, validity, enforceability, priority or admissibility in evidence of the Applicable Non-U.S. Obligor Documents. It is not necessary to ensure the legality, validity, enforceability, priority or admissibility in evidence of the Applicable Non-U.S. Obligor Documents that the Applicable Non-U.S. Obligor Documents be filed, registered or recorded with, or executed or notarized before, any court or other authority in the jurisdiction in which such Non-U.S. Obligor

is organized and existing or that any registration charge or stamp or similar tax be paid on or in respect of the Applicable Non-U.S. Obligor Documents or any other document, except for (i) any such filing, registration, recording, execution or notarization as has been made or is not required to be made until the Applicable Non-U.S. Obligor Document or any other document is sought to be enforced and (ii) any charge or tax as has been timely paid.

(c)    There is no tax, levy, impost, duty, fee, assessment or other governmental charge, or any deduction or withholding, imposed by any Governmental Authority in or of the jurisdiction in which such Non-U.S. Obligor is organized and existing either (i) on or by virtue of the execution or delivery of the Applicable Non-U.S. Obligor Documents or (ii) on any payment to be made by such Non-U.S. Obligor pursuant to the Applicable Non-U.S. Obligor Documents, except as has been disclosed to the Administrative Agent.

(d)    The execution, delivery and performance of the Applicable Non-U.S. Obligor Documents executed by such Non-U.S. Obligor are, under applicable foreign exchange control regulations of the jurisdiction in which such Non-U.S. Obligor is organized and existing, not subject to any notification or authorization except (i) such as have been made or obtained or (ii) such as cannot be made or obtained until a later date (provided that any notification or authorization described in clause (ii) shall be made or obtained as soon as is reasonably practicable).

**5.17**    **Affected Financial Institutions**. No Loan Party is an Affected Financial Institution.

<div align="center">

**ARTICLE VI.**
**AFFIRMATIVE COVENANTS**

</div>

So long as any Lender shall have any Commitment hereunder, any Loan or other Obligation hereunder (other than contingent indemnification obligations as to which no claim has been asserted) shall remain unpaid or unsatisfied, the Company shall, and shall (except in the case of the covenants set forth in Sections 6.01, 6.02, and 6.03) cause each Subsidiary to:

**6.01**    **Financial Statements**. Deliver to the Administrative Agent for prompt further distribution to each Lender.

(a)    Within 90 days after the end of each fiscal year of the Company, a copy of the Company's annual report on Form 10 K in respect of such fiscal year, containing its Consolidated balance sheet as at the end of such fiscal year, together with the related Consolidated statements of operations, stockholders' equity and cash flows as of and through the end of such fiscal year, setting forth in each case in comparative form the figures for the preceding fiscal year, such Consolidated financial statements to be audited and certified without Impermissible Qualification by the Accountants; and

(b)    Within 60 days after the end of each of the first three fiscal quarters of each fiscal, a copy of the Company's quarterly report on Form 10 Q in respect of such fiscal quarter, containing the Consolidated balance sheet of the Company as at the end of each such quarterly period, together with the related Consolidated statements of operations, stockholders' equity and cash flows for such period and for the elapsed portion of the fiscal year through such date (setting

forth in each case in comparative form the figures for the corresponding periods of the preceding fiscal year), all of which shall be complete and correct in all material respects and shall present fairly the Consolidated financial condition and the Consolidated results of operations of the Company in accordance with GAAP (subject to normal year end adjustments and the absence of footnotes).

As to any information contained in materials furnished pursuant to Section 6.02(b), the Company shall not be separately required to furnish such information under subsection (a) or (b) above, but the foregoing shall not be in derogation of the obligation of the Company to furnish the information and materials described in subsections (a) and (b) above at the times specified therein.

6.02    **Certificates; Other Information**. Deliver to the Administrative Agent for prompt further distribution to each Lender:

(a)    Concurrently with the delivery of financial statements under clauses 6.01(a) or (b), a Compliance Certificate certified a Responsible Officer of the Company;

(b)    Promptly upon becoming available, copies of all registration statements, Annual Reports to shareholders, 10 Ks, 10 Qs, 8 Ks, proxy materials and other material documents which the Company or any of its Subsidiaries may now or hereafter be required to deliver to shareholders or file with or deliver to any securities exchange or the SEC;

(c)    Promptly, such other information regarding the business and financial affairs of the Company and its Subsidiaries as the Administrative Agent or any Lender through the Administrative Agent shall reasonably request in writing from time to time.

Documents required to be delivered pursuant to Section 6.01(a) or (b) or Section 6.02(b) (to the extent any such documents are included in materials otherwise filed with the SEC) may be delivered electronically and if so delivered, shall be deemed to have been delivered on the date (i) on which the Company posts such documents, or provides a link thereto on the Company's website on the Internet at the website address listed on Schedule 11.02; or (ii) on which such documents are posted on the Company's behalf on an Internet or intranet website, if any, to which each Lender and the Administrative Agent have access (whether a commercial, third-party website or whether sponsored by the Administrative Agent); provided that: (i) the Company shall deliver paper copies of such documents to the Administrative Agent or any Lender upon its request to the Company to deliver such paper copies until a written request to cease delivering paper copies is given by the Administrative Agent or such Lender and (ii) the Company shall notify the Administrative Agent and each Lender (by facsimile or electronic mail) of the posting of any such documents and provide to the Administrative Agent by electronic mail electronic versions (*i.e.*, soft copies) of such documents. The Administrative Agent shall have no obligation to request the delivery of or to maintain paper copies of the documents referred to above, and in any event shall have no responsibility to monitor compliance by the Company with any such request by a Lender for delivery, and each Lender shall be solely responsible for requesting delivery to it or maintaining its copies of such documents.

Lululemon Credit Agreement

Each Borrower hereby acknowledges that (a) the Administrative Agent and/or the Arrangers may, but shall not be obligated to, make available to the Lenders materials and/or information provided by or on behalf of such Borrower hereunder (collectively, "Borrower Materials") by posting the Borrower Materials on IntraLinks, Syndtrak, ClearPar, or a substantially similar electronic transmission system (the "Platform") and (b) certain of the Lenders (each, a "Public Lender") may have personnel who do not wish to receive material non-public information with respect to any of the Borrowers or their Subsidiaries, or the respective securities of any of the foregoing, and who may be engaged in investment and other market-related activities with respect to such Persons' securities. Each Borrower hereby agrees that so long as such Borrower is the issuer of any outstanding debt or equity securities that are registered or issued pursuant to a private offering or is actively contemplating issuing any such securities (w) all Borrower Materials that are to be made available to Public Lenders shall be clearly and conspicuously marked "PUBLIC" which, at a minimum, shall mean that the word "PUBLIC" shall appear prominently on the first page thereof; (x) by marking Borrower Materials "PUBLIC," the Borrowers shall be deemed to have authorized the Administrative Agent, the Arrangers and the Lenders to treat such Borrower Materials as not containing any material non-public information with respect to the Borrowers or their respective securities for purposes of United States Federal and state securities laws (provided, however, that to the extent such Borrower Materials constitute Information, they shall be treated as set forth in Section 11.07); (y) all Borrower Materials marked "PUBLIC" are permitted to be made available through a portion of the Platform designated "Public Side Information"; and (z) the Administrative Agent and the Arrangers shall be entitled to treat any Borrower Materials that are not marked "PUBLIC" as being suitable only for posting on a portion of the Platform not designated "Public Side Information." Notwithstanding the foregoing, no Borrower shall be under any obligation to mark any Borrower Materials "PUBLIC."

**6.03**    **Notices**. Promptly after a Responsible Officer obtains actual knowledge thereof, notify the Administrative Agent:

(a)    of the occurrence of any Default;

(b)    of any matter that has resulted or could reasonably be expected to result in a Material Adverse Effect, including (i) breach or non-performance of, or any default under, a Contractual Obligation of the Company or any Subsidiary; (ii) any dispute, litigation, formal investigation, proceeding or suspension between the Company or any Subsidiary and any Governmental Authority; or (iii) the commencement of, or any material development in, any litigation or proceeding affecting the Company or any Subsidiary, including pursuant to any applicable Environmental Laws;

(c)    in the event that the Company or any ERISA Affiliate knows, or has reason to know, that any event shall have occurred, or any condition exists, with respect to a Pension Plan the result of which could reasonably be expected to have a Material Adverse Effect; and

(d)    of any material change in accounting policies or financial reporting practices by the Company or any Subsidiary.

Each notice pursuant to this Section 6.03 shall be accompanied by a statement of a Responsible Officer of the Company setting forth details of the occurrence referred to therein and stating what action the Company has taken and proposes to take with respect thereto. Each notice pursuant to Section 6.03(a) shall describe with particularity any and all provisions of this Agreement and any other Loan Document that have been breached.

6.04    **Payment of Obligations.** Pay and discharge when due, and cause each of its Subsidiaries so to do, all lawful Indebtedness, obligations and claims for labor, materials and supplies or otherwise which, if unpaid, (i) would reasonably be expected to have a Material Adverse Effect, or (ii) become a Lien upon Property of the Company or any of its Subsidiaries other than a Lien permitted under Section 7.01, unless and to the extent only that (a) the validity of such Indebtedness, obligation or claim shall be contested in good faith and by appropriate proceedings diligently conducted for which appropriate reserves have been established in accordance with GAAP or (b) the failure to pay or discharge the same would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

6.05    **Preservation of Existence, Etc.** Except as may otherwise be permitted by Section 7.03, (a) preserve, renew and maintain its corporate, partnership or analogous existence, as the case may be, under the Laws of the jurisdiction of its organization and (b) take all reasonable action to remain in good standing in the jurisdiction of its incorporation or formation and in each other jurisdiction in which the failure so to do would reasonably be expected to have a Material Adverse Effect; _provided_, _however_, that any Subsidiary of the Company (other than a Loan Party) may be dissolved if such dissolution would not reasonably be expected to have a Material Adverse Effect.

6.06    **Maintenance of Properties.** At all times, maintain, protect and keep in good repair, working order and condition (ordinary wear and tear excepted), all Property necessary to the operation of the Company's or such Subsidiary's business except to the extent that the failure so to do will not reasonably be expected to have a Material Adverse Effect.

6.07    **Maintenance of Insurance.** Maintain, with financially sound and reputable insurance companies (in the good faith judgment of the Company), insurance on all its Property necessary to the operation of their respective business in at least such amounts, having such deductibles and against at least such risks (but including in any event public liability, product liability and business interruption coverage) (after giving effect to any self-insurance reasonable and customary for similarly situated Persons engaged in the same or similar businesses as the Company and their Subsidiaries) as are customarily carried under similar circumstances by companies engaged in the same or a similar business or advisable in the good faith judgment of the Company, and furnish to the Administrative Agent upon request full information as to all such insurance carried.

6.08    **Compliance with Laws.** Observe and comply in all respects, with all laws, ordinances, orders, judgments, rules, regulations, certifications, franchises, permits, licenses, directions and requirements of all Governmental Authorities, which now or at any time hereafter may be applicable to it, except to the extent the failure to so observe and comply thereof would not reasonably be expected to have a Material Adverse Effect, and except such violations thereof as shall be contested in good faith and by appropriate proceedings diligently conducted by it, _provided_ that the Company shall give the Administrative Agent prompt notice of such contest and that such

67

Lululemon Credit Agreement

reserve or other appropriate provision as shall be required in accordance with GAAP shall have been made therefor; and maintain policies and procedures reasonably designed to promote and achieve compliance with Anti-Corruption Laws and applicable Sanctions.

**6.09    Books and Records; Inspection Rights**. Keep proper books of record and account, in which full, true and correct entries in all material requests in conformity with GAAP and all requirements of law shall be made in all dealings and transactions in relation to its business and activities; and at all reasonable times during normal business hours, but no more than once per year provided no Event of Default has occurred and is continuing, upon reasonable prior notice, permit representatives of the Administrative Agent and each Lender to visit the offices of the Company and each of its Subsidiaries, to examine the books and records thereof and Accountants' reports relating thereto, and to make copies or extracts therefrom, to discuss the affairs of the Company and each such Subsidiary with the respective officers thereof, and to examine and inspect the Property of the Company and each such Subsidiary and to meet and discuss the affairs of the Company and each such Subsidiary with the Accountants (subject to such Accountants' customary policies and procedures).The Administrative Agent shall give the Company the opportunity to participate in any discussions with the Accountants. Notwithstanding anything to the contrary in this Section 6.09, none of the Company or any of its Subsidiaries will be required to disclose, permit the inspection, examination or making copies or abstracts of, or discussion of, any document, information or other matter that (a) constitutes non-financial trade secrets or non-financial proprietary information, (b) in respect of which disclosure to the Administrative Agent or any Lender (or their respective representatives or contractors) is prohibited by Law or any binding agreement or (c) is subject to attorney-client or similar privilege or constitutes attorney work product.

**6.10    Use of Proceeds**. Use the proceeds of the Credit Extensions to pay the purchase price of the Mirror Acquisition and for other general corporate purposes not in contravention of any applicable Law or of any Loan Document.

**6.11    Approvals and Authorizations**. Maintain all authorizations, consents, approvals and licenses from, exemptions of, and filings and registrations with, each Governmental Authority of the jurisdiction in which each Non-U.S. Obligor is organized and existing, and all approvals and consents of each other Person in such jurisdiction, in each case that are required in connection with the Loan Documents.

<div align="center">

**ARTICLE VII.**
**NEGATIVE COVENANTS**

</div>

So long as any Lender shall have any Commitment hereunder, any Loan or other Obligation hereunder (other than contingent indemnification obligations as to which no claim has been asserted) shall remain unpaid or unsatisfied, the Company shall not, nor shall it permit any Subsidiary to, directly or indirectly:

**7.01    Liens**. Create, incur, assume or suffer to exist any Lien upon any of its Property, whether now owned or hereafter acquired, other than the following:

(a)    Liens created pursuant to any Loan Document;

<div align="center">

68
Lululemon Credit Agreement

</div>

(b)    Liens for taxes, assessments or governmental charges in the ordinary course of business that are not overdue for a period of more than 60 days or that are being contested in good faith and by appropriate actions, if adequate reserves with respect thereto are maintained on the books of the applicable Person in accordance with GAAP or the equivalent accounting principles in the relevant local jurisdiction;

(c)    pledges or deposits in the ordinary course of business in connection with workers' compensation, health, disability or employee benefits, unemployment insurance and other social security laws or similar legislation or regulation or other insurance-related obligations (including, but not limited to, in respect of deductibles, self-insured retention amounts and premiums and adjustments thereto) or letters of credit or guarantees issued in respect thereof, (ii) incurred in the ordinary course of business to secure the performance of tenders, statutory obligations (other than excise taxes), surety, stay, customs and appeal bonds, statutory bonds, bids, leases, government contracts, trade contracts, performance and return of money bonds and other similar obligations or letters of credit or guarantees issued in respect thereof (in each case, exclusive of obligations for the payment of Indebtedness) and (iii) pledges and deposits in the ordinary course of business securing liability for reimbursement or indemnification obligations of (including obligations in respect of letters of credit or bank guarantees for the benefit of) insurance carriers providing property, casualty or liability insurance to the Company or any of its Subsidiaries;

(d)    deposits to secure the performance of bids, trade contracts, governmental contracts and leases, statutory obligations, surety, stay, customs and appeal bonds, performance bonds and other obligations of a like nature (including those to secure health, safety and environmental obligations but not, in any case, for the payment of borrowed money) incurred in the ordinary course of business;

(e)    zoning ordinances, easements, rights of way, minor defects, irregularities, and other similar restrictions affecting real Property which do not materially adversely affect the value of such real Property or materially impair its use for the operation of the business of the Company or such Subsidiary;

(f)    statutory or common law Liens of landlords, sublandlords, carriers, warehousemen, mechanics, materialmen, repairmen, construction contractors or other like Liens, so long as, in each case, such Liens secure amounts not overdue for a period of more than 30 days or if more than 60 days overdue, are unfiled and no other action has been taken to enforce such Liens or that are being contested in good faith and by appropriate actions, if adequate reserves with respect thereto are maintained on the books of the applicable Person in accordance with GAAP or the equivalent accounting principles in the relevant local jurisdiction;

(g)    Liens arising out of judgments or decrees (to the extent not constituting an Event of Default under Section 8.01(h));

(h)    Liens on Margin Stock to the extent that a prohibition on such Liens would result in any Lender being deemed to be "indirectly secured" by Margin Stock under Regulation U of the Board of Governors of the Federal Reserve System, as amended;

(i)    Liens on Property of the Company and its Subsidiaries existing on the Closing Date as set forth on <u>Schedule 7.01</u> as renewed from time to time, but not any increases in the amounts secured thereby or extensions thereof to additional Property;

(j)    consensual Liens on fixed or capital assets (including any accessions thereto) acquired (including by lease under any Capital Lease), constructed or improved by the Company or any Subsidiary thereof, <u>provided</u> that (i) such consensual Liens secure only Indebtedness of the Company's Subsidiaries permitted by Section 7.02 or Indebtedness of the Loan Parties, (ii) such consensual Liens and such Indebtedness are incurred no later than the 180th day after such acquisition, leasing or the completion of such construction or improvement, (iii) the Indebtedness secured thereby does not exceed the cost of acquiring, leasing, constructing or improving such fixed or capital assets, and (iv) such consensual Liens shall not apply to any other Property (other than accessions to such fixed or capital assets) of the Company or any Subsidiary thereof;

(k)    consensual Liens existing on any Property (and any accessions thereto) prior to the acquisition thereof by the Company or any Subsidiary thereof or existing on any Property (and any accessions thereto) of any Person that becomes a Subsidiary of the Company after the Closing Date prior to the time such Person became a Subsidiary of the Company, <u>provided</u> that (a) such consensual Liens secure only Indebtedness of the Company's Subsidiaries permitted by <u>Section 7.02</u> or Indebtedness of the Loan Parties, (ii) such consensual Liens are not created in contemplation of or in connection with such acquisition or such Person becoming a Subsidiary of the Company, as applicable, (iii) such consensual Liens shall not apply to any other Property of the Company or any Subsidiary thereof, and (iv) such consensual Liens shall secure only the Indebtedness that they secure on the date of such acquisition or the date such Person becomes a Subsidiary of the Company, as applicable, and any extensions, renewals and replacements thereof that do not increase the outstanding principal amount thereof;

(l)    leases, franchises, grants, subleases, licenses, sublicenses, covenants not to sue, releases, consents and other forms of license (including of IP Rights) granted to others in the ordinary course of business which do not materially interfere with the ordinary conduct of the business of the Company or any Subsidiary and do not secure any Indebtedness;

(m)    contractual Liens of any landlord for the payment of obligations under any lease entered into by the Company or any Subsidiary;

(n)    Liens arising out of conditional sale, title retention, consignment or similar arrangements for the sale of goods entered into by the Company in the ordinary course of business; and

(o)    other Liens on the property of the Company and the Subsidiaries securing obligations in an aggregate Consolidated amount not in excess of the greater of (a) $50,000,000 and (2) 5% of Consolidated Tangible Net Worth.

**7.02    Subsidiary Indebtedness.** Permit any Subsidiary that is not a Loan Party to create, incur, assume or suffer to exist any liability for Indebtedness, other than (a) any Indebtedness in respect of undrawn trade letters of credit, (b) Indebtedness under each Capital Lease, (c)

Indebtedness of a Subsidiary owing to the Company or to another Subsidiary, (d) Indebtedness of any Person that becomes a Subsidiary after the Closing Date and refinancings, extensions, renewals and replacements of any such Indebtedness that do not increase the outstanding principal amount thereof; <u>provided</u> that such Indebtedness is not incurred in contemplation or in connection with such acquisition or such Person becoming a Subsidiary of the Company, (e) Indebtedness of any Subsidiary existing on the Closing Date as set forth in <u>Schedule 7.02</u> and any modification, replacements, renewals, refinancings or extensions thereof, but not any increases in the amounts secured thereby and (f) other Indebtedness, together with Indebtedness of the other Subsidiaries of the Company incurred, assumed or permitted to exist pursuant to this clause (f), that in an aggregate principal amount at any time outstanding does not exceed 5% of Consolidated Tangible Net Worth.

7.03   **Fundamental Changes**. Consolidate with, or merge into or with, any Person, or make any Acquisition, or change its fiscal year, or permit any of its Subsidiaries so to do, except that provided both immediately before and after giving effect thereto no Default shall have occurred and be continuing, the Company or any Subsidiary thereof may:

(a)   merge with the Company or any Subsidiary thereof, <u>provided</u> that in the event of a merger involving the Company, the Company shall be the surviving corporation,

(b)   merge with any other Person or make any Acquisition, <u>provided</u> that (i) immediately after giving effect thereto and any Indebtedness or other obligation incurred or assumed in connection therewith, all of the representations and warranties contained in <u>Article V</u> and the other Loan Documents are true and correct in all material respects as if then made, except to the extent that such representations and warranties specifically refer to an earlier date, in which case they shall be true and correct in all material respects as of such earlier date (<u>provided</u> that any representation or warranty qualified by materiality or material adverse effect shall be true and correct in all respects), and the Company will be in compliance herewith on a *pro forma* basis, (ii) it is on a non hostile basis pursuant to a negotiated agreement, and (iii) in the event of a merger involving the Company, the Company shall be the surviving corporation, or

(c)   change its fiscal year to any other fiscal year reasonably acceptable to the Administrative Agent upon written notice to the Administrative Agent, in which case, the Borrowers and the Administrative Agent will, and are hereby authorized by the Lenders to, make any adjustments that are necessary to reflect such change in fiscal year.

7.04   **Dispositions**. Make any Disposition of all or substantially all of the assets of the Company or any other Loan Party.

7.05   **Change in Nature of Business**. Become significantly engaged in any business other than in substantially the same or complimentary fields of enterprise as conducted by the Company and its Subsidiaries on the Closing Date or any business or any other activities reasonably related, complementary, synergistic or ancillary thereto or reasonable extensions thereof.

7.06   **Burdensome Agreements**. The Company will not, and will not permit any of its Subsidiaries (other than Subsidiaries which are special purpose entities involved in securitization relating to the sale or financing of accounts receivable) to, directly or indirectly, enter into, incur

or permit to exist any agreement or other arrangement binding on the Company or any Subsidiary thereof that prohibits, restricts or imposes any condition upon the ability of any Subsidiary of the Company to pay dividends or make other distributions with respect to any of its Capital Stock or to make or repay loans or advances to the Company or any other Subsidiary thereof, *provided* that the foregoing shall not apply to restrictions and conditions (a) imposed by law, by this Agreement, or by any other loan or credit agreement containing such restrictions and conditions that are no more onerous than the restrictions and conditions contained herein, (b) existing on the Closing Date and identified on Schedule 7.06 (but shall apply to any extension or renewal of, or any amendment or modification expanding the scope of, any such restriction or condition), (c) that are customarily contained in agreements relating to the sale of a Subsidiary of the Company pending such sale, *provided* that such restrictions and conditions apply only to such Subsidiary and such sale is permitted hereunder, (d) are binding on a Subsidiary at the time such Subsidiary first becomes a Subsidiary of the Company, so long as such restrictions or conditions were not entered into solely in contemplation of such Person becoming a Subsidiary of the Company and (e) are customary restrictions in joint venture agreements and other similar agreements applicable to joint ventures.

**7.07    Use of Proceeds**. Use the proceeds of any Credit Extension, whether directly or indirectly, and whether immediately, incidentally or ultimately, to purchase or carry margin stock (within the meaning of Regulation U of the FRB) or to extend credit to others for the purpose of purchasing or carrying margin stock or to refund indebtedness originally incurred for such purpose; or request any Borrowing to use, directly, or to the Company's knowledge, indirectly, or permit any other Borrower, its Subsidiaries or its or their respective directors, officers, employees and agents to knowingly use, directly, or to the Company's knowledge, indirectly, the proceeds of any Borrowing (i) in furtherance of an offer, payment, promise to pay, or authorization of the payment or giving of money, or anything else of value, to any Person in violation of any Anti-Corruption Laws, (ii) for the purpose of funding, financing or facilitating any activities, business or transaction of or with any Sanctioned Person, or in any country or region subject to Sanctions, or (iii) in any manner that would result in a violation of Sanctions by any Person (including any Person participating in the Loans, whether as a lender, underwriter, advisor, investor or otherwise).

**7.08    Financial Covenants**.

(a)    Consolidated Fixed Charge Ratio. Permit the Consolidated Fixed Charge Ratio to be less than 2.00 to 1.00 as of the last day of any Test Period (commencing with the first fiscal quarter following the Closing Date).

(b)    Consolidated Rent-Adjusted Leverage Ratio. Permit the Consolidated Rent-Adjusted Leverage Ratio to be greater than 3.50 to 1.00 as of the last day of any Test Period (commencing with the first fiscal quarter following the Closing Date).

**ARTICLE VIII.**
**EVENTS OF DEFAULT AND REMEDIES**

**8.01    Events of Default**. Any of the following shall constitute an "Event of Default":

(a)    <u>Non-Payment</u>. Any Borrower or any other Loan Party fails to pay (i) when and as required to be paid herein, and in the currency required hereunder, any amount of principal of any Loan, or (ii) within five Business Days after the same becomes due, any interest on any Loan, or any fee due hereunder, any other amount payable hereunder or under any other Loan Document; or

(b)    <u>Specific Covenants</u>. The Company fails to perform or observe any term, covenant or agreement contained in any of <u>Section 6.03</u>(a), <u>6.05</u>(a) (with respect to the Borrowers), <u>6.10</u> or <u>Article VII</u>; or

(c)    <u>Other Defaults</u>. Any Loan Party fails to perform or observe any other covenant or agreement (not specified in <u>subsection (a)</u> or (b) above) contained in any Loan Document on its part to be performed or observed and such failure shall have continued unremedied for a period of 30 days after any Loan Party shall have actual knowledge thereof; or

(d)    <u>Representations and Warranties</u>. Any representation or warranty made or deemed made by any Loan Party (or by an officer thereof on its behalf) in any Loan Document or in any certificate, report, opinion (other than an opinion of counsel) or other document delivered or to be delivered pursuant thereto (including any amendment or modification thereof or waiver thereunder), shall prove to have been incorrect or misleading (whether because of misstatement or omission) in any material respect when made or deemed made; or

(e)    <u>Cross-Default</u>. (i) The Company or any Subsidiary thereof shall fail to make any payment (whether in respect of principal, interest or otherwise and regardless of amount) in respect of any Material Obligations when as the same shall become due and payable (after giving effect to any applicable grace period), or (ii) any event or condition occurs that results in any Material Obligations becoming due prior to their scheduled maturity, or that enables or permits (with or without the giving of notice, the lapse of time or both) the holder or holders of any Material Obligations or any trustee or agent on its or their behalf to cause any Material Obligations to become due prior to their scheduled maturity or to require the prepayment, repurchase, redemption or defeasance thereof, prior to their scheduled maturity (in each case after giving effect to any applicable cure period), <u>provided</u> that this clause (e)(ii) shall not apply to secured Indebtedness that becomes due solely as a result of the voluntary sale or transfer of the property or assets securing such Indebtedness; or

(f)    <u>Insolvency Proceedings, Etc.</u> An order for relief is entered under the United States bankruptcy laws or any other decree or order is entered by a court having jurisdiction (i) adjudging the Company, any other Loan Party or any Significant Subsidiary bankrupt or insolvent, (ii) approving as properly filed a petition seeking reorganization, liquidation, arrangement, adjustment or composition of or in respect of the Company or any Significant Subsidiary under the United States bankruptcy laws or any other applicable Federal or state law, (iii) appointing a receiver, liquidator, assignee, trustee, custodian, sequestrator (or other similar official) of the Company, any other Loan Party or any Significant Subsidiary or of any substantial part of the Property of any thereof, or (iv) ordering the winding up or liquidation of the affairs of the Company, any other Loan Party or any Significant Subsidiary, and any such decree or order continues unstayed and in effect for a period of 60 days; or

(g)    <u>Inability to Pay Debts; Attachment</u>. (i) The Company, any other Loan Party or any Significant Subsidiary shall (i) suspend or discontinue its retail business (other than pursuant to the transfer of such business to the Company, any other Loan Party or any Subsidiary thereof), (ii) make an assignment for the benefit of creditors, (iii) generally not be paying its debts as such debts become due, (iv) admit in writing its inability to pay its debts as they become due, (v) file a voluntary petition in bankruptcy, (vi) become insolvent (however such insolvency shall be evidenced), (vii) file any petition or answer seeking for itself any reorganization, arrangement, composition, readjustment of debt, liquidation or dissolution or similar relief under any present or future statute, law or regulation of any jurisdiction, (viii) petition or apply to any tribunal for any receiver, custodian or any trustee for any substantial part of its Property, (ix) be the subject of any such proceeding filed against it which remains undismissed for a period of 60 days, (x) file any answer admitting or not contesting the material allegations of any such petition filed against it or any order, judgment or decree approving such petition in any such proceeding, (xi) seek, approve, consent to, or acquiesce in any such proceeding, or in the appointment of any trustee, receiver, sequestrator, custodian, liquidator, or fiscal agent for it, or any substantial part of its Property, or an order is entered appointing any such trustee, receiver, custodian, liquidator or fiscal agent and such order remains in effect for 60 days, or (xii) take any formal action for the purpose of effecting any of the foregoing or looking to the liquidation or dissolution of the Company, any other Loan Party or any Significant Subsidiary under any laws relating to bankruptcy, insolvency, reorganization or relief of debtors; or

(h)    <u>Judgments</u>. One or more judgments for the payment of money in an aggregate amount (exclusive of any portions thereof covered by insurance) in excess of $50,000,000 shall be rendered against any Borrower or any Subsidiary thereof or any combination thereof and the same shall remain undischarged or unbonded for a period of 60 consecutive days during which execution shall not be effectively stayed, or any action shall be legally taken by a judgment creditor to attach or levy upon any assets of any Borrower or any Subsidiary to enforce any such judgment; or

(i)    <u>ERISA</u>. (i) Any Termination Event shall occur, (ii) any failure to comply with the Pension Funding Rules shall occur, which failure has not been corrected within 60 days following the final due dates for all required contributions or payment for the applicable plan year, (iii) any Borrower or any ERISA Affiliate shall fail to pay when due an amount which is payable by it to the PBGC or to any Employee Benefit Plan, or (iv) the conditions for the imposition of a lien under Section 303(k) of ERISA have been met with respect to any Pension Plan, which, in each case, would, individually or in the aggregate, have a Material Adverse Effect; or

(j)    <u>Invalidity of Loan Documents</u>. Any Loan Document shall cease, for any reason, to be in full force and effect, or the applicable Loan Party shall so assert in writing or shall disavow any of its material obligations thereunder; or

(k)    <u>Change of Control</u>. There occurs any Change of Control.

**8.02    Remedies Upon Event of Default**. If any Event of Default occurs and is continuing, the Administrative Agent shall, at the request of, or may, with the consent of, the Required Lenders, take any or all of the following actions:

(a)   declare the commitment of each Lender to make Loans to be terminated, whereupon such commitments and obligation shall be terminated;

(b)   declare the unpaid principal amount of all outstanding Loans, all interest accrued and unpaid thereon, and all other amounts owing or payable hereunder or under any other Loan Document to be immediately due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by the Borrowers;

(c)   exercise on behalf of itself and the Lenders all rights and remedies available to it and the Lenders under the Loan Documents;

provided, however, that upon the occurrence of an actual or deemed entry of an order for relief with respect to any Borrower under the Bankruptcy Code of the United States, the obligation of each Lender to make Loans shall automatically terminate and the unpaid principal amount of all outstanding Loans and all interest and other amounts as aforesaid shall automatically become due and payable, in each case without further act of the Administrative Agent or any Lender.

**8.03    Application of Funds**. After the exercise of remedies provided for in Section 8.02 (or after the Loans have automatically become immediately due and payable as set forth in the proviso to Section 8.02), any amounts received on account of the Obligations shall, subject to the provisions of Section 2.15, and subject, for the avoidance of doubt, to Section 2.16, be applied by the Administrative Agent in the following order:

First, to payment of that portion of the Obligations constituting fees, indemnities, expenses and other amounts (including the reasonable and documented out-of-pocket fees, charges and disbursements of counsel to the Administrative Agent and amounts payable under Article III) payable to the Administrative Agent in its capacity as such;

Second, to payment of that portion of the Obligations constituting fees, indemnities and other amounts (other than principal and interest) payable to the Lenders (including the reasonable and documented out-of-pocket fees, charges and disbursements of counsel to the respective Lenders and amounts payable under Article III), ratably among them in proportion to the respective amounts described in this clause Second payable to them;

Third, to payment of that portion of the Obligations constituting accrued and unpaid interest on the Loans and other Obligations, ratably among the Lenders in proportion to the respective amounts described in this clause Third payable to them;

Fourth, to payment of that portion of the Obligations constituting unpaid principal of the Loans, ratably among the Lenders in proportion to the respective amounts described in this clause Fourth held by them;

Last, the balance, if any, after all of the Obligations have been indefeasibly paid in full, to the Company or as otherwise required by Law.

## ARTICLE IX.
## ADMINISTRATIVE AGENT

**9.01    Appointment and Authority**.

Each of the Lenders hereby irrevocably appoints Bank of America to act on its behalf as the Administrative Agent hereunder and under the other Loan Documents and authorizes the Administrative Agent to take such actions on its behalf and to exercise such powers as are delegated to the Administrative Agent by the terms hereof or thereof, together with such actions and powers as are reasonably incidental thereto. The provisions of this Article are solely for the benefit of the Administrative Agent and the Lenders, and neither the Company nor any other Loan Party shall have rights as a third party beneficiary of any of such provisions. It is understood and agreed that the use of the term "agent" herein or in any other Loan Documents (or any other similar term) with reference to the Administrative Agent is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any applicable Law. Instead such term is used as a matter of market custom, and is intended to create or reflect only an administrative relationship between contracting parties.

**9.02    Rights as a Lender**. The Person serving as the Administrative Agent hereunder shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though it were not the Administrative Agent and the term "Lender" or "Lenders" shall, unless otherwise expressly indicated or unless the context otherwise requires, include the Person serving as the Administrative Agent hereunder in its individual capacity. Such Person and its Affiliates may accept deposits from, lend money to, own securities of, act as the financial advisor or in any other advisory capacity for and generally engage in any kind of business with the Borrowers or any Subsidiary or other Affiliate thereof as if such Person were not the Administrative Agent hereunder and without any duty to account therefor to the Lenders.

**9.03    Exculpatory Provisions**. The Administrative Agent shall not have any duties or obligations except those expressly set forth herein and in the other Loan Documents, and its duties hereunder shall be administrative in nature. Without limiting the generality of the foregoing, the Administrative Agent:

(a)    shall not be subject to any fiduciary or other implied duties, regardless of whether a Default has occurred and is continuing;

(b)    shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or by the other Loan Documents that the Administrative Agent is required to exercise as directed in writing by the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Loan Documents), <u>provided</u> that the Administrative Agent shall not be required to take any action that, in its opinion or the opinion of its counsel, may expose the Administrative Agent to liability or that is contrary to any Loan Document or applicable law, including for the avoidance of doubt any action that may be in violation of the automatic stay under any Debtor Relief Law or that may effect a forfeiture, modification or termination of property of a Defaulting Lender in violation of any Debtor Relief Law; and

(c)    shall not, except as expressly set forth herein and in the other Loan Documents, have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to any of the Borrowers or any of their respective Affiliates that is communicated to or obtained by the Person serving as the Administrative Agent or any of its Affiliates in any capacity.

The Administrative Agent shall not be liable for any action taken or not taken by it (i) with the consent or at the request of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary, or as the Administrative Agent shall believe in good faith shall be necessary, under the circumstances as provided in Sections 11.01 and 8.02) or (ii) in the absence of its own gross negligence, bad faith or willful misconduct as determined by a court of competent jurisdiction by final and nonappealable judgment. The Administrative Agent shall be deemed not to have knowledge of any Default unless and until notice describing such Default is given in writing to the Administrative Agent by the Company or a Lender.

The Administrative Agent shall not be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with this Agreement or any other Loan Document, (ii) the contents of any certificate, report or other document delivered hereunder or thereunder or in connection herewith or therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or therein or the occurrence of any Default, (iv) the validity, enforceability, effectiveness or genuineness of this Agreement, any other Loan Document or any other agreement, instrument or document or (v) the satisfaction of any condition set forth in Article IV or elsewhere herein, other than to confirm receipt of items expressly required to be delivered to the Administrative Agent.

9.04    **Reliance by Administrative Agent**.

The Administrative Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing (including any electronic message, Internet or intranet website posting or other distribution) believed by it to be genuine and to have been signed, sent or otherwise authenticated by the proper Person. The Administrative Agent also may rely upon any statement made to it orally or by telephone and believed by it to have been made by the proper Person, and shall not incur any liability for relying thereon. In determining compliance with any condition hereunder to the making of a Loan that by its terms must be fulfilled to the satisfaction of a Lender, the Administrative Agent may presume that such condition is satisfactory to such Lender unless the Administrative Agent shall have received notice to the contrary from such Lender prior to the making of such Loan. The Administrative Agent may consult with legal counsel (who may be counsel for the Company), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.

9.05    **Delegation of Duties**. The Administrative Agent may perform any and all of its duties and exercise its rights and powers hereunder or under any other Loan Document by or through any one or more sub-agents appointed by the Administrative Agent, provided, however, that any such sub-agent receiving payments from the U.S. Borrowers or U.S. Guarantors shall be a "U.S. Person" and a "financial institution" within the meaning of Treasury Regulations section 1.1441-1.

The Administrative Agent and any such sub-agent may perform any and all of its duties and exercise its rights and powers by or through their respective Related Parties. The exculpatory provisions of this Article shall apply to any such sub-agent and to the Related Parties of the Administrative Agent and any such sub-agent, and shall apply to their respective activities in connection with the syndication of the credit facilities provided for herein as well as activities as Administrative Agent. The Administrative Agent shall not be responsible for the negligence or misconduct of any sub-agents except to the extent that a court of competent jurisdiction determines in a final and nonappealable judgment that the Administrative Agent acted with gross negligence, bad faith or willful misconduct in the selection of such sub-agents.

**9.06    Resignation of Administrative Agent.** (a) The Administrative Agent may at any time give notice of its resignation to the Lenders and the Company. Upon receipt of any such notice of resignation, the Required Lenders shall have the right, in consultation with the Company, to appoint a successor, which shall be a bank with an office in the United States, or an Affiliate of any such bank with an office in the United States, and who shall be a "U.S. Person" and a "financial institution" within the meaning of Treasury Regulations section 1.1441-1. If no such successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within 30 days after the retiring Administrative Agent gives notice of its resignation (or such earlier day as shall be agreed by the Required Lenders) (the "Resignation Effective Date"), then the retiring Administrative Agent may (but shall not be obligated to) on behalf of the Lenders, appoint a successor Administrative Agent meeting the qualifications set forth above, provided that in no event shall any such successor Administrative Agent be a Defaulting Lender. Whether or not a successor has been appointed, such resignation shall become effective in accordance with such notice on the Resignation Effective Date.

(b)    If the Person serving as Administrative Agent is a Defaulting Lender pursuant to clause (d) of the definition thereof, the Required Lenders may, to the extent permitted by applicable law, by notice in writing to the Company and such Person remove such Person as Administrative Agent and, in consultation with the Company, appoint a successor. If no such successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within 30 days (or such earlier day as shall be agreed by the Required Lenders) (the "Removal Effective Date"), then such removal shall nonetheless become effective in accordance with such notice on the Removal Effective Date.

(c)    With effect from the Resignation Effective Date or the Removal Effective Date (as applicable) (1) the retiring or removed Administrative Agent shall be discharged from its duties and obligations hereunder and under the other Loan Documents (except that in the case of any collateral security held by the Administrative Agent on behalf of the Lenders under any of the Loan Documents, the retiring or removed Administrative Agent shall continue to hold such collateral security until such time as a successor Administrative Agent is appointed) and (2) except for any indemnity payments or other amounts then owed to the retiring or removed Administrative Agent, all payments, communications and determinations provided to be made by, to or through the Administrative Agent shall instead be made by or to each Lender directly, until such time, if any, as the Required Lenders appoint a successor Administrative Agent as provided for above. Upon the acceptance of a successor's appointment as Administrative Agent hereunder, such successor

shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring (or removed) Administrative Agent (other than as provided in Section 3.01(g) and other than any rights to indemnity payments or other amounts owed to the retiring or removed Administrative Agent as of the Resignation Effective Date or the Removal Effective Date, as applicable, and the retiring or removed Administrative Agent shall be discharged from all of its duties and obligations hereunder or under the other Loan Documents (if not already discharged therefrom as provided above in this Section). The fees payable by the Company to a successor Administrative Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Company and such successor. After the retiring or removed Administrative Agent's resignation or removal hereunder and under the other Loan Documents, the provisions of this Article and Section 11.04 shall continue in effect for the benefit of such retiring or removed Administrative Agent, its sub agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them (i) while the retiring or removed Administrative Agent was acting as Administrative Agent and (ii) after such resignation or removal for as long as any of them continues to act in any capacity hereunder or under the other Loan Documents, including (a) acting as collateral agent or otherwise holding any collateral security on behalf of any of the Lenders and (b) in respect of any actions taken in connection with transferring the agency to any successor Administrative Agent.

(d)   Any resignation by Bank of America as Administrative Agent pursuant to this Section shall also constitute its resignation as Swing Line Lender. If Bank of America resigns as Swing Line Lender, it shall retain all the rights of the Swing Line Lender provided for hereunder with respect to Swing Line Loans made by it and outstanding as of the effective date of such resignation, including the right to require the Lenders to make Base Rate Loans or fund risk participations in outstanding Swing Line Loans pursuant to Section 2.04(c). Upon the appointment by the Company of a successor Swing Line Lender hereunder (which successor shall in all cases be a Lender, other than a Defaulting Lender, that accepts such appointment), (a) such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring Swing Line Lender and (b) the retiring Swing Line Lender shall be discharged from all of its duties and obligations hereunder or under the other Loan Documents.

**9.07   Non-Reliance on Administrative Agent and Other Lenders.** Each Lender acknowledges that it has, independently and without reliance upon the Administrative Agent or any other Lender or any of their Related Parties and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement. Each Lender also acknowledges that it will, independently and without reliance upon the Administrative Agent or any other Lender or any of their Related Parties and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any other Loan Document or any related agreement or any document furnished hereunder or thereunder.

**9.08   No Other Duties, Etc.** Anything herein to the contrary notwithstanding, none of the Bookrunners, Arrangers or syndication agents listed on the cover page hereof shall have any powers, duties or responsibilities under this Agreement or any of the other Loan Documents, except in its capacity, as applicable, as the Administrative Agent or a Lender hereunder.

**9.09    Guaranty Matters**. The Lenders irrevocably authorize the Administrative Agent, at its option and in its discretion, to release LUSA from its obligations under the Guaranty if such Person ceases to be a Subsidiary as a result of a transaction permitted under the Loan Documents.

Upon request by the Administrative Agent at any time, the Required Lenders will confirm in writing the Administrative Agent's authority to release LUSA from its obligations under the Guaranty pursuant to this Section 9.09.

**9.10    Lender ERISA Matters**. (a) Each Lender (x) represents and warrants, as of the date such Person became a Lender party hereto, to, and (y) covenants, from the date such Person became a Lender party hereto to the date such Person ceases being a Lender party hereto, for the benefit of, the Administrative Agent and each Arranger and their respective Affiliates, and not, for the avoidance of doubt, to or for the benefit of any Loan Party, that at least one of the following is and will be true:

(i)    such Lender is not using "plan assets" (within the meaning of 29 CFR § 2510.3-101, as modified by Section 3(42) of ERISA) of one or more Benefit Plans in connection with the Loans or the Commitments,

(ii)    the transaction exemption set forth in one or more PTEs, such as PTE 84-14 (a class exemption for certain transactions determined by independent qualified professional asset managers), PTE 95-60 (a class exemption for certain transactions involving insurance company general accounts), PTE 90-1 (a class exemption for certain transactions involving insurance company pooled separate accounts), PTE 91-38 (a class exemption for certain transactions involving bank collective investment funds) or PTE 96-23 (a class exemption for certain transactions determined by in-house asset managers), is applicable with respect to such Lender's entrance into, participation in, administration of and performance of the Loans, the Commitments and this Agreement,

(iii)    (A) such Lender is an investment fund managed by a "Qualified Professional Asset Manager" (within the meaning of Part VI of PTE 84-14), (B) such Qualified Professional Asset Manager made the investment decision on behalf of such Lender to enter into, participate in, administer and perform the Loans, the Commitments and this Agreement, (C) the entrance into, participation in, administration of and performance of the Loans, the Commitments and this Agreement satisfies the requirements of sub-sections (b) through (g) of Part I of PTE 84-14 and (D) to the best knowledge of such Lender, the requirements of subsection (a) of Part I of PTE 84-14 are satisfied with respect to such Lender's entrance into, participation in, administration of and performance of the Loans, the Commitments and this Agreement, or

(iv)    such other representation, warranty and covenant as may be agreed in writing between the Administrative Agent, in its sole discretion, and such Lender.

(b)    In addition, unless sub-clause (i) in the immediately preceding clause (a) is true with respect to a Lender or such Lender has not provided another representation, warranty and covenant as provided in sub-clause (iv) in the immediately preceding clause (a), such Lender further

(x) represents and warrants, as of the date such Person became a Lender party hereto, and (y) covenants, from the date such Person became a Lender party hereto to the date such Person ceases being a Lender party hereto, for the benefit of, the Administrative Agent and each Arranger and their respective Affiliates, and not, for the avoidance of doubt, to or for the benefit of any Loan Party, that:

(i)     none of the Administrative Agent or any Arranger or any of their respective Affiliates is a fiduciary with respect to the assets of such Lender (including in connection with the reservation or exercise of any rights by the Administrative Agent under this Agreement, any Loan Document or any documents related to hereto or thereto),

(ii)     the Person making the investment decision on behalf of such Lender with respect to the entrance into, participation in, administration of and performance of the Loans, the Commitments and this Agreement is independent and is a bank, an insurance carrier, an investment adviser, a broker-dealer or other person that holds, or has under management or control, total assets of at least $50 million,

(iii)     the Person making the investment decision on behalf of such Lender with respect to the entrance into, participation in, administration of and performance of the Loans, the Commitments and this Agreement is capable of evaluating investment risks independently, both in general and with regard to particular transactions and investment strategies (including in respect of the Obligations),

(iv) the Person making the investment decision on behalf of such Lender with respect to the entrance into, participation in, administration of and performance of the Loans, the Commitments and this Agreement is a fiduciary under ERISA or the Code, or both, with respect to the Loans, the Commitments and this Agreement and is responsible for exercising independent judgment in evaluating the transactions hereunder, and

(v)     no fee or other compensation is being paid directly to the Administrative Agent or any Arranger or any their respective Affiliates for investment advice (as opposed to other services) in connection with the Loans, the Commitments or this Agreement.

(c)     The Administrative Agent and each Arranger hereby informs the Lenders that each such Person is not undertaking to provide impartial investment advice, or to give advice in a fiduciary capacity, in connection with the transactions contemplated hereby, and that such Person has a financial interest in the transactions contemplated hereby in that such Person or an Affiliate thereof (i) may receive interest or other payments with respect to the Loans, the Commitments and this Agreement, (ii) may recognize a gain if it extended the Loans or the Commitments for an amount less than the amount being paid for an interest in the Loans or the Commitments by such Lender or (iii) may receive fees or other payments in connection with the transactions contemplated hereby, the Loan Documents or otherwise, including structuring fees, commitment fees, arrangement fees, facility fees, upfront fees, underwriting fees, ticking fees, agency fees, administrative agent or collateral agent fees, utilization fees, minimum usage fees, letter of credit fees, fronting fees, deal-away or alternate transaction fees, amendment fees,

processing fees, term out premiums, banker's acceptance fees, breakage or other early termination fees or fees similar to the foregoing.

## ARTICLE X.
## GUARANTY

**10.01   Unconditional Guaranty**. (a) Each U.S. Guarantor hereby absolutely, unconditionally and irrevocably guarantees the punctual payment when due (but not the collection), whether at scheduled maturity or on any date of a required prepayment or by acceleration, demand or otherwise, of all Obligations of each other Borrower now or hereafter existing under or in respect of this Agreement and each other Loan Document (including, without limitation, any extensions, modifications, substitutions, amendments or renewals of any or all of the foregoing Obligations), whether direct or indirect, absolute or contingent, and whether for principal, interest, premiums, fees, indemnities, contract causes of action, costs, expenses or otherwise (such obligations being the "Total Guaranteed Obligations"), and agrees to pay any and all expenses (including, without limitation, the reasonable and documented fees and out-of-pocket expenses of counsel) incurred by the Administrative Agent or any Lender in enforcing any rights under this Agreement. Without limiting the generality of the foregoing, each U.S. Guarantor's liability shall extend to all amounts that constitute part of the Total Guaranteed Obligations and would be owed by a Borrower to the Administrative Agent or any Lender under or in respect of this Agreement and any other Loan Document but for the fact that they are unenforceable or not allowable due to the existence of a bankruptcy, reorganization or similar proceeding involving such Borrower.

(b)   Each Non-U.S. Guarantor hereby absolutely, unconditionally and irrevocably guarantees the punctual payment when due (but not the collection), whether at scheduled maturity or on any date of a required prepayment or by acceleration, demand or otherwise, of all Obligations of each other Non-U.S. Borrower now or hereafter existing under or in respect of this Agreement and each other Loan Document (including, without limitation, any extensions, modifications, substitutions, amendments or renewals of any or all of the foregoing Obligations), whether direct or indirect, absolute or contingent, and whether for principal, interest, premiums, fees, indemnities, contract causes of action, costs, expenses or otherwise (such obligations being the "Non-U.S. Guaranteed Obligations"), and agrees to pay any and all expenses (including, without limitation, the reasonable and documented fees and out-of-pocket expenses of counsel) incurred by the Administrative Agent or any Lender in enforcing any rights under this Agreement. Without limiting the generality of the foregoing, each Non-U.S. Guarantor's liability shall extend to all amounts that constitute part of the Non-U.S. Guaranteed Obligations and would be owed by a Non-U.S. Borrower to the Administrative Agent or any Lender under or in respect of this Agreement and any other Loan Document but for the fact that they are unenforceable or not allowable due to the existence of a bankruptcy, reorganization or similar proceeding involving such Borrower.

(c)   In no event shall any Non-U.S. Guarantor guarantee the obligations of a U.S. Person. In this Article X, "Guaranteed Obligations" means (i) in respect of the U.S. Guarantors, the Total Guaranteed Obligations and (ii) in respect of the Non-U.S. Guarantors, the Non-U.S. Guaranteed Obligations.

(d)    Subject to Section 2.16, the Guarantors hereby agree as among themselves that, in connection with payments made hereunder, each U.S Guarantor shall have a right of contribution from each other U.S. Guarantor, and each Non-U.S Guarantor shall have a right of contribution from each other Non-U.S. Guarantor, in each case in accordance with applicable Law. Such contribution rights shall be subordinate and subject in right of payment to the Obligations until such time as the Obligations have been irrevocably paid in full and the commitments relating thereto shall have expired or been terminated, and none of the Guarantors shall exercise any such contribution rights until the Obligations have been irrevocably paid in full and the commitments relating thereto shall have expired or been terminated.

(e)    Each Guarantor, and by its acceptance of this Guaranty, the Administrative Agent and each Lender hereby confirms that it is the intention of all such Persons that this Guaranty and the obligations of each Guarantor hereunder not constitute a fraudulent transfer or conveyance for purposes of any Debtor Relief Law to the extent applicable to this Guaranty and the obligations of each Guarantor hereunder. To effectuate the foregoing intention, the Administrative Agent, the Lenders and the Guarantors hereby irrevocably agree that the obligations of each Guarantor other than the Company under this Guaranty at any time shall be limited to the maximum amount as will result in the obligations of such Guarantor under this Guaranty not constituting a fraudulent transfer or conveyance.

10.02    **Guaranty Absolute.** Each Guarantor jointly and severally guarantees that the applicable Guaranteed Obligations will be paid strictly in accordance with the terms of this Agreement and other Loan Documents, regardless of any law, regulation or order now or hereafter in effect in any jurisdiction affecting any of such terms or the rights of the Administrative Agent or any Lender with respect thereto. The obligations of each Guarantor under or in respect of this Guaranty are independent of the applicable Guaranteed Obligations or any Obligations of any other applicable Borrower under or in respect of this Agreement and the other Loan Documents, and a separate action or actions may be brought and prosecuted against any Guarantor to enforce this Guaranty, irrespective of whether any action is brought against any Borrower or whether any Borrower is joined in any such action or actions. The liability of each Guarantor under this Guaranty shall be irrevocable, absolute and unconditional irrespective of, and each Guarantor hereby irrevocably waives any defenses it may now have or hereafter acquire in any way relating to, any or all of the following:

(a)    any lack of validity or enforceability of this Agreement, any other Loan Document or any agreement or instrument relating thereto;

(b)    any change in the time, manner or place of payment of, or in any other term of, all or any of the applicable Guaranteed Obligations or any other obligations of any Borrower under or in respect of this Agreement and each other Loan Document, or any other amendment or waiver of or any consent to departure from this Agreement or any other Loan Document, including, without limitation, any increase in the applicable Guaranteed Obligations resulting from the extension of additional credit to any Borrower or any of its Subsidiaries or otherwise;

(c)   any taking, exchange, release or non-perfection of any collateral, or any taking, release or amendment or waiver of, or consent to departure from, any other guaranty, for all or any of the applicable Guaranteed Obligations;

(d)   any manner of application of any collateral, or proceeds thereof, to all or any of the applicable Guaranteed Obligations, or any manner of sale or other disposition of any collateral for all or any of the applicable Guaranteed Obligations or any other obligations of any Borrower under this Agreement and the other Loan Documents or any other assets of any Borrower or any of its Subsidiaries;

(e)   any change, restructuring or termination of the corporate structure or existence of any Borrower or any of its Subsidiaries;

(f)   any failure of the Administrative Agent or any Lender to disclose to such Guarantor any information relating to the business, condition (financial or otherwise), operations, performance, properties or prospects of any Borrower now or hereafter known to the Administrative Agent or such Lender (each Guarantor waiving any duty on the part of the Administrative Agent and the Lenders to disclose such information);

(g)   the failure of any other Person to execute or deliver this Guaranty or any other guaranty or agreement or the release or reduction of liability of such Guarantor or other guarantor or surety with respect to the applicable Guaranteed Obligations; or

(h)   any other circumstance (including, without limitation, any statute of limitations) or any existence of or reliance on any representation by the Administrative Agent or any Lender that might otherwise constitute a defense available to, or a discharge of, any Borrower or any other guarantor or surety.

This Guaranty shall continue to be effective or be reinstated, as the case may be, if at any time any payment of any of the applicable Guaranteed Obligations is rescinded or must otherwise be returned by the Administrative Agent or any Lender or any other Person upon the insolvency, bankruptcy or reorganization of any Borrower or otherwise, all as though such payment had not been made.

**10.03      Waivers and Acknowledgments**. (a) Each Guarantor hereby unconditionally and irrevocably waives promptness, diligence, notice of acceptance, presentment, demand for performance, notice of nonperformance, default, acceleration, protest or dishonor and any other notice with respect to any of the applicable Guaranteed Obligations and this Guaranty and any requirement that the Administrative Agent or any Lender protect, secure, perfect or insure any Lien or any property subject thereto or exhaust any right or take any action against any Borrower or any other Person or any collateral.

(a)   Each Guarantor hereby unconditionally and irrevocably waives to the fullest extent permitted under applicable Law any right to revoke this Guaranty and acknowledges that this Guaranty is continuing in nature and applies to all applicable Guaranteed Obligations, whether existing now or in the future.

(b)   Each Guarantor hereby unconditionally and irrevocably waives to the fullest extent permitted under applicable Law (i) any defense arising by reason of any claim or defense based upon an election of remedies by the Administrative Agent or any Lender that in any manner impairs, reduces, releases or otherwise adversely affects the subrogation, reimbursement, exoneration, contribution or indemnification rights of such Guarantor or other rights of such Guarantor to proceed against any Borrower, any other guarantor or any other Person or any collateral and (ii) any defense based on any right of set-off or counterclaim against or in respect of the obligations of such Guarantor hereunder.

(c)   Each Guarantor hereby unconditionally and irrevocably waives to the fullest extent permitted under applicable Law any duty on the part of the Administrative Agent or any Lender to disclose to such Guarantor any matter, fact or thing relating to the business, condition (financial or otherwise), operations, performance, properties or prospects of any Borrower or any of its Subsidiaries now or hereafter known by the Administrative Agent or such Lender.

(d)   Each Guarantor acknowledges that it will receive substantial direct and indirect benefits from the financing arrangements contemplated by this Agreement and the other Loan Documents and that the waivers set forth in Section 10.02 and this Section 10.03 are knowingly made in contemplation of such benefits.

**10.04   Subrogation.** Each Guarantor hereby unconditionally and irrevocably agrees not to exercise any rights that it may now have or hereafter acquire against any Borrower or any other insider guarantor that arise from the existence, payment, performance or enforcement of such Guarantor's obligations under or in respect of this Guaranty, including, without limitation, any right of subrogation, reimbursement, exoneration, contribution or indemnification and any right to participate in any claim or remedy of the Administrative Agent or any Lender against any Borrower or any other insider guarantor or any collateral, whether or not such claim, remedy or right arises in equity or under contract, statute or common law, including, without limitation, the right to take or receive from any Borrower or any other insider guarantor, directly or indirectly, in cash or other property or by set-off or in any other manner, payment or security on account of such claim, remedy or right, unless and until all of the applicable Guaranteed Obligations and all other amounts payable under this Guaranty shall have been paid in full in cash and the Commitments shall have expired or been terminated. If any amount shall be paid to any Guarantor in violation of the immediately preceding sentence at any time prior to the latest of (a) the payment in full in cash of the applicable Guaranteed Obligations and all other amounts payable under this Guaranty and (b) the Maturity Date, such amount shall be received and held in trust for the benefit of the Administrative Agent and the Lenders, shall be segregated from other property and funds of such Guarantor and shall forthwith be paid or delivered to the Administrative Agent in the same form as so received (with any necessary endorsement or assignment) to be credited and applied to the applicable Guaranteed Obligations and all other amounts payable under this Guaranty, whether matured or unmatured, in accordance with the terms of this Agreement and the other Loan Documents, or to be held as collateral for any applicable Guaranteed Obligations or other amounts payable under this Guaranty thereafter arising. If (i) any Guarantor shall make payment to the Administrative Agent or any Lender of all or any part of the applicable Guaranteed Obligations, (ii) all of the applicable Guaranteed Obligations and all other amounts payable under this Guaranty shall have been paid in full in cash

and (iii) the Maturity Date shall have occurred, the Administrative Agent and the Lenders will at the applicable Guarantor's request and expense, execute and deliver to such Guarantor appropriate documents, without recourse and without representation or warranty, necessary to evidence the transfer by subrogation to such Guarantor of an interest in the applicable Guaranteed Obligations resulting from such payment made by such Guarantor pursuant to this Guaranty.

    **10.05**    **Subordination**. Each Guarantor hereby subordinates any and all debts, liabilities and other obligations owed to such Guarantor by any Borrower (the "Subordinated Obligations") to the applicable Guaranteed Obligations to the extent and in the manner hereinafter set forth in this Section 10.05:

        (a)    Prohibited Payments, Etc. Except during the continuance of an Event of Default under (including the commencement and continuation of any proceeding under any Debtor Relief Law relating to such Borrower), such Guarantor may receive regularly scheduled payments from such Borrower on account of the Subordinated Obligations. After the occurrence and during the continuance of any Event of Default (including the commencement and continuation of any proceeding under any Debtor Relief Law relating to such Borrower), however, unless the Required Lenders otherwise agree, such Guarantor shall not demand, accept or take any action to collect any payment on account of the Subordinated Obligations.

        (b)    Prior Payment of Guaranteed Obligations. In any proceeding under any Debtor Relief Law relating to such Borrower, such Guarantor agrees that the Administrative Agent and the Lenders shall be entitled to receive payment in full in cash of all applicable Guaranteed Obligations (including all interest and expenses accruing after the commencement of a proceeding under any Bankruptcy Law, whether or not constituting an allowed claim in such proceeding ("Post Petition Interest")) before such Guarantor receives payment of any Subordinated Obligations.

        (c)    Turn-Over. After the occurrence and during the continuance of any Event of Default (including the commencement and continuation of any proceeding under any Debtor Relief Law relating to such Borrower), such Guarantor shall, if the Administrative Agent so requests, collect, enforce and receive payments on account of the Subordinated Obligations as trustee for the Administrative Agent and the Lenders and deliver such payments to the Administrative Agent on account of the applicable Guaranteed Obligations (including all Post Petition Interest), together with any necessary endorsements or other instruments of transfer, but without reducing or affecting in any manner the liability of such Guarantor under the other provisions of this Guaranty.

        (d)    Agent Authorization. After the occurrence and during the continuance of any Event of Default (including the commencement and continuation of any proceeding under any Debtor Relief Law relating to such Borrower), the Administrative Agent is authorized and empowered (but without any obligation to so do), in its discretion, (i) in the name of such Guarantor, to collect and enforce, and to submit claims in respect of, Subordinated Obligations and to apply any amounts received thereon to the applicable Guaranteed Obligations (including any and all Post Petition Interest), and (ii) to require such Guarantor (A) to collect and enforce, and to submit claims in respect of, Subordinated Obligations and (B) to pay any amounts received on such obligations to the Administrative Agent for application to the applicable Guaranteed Obligations (including any and all Post Petition Interest).

**10.06    Continuing Guaranty; Assignments**. This Guaranty is a continuing guaranty and shall (a) remain in full force and effect until the latest of (i) the payment in full in cash of the applicable Guaranteed Obligations and all other amounts payable under this Guaranty and (ii) the latest Maturity Date, (b) be binding upon the Company, its successors and assigns and (c) inure to the benefit of and be enforceable by the Administrative Agent and the Lenders and their successors, transferees and assigns. Without limiting the generality of clause (c) of the immediately preceding sentence, the Administrative Agent or any Lender may assign or otherwise transfer all or any portion of its rights and obligations under this Agreement (including, without limitation, all or any portion of its Commitments, the Loans owing to it and the Note or Notes held by it) to any other Person, and such other Person shall thereupon become vested with all the benefits in respect thereof granted to the Administrative Agent or such Lender herein or otherwise, in each case as and to the extent provided in Section 11.06.

<div align="center">

**ARTICLE XI.**
**MISCELLANEOUS**

</div>

**11.01    Amendments, Etc.** No amendment or waiver of any provision of this Agreement or any other Loan Document, and no consent to any departure by the Company or any other Loan Party therefrom, shall be effective unless in writing signed by the Required Lenders and the Company or the applicable Loan Party, as the case may be, and acknowledged by the Administrative Agent, and each such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given; provided, however, that no such amendment, waiver or consent shall:

(a)    waive any condition set forth in Section 4.01(a) without the written consent of each Lender;

(b)    extend or increase the Commitment of any Lender (or reinstate any Commitment terminated pursuant to Section 8.02) (it being understood and agreed that amendment or waiver of any condition precedent set forth in Section 4.02 or of any Default or Event of Default shall not be considered an extension or increase in Commitment for the purposes hereof) without the written consent of such Lender;

(c)    postpone any date fixed by this Agreement or any other Loan Document for any payment or mandatory prepayment of principal, interest, fees or other amounts due to the Lenders (or any of them) hereunder or under any other Loan Document without the written consent of each Lender directly and adversely affected thereby;

(d)    reduce the principal of, or the rate of interest specified herein on, any Loan or (subject to clause (iv) of the second proviso to this Section 11.01) any fees or other amounts payable hereunder or under any other Loan Document without the written consent of each Lender directly and adversely affected thereby; provided, however, that only the consent of the Required Lenders shall be necessary (i) to amend the definition of "Default Rate" or to waive any obligation of any Borrower to pay interest at the Default Rate or (ii) to amend any financial covenant hereunder (or any defined term used therein) even if the effect of such amendment would be to reduce the rate of interest on any Loan or to reduce any fee payable hereunder;

<div align="center">

87
Lululemon Credit Agreement

</div>

(e)   change Section 8.03 in a manner that would alter the pro rata sharing of payments required thereby without the written consent of each Lender;

(f)   amend Section 1.06 or the definition of "Alternative Currency" without the written consent of each Lender;

(g)   change any provision of this Section or the definition of "Required Lenders" or any other provision hereof specifying the number or percentage of Lenders required to amend, waive or otherwise modify any rights hereunder or make any determination or grant any consent hereunder without the written consent of each Lender; or

(h)   release any Guarantor from the Guaranty without the written consent of each Lender, except to the extent the release of LUSA is permitted pursuant to Section 9.09 (in which case such release may be made by the Administrative Agent acting alone);

and, provided further, that (i) no amendment, waiver or consent shall, unless in writing and signed by the Swing Line Lender in addition to the Lenders required above, affect the rights or duties of the Swing Line Lender under this Agreement; (ii) no amendment, waiver or consent shall, unless in writing and signed by the Administrative Agent in addition to the Lenders required above, affect the rights or duties of the Administrative Agent under this Agreement or any other Loan Document; and (iii) the Fee Letter may be amended, or rights or privileges thereunder waived, in a writing executed only by the parties thereto. Notwithstanding anything to the contrary herein, no Defaulting Lender shall have any right to approve or disapprove any amendment, waiver or consent hereunder (and any amendment, waiver or consent which by its terms requires the consent of all Lenders or each affected Lender may be effected with the consent of the applicable Lenders other than Defaulting Lenders), except that (x) the Commitment of any Defaulting Lender may not be increased or extended without the consent of such Lender and (y) any waiver, amendment or modification requiring the consent of all Lenders or each affected Lender that by its terms affects any Defaulting Lender disproportionately adversely relative to other affected Lenders shall require the consent of such Defaulting Lender.

If the Administrative Agent and the Company shall have jointly identified an obvious error (including, but not limited to, an incorrect cross-reference) or any error or omission of a technical or immaterial nature, in each case, in any provision of this Agreement or any other Loan Document (including, for the avoidance of doubt, any exhibit, schedule or other attachment to any Loan Document), then the Administrative Agent (acting in its sole discretion) and the Company or any other relevant Loan Party shall be permitted to amend such provision and such amendment shall be deemed approved by the Lenders if the Lenders shall have received five (5) Business Days' prior written notice of such change and the Administrative Agent shall not have received, within five (5) Business Days of the date of such notice to the Lenders, a written notice from the Required Lenders stating that the Required Lenders object to such amendment.

**11.02   Notices; Effectiveness; Electronic Communication**.

(a)   Notices Generally. Except in the case of notices and other communications expressly permitted to be given by telephone (and except as provided in subsection (b) below), all

notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by facsimile or electronic mail as follows, and all notices and other communications expressly permitted hereunder to be given by telephone shall be made to the applicable telephone number, as follows:

      (i)   if to the Company or any other Loan Party, the Administrative Agent or the Swing Line Lender, to the address, facsimile number, electronic mail address or telephone number specified for such Person on Schedule 11.02; and

      (ii)   if to any other Lender, to the address, facsimile number, electronic mail address or telephone number specified in its Administrative Questionnaire (including, as appropriate, notices delivered solely to the Person designated by a Lender on its Administrative Questionnaire then in effect for the delivery of notices that may contain material non-public information relating to the Company).

Notices and other communications sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received; notices and other communications sent by facsimile shall be deemed to have been given when sent (except that, if not given during normal business hours for the recipient, shall be deemed to have been given at the opening of business on the next Business Day for the recipient). Notices and other communications delivered through electronic communications to the extent provided in subsection (b) below, shall be effective as provided in such subsection (b).

    (b)   Electronic Communications. Notices and other communications to the Lenders hereunder may be delivered or furnished by electronic communication (including e-mail, FpML messaging, and Internet or intranet websites) pursuant to procedures approved by the Administrative Agent, provided that the foregoing shall not apply to notices to any Lender pursuant to Article II if such Lender has notified the Administrative Agent that it is incapable of receiving notices under such Article by electronic communication. The Administrative Agent, the Swing Line Lender or the Company may each, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it, provided that approval of such procedures may be limited to particular notices or communications.

Unless the Administrative Agent otherwise prescribes, (i) notices and other communications sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgement), and (ii) notices or communications posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient at its e-mail address as described in the foregoing clause (i) of notification that such notice or communication is available and identifying the website address therefor; provided that, for both clauses (i) and (ii), if such notice, email or other communication is not sent during the normal business hours of the recipient, such notice, email or communication shall be deemed to have been sent at the opening of business on the next business day for the recipient.

    (c)   The Platform. THE PLATFORM IS PROVIDED "AS IS" AND "AS AVAILABLE." THE AGENT PARTIES (AS DEFINED BELOW) DO NOT WARRANT THE

ACCURACY OR COMPLETENESS OF THE BORROWER MATERIALS OR THE ADEQUACY OF THE PLATFORM, AND EXPRESSLY DISCLAIM LIABILITY FOR ERRORS OR OMISSIONS FROM THE BORROWER MATERIALS. NO WARRANTY OF ANY KIND, EXPRESS, IMPLIED OR STATUTORY, INCLUDING ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT OF THIRD PARTY RIGHTS OR FREEDOM FROM VIRUSES OR OTHER CODE DEFECTS, IS MADE BY ANY AGENT PARTY IN CONNECTION WITH THE BORROWER MATERIALS OR THE PLATFORM. In no event shall the Administrative Agent or any of its Related Parties (collectively, the "Agent Parties") have any liability to any Borrower, any Lender or any other Person for losses, claims, damages, liabilities or expenses of any kind (whether in tort, contract or otherwise) arising out of the Company's, any Loan Party's or the Administrative Agent's transmission of Borrower Materials or notices through the platform, any other electronic platform or electronic messaging service, or through the Internet except to the extent that such losses, claims, damages, liabilities or expenses are determined by a court of competent jurisdiction by a final and nonappealable judgment to have resulted from the gross negligence, bad faith or willful misconduct of such Agent Party; provided, however, that in no event shall any Agent Party have any liability to the Borrowers, any Lender or any other Person for indirect, special, incidental, consequential or punitive damages (as opposed to direct or actual damages).

(d)     Change of Address, Etc. Each of the Borrowers, the Administrative Agent and the Swing Line Lender may change its address, facsimile or telephone number for notices and other communications hereunder by notice to the other parties hereto. Each other Lender may change its address, facsimile or telephone number for notices and other communications hereunder by notice to the Company, the Administrative Agent and the Swing Line Lender. In addition, each Lender agrees to notify the Administrative Agent from time to time to ensure that the Administrative Agent has on record (i) an effective address, contact name, telephone number, facsimile number and electronic mail address to which notices and other communications may be sent and (ii) accurate wire instructions for such Lender. Furthermore, each Public Lender agrees to cause at least one individual at or on behalf of such Public Lender or its delegate, in accordance with such Public Lender's compliance procedures and applicable Law, including United States Federal and state securities Laws, to make reference to Borrower Materials that are not made available through the "Public Side Information" or similar designation on the content declaration screen of the Platform in order to enable such Public Lender or its delegate, in accordance with such Public Lender's compliance procedures and applicable Law, including United States Federal and state securities Laws, to make reference to Borrower Materials that are not made available through the "Public Side Information" portion of the Platform and that may contain material non-public information with respect to the Company or its securities for purposes of United States Federal or state securities laws.

(e)     Reliance by Administrative Agent and Lenders. The Administrative Agent and the Lenders shall be entitled to rely and act upon any notices (including telephonic notices and Committed Loan Notices and Swing Line Loan Notices) purportedly given by or on behalf of any Borrower even if (i) such notices were not made in a manner specified herein, were incomplete or were not preceded or followed by any other form of notice specified herein, or (ii) the terms thereof, as understood by the recipient, varied from any confirmation thereof. The Company shall indemnify the Administrative Agent, each Lender and the Related Parties of each of them from all losses, costs, expenses and liabilities resulting from the reliance by such Person on each notice purportedly given by or on behalf of any Borrower in the absence of gross negligence, bad faith or willful misconduct

of such Person, as determined by a court of competent jurisdiction in a final and non-appealable judgment. All telephonic notices and other telephonic communications with the Administrative Agent may be recorded by the Administrative Agent, and each of the parties hereto hereby consents to such recording.

**11.03    No Waiver; Cumulative Remedies; Enforcement**.  No failure by any Lender or the Administrative Agent to exercise, and no delay by any such Person in exercising, any right, remedy, power or privilege hereunder or under any other Loan Document shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege. The rights, remedies, powers and privileges herein provided, and provided under each other Loan Document, are cumulative and not exclusive of any rights, remedies, powers and privileges provided by law.

Notwithstanding anything to the contrary contained herein or in any other Loan Document, the authority to enforce rights and remedies hereunder and under the other Loan Documents against the Loan Parties or any of them shall be vested exclusively in, and all actions and proceedings at law in connection with such enforcement shall be instituted and maintained exclusively by, the Administrative Agent in accordance with Section 8.02 for the benefit of all the Lenders; provided, however, that the foregoing shall not prohibit (a) the Administrative Agent from exercising on its own behalf the rights and remedies that inure to its benefit (solely in its capacity as Administrative Agent) hereunder and under the other Loan Documents, (b) the Swing Line Lender from exercising the rights and remedies that inure to its benefit (solely in its capacity Swing Line Lender) hereunder and under the other Loan Documents, (c) any Lender from exercising setoff rights in accordance with Section 11.08 (subject to the terms of Section 2.13), or (d) any Lender from filing proofs of claim or appearing and filing pleadings on its own behalf during the pendency of a proceeding relative to any Loan Party under any Debtor Relief Law; and provided, further, that if at any time there is no Person acting as Administrative Agent hereunder and under the other Loan Documents, then (i) the Required Lenders shall have the rights otherwise ascribed to the Administrative Agent pursuant to Section 8.02 and (ii) in addition to the matters set forth in clauses (b), (c) and (d) of the preceding proviso and subject to Section 2.13, any Lender may, with the consent of the Required Lenders, enforce any rights and remedies available to it and as authorized by the Required Lenders.

**11.04    Expenses; Indemnity; Damage Waiver**.

(a)    Costs and Expenses. The Company shall pay (i) all reasonable and documented out-of-pocket expenses (within 30 days of a written demand therefor, together with backup documentation supporting such reimbursement request) incurred by the Administrative Agent and its Affiliates (including the reasonable and documented fees, charges and out-of-pocket disbursements of counsel for the Administrative Agent (but limited, in the case of legal fees and expenses, to the reasonable and documented fees, out-of-pocket disbursements and other charges of one counsel to the Administrative Agent and the Arrangers taken as a whole and, if necessary, of one local counsel in any relevant jurisdiction)), in connection with the syndication of the credit facilities provided for herein, the preparation, negotiation, execution, delivery and administration of this Agreement and the other Loan Documents or any amendments, modifications or waivers of

91
Lululemon Credit Agreement

the provisions hereof or thereof (whether or not the transactions contemplated hereby or thereby shall be consummated) and (ii) all reasonable and documented out-of-pocket expenses incurred by the Administrative Agent or any Lender within 30 days of a written demand therefor, together with backup documentation supporting such reimbursement request (including the reasonable and documented fees, out-of-pocket disbursements and other charges of counsel for the Administrative Agent or any Lender), in connection with the enforcement or protection of its rights (A) in connection with this Agreement and the other Loan Documents, including its rights under this Section, or (B) in connection with the Loans made hereunder, including all such reasonable and documented out-of-pocket expenses incurred during any workout, restructuring or negotiations in respect of such Loans.

      (b)    <u>Indemnification by the Company</u>. The Company shall indemnify the Administrative Agent (and any sub-agent thereof), each Lender and each Related Party of any of the foregoing Persons (each such Person being called an "<u>Indemnitee</u>") against, and hold each Indemnitee harmless from, any and all losses, claims, damages, liabilities and related reasonable and documented out-of-pocket expenses (but limited, in the case of legal fees and expenses, to the reasonable and documented fees, out-of-pocket disbursements and other charges of one counsel to all Indemnitees taken as a whole and, solely in the case of a conflict of interest, one additional counsel in each relevant jurisdiction to the affected Indemnitees similarly situated taken as a whole, and, if reasonably necessary, one local counsel to all Indemnitees taken as a whole in any relevant jurisdiction) incurred by any Indemnitee or asserted against any Indemnitee by any Person (including the Company or any other Loan Party) other than such Indemnitee and its Related Parties arising out of, in connection with, or as a result of (i) the execution or delivery of this Agreement, any other Loan Document or any agreement or instrument contemplated hereby or thereby, the performance by the parties hereto of their respective obligations hereunder or thereunder, the consummation of the transactions contemplated hereby or thereby, or, in the case of the Administrative Agent (and any sub-agent thereof) and its Related Parties only, the administration of this Agreement and the other Loan Documents (including in respect of any matters addressed in <u>Section 3.01</u>), (ii) any Loan or the use or proposed use of the proceeds therefrom, (iii) any actual or alleged presence or release of Hazardous Materials on or from any property owned or operated by any Borrower or any of its Subsidiaries, or any Environmental Liability related in any way to any Borrower or any of its Subsidiaries, or (iv) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory, whether brought by a third party or by the Company or any Loan Party, and regardless of whether any Indemnitee is a party thereto, **IN ALL CASES, WHETHER OR NOT CAUSED BY OR ARISING, IN WHOLE OR IN PART, OUT OF THE COMPARATIVE, CONTRIBUTORY OR SOLE NEGLIGENCE OF THE INDEMNITEE**; <u>provided</u> that such indemnity shall not, as to any Indemnitee, be available to the extent arising from the gross negligence, bad faith or willful misconduct of, or material breach of this Agreement by, the relevant Indemnitee or any of its Related Indemnified Parties as determined by a final, non-appealable judgment of a court of competent jurisdiction or any dispute solely among the Indemnitees other than any claims against an Indemnitee in its capacity as the Administrative Agent or an Arranger or any similar role hereunder and other than any claims arising out of any act or omission of the Borrowers or any of their affiliates, <u>provided</u> that the Borrowers shall not be liable for any indirect, special, punitive or consequential damages (other than in respect of any such damages incurred or paid by an Indemnitee to a third party).

<div align="center">92</div>
<div align="center">Lululemon Credit Agreement</div>

Notwithstanding the foregoing, each Indemnitee (and its Related Indemnified Parties) shall be obligated to refund and return promptly any and all amounts paid by the Borrowers or any of their affiliates under this <u>Section 11.06(b)</u> to such Indemnitee (or its Related Indemnified Parties) for any such fees, expenses or damages to the extent such Indemnitee is not entitled to payment of such amounts in accordance with the terms hereof. For purposes hereof, a "<u>Related Indemnified Party</u>" of an Indemnitee means (1) any controlling person or controlled affiliate of such Indemnitee, (2) the respective directors, officers, or employees of such Indemnitee or any of its controlling persons or controlled affiliates, in the case of this clause (3), acting on behalf of or at the instructions of such Indemnitee, controlling person or such controlled affiliate; <u>provided</u> that each reference to a controlled affiliate, director, officer or employee in this sentence pertains to a controlled affiliate, director, officer or employee involved in the administration of this Agreement. This <u>Section 11.04(b)</u> does not apply with respect to Taxes other than any Taxes that represent losses, claims, damages, etc. arising from any non-Tax claim.

(c)     <u>Reimbursement by Lenders</u>. To the extent that the Company for any reason fails to indefeasibly pay any amount required under <u>subsection (a)</u> or (b) of this Section to be paid by it to the Administrative Agent (or any sub-agent thereof), the Swing Line Lender or any Related Party of any of the foregoing, each Lender severally agrees to pay to the Administrative Agent (or any such sub-agent), the Swing Line Lender or such Related Party, as the case may be, such Lender's <u>pro</u> <u>rata</u> share (determined as of the time that the applicable unreimbursed expense or indemnity payment is sought based on each Lender's share of the Total Credit Exposure at such time) of such unpaid amount (including any such unpaid amount in respect of a claim asserted by such Lender), <u>provided</u> <u>further</u> that the unreimbursed expense or indemnified loss, claim, damage, liability or related expense, as the case may be, was incurred by or asserted against the Administrative Agent (or any such sub-agent) or the Swing Line Lender in its capacity as such, or against any Related Party of any of the foregoing acting for the Administrative Agent (or any such sub-agent) or the Swing Line Lender in connection with such capacity. The obligations of the Lenders under this <u>subsection (c)</u> are subject to the provisions of <u>Section 2.12(d)</u>.

(d)     <u>Waiver of Consequential Damages, Etc.</u> To the fullest extent permitted by applicable law, no party to this Agreement shall assert, and hereby waives, and acknowledges that no other Person shall have, any claim against any other party, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, any other Loan Document or any agreement or instrument contemplated hereby, the transactions contemplated hereby or thereby, any Loan or the use of the proceeds thereof; <u>provided</u> that nothing in this subsection (d) shall relieve the Company of any obligation it may have to indemnify an Indemnitee against special, indirect, consequential or punitive damages asserted against such Indemnitee by a third party. No party to this Agreement referred to in <u>subsection (b)</u> above shall be liable for any damages arising from the use by unintended recipients of any information or other materials distributed to such unintended recipients by such party through telecommunications, electronic or other information transmission systems in connection with this Agreement or the other Loan Documents or the transactions contemplated hereby or thereby.

(e)  <u>Payments</u>. All amounts due under this Section shall be payable not later than two Business Days after demand therefor.

(f)  <u>Survival</u>. The agreements in this Section and the indemnity provisions of <u>Section 11.02(e)</u> shall survive the resignation of the Administrative Agent and the Swing Line Lender, the replacement of any Lender, the termination of the Aggregate Commitments and the repayment, satisfaction or discharge of all the other Obligations.

11.05    **Payments Set Aside.** To the extent that any payment by or on behalf of any Borrower is made to the Administrative Agent or any Lender, or the Administrative Agent or any Lender exercises its right of setoff, and such payment or the proceeds of such setoff or any part thereof is subsequently invalidated, declared to be fraudulent or preferential, set aside or required (including pursuant to any settlement entered into by the Administrative Agent or such Lender in its discretion) to be repaid to a trustee, receiver or any other party, in connection with any proceeding under any Debtor Relief Law or otherwise, then (a) to the extent of such recovery, the obligation or part thereof originally intended to be satisfied shall be revived and continued in full force and effect as if such payment had not been made or such setoff had not occurred, and (b) each Lender severally agrees to pay to the Administrative Agent upon demand its applicable share (without duplication) of any amount so recovered from or repaid by the Administrative Agent, plus interest thereon from the date of such demand to the date such payment is made at a rate per annum equal to the applicable Overnight Rate from time to time in effect, in the applicable currency of such recovery or payment. The obligations of the Lenders under clause (b) of the preceding sentence shall survive the payment in full of the Obligations and the termination of this Agreement.

11.06    **Successors and Assigns.**

(a)  <u>Successors and Assigns Generally</u>. The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that neither the Company nor any other Loan Party may assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of the Administrative Agent and each Lender and no Lender may assign or otherwise transfer any of its rights or obligations hereunder except (i) to an assignee in accordance with the provisions of <u>subsection (b)</u> of this Section, (ii) by way of participation in accordance with the provisions of <u>subsection (d)</u> of this Section, or (iii) by way of pledge or assignment of a security interest subject to the restrictions of subsection (f) of this Section (and any other attempted assignment or transfer by any party hereto shall be null and void). Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants to the extent provided in <u>subsection (d)</u> of this Section and, to the extent expressly contemplated hereby, the Related Parties of each of the Administrative Agent and the Lenders) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)  <u>Assignments by Lenders</u>. Any Lender may at any time assign to one or more assignees all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitment and the Loans (including for purposes of this <u>subsection (b)</u>, participations in

Swing Line Loans) at the time owing to it); <u>provided</u> that any such assignment shall be subject to the following conditions:

(i)    <u>Minimum Amounts</u>.

(A)    in the case of an assignment of the entire remaining amount of the assigning Lender's Commitment or contemporaneous assignments to related Approved Funds (determined after giving effect to such Assignments) that equal at least the amount specified in <u>paragraph (b)(i)(B)</u> of this Section in the aggregate and the Loans at the time owing to it or in the case of an assignment to a Lender, an Affiliate of a Lender or an Approved Fund, no minimum amount need be assigned; and

(B)    in any case not described in <u>subsection (b)(i)(A)</u> of this Section, the aggregate amount of the Commitment (which for this purpose includes Loans outstanding thereunder) or, if the Commitment is not then in effect, the principal outstanding balance of the Loans of the assigning Lender subject to each such assignment, determined as of the date the Assignment and Assumption with respect to such assignment is delivered to the Administrative Agent or, if "Trade Date" is specified in the Assignment and Assumption, as of the Trade Date, shall not be less than $5,000,000 and integral multiples thereof (or, if less, all of such Lender's remaining Commitments (and the Loans relating thereto)) unless each of the Administrative Agent and, so long as no Event of Default has occurred and is continuing, the Company otherwise consents (each such consent not to be unreasonably withheld or delayed).

(ii)    <u>Proportionate Amounts</u>. Each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement with respect to the Loans or the Commitment assigned, except that this clause (ii) shall not apply to the Swing Line Lender's rights and obligations in respect of Swing Line Loans.

(iii)    <u>Required Consents</u>. No consent shall be required for any assignment except to the extent required by <u>subsection (b)(i)(B)</u> of this Section and, in addition:

(A)    the consent of the Company (such consent not to be unreasonably withheld or delayed) shall be required unless (1) an Event of Default has occurred and is continuing at the time of such assignment or (2) such assignment is to an existing Lender, an Affiliate of an existing Lender or an Approved Fund;

(B)    the consent of the Administrative Agent (such consent not to be unreasonably withheld or delayed) shall be required if such assignment is to a Person that is not an existing Lender, an Affiliate of such existing Lender or an Approved Fund with respect to such existing Lender; and

(C)    the consent of the Swing Line Lender shall be required for any assignment.

(iv)    Assignment and Assumption. The parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Assumption, together with a processing and recordation fee in the amount of $3,500; provided, however, that the Administrative Agent may, in its sole discretion, elect to waive such processing and recordation fee in the case of any assignment. The assignee, if it is not a Lender, shall deliver to the Administrative Agent an Administrative Questionnaire.

(v)    No Assignment to Certain Persons. No such assignment shall be made (A) to the Company or any of the Company's Affiliates or Subsidiaries, (B) to any Defaulting Lender or any of its Subsidiaries, or any Person who, upon becoming a Lender hereunder, would constitute any of the foregoing Persons described in this clause (B), or (C) to a natural Person (or to a holding company, investment vehicle or trust for, or owned and operated for the primary benefit of a natural Person).

(vi)    Certain Additional Payments. In connection with any assignment of rights and obligations of any Defaulting Lender hereunder, no such assignment shall be effective unless and until, in addition to the other conditions thereto set forth herein, the parties to the assignment shall make such additional payments to the Administrative Agent in an aggregate amount sufficient, upon distribution thereof as appropriate (which may be outright payment, purchases by the assignee of participations or subparticipations, or other compensating actions, including funding, with the consent of the Company and the Administrative Agent, the applicable pro rata share of Loans previously requested but not funded by the Defaulting Lender, to each of which the applicable assignee and assignor hereby irrevocably consent), to (x) pay and satisfy in full all payment liabilities then owed by such Defaulting Lender to the Administrative Agent or any Lender hereunder (and interest accrued thereon) and (y) acquire (and fund as appropriate) its full pro rata share of all Loans and participations in Swing Line Loans in accordance with its Applicable Percentage. Notwithstanding the foregoing, in the event that any assignment of rights and obligations of any Defaulting Lender hereunder shall become effective under applicable Law without compliance with the provisions of this paragraph, then the assignee of such interest shall be deemed to be a Defaulting Lender for all purposes of this Agreement until such compliance occurs.

Subject to acceptance and recording thereof by the Administrative Agent pursuant to subsection (c) of this Section, from and after the effective date specified in each Assignment and Assumption, the assignee thereunder shall be a party to this Agreement and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto) but shall continue to be entitled to the benefits of Sections 3.01, 3.04, 3.05, and 11.04 with respect to facts and circumstances

occurring prior to the effective date of such assignment; provided, that except to the extent otherwise expressly agreed by the affected parties, no assignment by a Defaulting Lender will constitute a waiver or release of any claim of any party hereunder arising from that Lender's having been a Defaulting Lender. Upon request, each Borrower (at its expense) shall execute and deliver a Note to the assignee Lender. Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this subsection shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with subsection (d) of this Section.

(c)    Register.  The Administrative Agent, acting solely for this purpose as an agent of the Borrowers (and such agency being solely for tax purposes), shall maintain at the Administrative Agent's Office a copy of each Assignment and Assumption delivered to it (or the equivalent thereof in electronic form) and a register for the recordation of the names and addresses of the Lenders, and the Commitments of, and principal amounts (and stated interest) of the Loans owing to, each Lender pursuant to the terms hereof from time to time (the "Register").  The entries in the Register shall be conclusive absent manifest error, and the Borrowers, the Administrative Agent and the Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement.  The Register shall be available for inspection by the Borrowers and any Lender, at any reasonable time and from time to time upon reasonable prior notice.

(d)    Participations.  Any Lender may at any time, without the consent of, or notice to, any Borrower or the Administrative Agent, sell participations to any Person (other than a natural Person, or a holding company, investment vehicle or trust for, or owned and operated for the primary benefit of a natural Person, a Defaulting Lender or the Company or any of the Company's Affiliates or Subsidiaries) (each, a "Participant") in all or a portion of such Lender's rights and/or obligations under this Agreement (including all or a portion of its Commitment and/or the Loans (including such Lender's participations in Swing Line Loans) owing to it); provided that (i) such Lender's obligations under this Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (iii) the Borrowers, the Administrative Agent and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement.  For the avoidance of doubt, each Lender shall be responsible for the indemnity under Section 11.04(c) without regard to the existence of any participation.

Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and to approve any amendment, modification or waiver of any provision of this Agreement; provided that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, waiver or other modification described in the first proviso to Section 11.01 that affects such Participant.  The Company agrees that each Participant shall be entitled to the benefits of Sections 3.01, 3.04 and 3.05 to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to subsection (b) of this Section (it being understood that the documentation required under Section 3.01(e) shall be delivered to the Lender who sells the participation) to the same extent as if it were a Lender and had acquired its interest by assignment

pursuant to paragraph (b) of this Section; provided that such Participant (A) agrees to be subject to the provisions of Sections 3.06 and 11.13 as if it were an assignee under paragraph (b) of this Section and (B) shall not be entitled to receive any greater payment under Sections 3.01 or 3.05, with respect to any participation, than the Lender from whom it acquired the applicable participation would have been entitled to receive, except to the extent such entitlement to receive a greater payment results from a Change in Law that occurs after the Participant acquired the applicable participation. Each Lender that sells a participation agrees, at the Company's request and expense, to use reasonable efforts to cooperate with the Company to effectuate the provisions of Section 3.06 with respect to any Participant. To the extent permitted by law, each Participant also shall be entitled to the benefits of Section 11.08 as though it were a Lender; provided that such Participant agrees to be subject to Section 2.13 as though it were a Lender. Each Lender that sells a participation shall, acting solely for this purpose as a non-fiduciary agent of the Company, maintain a register on which it enters the name and address of each Participant and the principal amounts (and stated interest) of each Participant's interest in the Loans or other obligations under the Loan Documents (the "Participant Register"); provided that no Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any Participant or any information relating to a Participant's interest in any commitments, loans, letters of credit or its other obligations under any Loan Document) to any Person except to the extent that such disclosure is necessary to establish that such commitment, loan or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations. The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary. For the avoidance of doubt, the Administrative Agent (in its capacity as Administrative Agent) shall have no responsibility for maintaining a Participant Register.

(e)    Certain Pledges. Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement (including under its Note, if any) to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank; provided that no such pledge or assignment shall release such Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

(f)    Resignation as Swing Line Lender after Assignment. Notwithstanding anything to the contrary contained herein, if at any time Bank of America assigns all of its Commitment and Loans pursuant to subsection (b) above, Bank of America may, upon 30 days' notice to the Company, resign as Swing Line Lender. In the event of any such resignation as Swing Line Lender, the Company shall be entitled to appoint from among the Lenders a successor Swing Line Lender hereunder; provided, however, that no failure by the Company to appoint any such successor shall affect the resignation of Bank of America as Swing Line Lender and provided, further, that such successor Swing Line Lender accepts such appointment. If Bank of America resigns as Swing Line Lender, it shall retain all the rights of the Swing Line Lender provided for hereunder with respect to Swing Line Loans made by it and outstanding as of the effective date of such resignation, including the right to require the Lenders to make Base Rate Committed Loans or fund risk participations in outstanding Swing Line Loans pursuant to Section 2.04(c). Upon the

appointment of a successor Swing Line Lender, such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring Swing Line Lender.

**11.07    Treatment of Certain Information; Confidentiality.** Each of the Administrative Agent and the Lenders agrees to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed (a) to its Affiliates and its Related Parties (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential), (b) to the extent required or requested by any regulatory authority purporting to have jurisdiction over such Person or its Related Parties (including any self-regulatory authority, such as the National Association of Insurance Commissioners), (c) pursuant to the order of any court or administrative agency or in any pending legal or administrative proceeding, or otherwise as required by applicable law or compulsory legal process (in which case the Administrative Agent or the applicable Lender agrees to inform you promptly thereof prior to such disclosure to the extent not prohibited by law, rule or regulation), (d) to any other party hereto, (e) in connection with the exercise of any remedies hereunder or under any other Loan Document or any action or proceeding relating to this Agreement or any other Loan Document or the enforcement of rights hereunder or thereunder, (f) subject to an agreement containing provisions substantially the same as those of this Section, to (i) any assignee of or Participant in, or any prospective assignee of or Participant in, any of its rights and obligations under this Agreement or (ii) any actual or prospective party (or its Related Parties) to any swap, derivative or other transaction under which payments are to be made by reference to any of the Borrowers and their respective obligations, this Agreement or payments hereunder, (g) on a confidential basis to (i) any rating agency in connection with rating the Company or its Subsidiaries or the credit facilities provided hereunder or (ii) the CUSIP Service Bureau or any similar agency in connection with the issuance and monitoring of CUSIP numbers or other market identifiers with respect to the credit facilities provided hereunder, (h) with the consent of the Company or (i) to the extent such Information (x) becomes publicly available other than as a result of a breach of this Section or (y) becomes available to the Administrative Agent, any Lender or any of their respective Affiliates from a third party that is not to the knowledge of such Person subject to confidentiality obligations to the Company or its Subsidiaries. In addition, the Administrative Agent and the Lenders may disclose the existence of this Agreement and information about this Agreement to market data collectors, similar service providers to the lending industry and service providers to the Administrative Agent and the Lenders in connection with the administration of this Agreement, the other Loan Documents, and the Commitments.

For purposes of this Section, "Information" means all information received from the Company or any Subsidiary relating to the Company or any Subsidiary or any of their respective businesses, other than any such information that is available to the Administrative Agent or any Lender on a nonconfidential basis prior to disclosure by the Company or any Subsidiary, <u>provided</u> that, in the case of information received from the Company or any Subsidiary after the Closing Date, such information is clearly identified at the time of delivery as confidential. Any Person required to maintain the confidentiality of Information as provided in this Section shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information.

Each of the Administrative Agent and the Lenders acknowledges that (a) the Information may include material non-public information concerning the Company or a Subsidiary, as the case may be, (b) it has developed compliance procedures regarding the use of material non-public information and (c) it will handle such material non-public information in accordance with applicable Law, including United States Federal and state securities Laws.

**11.08    Right of Setoff.** (a) In addition to any rights and remedies provided by law, and subject, for the avoidance of doubt, to Section 2.16, upon the occurrence of an Event of Default and acceleration of the Loans, or at any time upon the occurrence and during the continuance of an Event of Default under Section 8.01(a), each Lender and each of its respective Affiliates is hereby authorized at any time and from time to time, to the fullest extent permitted by applicable law, to set off and apply any and all deposits (general or special, time or demand, provisional or final, in whatever currency) at any time held and other obligations (in whatever currency) at any time owing by such Lender or any such Affiliate to or for the credit or the account of the Company or any other Loan Party against any and all of the obligations of the Company or such Loan Party now or hereafter existing under this Agreement or any other Loan Document to such Lender or its Affiliates, irrespective of whether or not such Lender or Affiliate shall have made any demand under this Agreement or any other Loan Document and although such obligations of the Company or such Loan Party may be contingent or unmatured or are owed to a branch, office or Affiliate of such Lender different from the branch, office or Affiliate holding such deposit or obligated on such indebtedness; provided, that in the event that any Defaulting Lender shall exercise any such right of setoff, (x) all amounts so set off shall be paid over immediately to the Administrative Agent for further application in accordance with the provisions of Section 2.15 and, pending such payment, shall be segregated by such Defaulting Lender from its other funds and deemed held in trust for the benefit of the Administrative Agent and the Lenders, and (y) the Defaulting Lender shall provide promptly to the Administrative Agent a statement describing in reasonable detail the Obligations owing to such Defaulting Lender as to which it exercised such right of setoff. The rights of each Lender and its Affiliates under this Section are in addition to other rights and remedies (including other rights of setoff) that such Lender or its Affiliates may have. Each Lender agrees to notify the Company and the Administrative Agent promptly after any such setoff and application, provided that the failure to give such notice shall not affect the validity of such setoff and application.

**11.09    Interest Rate Limitation.** Subject to Section 2.08(e) of this Agreement in respect of a Borrower organized under the laws of Canada, notwithstanding anything to the contrary contained in any Loan Document, the interest paid or agreed to be paid under the Loan Documents shall not exceed the maximum rate of non-usurious interest permitted by applicable Law (the "Maximum Rate"). If the Administrative Agent or any Lender shall receive interest in an amount that exceeds the Maximum Rate, the excess interest shall be applied to the principal of the Loans or, if it exceeds such unpaid principal, refunded to the Company. In determining whether the interest contracted for, charged, or received by the Administrative Agent or a Lender exceeds the Maximum Rate, such Person may, to the extent permitted by applicable Law, (a) characterize any payment that is not principal as an expense, fee, or premium rather than interest, (b) exclude voluntary prepayments and the effects thereof, and (c) amortize, prorate, allocate, and spread in equal or unequal parts the total amount of interest throughout the contemplated term of the Obligations hereunder.

11.10    **Counterparts; Integration; Effectiveness**. This Agreement may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract. This Agreement, the other Loan Documents, and any separate letter agreements with respect to fees payable to the Administrative Agent constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof. Except as provided in Section 4.01, this Agreement shall become effective when it shall have been executed by the Administrative Agent and when the Administrative Agent shall have received counterparts hereof that, when taken together, bear the signatures of each of the other parties hereto. Delivery of an executed counterpart of a signature page of this Agreement by facsimile or other electronic imaging means (*e.g.* "pdf" or "tif") shall be effective as delivery of a manually executed counterpart of this Agreement.

11.11    **Survival of Representations and Warranties**. All representations and warranties made hereunder and in any other Loan Document or other document delivered pursuant hereto or thereto or in connection herewith or therewith shall survive the execution and delivery hereof and thereof. Such representations and warranties have been or will be relied upon by the Administrative Agent and each Lender, regardless of any investigation made by the Administrative Agent or any Lender or on their behalf and notwithstanding that the Administrative Agent or any Lender may have had notice or knowledge of any Default at the time of any Credit Extension, and shall continue in full force and effect as long as any Loan or any other Obligation hereunder shall remain unpaid or unsatisfied.

11.12    **Severability**. If any provision of this Agreement or the other Loan Documents is held to be illegal, invalid or unenforceable, (a) the legality, validity and enforceability of the remaining provisions of this Agreement and the other Loan Documents shall not be affected or impaired thereby and (b) the parties shall endeavor in good faith negotiations to replace the illegal, invalid or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the illegal, invalid or unenforceable provisions. The invalidity of a provision in a particular jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction. Without limiting the foregoing provisions of this Section 11.12, if and to the extent that the enforceability of any provisions in this Agreement relating to Defaulting Lenders shall be limited by Debtor Relief Laws, as determined in good faith by the Administrative Agent or the Swing Line Lender, as applicable, then such provisions shall be deemed to be in effect only to the extent not so limited.

11.13    **Replacement of Lenders**. If the Company is entitled to replace a Lender pursuant to the provisions of Section 3.06, or if any Lender is a Defaulting Lender or a Non-Consenting Lender or if any other circumstance exists hereunder that gives the Company the right to replace a Lender as a party hereto, then the Company may, at its sole expense and effort, upon notice to such Lender and the Administrative Agent, require such Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in, and consents required by, Section 11.06), all of its interests, rights (other than its existing rights to payments pursuant to Sections 3.01 and 3.04) and obligations under this Agreement and the related Loan Documents to

101

an Eligible Assignee that shall assume such obligations (which assignee may be another Lender, if a Lender accepts such assignment), <u>provided</u> that:

(a)  the Company shall have paid to the Administrative Agent the assignment fee (if any) specified in <u>Section 11.06(b</u>);

(b)  such Lender shall have received payment of an amount equal to the outstanding principal of its Loans, accrued interest thereon, accrued fees and all other amounts payable to it hereunder and under the other Loan Documents (including any amounts under <u>Section 3.05</u>) from the assignee (to the extent of such outstanding principal and accrued interest and fees) or the applicable Borrower (in the case of all other amounts);

(c)  in the case of any such assignment resulting from a claim for compensation under <u>Section 3.04</u> or payments required to be made pursuant to <u>Section 3.01</u>, such assignment will result in a reduction in such compensation or payments thereafter;

(d)  such assignment does not conflict with applicable Laws; and

(e)  in the case of an assignment resulting from a Lender becoming a Non-Consenting Lender, the applicable assignee shall have consented to the applicable amendment, waiver or consent.

A Lender shall not be required to make any such assignment or delegation if, prior thereto, as a result of a waiver by such Lender or otherwise, the circumstances entitling the Company to require such assignment and delegation cease to apply.

**11.14  Governing Law; Jurisdiction; Etc.**

(a)  <u>GOVERNING LAW</u>. THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS AND ANY CLAIMS, CONTROVERSY, DISPUTE OR CAUSE OF ACTION (WHETHER IN CONTRACT OR TORT OR OTHERWISE) BASED UPON, ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT (EXCEPT, AS TO ANY OTHER LOAN DOCUMENT, AS EXPRESSLY SET FORTH THEREIN) AND THE TRANSACTIONS CONTEMPLATED HEREBY AND THEREBY SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK.

(b)  <u>SUBMISSION TO JURISDICTION</u>. EACH PARTY HERETO IRREVOCABLY AND UNCONDITIONALLY AGREES THAT IT WILL NOT COMMENCE ANY ACTION, LITIGATION OR PROCEEDING OF ANY KIND OR DESCRIPTION, WHETHER IN LAW OR EQUITY, WHETHER IN CONTRACT OR IN TORT OR OTHERWISE, ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT, OR FOR RECOGNITION OR ENFORCEMENT OF ANY JUDGMENT, AND, IN ANY FORUM OTHER THAN THE COURTS OF THE STATE OF NEW YORK SITTING IN NEW YORK COUNTY AND OF THE UNITED STATES DISTRICT COURT OF THE SOUTHERN DISTRICT OF NEW YORK, AND ANY APPELLATE COURT FROM ANY THEREOF, AND EACH OF THE PARTIES HERETO IRREVOCABLY AND

UNCONDITIONALLY SUBMITS TO THE JURISDICTION OF SUCH COURTS AND AGREES THAT ALL CLAIMS IN RESPECT OF ANY SUCH ACTION, LITIGATION OR PROCEEDING MAY BE HEARD AND DETERMINED IN SUCH NEW YORK STATE COURT OR, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, IN SUCH FEDERAL COURT. EACH OF THE PARTIES HERETO AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION, LITIGATION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW. NOTHING IN THIS AGREEMENT OR IN ANY OTHER LOAN DOCUMENT SHALL AFFECT ANY RIGHT THAT THE ADMINISTRATIVE AGENT OR ANY LENDER MAY OTHERWISE HAVE TO BRING ANY ACTION OR PROCEEDING RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT AGAINST THE COMPANY OR ANY OTHER LOAN PARTY OR ITS PROPERTIES IN THE COURTS OF ANY JURISDICTION.

(c)    WAIVER OF VENUE. EACH PARTY HERETO IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT IN ANY COURT REFERRED TO IN PARAGRAPH (B) OF THIS SECTION. EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, THE DEFENSE OF AN INCONVENIENT FORUM TO THE MAINTENANCE OF SUCH ACTION OR PROCEEDING IN ANY SUCH COURT.

(d)    SERVICE OF PROCESS. EACH PARTY HERETO IRREVOCABLY CONSENTS TO SERVICE OF PROCESS IN THE MANNER PROVIDED FOR NOTICES IN SECTION 11.02. NOTHING IN THIS AGREEMENT WILL AFFECT THE RIGHT OF ANY PARTY HERETO TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY APPLICABLE LAW.

**11.15    Waiver of Jury Trial**. EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

11.16    **No Advisory or Fiduciary Responsibility**. In connection with all aspects of each transaction contemplated hereby (including in connection with any amendment, waiver or other modification hereof or of any other Loan Document), the Company and each other Loan Party acknowledges and agrees, and acknowledges its Affiliates' understanding, that: (i) (A) the arranging and other services regarding this Agreement provided by the Administrative Agent, the Arrangers and the Lenders are arm's-length commercial transactions between the Company, each other Loan Party and their respective Affiliates, on the one hand, and the Administrative Agent, the Arrangers and the Lenders, on the other hand, (B) each of the Company and the other Loan Parties has consulted its own legal, accounting, regulatory and tax advisors to the extent it has deemed appropriate, and (C) the Company and each other Loan Party is capable of evaluating, and understands and accepts, the terms, risks and conditions of the transactions contemplated hereby and by the other Loan Documents; (ii) (A) the Administrative Agent, each Arranger and each Lender is and has been acting solely as a principal and, except as expressly agreed in writing by the relevant parties, has not been, is not, and will not be acting as an advisor, agent or fiduciary for the Company, any other Loan Party or any of their respective Affiliates, or any other Person and (B) neither the Administrative Agent, any Arranger nor any Lender has any obligation to the Company, any other Loan Party or any of their respective Affiliates with respect to the transactions contemplated hereby except those obligations expressly set forth herein and in the other Loan Documents; and (iii) the Administrative Agent, the Arrangers, the Lenders and their respective Affiliates may be engaged in a broad range of transactions that involve interests that differ from those of the Company, the other Loan Parties and their respective Affiliates, and neither the Administrative Agent, any Arranger nor any Lender has any obligation to disclose any of such interests to the Company, any other Loan Party or any of their respective Affiliates. To the fullest extent permitted by law, each of the Company and each other Loan Party hereby waives and releases any claims that it may have against the Administrative Agent, any Arranger or any Lender with respect to any breach or alleged breach of agency or fiduciary duty in connection with any aspect of any transaction contemplated hereby.

11.17    **Electronic Execution of Assignments and Certain Other Documents**. The words "execute," "execution," "signed," "signature," and words of like import in or related to any document to be signed in connection with this Agreement and the transactions contemplated hereby (including without limitation Assignment and Assumptions, amendments or other modifications, Committed Loan Notices, Swing Line Loan Notices, waivers and consents) shall be deemed to include electronic signatures, the electronic matching of assignment terms and contract formations on electronic platforms approved by the Administrative Agent, or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act; provided that notwithstanding anything contained herein to the contrary the Administrative Agent is under no obligation to agree to accept electronic signatures in any form or in any format unless expressly agreed to by the Administrative Agent pursuant to procedures approved by it; provided further, without limiting the foregoing, upon the request of the Administrative Agent, any electronic signature shall be promptly followed by such manually executed counterpart.

**11.18    USA PATRIOT Act**. Each Lender that is subject to the Act (as hereinafter defined) and the Administrative Agent (for itself and not on behalf of any Lender) hereby notifies the Borrowers that pursuant to the requirements of the USA PATRIOT Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) (the "Act"), it is required to obtain, verify and record information that identifies the Borrowers, which information includes the name and address of each Borrower and other information that will allow such Lender or the Administrative Agent, as applicable, to identify such Borrower in accordance with the Act. Each Borrower shall, promptly following a request by the Administrative Agent or any Lender, provide all documentation and other information that the Administrative Agent or such Lender requests in order to comply with its ongoing obligations under applicable "know your customer" and anti-money laundering rules and regulations, including the Act.

**11.19    Judgment Currency**. If, for the purposes of obtaining judgment in any court, it is necessary to convert a sum due hereunder or any other Loan Document in one currency into another currency, the rate of exchange used shall be that at which in accordance with normal banking procedures the Administrative Agent could purchase the first currency with such other currency on the Business Day preceding that on which final judgment is given. The obligation of each Borrower in respect of any such sum due from it to the Administrative Agent or any Lender hereunder or under the other Loan Documents in respect of its respective Obligations hereunder shall, notwithstanding any judgment in a currency (the "Judgment Currency") other than that in which such sum is denominated in accordance with the applicable provisions of this Agreement (the "Agreement Currency"), be discharged only to the extent that on the Business Day following receipt by the Administrative Agent or such Lender, as the case may be, of any sum adjudged to be so due in the Judgment Currency, the Administrative Agent or such Lender, as the case may be, may in accordance with normal banking procedures purchase the Agreement Currency with the Judgment Currency. If the amount of the Agreement Currency so purchased is less than the sum originally due to the Administrative Agent or any Lender from any Borrower in the Agreement Currency, such Borrower agrees, as a separate obligation and notwithstanding any such judgment, to indemnify the Administrative Agent or such Lender, as the case may be, against such loss. If the amount of the Agreement Currency so purchased is greater than the sum originally due to the Administrative Agent or any Lender in such currency, the Administrative Agent or such Lender, as the case may be, agrees to return the amount of any excess to such Borrower (or to any other Person who may be entitled thereto under applicable law).

**11.20    ENTIRE AGREEMENT**

THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS REPRESENT THE FINAL AGREEMENT AMONG THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES. THERE ARE NO UNWRITTEN ORAL AGREEMENTS AMONG THE PARTIES.

**11.21    Acknowledgement and Consent to Bail-In of Affected Financial Institutions**. Notwithstanding anything to the contrary in any Loan Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any

liability of any Affected Financial Institution arising under any Loan Document, to the extent such liability is unsecured, may be subject to the write-down and conversion powers of the applicable Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(a)    the application of any Write-Down and Conversion Powers by the applicable Resolution Authority to any such liabilities arising hereunder which may be payable to it by any party hereto that is an Affected Financial Institution; and

(b)    the effects of any Bail-in Action on any such liability, including, if applicable:

(i)    a reduction in full or in part or cancellation of any such liability;

(ii)    a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such Affected Financial Institution, its parent undertaking, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Loan Document; or

(iii)    the variation of the terms of such liability in connection with the exercise of the Write-Down and Conversion Powers of the applicable Resolution Authority.

[Signature pages follow.]

*IN WITNESS WHEREOF*, the parties hereto have caused this Agreement to be duly executed as of the date first above written.

**LULULEMON ATHLETICA INC.**
By: /s/ Alex Grieve
Name: Alex Grieve
Title: Vice President, Controller

**LULULEMON ATHLETICA CANADA INC.**
By: /s/ Alex Grieve
Name: Alex Grieve
Title: Vice President, Controller

**LULU CANADIAN HOLDING, INC.**
By: /s/ Alex Grieve
Name: Alex Grieve
Title: Vice President, Controller

**LULULEMON USA INC.**
By: /s/ Alex Grieve
Name: Alex Grieve
Title: Vice President, Controller

**BANK OF AMERICA, N.A.,** as
Administrative Agent
By: /s/ Kyle D Harding
Name: Kyle D Harding
Title: Vice President

S - 2
Lululemon Credit Agreement

**BANK OF AMERICA, N.A.**, as a Lender and Swing Line Lender

By: /s/ David Rafferty
Name: David Rafferty
Title: Senior Vice President

**BANK OF AMERICA, N.A.**, CANADA BRANCH, as a Lender

By: /s/ David Rafferty
Name: David Rafferty
Title: Senior Vice President

S - 3
Lululemon Credit Agreement

**BARCLAYS BANK PLC**

By: /s/ Christopher M. Aitkin
Name: Christopher M. Aitkin
Title: Vice President

S - 4
Lululemon Credit Agreement

**HSBC BANK CANADA**

By: /s/ Reid Hamilton
Name: Reid Hamilton
Title: Director, Large Corporate


By: /s/ Todd Patchell
Name: Todd Patchell
Title: Vice President, BC Region Head of Large Corporate


S - 5

Lululemon Credit Agreement

**ROYAL BANK OF CANADA**

By: /s/ Baljit Mann
Name: Baljit Mann
Title: Authorized Signatory

S - 6
Lululemon Credit Agreement

*SCHEDULE 2.01*

**COMMITMENTS
AND APPLICABLE PERCENTAGES**

| Lender | Commitment | Applicable Percentage |
|--------|-----------:|----------------------:|
| Bank of America, N.A. | $85,000,000 | 28.333333330% |
| Barclays Bank PLC | $85,000,000 | 28.333333330% |
| HSBC Bank Canada | $85,000,000 | 28.333333330% |
| Royal Bank of Canada | $45,000,000 | 15.000000000% |
| Total | $300,000,000 | 100.000000000% |

**EXHIBIT A**

**FORM OF COMMITTED LOAN NOTICE**

Date: _____, _____

To:   Bank of America, N.A., as Administrative Agent

Ladies and Gentlemen:

Reference is made to that certain 364-Day Credit Agreement, dated as of June 29, 2020 (as amended, restated, extended, supplemented or otherwise modified in writing from time to time, the "Agreement"; the terms defined therein being used herein as therein defined), among Lululemon Athletica Inc., a Delaware corporation (the "Company"), Lululemon Athletica Canada Inc., a corporation organized under the laws of British Columbia, Lulu Canadian Holding, Inc., a corporation organized under the laws of British Columbia, Lululemon USA Inc., a Nevada corporation, the Lenders from time to time party thereto, and Bank of America, N.A., as Administrative Agent and Swing Line Lender.

The undersigned hereby requests (select one):

A Borrowing of Committed Loans     A conversion or continuation of Loans

1.     On _____ (a Business Day).

2.     In the amount of _____.

3.     Comprised of _____.
         **[Type of Committed Loan requested]**

4.     In the following currency: _____

5.     For Eurocurrency Rate Loans: with an Interest Period of ____ months.

The Committed Borrowing, if any, requested herein complies with the provisos to the first sentence of Section 2.01 of the Agreement.

[Remainder of page intentionally left blank, signature page to follow.]

A-1
Form of Committed Loan Notice

**[NAME OF BORROWER]**

By: __

Name: __

Title: __

A-2
Form of Committed Loan Notice

*EXHIBIT B*

**FORM OF SWING LINE LOAN NOTICE**

Date: _____, _____

To:   Bank of America, N.A., as Swing Line Lender
      Bank of America, N.A., as Administrative Agent

Ladies and Gentlemen:

Reference is made to that certain 364-Day Credit Agreement, dated as of June 29, 2020 (as amended, restated, extended, supplemented or otherwise modified in writing from time to time, the "<u>Agreement</u>"; the terms defined therein being used herein as therein defined), among Lululemon Athletica Inc., a Delaware corporation (the "<u>Company</u>"), Lululemon Athletica Canada Inc., a corporation organized under the laws of British Columbia, Lulu Canadian Holding, Inc., a corporation organized under the laws of British Columbia, Lululemon USA Inc., a Nevada corporation, the Lenders from time to time party thereto, and Bank of America, N.A., as Administrative Agent and Swing Line Lender.

The undersigned hereby requests a Swing Line Loan:

1.   On _____ (a Business Day).

2.   In the amount of _____.

The Swing Line Borrowing requested herein complies with the requirements of the provisos to the first sentence of <u>Section 2.04(a</u>) of the Agreement.

[Remainder of page intentionally left blank, signature page to follow.]

B-**1**

**LULULEMON ATHLETICA INC.**

By: __

Name: __

Title: __

A-2
Form of Committed Loan Notice

EXHIBIT C

**FORM OF NOTE**

_____

FOR VALUE RECEIVED, each of the undersigned (each, a "Borrower" and, collectively, the "Borrowers") hereby promises to pay to _____ or registered assigns (the "Lender"), in accordance with the provisions of the Agreement (as hereinafter defined), the principal amount of each Loan from time to time made by the Lender to such Borrower under that certain 364-Day Credit Agreement, dated as of June 29, 2020 (as amended, restated, extended, supplemented or otherwise modified in writing from time to time, the "Agreement"; the terms defined therein being used herein as therein defined), among Lululemon Athletica Inc., a Delaware corporation (the "Company"), Lululemon Athletica Canada Inc., a corporation organized under the laws of British Columbia, Lulu Canadian Holding, Inc., a corporation organized under the laws of British Columbia, Lululemon USA Inc., a Nevada corporation, the Lenders from time to time party thereto, and Bank of America, N.A., as Administrative Agent and Swing Line Lender.

Each Borrower promises to pay interest on the unpaid principal amount of each Loan made to it from the date of such Loan until such principal amount is paid in full, at such interest rates and at such times as provided in the Agreement. All payments of principal and interest shall be made to the Administrative Agent for the account of the Lender in the currency in which such Committed Loan is denominated and in Same Day Funds at the Administrative Agent's Office for such currency. If any amount is not paid in full when due hereunder, such unpaid amount shall bear interest, to be paid upon demand, from the due date thereof until the date of actual payment (and before as well as after judgment) computed at the per annum rate set forth in the Agreement.

This Note is one of the Notes referred to in the Agreement, is entitled to the benefits thereof and may be prepaid in whole or in part subject to the terms and conditions provided therein. This Note is also entitled to the benefits of the Guaranty. Upon the occurrence and continuation of one or more of the Events of Default specified in the Agreement, all amounts then remaining unpaid on this Note shall become, or may be declared to be, immediately due and payable all as provided in the Agreement. Loans made by the Lender shall be evidenced by one or more loan accounts or records maintained by the Lender in the ordinary course of business. The Lender may also attach schedules to this Note and endorse thereon the date, amount, currency and maturity of its Loans and payments with respect thereto.

Each Borrower, for itself, its successors and assigns, hereby waives diligence, presentment, protest and demand and notice of protest, demand, dishonor and non-payment of this Note.

[Remainder of page intentionally left blank, signature page to follow.]

B-1

THIS NOTE SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK.

[**APPLICABLE BORROWER**]

By: __

Name: __

Title:__

A-2
Form of Committed Loan Notice

**LOANS AND PAYMENTS WITH RESPECT THERETO**

| Date | Type of Loan Made | Currency and Amount of Loan Made | End of Interest Period | Amount of Principal or Interest Paid This Date | Outstanding Principal Balance This Date | Notation Made By |
|------|-------------------|----------------------------------|------------------------|------------------------------------------------|------------------------------------------|------------------|
| _____ | _____ | _____ | _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ | _____ | _____ | _____ |

A-3
Form of Committed Loan Notice

**FORM OF COMPLIANCE CERTIFICATE**

Financial Statement Date: _____,

To:   Bank of America, N.A., as Administrative Agent

Ladies and Gentlemen:

Reference is made to that certain 364-Day Credit Agreement, dated as of June 29, 2020 (as amended, restated, extended, supplemented or otherwise modified in writing from time to time, the "Agreement"; the terms defined therein being used herein as therein defined), among Lululemon Athletica Inc., a Delaware corporation (the "Company"), Lululemon Athletica Canada Inc., a corporation organized under the laws of British Columbia, Lulu Canadian Holding, Inc., a corporation organized under the laws of British Columbia, Lululemon USA Inc., a Nevada corporation, the Lenders from time to time party thereto, and Bank of America, N.A., as Administrative Agent and Swing Line Lender.

The undersigned Responsible Officer hereby certifies as of the date hereof that he/she is the _____ of the Company, and that, as such, he/she is authorized to execute and deliver this Certificate to the Administrative Agent on the behalf of the Company, and that:

[*Use following paragraph 1 for fiscal year-end financial statements*]

1.    The Company has delivered the year-end audited financial statements required by Section 6.01(a) of the Agreement for the fiscal year of the Company ended as of the above date, together with the report and opinion of an independent certified public accountant required by such section.

[*Use following paragraph 1 for fiscal quarter-end financial statements*]

1.    The Company has delivered the unaudited financial statements required by Section 6.01(b) of the Agreement for the fiscal quarter of the Company ended as of the above date. Such financial statements fairly present the financial condition, results of operations and cash flows of the Company and its Subsidiaries in accordance with GAAP as at such date and for such period, subject only to normal year-end audit adjustments and the absence of footnotes.

2.    The undersigned has reviewed and is familiar with the terms of the Agreement and has made, or has caused to be made under his/her supervision, a detailed review of the transactions and condition (financial or otherwise) of the Company during the accounting period covered by such financial statements.

3.    A review of the activities of the Company during such fiscal period has been made under the supervision of the undersigned with a view to determining whether during such fiscal period the Company performed and observed all its Obligations under the Loan Documents, and

D-1
Form of Compliance Certificate

[*select one*:]

[to the best knowledge of the undersigned, during such fiscal period the Company performed and observed each covenant and condition of the Loan Documents applicable to it, and no Default has occurred and is continuing.]

--*or*--

[to the best knowledge of the undersigned, during such fiscal period the following covenants or conditions have not been performed or observed and the following is a list of each such Default and its nature and status:]

4.    The representations and warranties of the Borrowers contained in Article V of the Agreement, and any representations and warranties of any Loan Party that are contained in any document furnished at any time under or in connection with the Loan Documents, are true and correct in all material respects on and as of the date hereof, except to the extent that such representations and warranties specifically refer to an earlier date, in which case they are true and correct in all material respects as of such earlier date (provided that any representation or warranty qualified by materiality or material adverse effect shall be true and correct in all respects), and except that for purposes of this Compliance Certificate, the representations and warranties contained in subsections (a) and (b) of Section 5.05 of the Agreement shall be deemed to refer to the most recent statements furnished pursuant to subsections (a) and (b), respectively, of Section 6.01 of the Agreement, including the statements in connection with which this Compliance Certificate is delivered.

5.    The financial covenant analyses and information set forth on Schedules 1 and 2 attached hereto are true and accurate on and as of the date of this Certificate.

*IN WITNESS WHEREOF*, the undersigned has executed this Certificate as of _____, _____.

[Remainder of page intentionally left blank, signature page to follow.]

F-4-2
Form of U.S. Tax Compliance Certificate

**LULULEMON ATHLETICA INC.**

By: __

Name: __

Title: __

F-4-3
Form of U.S. Tax Compliance Certificate

For the Quarter/Year ended _____("Statement Date")

**SCHEDULE 1**
to the Compliance Certificate
($ in 000's)

**I.   Section 7.08 (a) – Consolidated Fixed Charge Coverage Ratio.**

A.   Consolidated EBITDAR for four consecutive fiscal quarters ending on above date ("Subject Period"):

| | | |
|---|---|---|
| 1. | Consolidated net income for Subject Period: | $_____ |
| 2. | Interest charges for Subject Period: | $_____ |
| 3. | Provision for income taxes (foreign and domestic) for Subject Period: | $_____ |
| 4. | Depreciation expenses for Subject Period: | $_____ |
| 5. | Amortization expenses for Subject Period: | $_____ |
| 6. | Extraordinary, non-recurring or unusual losses (including all fees and expenses relating thereto), expenses or charges for Subject Period (cash losses limited to $25,000,000) | $_____ |
| 7. | Capital losses from the Deposition of fixed assets for Subject Period | $_____ |
| 8. | Non-cash reductions of net income for Subject Period: | $_____ |
| 9. | Non-cash additions to net income for Subject Period: | $_____ |
| 10. | Capital gains from the Disposition of fixed assets for Subject Period | $_____ |
| 11. | Extraordinary gains and unusual or non-recurring gains (less all fees and expenses relating thereto) | $_____ |
| 12. | Rent for the Subject Period | $_____ |
| 13. | Consolidated EBITDAR (Lines II.A.1 + 2 + 3 + 4 + 5 + 6 +7 + 8 - 9 - 10 - 11 + 12): | $_____ |
| B. | Consolidated Interest Charges + Rent for Subject Period: | $_____ |
| C. | Consolidated Fixed Charge Coverage Ratio (Line II.A.13 / Line II.B): | _____ to 1 |

*Minimum required:*                                                                    2.00 to 1

F-4-4
Form of U.S. Tax Compliance Certificate

**III.   Section 7.08 (b) – Consolidated Rent-Adjusted Leverage Ratio.**

| | | |
|---|---|---|
| A. | Consolidated Covenant Indebtedness at Statement Date: | $_____ |
| B. | Consolidated EBITDAR for Subject Period (Line II.A.13 above): | $_____ |
| C. | Consolidated Rent-Adjusted Leverage Ratio (Line III.A / Line III.B): | _____ to 1 |
| *Maximum permitted* | | 3.50 to 1 |

F-4-5
Form of U.S. Tax Compliance Certificate

For the Quarter/Year ended _____ ("Statement Date")

**SCHEDULE 2**
to the Compliance Certificate
($ in 000's)

**Consolidated EBITDAR**
(in accordance with the definition of Consolidated EBITDA
as set forth in the Agreement)

| Consolidated EBITDAR | Quarter Ended — | Quarter Ended — | Quarter Ended — | Quarter Ended — | Twelve Months Ended — |
|---|---|---|---|---|---|
| Consolidated net income | | | | | |
| + interest charges | | | | | |
| + income taxes | | | | | |
| + depreciation expense | | | | | |
| + amortization expense | | | | | |
| + extraordinary, non-recurring or unusual losses, expenses or charges (cash losses limited to $25,000,000) | | | | | |
| + capital losses from the Deposition of fixed assets | | | | | |
| + non-cash expenses | | | | | |
| - non-cash income | | | | | |
| - capital gains from the Disposition of fixed assets | | | | | |
| - extraordinary gains and unusual or non-recurring gains | | | | | |
| + Rent | | | | | |
| = Consolidated EBITDAR | | | | | |

F-4-6
Form of U.S. Tax Compliance Certificate

**ASSIGNMENT AND ASSUMPTION**

This Assignment and Assumption (this "Assignment and Assumption") is dated as of the Effective Date set forth below and is entered into by and between **[the][each]** Assignor identified in item 1 below (**[the][each, an]** "Assignor") and **[the][each]** Assignee identified in item 2 below (**[the][each, an]** "Assignee"). **[It is understood and agreed that the rights and obligations of [the Assignors][the Assignees] hereunder are several and not joint.]** Capitalized terms used but not defined herein shall have the meanings given to them in the Credit Agreement identified below (as amended, the "Credit Agreement"), receipt of a copy of which is hereby acknowledged by the Assignee. The Standard Terms and Conditions set forth in Annex 1 attached hereto (the "Standard Terms and Conditions") are hereby agreed to and incorporated herein by reference and made a part of this Assignment and Assumption as if set forth herein in full.

For an agreed consideration, **[the][each]** Assignor hereby irrevocably sells and assigns to **[the Assignee][the respective Assignees]**, and **[the][each]** Assignee hereby irrevocably purchases and assumes from **[the Assignor][the respective Assignors]**, subject to and in accordance with the Standard Terms and Conditions and the Credit Agreement, as of the Effective Date inserted by the Administrative Agent as contemplated below (i) all of **[the Assignor's][the respective Assignors']** rights and obligations in **[its capacity as a Lender][their respective capacities as Lenders]** under the Credit Agreement and any other documents or instruments delivered pursuant thereto in the amount**[s]** and equal to the percentage interest**[s]** identified below of all the outstanding rights and obligations under the respective facilities identified below (including, without limitation, the Swing Line Loans included in such facilities) and (ii) to the extent permitted to be assigned under applicable law, all claims, suits, causes of action and any other right of **[the Assignor (in its capacity as a Lender)][the respective Assignors (in their respective capacities as Lenders)]** against any Person, whether known or unknown, arising under or in connection with the Credit Agreement, any other documents or instruments delivered pursuant thereto or the loan transactions governed thereby or in any way based on or related to any of the foregoing, including, but not limited to, contract claims, tort claims, malpractice claims, statutory claims and all other claims at law or in equity related to the rights and obligations sold and assigned pursuant to clause (i) above (the rights and obligations sold and assigned by **[the][any]** Assignor to **[the][any]** Assignee pursuant to clauses (i) and (ii) above being referred to herein collectively as **[the][an]** "Assigned Interest"). Each such sale and assignment is without recourse to **[the][any]** Assignor and, except as expressly provided in this Assignment and Assumption, without representation or warranty by **[the][any]** Assignor.

1.  Assignor**[s]**:    _____

    _____

    **[Assignor [is] [is not] a Defaulting Lender]**

2.  Assignee**[s]**:    _____

    _____

E-1-1
Form of Assignment and Assumption

[for each Assignee, indicate [Affiliate][Approved Fund] of [*identify Lender*]]

3.    <u>Borrower</u>(s):    Lululemon Athletica Inc., Lululemon Athletica Canada Inc., Lulu Canadian Holding, Inc. and Lululemon USA Inc.

4.    <u>Administrative Agent</u>: Bank of America, N.A., as the administrative agent under the Credit Agreement

5.    <u>Credit Agreement</u>: 364-Day Credit Agreement, dated as of June [ ], 2020 among Lululemon Athletica Inc., a Delaware corporation (the "<u>Company</u>"), Lululemon Athletica Canada Inc., corporation organized under the laws of British Columbia, Lulu Canadian Holding, Inc., a corporation organized under the laws of British Columbia, Lululemon USA Inc., a Nevada corporation, the Lenders from time to time party thereto, and Bank of America, N.A., as Administrative Agent and Swing Line Lender

6.    <u>Assigned Interest</u>[s]:

| Assignor[s] | Assignee[s] | Facility <u>Assigned</u> | Aggregate Amount of Commitment/ Loans for all <u>Lenders</u> | Amount of Commitment/ <u>Loans</u> <u>Assigned</u> | Percentage Assigned of Commitment/ <u>Loans</u> | CUSIP <u>Number</u> |
|---|---|---|---|---|---|---|
| | | _____ | $_____ | $_____ | %_____ | |
| | | _____ | $_____ | $_____ | %_____ | |
| | | _____ | $_____ | $_____ | %_____ | |

[7.    <u>Trade Date</u>:    _____]

Effective Date: _____, 20__ **[TO BE INSERTED BY ADMINISTRATIVE AGENT AND WHICH SHALL BE THE EFFECTIVE DATE OF RECORDATION OF TRANSFER IN THE REGISTER THEREFOR.]**

The terms set forth in this Assignment and Assumption are hereby agreed to:

ASSIGNOR**[S]**

**[NAME OF ASSIGNOR]**

By: _____
    Title:


**[NAME OF ASSIGNOR]**

By: _____
    Title:


ASSIGNEE**[S]**


F-4-2
Form of U.S. Tax Compliance Certificate

**[NAME OF ASSIGNOR]**

By: _____

    Title:

**[NAME OF ASSIGNOR]**

By: _____

    Title:

**[Consented to and]** Accepted:

BANK OF AMERICA, N.A., as
  Administrative Agent

By: _____

    Title:

**[Consented to:]**

[_____]

By: _____

    Title:

F-4-3
Form of U.S. Tax Compliance Certificate

**LULULEMON ATHLETICA INC. CREDIT AGREEMENT**

STANDARD TERMS AND CONDITIONS FOR
ASSIGNMENT AND ASSUMPTION

1.    Representations and Warranties.

1.1.    Assignor. **[The][Each]** Assignor (a) represents and warrants that (i) it is the legal and beneficial owner of **[the][the relevant]** Assigned Interest, (ii) **[the][such]** Assigned Interest is free and clear of any lien, encumbrance or other adverse claim, (iii) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and Assumption and to consummate the transactions contemplated hereby and (iv) it is **[not]** a Defaulting Lender; and (b) assumes no responsibility with respect to (i) any statements, warranties or representations made in or in connection with the Credit Agreement or any other Loan Document, (ii) the execution, legality, validity, enforceability, genuineness, sufficiency or value of the Loan Documents or any collateral thereunder, (iii) the financial condition of the Company, any of its Subsidiaries or Affiliates or any other Person obligated in respect of any Loan Document or (iv) the performance or observance by the Company, any of its Subsidiaries or Affiliates or any other Person of any of their respective obligations under any Loan Document.

1.2.    Assignee. **[The][Each]** Assignee (a) represents and warrants that (i) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and Assumption and to consummate the transactions contemplated hereby and to become a Lender under the Credit Agreement, (ii) it meets all the requirements to be an assignee under Section 11.06(b)(iii) and (v) of the Credit Agreement (subject to such consents, if any, as may be required under Section 11.06(b)(iii) of the Credit Agreement), (iii) from and after the Effective Date, it shall be bound by the provisions of the Credit Agreement as a Lender thereunder and, to the extent of **[the][the relevant]** Assigned Interest, shall have the obligations of a Lender thereunder, (iv) it is sophisticated with respect to decisions to acquire assets of the type represented by **[the][such]** Assigned Interest and either it, or the Person exercising discretion in making its decision to acquire **[the][such]** Assigned Interest, is experienced in acquiring assets of such type, (v) it has received a copy of the Credit Agreement, and has received or has been accorded the opportunity to receive copies of the most recent financial statements delivered pursuant to Section 6.01 thereof, as applicable, and such other documents and information as it deems appropriate to make its own credit analysis and decision to enter into this Assignment and Assumption and to purchase **[the][such]** Assigned Interest, (vi) it has, independently and without reliance upon the Administrative Agent or any other Lender and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Assignment and Assumption and to purchase **[the][such]** Assigned Interest, and (vii) if it is a Non-U.S. Lender, attached hereto is any documentation required to be delivered by it pursuant to the terms of the Credit Agreement, duly completed and executed by **[the][such]** Assignee; and (b) agrees that (i) it will, independently and without reliance upon the Administrative Agent, **[the][any]** Assignor or any other Lender, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under the Loan Documents, and (ii) it will

F-4-4
Form of U.S. Tax Compliance Certificate

perform in accordance with their terms all of the obligations which by the terms of the Loan Documents are required to be performed by it as a Lender.

2.    <u>Payments</u>. From and after the Effective Date, the Administrative Agent shall make all payments in respect of **[the][each]** Assigned Interest (including payments of principal, interest, fees and other amounts) to **[the][the relevant]** Assignor for amounts which have accrued to but excluding the Effective Date and to **[the][the relevant]** Assignee for amounts which have accrued from and after the Effective Date. Notwithstanding the foregoing, the Administrative Agent shall make all payments of interest, fees or other amounts paid or payable in kind from and after the Effective Date to **[the][the relevant]** Assignee.

3.    <u>General Provisions</u>. This Assignment and Assumption shall be binding upon, and inure to the benefit of, the parties hereto and their respective successors and assigns. This Assignment and Assumption may be executed in any number of counterparts, which together shall constitute one instrument. Delivery of an executed counterpart of a signature page of this Assignment and Assumption by telecopy shall be effective as delivery of a manually executed counterpart of this Assignment and Assumption. This Assignment and Assumption shall be governed by, and construed in accordance with, the law of the State of New York.

<div align="center">

F-4-5

Form of U.S. Tax Compliance Certificate

</div>

**FORM OF ADMINISTRATIVE QUESTIONNAIRE**

E-2-1
Form of Administrative Questionnaire

**FORM OF**
**U.S. TAX COMPLIANCE CERTIFICATE**

(For Non-U.S. Lenders That Are Not Partnerships For U.S. Federal Income Tax Purposes)

Reference is hereby made to the 364-Day Credit Agreement dated as of June 29, 2020 (as amended, supplemented or otherwise modified from time to time, the "Credit Agreement"), among Lululemon Athletica Inc., a Delaware corporation (the "Company"), Lululemon Athletica Canada Inc., corporation organized under the laws of British Columbia, Lulu Canadian Holding, Inc., a corporation organized under the laws of British Columbia, Lululemon USA Inc., a Nevada corporation, the Lenders from time to time party thereto, and Bank of America, N.A., as Administrative Agent and Swing Line Lender.

Pursuant to the provisions of Section 3.01(e) of the Credit Agreement, the undersigned hereby certifies that (i) it is the sole record and beneficial owner of the Loan(s) (as well as any Note(s) evidencing such Loan(s)) in respect of which it is providing this certificate, (ii) it is not a bank within the meaning of Section 881(c)(3)(A) of the Code, (iii) it is not a ten percent shareholder of the Company within the meaning of Section 871(h)(3)(B) of the Code and (iv) it is not a controlled foreign corporation related to the Company as described in Section 881(c)(3)(C) of the Code.

The undersigned has furnished the Administrative Agent and the Company with a certificate of its non-U.S. Person status on IRS Form W-8BEN-E (or W-8BEN, as applicable). By executing this certificate, the undersigned agrees that (1) if the information provided on this certificate changes, the undersigned shall promptly so inform the Company and the Administrative Agent, and (2) the undersigned shall have at all times furnished the Company and the Administrative Agent with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

Unless otherwise defined herein, terms defined in the Credit Agreement and used herein shall have the meanings given to them in the Credit Agreement.

**[NAME OF LENDER]**

By: _____

    Name: _____

    Title: _____

Date: _____ __, 20**[ ]**

**FORM OF**
**U.S. TAX COMPLIANCE CERTIFICATE**

(For Non-U.S. Participants That Are Not Partnerships For U.S. Federal Income Tax Purposes)

Reference is hereby made to the 364-Day Credit Agreement dated as of June 29, 2020 (as amended, supplemented or otherwise modified from time to time, the "Credit Agreement"), among Lululemon Athletica Inc., a Delaware corporation (the "Company"), Lululemon Athletica Canada Inc., corporation organized under the laws of British Columbia, Lulu Canadian Holding, Inc., a corporation organized under the laws of British Columbia, Lululemon USA Inc., a Nevada corporation, the Lenders from time to time party thereto, and Bank of America, N.A., as Administrative Agent and Swing Line Lender.

Pursuant to the provisions of Section 3.01(e) of the Credit Agreement, the undersigned hereby certifies that (i) it is the sole record and beneficial owner of the participation in respect of which it is providing this certificate, (ii) it is not a bank within the meaning of Section 881(c)(3)(A) of the Code, (iii) it is not a ten percent shareholder of the Company within the meaning of Section 871(h)(3)(B) of the Code, and (iv) it is not a controlled foreign corporation related to the Company as described in Section 881(c)(3)(C) of the Code.

The undersigned has furnished its participating Lender with a certificate of its non-U.S. Person status on IRS Form W-8BEN-E (or W-8BEN, as applicable). By executing this certificate, the undersigned agrees that (1) if the information provided on this certificate changes, the undersigned shall promptly so inform such Lender in writing, and (2) the undersigned shall have at all times furnished such Lender with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

Unless otherwise defined herein, terms defined in the Credit Agreement and used herein shall have the meanings given to them in the Credit Agreement.

**[NAME OF PARTICIPANT]**

By: _____

    Name: _____

    Title: _____

Date: _____ __, 20**[ ]**

F-2-1
Form of U.S. Tax Compliance Certificate

**FORM OF**
**U.S. TAX COMPLIANCE CERTIFICATE**

(For Non-U.S. Participants That Are Partnerships For U.S. Federal Income Tax Purposes)

Reference is hereby made to the 364-Day Credit Agreement dated as of June 29], 2020 (as amended, supplemented or otherwise modified from time to time, the "Credit Agreement"), among Lululemon Athletica Inc., a Delaware corporation (the "Company"), Lululemon Athletica Canada Inc., corporation organized under the laws of British Columbia, Lulu Canadian Holding, Inc., a corporation organized under the laws of British Columbia, Lululemon USA Inc., a Nevada corporation, the Lenders from time to time party thereto, and Bank of America, N.A., as Administrative Agent and Swing Line Lender.

Pursuant to the provisions of Section 3.01(e) of the Credit Agreement, the undersigned hereby certifies that (i) it is the sole record owner of the participation in respect of which it is providing this certificate, (ii) its direct or indirect partners/members are the sole beneficial owners of such participation, (iii) with respect such participation, neither the undersigned nor any of its direct or indirect partners/members is a bank extending credit pursuant to a loan agreement entered into in the ordinary course of its trade or business within the meaning of Section 881(c)(3)(A) of the Code, (iv) none of its direct or indirect partners/members is a ten percent shareholder of the Company within the meaning of Section 871(h)(3)(B) of the Code and (v) none of its direct or indirect partners/members is a controlled foreign corporation related to the Company as described in Section 881(c)(3)(C) of the Code.

The undersigned has furnished its participating Lender with IRS Form W-8IMY accompanied by one of the following forms from each of its partners/members that is claiming the portfolio interest exemption: (i) an IRS Form W-8BEN-E (or W-8BEN, as applicable) or (ii) an IRS Form W-8IMY accompanied by an IRS Form W-8BEN-E (or W-8BEN, as applicable) from each of such partner's/member's beneficial owners that is claiming the portfolio interest exemption. By executing this certificate, the undersigned agrees that (1) if the information provided on this certificate changes, the undersigned shall promptly so inform such Lender and (2) the undersigned shall have at all times furnished such Lender with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

Unless otherwise defined herein, terms defined in the Credit Agreement and used herein shall have the meanings given to them in the Credit Agreement.

F-3-1
Form of U.S. Tax Compliance Certificate

**[NAME OF PARTICIPANT]**

By: _____

      Name: _____

      Title: _____

Date: _____ __, 20[ ]

<div align="center">

F-4-2

Form of U.S. Tax Compliance Certificate

</div>

**FORM OF**
**U.S. TAX COMPLIANCE CERTIFICATE**

(For Non-U.S. Lenders That Are Partnerships For U.S. Federal Income Tax Purposes)

Reference is hereby made to the 364-Day Credit Agreement dated as of June 29, 2020 (as amended, supplemented or otherwise modified from time to time, the "Credit Agreement"), among Lululemon Athletica Inc., a Delaware corporation (the "Company"), Lululemon Athletica Canada Inc., corporation organized under the laws of British Columbia, Lulu Canadian Holding, Inc., a corporation organized under the laws of British Columbia, Lululemon USA Inc., a Nevada corporation, the Lenders from time to time party thereto, and Bank of America, N.A., as Administrative Agent and Swing Line Lender.

Pursuant to the provisions of Section 3.01(e) of the Credit Agreement, the undersigned hereby certifies that (i) it is the sole record owner of the Loan(s) (as well as any Note(s) evidencing such Loan(s)) in respect of which it is providing this certificate, (ii) its direct or indirect partners/members are the sole beneficial owners of such Loan(s) (as well as any Note(s) evidencing such Loan(s)), (iii) with respect to the extension of credit pursuant to this Credit Agreement or any other Loan Document, neither the undersigned nor any of its direct or indirect partners/members is a bank extending credit pursuant to a loan agreement entered into in the ordinary course of its trade or business within the meaning of Section 881(c)(3)(A) of the Code, (iv) none of its direct or indirect partners/members is a ten percent shareholder of the Company within the meaning of Section 871(h)(3)(B) of the Code and (v) none of its direct or indirect partners/members is a controlled foreign corporation related to the Company as described in Section 881(c)(3)(C) of the Code.

The undersigned has furnished the Administrative Agent and the Company with IRS Form W-8IMY accompanied by one of the following forms from each of its partners/members that is claiming the portfolio interest exemption: (i) an IRS Form W-8BEN-E (or W-8BEN, as applicable) or (ii) an IRS Form W-8IMY accompanied by an IRS Form W-8BEN-E (or W-8BEN, as applicable) from each of such partner's/member's beneficial owners that is claiming the portfolio interest exemption. By executing this certificate, the undersigned agrees that (1) if the information provided on this certificate changes, the undersigned shall promptly so inform the Company and the Administrative Agent, and (2) the undersigned shall have at all times furnished the Company and the Administrative Agent with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

Unless otherwise defined herein, terms defined in the Credit Agreement and used herein shall have the meanings given to them in the Credit Agreement.

F-4-3

Form of U.S. Tax Compliance Certificate

**[NAME OF LENDER]**

By: _____

      Name: _____

      Title: _____

DATE: _____ __, 20**[ ]**

F-4-4
Form of U.S. Tax Compliance Certificate

Exhibit 99.1



**LULULEMON ATHLETICA INC. TO ACQUIRE HOME FITNESS INNOVATOR MIRROR**

*Acquisition will advance lululemon's strategic vision by strengthening its omni guest experiences through digital sweat*

**VANCOUVER, British Columbia – June 29, 2020** – lululemon athletica inc. (NASDAQ:LULU) today announced that it has entered into a definitive agreement to acquire MIRROR, a leading in-home fitness company that created an interactive workout platform that features live and on-demand classes, for a purchase price of $500 million.

With its best-in-class content and versatile platform, MIRROR positions lululemon to accelerate its vision and build upon an ecosystem that will fuel the Company's Power of Three growth plan, which includes driving the business through omni guest experiences. MIRROR will bolster the company's digital sweatlife offerings and bring immersive and personalized in-home sweat, and mindfulness solutions to new and existing lululemon guests.

Calvin McDonald, Chief Executive Officer, commented, "In 2019, we detailed our vision to be the experiential brand that ignites a community of people living the sweatlife through sweat, grow and connect. The acquisition of MIRROR is an exciting opportunity to build upon that vision, enhance our digital and interactive capabilities, and deepen our roots in the sweatlife. We look forward to learning from and working with Brynn Putnam and the team at MIRROR to accelerate the growth of personalized in-home fitness."

MIRROR offers weekly live classes and thousands of on-demand workouts as well as immersive one-on-one personal training. MIRROR has seen rapid growth and strong engagement since it launched in 2018 as demand for in-home fitness offerings continue to increase significantly.

This transaction builds on a successful partnership between the two companies, which began in mid-2019 with an initial investment in MIRROR by lululemon, and also includes a content partnership which brought sweat and meditation classes to the MIRROR platform by lululemon's Global Ambassadors. This acquisition will further expand the content creation partnership between the two brands and will help lululemon, MIRROR and lululemon Ambassadors reach new guests.

Ms. Putnam, founder and chief executive officer of MIRROR, and a former lululemon Ambassador said, "We are thrilled to officially become a part of the lululemon family. As part of lululemon, MIRROR can further strengthen its position and accelerate its growth by leveraging lululemon's deep relationships with its guests, ambassadors and communities, as well as the company's infrastructure, including its store network and ecommerce channels, to acquire new users."

The purchase price is expected to be paid from the company's primary sources of liquidity, which include over $800 million in cash, its existing $400 million revolving credit facility, and a new one-year, $300 million revolving credit facility.

Following completion of the transaction, MIRROR will operate as a standalone company within lululemon and Ms. Putnam will continue as MIRROR's chief executive officer, reporting to Mr. McDonald. The transaction is subject to customary closing conditions and is expected to close in the second quarter of fiscal 2020.

A conference call to discuss this transaction with analysts and investors is scheduled for today, June 29, at 4:45 p.m. Eastern time. If you would like to participate in the call, please dial (800) 319-4610 or (604) 638-5340, if calling internationally, approximately 10 minutes prior to the start of the call.

A live webcast of the conference call and downloadable slides will be available online at: HTTP://INVESTOR.LULULEMON.COM/EVENTS.CFM. A replay will be made available online approximately 2 hours following the live call for a period of 30 days.

**Advisors**

Barclays served as the financial advisor to lululemon and Fenwick & West LLP and Blake, Cassels & Graydon LLP served as legal counsel. Cooley LLP served as legal counsel to MIRROR.

**About lululemon athletica inc.**

lululemon athletica inc. (NASDAQ:LULU) is a healthy lifestyle inspired athletic apparel company for yoga, running, training, and most other sweaty pursuits, creating transformational products and experiences which enable people to live a life they love. Setting the bar in technical fabrics and functional designs, lululemon works with yogis and athletes in local communities for continuous research and product feedback. For more information, visit WWW.LULULEMON.COM.

**About MIRROR**

MIRROR is a nearly invisible, interactive home gym featuring live and on-demand fitness classes and personal training in a variety of workout genres. MIRROR is creating a new category of in-home fitness with cutting-edge hardware, responsive software, and best-in-class content that transforms any room into a complete home gym. For the first time, the essential components of a great studio workout - variety, personalization, and community - are brought to the most convenient place: the home. MIRROR was founded by Brynn Putnam, creator of Refine Method, named "New York's Smartest Workout." MIRROR is headquartered in New York City. https://mirror.co

**Forward-Looking Statements:**

This press release includes statements relating to the acquisition and the Company's business plans, objectives, and expected results that are "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995, Section 27A of the Securities Act of 1933 and Section 21E of the Securities Exchange Act of 1934. In many cases, you can identify forward-looking statements by terms such as "may," "will," "should," "expects," "plans," "anticipates," "outlook," "believes," "intends," "estimates," "predicts," "potential" or the negative of these terms or other comparable terminology. These statements are based on management's current expectations but they involve a number of risks and uncertainties. Actual results and the timing of events could differ materially from those anticipated in the forward-looking statements as a result of risks and uncertainties, which include, without limitation: that the potential benefits and synergies sought in the acquisition may not be fully realized, if at all; that the Company may need to use significant resources to respond to a resurgence in COVID-19 cases; that the Company will incur significant costs in connection with the acquisition, which could limit its operating flexibility and ability to take responsive actions to current and future economic uncertainty; that the Company's current management team has limited experience in addressing the challenges of integrating the management teams, strategies, cultures and organizations of the two companies; that the acquisition may not be well received by customers or employees of the two companies; that the acquisition may not be completed in a timely manner or at all; and other risks and uncertainties set out in filings made from time to time with the United States Securities and Exchange Commission and available at www.sec.gov, including, without limitation, its most recent reports on Form 10-K and Form 10-Q. You are urged to consider these factors carefully in evaluating the forward-looking statements contained herein and are cautioned not to place undue reliance on such forward-looking statements, which are qualified in their entirety by these cautionary statements. The forward-looking statements made herein speak only as of the date of this press release and the Company undertakes no obligation to publicly update such forward-looking statements to reflect subsequent events or circumstances, except as may be required by law.

2

**Contacts:**

**Investor Contact:**
lululemon athletica inc.
Howard Tubin
604-732-6124

or

ICR, Inc.
Joseph Teklits/Caitlin Churchill
203-682-8200

**Media Contact:**
lululemon athletica inc.
Tatiana Jovic
tjovic@lululemon.com
604-250-9823

or

Brunswick Group
Eleanor French
efrench@brunswickgroup.com
415-671-7676





This presentation includes statements relating to the acquisition and the Company's business plans, objectives, and expected results that are "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995, Section 27A of the Securities Act of 1933 and Section 21E of the Securities Exchange Act of 1934. In many cases, you can identify forward-looking statements by terms such as "may," "will," "should," "expects," "plans," "anticipates," "outlook," "believes," "intends," "estimates," "predicts," "potential" or the negative of these terms or other comparable terminology. These statements are based on management's current expectations but they involve a number of risks and uncertainties. Actual results and the timing of events could differ materially from those anticipated in the forward-looking statements as a result of risks and uncertainties, which include, without limitation: that the potential benefits and synergies sought in the acquisition may not be fully realized, if at all; that the Company may need to use significant resources to respond to a resurgence in COVID-19 cases; that the Company will incur significant costs in connection with the acquisition, which could limit its operating flexibility and ability to take responsive action to current and future economic uncertainty; that the Company's current management team has limited experience in addressing the challenges of integrating the management teams, strategies, cultures and organizations of the two companies; that the acquisition may not be well received by customers or employees of the two companies; that the acquisition may not be completed in a timely manner or at all; and other risks and uncertainties set out in filings made from time to time with the United States Securities and Exchange Commission and available at www.sec.gov, including, without limitation, its most recent reports on Form 10-K and Form 10-Q. You are urged to consider these factors carefully in evaluating the forward-looking statements contained herein and are cautioned not to place undue reliance on such forward-looking statements, which are qualified in their entirety by these cautionary statements. The forward-looking statements made herein speak only as of the date of this press release and the Company undertakes no obligation to publicly update such forward-looking statements to reflect subsequent events or circumstances, except as may be required by law.





There's something special about lululemon—a well-informed intuition

We listen deeply to our guests, ambassadors, and our collective

We developed our five-year vision and strategy understanding the future, and the opportunity to:

- Integrate both digital and physical experiences
- Recognize the power of versatile sweat activities
- Bring together physical, social and emotional health

Our five-year strategic roadmap was built around these premises.

We have invested in this future -- through omni experiences, our partnership with MIRROR in 2019, digital sweat offerings, and a dynamic channel infrastructure

We are seeing these trends accelerate to create a structural change, and we're ready

MIRROR is an important step in our strategy and creating the future of the sweatlife



# MIRROR overview

### Known for

Innovative in-home interactive fitness studio experience

Versatile fitness and activity offering

Energized community and influencer buzz

Powerful and scalable content platform

### What they're doing well

Lean and efficient revenue-generating operating model

Compelling value proposition

Strong online channel sales and marketing

### lululemon + MIRROR partnership

lululemon made initial investment in MIRROR in mid-2019

MIRROR launched Meditation content vertical with lululemon Global Ambassador Gabby Bernstein in January





# MIRROR overview: Key stats

**2018**
Launched Sept 2018 in NY by Brynn Putnam

**$100M+**
2020 revenue run rate

**50%**
Female / male demographic

**70+**
New classes per week

**40+**
Class types

**10%**
Familiar with product



**'MIRROR fitness' search trend**
Google trends: Level of interest in US past 2 years

Trendline

2018                                2019                                2020







# The Power of Three





# Omni guest experience and digital sweatlife have been key to our strategic roadmap



Digital content is changing **how and where** our guests sweat, grow and connect



Digital content is changing **studio and trainer models** for our Ambassadors

**1** **Support our community vision**
To foster connection among people in the practice of the sweatlife, inspired by our ambassadors, in a seamless physical and digital journey

**2** **Scale the sweatlife**
Reach more of our guests and future guests with the power of our community

**3** **Bolster our competitive advantage**
Modernize our grass roots marketing

**4** **Accelerate Membership growth**
Integrate a digital solution to enable faster expansion



# MIRROR unlocks the ecosystem of our omni assets to create new sweatlife experiences





# Synergies with MIRROR and lululemon





**What we can bring to MIRROR**

Access to our large, growing and loyal guests

Leverage distribution channels to scale growth

Utilize marketing channels to lower guest acquisition costs

Expand talent through our unique Ambassador community

Reduce consideration barriers with strong brand credibility

Lead generation from our most engaged guests

**What MIRROR can bring to lululemon**

Expand and innovate our omni guest experiences

Dynamic platform to enhance and scale guest offerings

Accelerate monetization of digital sweat

Create immediate revenue stream with a path to profitability

Amplify lululemon ambassadors and creates community

Establish product integration opportunities



# Deal related financials

### Purchase price
$500 million*

### Financing
Paid from the company's
$1.5 billion of liquidity
>$800 million cash, $400 million
existing revolver, $300 million
new revolver

### Closing
Within the next 1-2 weeks

*Subject to certain adjustments at closing



MIRROR: on track to gener
in excess of $100 million in
revenue in 2020.

Transaction is modestly
dilutive in 2020 and modes
profitable in 2021 (excludin
deal related costs)

No change to the revenue
or EPS outlook we provide
on our Q1 conference call.





# Summary

MIRROR brings a **content platform** that connects our **sweatlife ecosystem**, and integrates our strong assets

MIRROR allows us to offer **new omni experiences** to our guest and support them to live the sweatlife in new ways

lululemon can **bring significant awareness** to MIRROR, through our marketing and distribution channels: helping them grow and reduce customer acquisition costs

Our vision and Power of Three plan has not changed: **MIRROR growth adds to the potential**

We have the **financial strength and liquidity** to complete this transaction and continue to run our business day to day and plan for contingencies



# EXHIBIT 5

screenshot-www.mirror.co-2021.03.30-16_38_18
https://www.mirror.co/how-it-works/?utm_source=google_ads&utm_medium=search_cpc&utm_campaign=brand_mirror&utm_content=mirror_classes_broad_match&utm_term=mirror%20class
30.03.2021

THRU 3/30, GET FREE DELIVERY & INSTALLATION WITH CODE MARCH21 ($250 VALUE)! SHOP NOW

MIRROR | HOW IT WORKS | WORKOUTS | REVIEWS | HOME TRIAL | ACCESSORIES | BUY THE MIRROR

## PERSONALIZED FOR YOU

### EXPERT INSTRUCTION

Certified trainers from the country's top fitness studios provide motivation and live feedback.

### REAL-TIME OPTIMIZATION

Advanced camera technology and proprietary algorithms deliver in-workout adjustments based on your goals, preferences, and personal profile.

### CUSTOMIZED PLAYLISTS

Choose from expertly curated playlists featuring popular music in a variety of genres from rock to pop, or sync with Apple Music and use your own playlists.

## EXPERIENCE MIRROR RISK FREE FOR 30 DAYS

SHOP NOW

## PUSH YOURSELF FURTHER

### COMPETE WITH YOURSELF AND OTHERS





# TRAIN NOW, PAY OVER TIME

$0
NO MONEY DOWN

AS LOW AS
$42/MO
FOR 36 MONTHS

0%
APR FINANCING

**Prequalify Now**
MIRROR Membership Separate

# SIMPLE AND EASY SET-UP

**①**

## SCHEDULE YOUR DELIVERY

Our white glove delivery and installation team will get you set up and ready to go.

**②**

## ADD YOUR FAMILY

Your MIRROR Membership provides unlimited access for up to six household members.

**③**

## CONNECT YOUR DEVICES

Connect with your Bluetooth heart rate monitor, speaker, Apple Watch and more.



SHOP NOW



# AT HOME IN ANY HOME

With a small footprint and elegant design, The Mirror blends seamlessly into any home. Turn less than two feet of wall space into a personal fitness studio.

## MIRROR REVIEWS

★★★★★ 4.9/5 407 reviews

"The Mirror is the single greatest home workout product I have ever used!! It's user friendly, there are so many different classes to choose from, and the instructors are great! Plus it looks sleek. I strongly recommend it to anyone and everyone. I work out so much more because of it!"

**Dan** | New York, New York

"If you're on the fence about purchasing a mirror, seriously, just do it! I'm busy, incredibly uncoordinated, and a little bit lazy! (haha!) The Mirror has changed this. The instructors are fun, engaging, and keep you on your toes. You will never get bored. It's the best money I have spent and I am seriously in LOVE with my Mirror!"

**Sharleen** | Sumner, Washington

"Some days I only have 15 minutes to exercise and there is always a class available no matter how tight on time I am that day. The instructors are top notch and watching myself while watching them is improving my form and making me work harder. What a fabulous invention!"

**Susan** | Bethesda, Maryland

**SEE ALL REVIEWS**

# EXPERIENCE MIRROR RISK FREE FOR 30 DAYS

**SHOP NOW**

# STAY IN TOUCH

Get product updates and news from MIRROR right in your inbox.
We won't spam you, promise.

Your Email

**SUBMIT**

Email address | **STAY IN TOUCH**

 

**EMAIL US**
HELLO@MIRROR.CO

**CALL US**
+1 (888) 288-1588

**CHAT WITH US**
EVERYDAY 10AM - 6PM ET

| | | | |
|---|---|---|---|
| FAQ | COVID-19 UPDATE | REFERRAL TERMS | CAREERS |
| AMAZON | PRIVACY POLICY | WARRANTY | SIGN IN |
| LOCATIONS | TERMS OF SERVICE | RISK-FREE TRIAL | |

© Curiouser Products Inc. 2021

# EXHIBIT 6

screenshot-www.mirror.co-2021.04.01-22_01_24
https://www.mirror.co/
01.04.2021



### THE NEARLY INVISIBLE HOME GYM

from ⊛ lululemon



"The holy grail of home gyms"

## HIDING IN PLAIN SIGHT

With a small footprint and elegant design, The Mirror blends seamlessly into your home. All you need is two feet of wall space to turn any room into a complete home gym.

**HOW IT WORKS**

## ONE MIRROR. EVERY WORKOUT.

With 50+ genres, 5-60 minute classes, and absolute beginner to expert levels, we have the perfect workout for everyone. Enjoy new live classes weekly, or choose from our library of thousands of on-demand classes anytime.


LATIN DANCE


TAI CHI


KETTLEBELL


COMPETITIVE


YOGA FLOW


BOXING


BARRE


BOOTCAMP

EXPLORE WORKOUTS



## TRAIN NOW, PAY OVER TIME

**$0**

NO MONEY DOWN

AS LOW AS

**$42**/MO

FOR 36 MONTHS

**0%**

APR FINANCING

Prequalify Now

MIRROR Membership Separate



## ADVANCED TRACKING TECHNOLOGY

Powered by advanced camera technology and machine learning, The Mirror is an interactive smart gym that gets to know you. The propriety optimization algorithms deliver real-time feedback based on your goals and preferences for maximum results in minimal time.

## CONNECT WITH FRIENDS

Make a sweat date with friends or compete against the community. Join programs, share your progress, and invite your workout buddies to cheer you on.



## MIRROR REVIEWS

★★★★★ **4.9/5**   407 reviews



"I absolutely love The Mirror. There are so many options for classes, the instructors are awesome, and you can do everything from the privacy and ease of your home. The workouts fly by and I'm SORE! I am thrilled I got The Mirror!"

**Jackie** | Chicago, Illinois

**SEE ALL REVIEWS**

## FULL FAMILY MEMBERSHIP

The MIRROR Membership is a full family plan. For just $39 per month, up to six household members get individual profiles and access to all of MIRROR's live and on-demand classes. Each user can take a class on The Mirror, or stream classes to their phone, tablet, or TV!

| (30) | | (30) | ⬡ | ⊛ |
|---|---|---|---|---|
| **30-DAY RISK-FREE TRIAL** | **WHI DELIVERY** | **30-DAY RISK-FREE TRIAL** | **WHITE GLOVE DELIVERY & INSTALLATION** | **STANDARD WA INCLUDE** |
| If you're not 100% satisfied you can return it for a replacement or a refund. | Your Mirror p | If you're not 100% satisfied you can return it for a replacement or a refund. | Your Mirror will be delivered by a professional. | Your Mirror comes wit standard warranty. protection plans are a |
| Learn More | L | Learn More | Learn More | Learn Mor |

## THE MIRROR STORY

Brynn Putnam is the founder and CEO of MIRROR. She started her career as a professional ballet dancer with the New York City Ballet, founded Refine Method, an acclaimed fitness studio, and now she's revolutionizing the way people work out by bringing the boutique studio experience in-home.



## EXPERIENCE MIRROR RISK FREE



FOR 30 DAYS

**SHOP NOW**

## STAY IN TOUCH

Get product updates and news from MIRROR right in your inbox.
We won't spam you, promise.

Your Email

**SUBMIT**



Email address    **STAY IN TOUCH**

FAQ       COVID-19 UPDATE       REFERRAL TERMS       CAREERS

AMAZON       PRIVACY POLICY       WARRANTY       SIGN IN

LOCATIONS       TERMS OF SERVICE       RISK-FREE TRIAL

**EMAIL US**
HELLO@MIRROR.CO

**CALL US**
+1 (888) 268-1568

**CHAT WITH US**
EVERYDAY 10AM - 6PM ET

© Curiouser Products Inc. 2021.

# EXHIBIT 7

**MIRROR** | SUPPORT

# FREQUENTLY ASKED QUESTIONS

Search for anything...

FAQ  ›  ABOUT MIRROR  ›  ABOUT MIRROR

## ABOUT MIRROR

The Mirror offers something for everyone -- classes range from absolute beginner to advanced and include boxing, weightlifting, dance, cardio, barre, yoga, Pilates, stretch, strength, personal training, and more (for full list, please see our Workouts page or sample classes). We have won numerous awards for our technology, design and workouts and are loved by many celebrities, including Jennifer Aniston, Reese Witherspoon and Ellen DeGeneres. If you'd like to learn more or hear what our Members have to say, please check out our website, instagram, Member reviews or recent press below!

When off, the Mirror is a beautiful full-length mirror. When on, it allows you to stream Live and On Demand workouts to you in your home.

The Mirror is normally $1,495 plus applicable tax, a $39 monthly Membership, and $250 for white glove delivery and installation. The Membership provides access to unlimited classes for up to 6 users in the same household, so your whole family can sweat together!

MIRROR also partners with Affirm to provide up to 3-year financing options for as low as $0 down and 0% APR. You have the option to split your purchase into 12, 24, or 36 monthly payments for as low as $42/month (not inclusive of subscription). This option is available to you during checkout -- just enter a few pieces of information for a real-time decision.

With our Risk Free Trial, you have the option to try the Mirror for 30 days, completely risk free. We know you will love your Mirror, but if you are not 100% satisfied, you can return it for a full refund within 30 days of installation (without any return, shipping or subscription fees). You can see our full return policy here.

Our Buzz:
- Time: Mirror Is One of TIME's Best Inventions of 2018.
- Ellen DeGeneres: "I don't know if you've seen this new Mirror, but Portia and I have it at home and it's super cool."
- Wall Street Journal": "A total body workout machine that puts your treadmill to shame."
- Fast Company: "Fitness startup Mirror claims it's 'building the next iPhone"
- Vogue: "The wellness industry's most game-changing device yet."
- Business Insider: "Lululemon just made a bet that the $1,500 interactive workout Mirror is the future of fitness, and it should terrify boutique workout studios"
- CBS Good Morning: Mirror "puts a personal trainer in your reflection"
- Men's Health: Mirror is one of the Best Tech Gifts of 2018

## DIDN'T FIND WHAT YOU WERE LOOKING FOR?

CONTACT US

Powered by Kustomer

# EXHIBIT 8



ADVERTISEMENT

May 4, 2007, 05:00pm EDT

## Better Than YouTube



**Quentin Hardy** Forbes Staff
*I cover enterprise tech & its impact on business*



ⓘ This article is more than 10 years old.



Big Media strikes back with Web video almost as good as real TV.

Until recently the internet strategy for broadcasters like Disney's ABC, Fox, Time Warner and Televisa was to promote shows online so people would go watch them on a TV set. Their big fear was that a generation of viewers would throw over traditional television for jerky, five-minute productions on YouTube.

But maybe short attention spans were just a function of bad technology. A handful of show producers are trading in the Web's old flavor of video delivery (the dominant one being Adobe Systems' Flash) for newer technologies that deliver clear and smooth streamed images. Their supposedly attention-deficient viewers are suddenly half-hour fans again.

"We've got them for 22 minutes a session, compared with 3 or 4 minutes," says Ronald Berryman, senior vice president at Fox Interactive Media. Fox and abc insert sponsors' names, such as Clorox and Allstate, right before the show and above the viewing box while the show runs. "We can increase advertising and deliver long-form content."

A company called Move Networks in American Fork, Utah is at the forefront of this next evolution. Move does for video what voice over Internet networks did for telephone calls: It breaks up the video into bits and efficiently reorganizes them over the network so there's no need for the special computer servers and dedicated transmission lines required on streams

ADVERTISEMENT





PRO-FORM POWERED BY iFIT
For. Every. Passion.
Only $39/month
0% APR for 39 months
1-Year iFit membership included
Shop Now

using Flash. Shows such as Fox's *24* and *Prison Break*, ABC's *Lost* and *Grey's Anatomy*, and the CW Network's *Everybody Hates Chris* are now being streamed using Move software.

Move executives say they handle more than a million full episode streams a week, and viewership has doubled every month. Move says it is now delivering as much as 200 terabytes, or 200 trillion bytes, of streams per day (the average is 80 terabytes), roughly in line with YouTube but more than the Web sites of CNN, NBC and CBS.

Fox, which tested Move Networks' technology on the Web sites of 24 of its affiliates last year, plans to expand to 200 affiliates this summer and give consumers video-editing tools so they can produce their own brief programs. Another broadcaster, which was paying $1 million a month to deliver jerky versions of its shows, expects those costs to drop up to 85% with Move.

Move, like Flash, requires users to install a software player. But unlike YouTube-style Flash video, which fetches streamed bits in a series of requests from a set of servers at the sender's end, Move gets bits from the closest storage cache (similar to technology from Web video giant Akamai) and brings them back to the screen at the best streaming rate based on the network's traffic load. It uses standard Internet protocols, which means it can take advantage of the many server farms around the world that offer up Web pages. Both ABC and Fox say there is nothing else that can stream at this scale.

Move, with 55 employees and $22 million in funding from Hummer Winblad and Steamboat Ventures (Disney's venture capital arm), has been in business for five years. It started out as an attempt to move large files by e-mail (thus the name Move Networks) but switched to video delivery in 2004 once its founders, both from Novell, realized that video was going to be a dominant medium online. "People may want to watch chunks, but more people want to watch long forms," says Chief Executive John Edwards. "The industry just had to solve the glitches." Quality and profits. How radical can the Internet get?

Subscribe to Forbes and Save. Click Here.



**Quentin Hardy**

As the SF-based National Editor at Forbes, I write a lot about tech, but am interested in a lots of different people and markets. I've done covers on Google, HP,... **Read More**

Print                              Reprints & Permissions

ADVERTISEMENT

**RELATED TOPICS**

| | |
|---|---|
| 01. TOP 5 ANNUITIES | › |
| 02. BEST FRANCHISES TO OWN | › |

ADVERTISEMENT



PRO-FORM POWERED BY iFIT

For. Every. Passion.
Only $39/month

0% APR for 39 months
1-Year iFit membership included

Shop Now

| | |
|---|---|
| 03.   NO 1 STOCK TO BUY | > |
| 04.   RETIREMENT INCOME PLAN CALCULATOR | > |
| 05.   TEXAS ESTATE PLANNING | > |
| 06.   SAMPLE OF A WILL | > |




ADVERTISEMENT

**5G leader in coverage and speed.**

Discover the unconventional »

T·MOBILE FOR BUSINESS

Mar 1, 2021, 09:00am EST | 64,669 views

# Success Doesn't Always Come Easy — And That's A Good Thing

and living the sweet life. These overnight success stories are the exception and always have been. Hard work, determination, grit, and drive are still the timeless qualities that propel most people to the top of their professions. And in the end, that's a good thing.

ADVERTISEMENT



Get it all »

T·MOBILE FOR BUSINESS



Along with this tough but positive, glass-is-half-full mentality, achieving success also involves playing the "long game".   CHERYL KEELER

As we take a moment to honor Women's History Month and look at the countless number of brilliant women who have made our world a better place, we see time and time again that the same qualities surface. Determination, passion, confidence, and tenacity; not luck or having success handed to them. What's even more amazing, is that when you stop and take a look around, you find so many of these hard-working women, right in your own backyard.

Take Cheryl Keeler, VP of Sales for T-Mobile for Business. It was an early setback that actually led Keeler down her current path. She reflected on starting out her career after graduating from college. She was certain she had the right stuff to be chosen for a coveted position with one of the top five management consulting firms in the U.S.  But as some of her friends landed the top spots, Cheryl did not.

"You have this moment when you think, 'Okay, am I going anywhere?'," she said, "That was the first time I had this feeling of just a relentless determination to succeed." She re-visualized her path and thought, "This is going to be a different road, it's not going to be a straight line, it's not going to be easy." That was over 20 years ago.

After shaking off the disappointment, she decided her drive, ambition, strong work ethic, and determination to succeed would be best rewarded by a career in sales. So, she took a sales job with cell phone provider Nextel, and began re-inventing her definition of success.

When we caught up with her to talk about how she became the successful businesswomen she is today, Cheryl shared, "Nobody tapped me on the shoulder and said, 'You've had enough resume experience and you now deserve to move to this role.'," she said. "It was about me advocating for my potential and my proof of execution. Throughout my career, whenever I face challenges, if I know I'm willing to outwork everyone, then it gives me the confidence that I don't need a certain degree, or a certain level of education, or even a certain work experience."

She said, "Without the self-advocacy, I don't think I would have gotten those roles," she said. "I've worked for women who have run business units and have always been grateful to them for not only paving the way but showing their strength. That helped me get there, as well."

**Taking ownership and focusing on the long game**

Keeler also credits the willingness to "take ownership of tough conversations" as a critical factor in moving her career forward. Like self-advocacy, too many businesspeople in general, and women in particular, shy away from difficult workplace conversations about performance because confrontation is uncomfortable. Keeler takes a different tack. Instead of a negative, she views the "productive tension" these conversations create as a necessary part of personal and professional growth.

Along with this tough but positive, glass-is-half-full mentality, achieving success also involves playing the "long game". Put another way, you need to think tactically *and* strategically. For Keeler, that means

seeing the forest *and* the trees. If you view challenges as one-off events to overcome, then you will miss the bigger picture and the greater opportunity. Tactics generate short-term results. Strategy achieves long-term objectives. To do this it's important to tackle the tough conversations head on, and above all never let fear of negative feedback stand in your way of achieving your end goal.

"I try to play chess, not checkers," said Keeler. "I try to make decisions that are not just going to achieve what's directly in front of me. The best leaders and the people who create career advancement opportunities for themselves are the ones that think beyond that. That's how you build success."

### Fostering a growth mindset

This outlook on life and career is why Keeler admires women entrepreneurs. They take on big challenges willingly. They have to be practical and introspective without being overly critical of what that self-examination reveals.

When roadblocks or challenges occur, instead of focusing on the negative, Keeler doesn't waste time beating herself up, she thinks of these situations as opportunities for personal and professional growth. "I know I can grow turning critical thoughts into something positive," she said. "It helps to be empathetic and humble. I always try to see the part I have. What did I contribute? How can I do better?"

The growth mindset also provides a cushion for when the inevitable failures and missteps do occur. Few careers follow straight lines. Setbacks are an important part of achieving success in any life journey. The key to overcoming failure is taking ownership of your mistakes but keeping them in perspective, as well. Failures provide teachable moments that, when approached with a growth mindset, often lead to greater successes in the future.

### Paying it forward

The mark of a true leader is not only demonstrated in their own success, but in their passion to see others succeed as well. One of her proudest accomplishments has been in the development of two leaderships programs; The Future Leaders and The Platinum Leadership Program. These initiatives focus on helping high-potential individuals learn the skills they need to advance.

Keeler coaches the groups herself, guiding them through activities such as public speaking to help them grow as individuals and professionals. In one session, Keeler even set up a "TED Talk" stage to give the experience a more realistic, hands-on feel.

"I'm proud to say that 80% of all participants that were in the program have since been promoted," she said. "It's not that they learned any specific skill set

that got them to the next level. The common thread was in helping them develop confidence, and the ability to be their own advocate, that helped them come out of their shells and execute."

For women looking to follow in Keeler's footsteps regardless of their chosen career path, the first step is to realize your path to success will rarely be that straight line you envision. There will be detours and setbacks—and you will make mistakes along the way. But that's OK. Embrace the fact that the road will be anything but perfect, learn from mistakes, advocate for yourself and above all let your passion to succeed guide you. Mentorship also plays a key role. For Cheryl, others saw her potential and worked with her to help her gain the confidence to start moving up and figure out how to spread her wings.

"You don't have to be the expert in everything," she said. "You don't need to do this alone. Can you collaborate your way to success? Can you motivate and get the best from your team? And remember, you don't have to have a manager's title to act as a leader. You just need the confidence and the ability to harness the best from those around you. That's how you get there."

*T-Mobile for Business is proud to honor the many extraordinary women throughout history that have helped make the world we live in a better place. Not only during Women's History Month – but every day of the year. To learn more about other women like Cheryl who push through the obstacles to achieve success, check out this article about a* mother daughter team from HHI Corp *who are making strides in the field of biocontainment mobile triage units to assist overburdened hospitals during the pandemic.*

 **T-Mobile for Business**

T-Mobile for Business brings the Un-carrier experience to customers unwilling to compromise on network, service, or value. Leading the charge, we offer the... **Read More**

Print                                    Reprints & Permissions



## Depends On Data – How To Build A TikTok Like Algorithm

**Lutz Finger** Contributor ⓘ
Tech

f    For someone like me who worked at Snap, LinkedIn,



For someone that has worked in computational, and built a social media analytics company (sold to WPP), the potential of Clubhouse was directly visible. The "drop-in audio chat" app can be called almost 'mainstream' after Oprah, Zuckerberg, Elon Musk, and even Drake appeared here. But the future success of Clubhouse depends on how it can help users find content and enable engagement. The answer is "through the use of user data," but it might not be as easy.

'What is Clubhouse?' People have described Clubhouse as:

1. Discord for old people (here)
2. Next Snapchat for audio (Rex Woodbury here)
3. Zoom with community aspect (here)
4. Gen Z alternative for radio (here)
5. First AirPods social network. (here)
6. Experience of meeting strangers on 'one chat

ADVERTISEMENT



incredible user growth in just a few months. Many attributed this success to our need to find social interaction during the pandemic. A need that text messages and carefully crafted videos in Twitch or youtube could not fulfill. While true, this need can only partly explain this exponential growth.

Clubhouse has lowered the barrier to participate in conversations. Writing blog posts and creating good looking videos demand effort and skills. Joining a voice chat is simpler than shooting a selfie. Setting up a one-time room is easier than planning a podcast series. In short, the app vastly simplifies talk radio content creation.

looking videos demand effort and skills. Joining a voice chat is simpler than shooting a selfie. Setting up a one-time room is easier than planning a podcast series. In short, the app vastly simplifies talk radio content creation.

PROMOTED



The future of Clubhouse depends on how it can help users find content and enable engagement. The ... [+] LUF2 FINGER

ADVERTISEMENT


## Clubhouse is Internet 1.0 of Talk Radio

Ten years before the internet browser was invented (yes, we are taking the 80th), Talk Radio became popular. The reasons are very similar to Clubhouse's

## Clubhouse is Internet 1.0 of Talk Radio

Ten years before the internet browser was invented (yes, we are taking the 80th), Talk Radio became popular. The reasons are very similar to Clubhouse's success: ease in distribution and proliferation of content. AM Bands allowed for more bandwidth to distribute content. Additionally, deregulation shifted content production from local radio stations to at industry scale content creation. Four decades later, the internet brought us the same two effects: Distribution of content at zero marginal cost and, in the case of Clubhouse, no COGS for radio shows or panel discussions. Clubhouse follows the rules of Internet 1.0 as @benthompson explained in social networking 2.0:



Training At Home

SHOP S1SI STUDIO CYCLE

MORE FOR YOU

*"Remember that the essential characteristic of v1 digital products is that they simply copy what already exists offline. For Facebook that meant digitizing connections between friends and family, and for Twitter it meant broadcasting conversations as if you were sitting at a bar. Such literal translations, though, have limits [...]*

*What truly makes a category is v2: products that are only possible because of the unique properties of digital."*

In turn, that means that Clubhouse is not using the "properties of digital" to their full advantage. At the core, any social app solves two issues (1) to find and (2) enable social interactions. Play around with Clubhouse, and you will quickly realize that finding interesting conversations is not easy. You curate your own content by following people. This social graph is not unlike the graph Twitter used as a first approximation for your interest.

As we all know from Twitter, a social graph is a clunky way to curate your feed. A good Friend of mine told me recently: *"My Twitter account is now set up so that I get the information I want."* He has been on Twitter since 2008! To be forced to update and adjust your following frequently is the opposite of 'user delight.' But worse, while at Twitter, we might quickly scroll over a message we don't like, we might get stuck in a long, dull conversation in Clubhouse before we know it.

**The challenges of Data.**

To find the right discussion for you, Clubhouse would need to understand all conversations. Meaning it

would need to live to transcribe them. Technically this is feasible. Speech to text algorithms has become very powerful. Take i2x.ai as an example (disclaimer: I am an investor): the founder @BrehmMichael created software that coaches call center agents in real-time by analyzing their conversations.

Clubhouse is currently not transcribing conversations. I assume that they do not want to impact the authenticity of the moment. It is the same ephemeral appeal that Snap had initially. Please note that neither Snap messages nor Clubhouse conversations are guaranteed to be ephemeral. (For example, recordings from a sexual moaning session in Clubhouse surfaced on Twitter.)

## Magic of TikTok's Recommendations

The power that data could have for Clubhouse growth can be seen if you look at TikTok, an algorithm first company. Unlike Clubhouse or Facebook, it does not mainly rely on the social graph but has built a powerful recommendation engine. As @eugenewei wrote in TikTok and the Sorting Hat:

*"Bytedance has an absurd proportion of their software engineers focused on their algorithms, more than half at last check. It is known as the algorithm company, first for its breakout algorithmic "news" app Toutiao, then for its Musical.ly clone Douyin, and now for TikTok."*

TikTok's machine learning magic is a supervised learning system that will find videos that are interesting to the user. It will measure how long you look, how fast you scroll, and many other features of your behavior for the algorithm to work. Additionally, the algorithm will evaluate the actual video clip: content, speed, sound, colors, words, and many more features. For this algorithm to work, TikTok needs data - loads of data. To give you some scale, only to create a system that can identify what is in an image, we need 14 million classified training photos (like imagenet)

To collect the data has been a product choice. At its core, TikTok's has been designed with this data collection focus in mind. Today, the algorithm is by far superior to the recommendation algorithm from Facebook. Moreover, this data has also created a sizable moat that not even Facebook could cross so easily.



TikTok is an algorithm-first company. It does not rely on the social

Limbus - Screenshot app | print

graph but has built a powerful LUTZ FINGER

As Clubhouse grows, their design choices will be necessary. How can they record the liking of a conversation? Clubhouse is a passive medium. That means users might not directly react to a conversation. Streaming companies like Spotify or Deezer can tell you that a delay between the user's dislike and an action such as 'skip' makes it way harder for the algorithm to work correctly.

To tip content creators could be one way of measuring user delight, but this might not be common - especially not in the beginning. At my own company, I found that the spread of content across different platforms was the best signal for high engagement. This insight seems to hold also for Clubhouse. Already today, you can see the best parts of Clubhouse conversations on other networks such as Twitter and Facebook. Therefore, I expect the fiercest competitors to be Twitter and Facebook as they do not only bring the existing social network graphs but also measure how content spreads.

## The future for Clubhouse

Despite those challenges, the trend Clubhouse started is undoubtedly not a covid19 fad. It's the unbundling of content creation and distribution. Talkshow Radio is no longer a domain of a few corporations, and the internet has made distribution virtually free. Whether or not Clubhouse will become what @benthompson calls a super-aggregator will depend on their ability to create a multi-sided network with decreasing acquisition costs. Therefore, it's no surprise that Clubhouse announced that they would invest in creator tools and an ability for content creators to get paid. In order to scale, they will need data and engagement metrics; otherwise, they will become something like a substack for audio - which would be a success in itself but below clubhouse's potential.

*Follow me on Twitter or LinkedIn. Check out some of my other work here.*

 Lutz Finger

Faculty at Cornell University and a Product Manager at Google Health. I am the author of the book "Ask Measure Learn." I think and talk about data and how machine...

**Read More**

Print                                    Reprints & Permissions

ADVERTISEMENT

**RELATED TOPICS**

| | |
|---|---|
| 01. 5 STOCKS TO BUY NOW | › |
| 02. NO 1 STOCK TO INVEST IN | › |
| 03. OLDER WOMEN TRENDY DRESSES | › |
| 04. BEST HEALTHY DOG TREATS | › |
| 05. SLOW MOTION VIDEO EDITOR | › |
| 06. TOP 3 STOCKS TO BUY | › |

SEE ALSO


10 HOT STOCKS TO BUY NOW
CREATE A CHART
EASY DATA VISUALIZATION

TRENDY CLOTHES FOR OLDER
BIG DATA ANALYTICS CERTIFICATE
HIGHEST PAYING DIVIDEND


PRO-FORM
For. Every. Passion.
Only $39/month
Shop Now

Feb 4, 2021, 08:35am EST | 11,237 views

# President Biden Is Man, Woman And 40 Years Old – Why We Need Algorithmic



You've reached your limit of free articles.
**Subscribe** to continue reading.

✓ Unlimited access to articles
✓ A better reading experience with fewer ads    ✓ Cancel anytime

| MONTHLY | ANNUAL : MOST POPULAR | TWO YEAR |
|---|---|---|
| $6.99 | $74.99 | $139.99 |
| Billed Monthly | Billed Annually<br>Save 11% | Billed Every Two Years<br>Save 17% |
| Subscribe | Subscribe | Subscribe |

Already a subscriber? Sign in here

🍎Pay  PayPal

"A boy wearing a blue shirt"

Angela Merkel's photo analyzed by Microsoft Azure Vision API.    CAMPAIGN
PHOTO – ANALYZED BY LUTZ FINGER

## AI IS EVERYWHERE

Artificial Intelligence (AI) is everywhere. No longer is AI only used by Netflix to serve you your next best evening entertainment. It helps determine whether you should get an interview, assess jail time, score

Limbus screenshot app/print

you should get an interview. Assess a job hunt, score your credit application, and give a medical diagnosis. But we as well know that AI can go wrong and can be biased. The example from Angela Merkel is just a funny example.

Similarly, the AI can not distinguish between a soccer ball and the linesman's bald head. But since AI systems are everywhere, their mistakes can have severe consequences. Take the study in science from @oziadias showing that an algorithm in healthcare is racially biased. Quote from the study:

*"Black patients assigned the same level of risk by the algorithm are sicker than White patients (see the Perspective by Benjamin). The authors estimated that this racial bias reduces the number of Black patients identified for extra care by more than half."*

We know that without extra precaution, many algorithms might exhibit. All too often, the initial training data is the culprit. As I wrote in "It's the data stupid":

MORE FOR YOU

**Clubhouse's Future Depends On Data – How To Build A TikTok Like Algorithm**

*"The data used to train many of the algorithms might be (1) not sufficient, (2) biased, or (3) out-right wrong. If the data is wrong, then the output might be wrong. However, often we won't know. There is little control and oversight to detect those issues."*

I am a believer in technology, and over time, I am confident we will fix those issues. Do you remember the times everyone made jokes about google translation? Twenty years later, we get annoyed if our smart speaker does not understand our German accent. We have come a long way. But while companies aim to update and improve their AI, we need transparency. Only with transparency can we create accountability, stability, and essential trust.

In their update, Microsoft did not only change Angela Merkel's gender. They as well identified me by name. Earlier, an image from me with my dog would get the cutline: "a dog wearing glasses." Now, after the update, it knows my full name. Did they ask me? No? There was no transparency. I wrote to Microsoft asking what they did but never got any reaction.



Microsoft Azure changed their algorithms and started to identify Lutz
Finger without his consent. LUTZ FINGER

Microsoft's behavior is no exception. Many
companies behave as much of a black box as the
algorithms themselves. In a world where AI creates a
competitive edge, companies want to protect their IP.
To inform the public about the inner workings of
their algorithm creates the opposite effect. Eric
Loomis learned this the hard way. He was sentenced
to seven years of prison partly based on an
algorithmic assessment that he was "high risk." The
private company (COMPAS) responsible for the
algorithm denied that Mr. Loomis independently
analyzed the algorithm to protect their trade secrets.
In this dispute between property rights and
transparency, Wisconsin's Supreme Court sided with
the private company.

## Transparency EU vs. the US

There are, however, boundaries for AI. For example:
in the US, algorithms are not allowed to discriminate
against race. Without transparency, it is, however,
hard to surface those biases. It took a study from
@propublica to determine that Asian families living
in the US are almost twice as likely to be charged
higher prices by college test prep service. It took
ACLU's and others' analysis to show that Amazon's
AI incorrectly identified 28 members of Congress as
criminals. And it took many studies (one from my
@cornellMBA team) to showcase the algorithmic
injustice in New York's stop and frisk program. But
only with transparency can researchers, journalists,
and civil society analyze and scrutinize those
algorithms.

The EU has adopted a more citizen-focused law. In
the EU, citizens have the right not to be subject to a
decision based solely on automated means. In their
GDPR guidance, they outline a case of automated
risk profiling:

*"You use an online bank for a loan. You are asked to
insert your data, and the bank's algorithm tells you
whether the bank will grant the loan or not and
gives the suggested interest rate. You must be
informed that you may express your opinion,
contest the decision, and demand that the decision
made via the algorithm be reviewed by a person."*

While this is a good start, it will still slow down our
progress in detecting algorithmic issues. As the
@AlgorithmWatch, a non-profit watchdog, outlined:

*"Why only offer this level of transparency to those
seeking redress when harm has already been done?
It would have been both powerful and coherent to
ask that mandatory registers be established that
make this information publicly accessible, ideally
including the results of assessments about the
systems' impact."*

## Explainable AI

Transparency of algorithms will often (as we saw in the GDPR discussion) lead to interpretability questions. E.g., why did the algorithm reject my credit application? Explainable AI or XAI is a new field in research. Some machine learning algorithms such as decision trees, Bayesian classifiers, and linear models are easy to interpret since the data/features used are explainable by themselves. For example, an algorithm predicting the odds of being 'overweight' might use age, type of residence, education level, wealth index, etc... Those variables will be weighted during model training. The combination of weights and variables can explain later predictions. Deep learning models, on the other hand, can not be explained so easily. In Deep Learning, the algorithms create their own variables, which might not make immediate sense for us humans.

Since this is the cutting edge of research, many new tools get developed to help with explainability. LIME is one of them. To understand where Microsoft Azure sees a Guitar in the image below, LIME creates many different versions of the same image by removing some pixels. If the AI stops seeing the "Guitar," we can assume that this area was linked to the guitar.



Explainable AI: LIME is one way to analyze why AI "sees" a guitar.
PHOTO: BY EVA RINALDI • ANALYSIS BY LUTZ FINGER AND PRITHVI SRIRAM

Can we explain why AI goes wrong? @sriramprithvi23, from CS @Cornell and @cornell_tech, and I dug into a few images. Let's take the example from Hillary Clinton at a speech. Microsoft sees here a Guitar (with low confidence). LIME shows that only a random area in the image seems to have triggered this response. To test LIME yourself, please see Prithvi Sriram's code on GitHub.



Azure sees a non-existing guitar and the LIME algorithm shows where the guitar is supposed to be.  LUTZ FINGER AND PRITHVI SRIRAM

**Biden is a man, a woman, and 40 years**

old.

The gender confusion about Angela Merkel extends as well towards president Biden. The AI tags him as a "man" and a "woman," assumes that he is 40 years old and does not recognize him as a celebrity. Test it out by yourself! The image is found here. You can upload it with ease to Azure's Vision Website. But please don't be surprised if Microsoft has fixed the issue overnight, without telling anyone.



AI failure: President Biden could not be identified. Azure assumes he is 40y old. PHOTO FROM THEHILL – ANALYSIS DONE BY BY LUTZ FINGER AND PRITHVI SHRIAM

*healthcare setting, and will help foster vital transparency and trust with their users.*

We see companies are making the right steps towards more transparency. Google started model cards and if-then tools. (Disclaimer: I am working for Google Health, but opinions are my own). Facebook offers a feature called "Why am I seeing this ad?". IBM provides the "AI Explainability 360" toolkit, and Microsoft offers a bias detector. But this is not enough. It should not be up to the consumer or citizen to parse the reason for a given AI decision. We, as a society, need to establish ethical standards and accountability for the AI we create.

*Follow me on Twitter or LinkedIn. Check out some of my other work here.*

 Lutz Finger

Faculty at Cornell University and a Product Manager at Google Health. I am the author of the book "Ask Measure Learn." I think and talk about data and how machine...

**Read More**

Print                                    Reprints & Permissions

ADVERTISEMENT

# EXHIBIT 9

http://herringevents.com/spring07/100winners.html Go AUG OCT DEC 15 2006 2007 2008
66 captures
4 May 2007 - 23 Apr 2016
About this capture

RED HERRING SPRING
May 1-3, 2007
Hyatt Regency Hotel
Monterey, California
TEN YEARS OF INNOVATION AND DISRUPTION
OTHER EVENTS • RED HERRING.COM

HOME

OVERVIEW

AGENDA

SPEAKERS

SPONSORS

RED HERRING 100

HOTEL/CITY

REGISTER

NEWS/PR

ABOUT US

CONTACT US

## RED HERRING 100 WINNERS

**Red Herring Magazine Digital Edition – FREE TRIAL**

Interact with Silicon Valley's top innovators. Check out China's hottest startups. Follow the investments of the most saavy financiers. And stay on top of the latest technology news. Sign up for your **free trial** of Red Herring's digital edition: **click here.**

RED HERRING
06.11.07
GAME PLAN

RED HERRING 100 WINNER N. AMERICA

| | |
|---|---|
| Actimagine | LifeSize Communications |
| AeroScout | Limelife |
| Agitar Software | LiveOps |
| Alien Technology | Mascoma Corp. |
| Altierre Corporation | MediNotes Corporation |
| athenahealth | Melodeo |
| Attenex Corporation | Meru Networks |
| Attensity Corporation | Millennial Media |
| Azaire Networks | MOG |
| Big Fish Games | Move Networks |
| BLADE Network Technologies | MyPublicInfo |
| blip.tv | Newsvine |
| Blogtronix | Ning |
| Bynari | NorthStar Systems International |
| Cedar Point Communications | oDesk |
| ClairMail | OpenPages |
| CoalTek | Oxy Systems |

| | |
|---|---|
| Corevalve | Plateau Systems |
| Covergence | Plextronics |
| Dabble | Pulse~LINK |
| Dash Navigation | Purkinje Inc. |
| DayJet | QlikTech International AB |
| decentral.tv | Rearden Commerce |
| EchoSign | Recordant |
| Enclarity Inc. | Reef Point Systems |
| EnteroMedics | Revision3 Corporation |
| EQO Communications | Right Media |
| Expericity | Roamware |
| Eyeball Networks Inc. | Satiety |
| Financial Engines | Scalent Systems |
| Firefly Mobile | Silver Peak Systems |
| Goodmail Systems | SimpleFeed |
| GreatPoint Energy | SimplyHired |
| Greenplum | Skytide Inc. |
| GridNetworks | Smart Imaging Technologies |
| GridPoint | Solaicx |
| Ice Energy | Solaria |
| iLike | Sylvan Source |
| Imperva Inc. | TeleFlip |
| InnerPulse | Tesla Motors |
| Innovalight | TransMedia |
| Interactive Supercomputing | VideoEgg |
| IPLocks | Vyatta |
| Jaduka | WebTrends Inc |
| Jangl | Widevine Technologies |
| jaxtr | Wikia |
| Kasenna | ZoomInfo |

[Contact Info] **Jordy Brazier** phone: 650.428.2900 Fax: 650.321.5597 Email: jbrazier@redherring.com

| Home |Overview | Agenda | Speakers | Sponsors | Red Herring 100 |
| Hotel/City | Register | News/PR | About Us | Contact Us |
©Red Herring, Inc. All Right Reserved.

# EXHIBIT 10

12/16/2020    Red Herring Spring 2007

http://herringevents.com/spring07/redherring100.html    Go

56 captures
5 Feb 2007 - 10 Mar 2017

AUG **OCT** NOV
◀ **19** ▶
2006 **2007** 2008





# RED HERRING 100



HOME

OVERVIEW

AGENDA

SPEAKERS

SPONSORS

RED HERRING 100

HOTEL/CITY

REGISTER

NEWS/PR

ABOUT US

CONTACT US

### Red Herring 100 North America Awards

For 10 years, the *Red Herring's* editorial team has diligently surveyed entrepreneurship around the globe. Technology industry executives, investors, and observers have regarded the Red Herring 100 lists as an invaluable instrument to discover and advocate the promising startups that will lead the next wave of disruption and innovation.

Past award winners includes Google, Yahoo!, Skype, Netscape, Salesforce.com, and YouTube.

### Award Finalists

The 200 finalists have been announced by Red Herring Magazine. The Top 100 award winners will be announced on May 1st at the Red Herring Spring 2007 Award Ceremony.

**View this Years 200 Finalists: Click Here**

**See Last Year's Top 100**

REGISTER NOW ▶

REQUEST INFO ▶

**Speakers 2007**


**Gen. Ken Minihan**
Managing Director
Paladin Capital Group


**Ray Lane**
General Partner
Kleiner Perkins Caufield & Byers


**Mark Jung**
Retired COO
Fox Interactive


**Bruce Jaffe**
Corporate VP
Corporate Development
Microsoft


**Salman Ullah**
Director of Acquisitions
Google Inc.


**Max Levchin**
CEO Slide, co-Founder
Paypal, Chairman Yelp


**Marthin De Beer**
Senior Vice President
Cisco


**Alex Welch**
Co-Founder & CEO
Photobucket

**Sponsors 2007**

*Microsoft*



http://herringevents.com/spring07/redherring100.html    Go

56 captures
5 Feb 2007 - 10 Mar 2017

AUG  OCT  NOV
◀  **19**  ▶
2006  **2007**  2008

▼ About this capture





















[Contact Info] **Jordy Brazier** phone: 650.428.2900 Fax: 650.321.5597 Email: jbrazier@redherring.com

| Home | Overview | Agenda | Speakers | Sponsors | Red Herring 100 |
| Hotel/City | Register | News/PR | About Us | Contact Us |

©Red Herring, Inc. All Right Reserved.

# EXHIBIT 11

http://alwayson.goingon.com/permalink/post/12780    Go

AUG **OCT** NOV

◀ **01** ▶

2006 **2007** 2011

44 captures

22 Apr 2007 - 30 Apr 2020

About this capture

Welcome, **Guest** [Sign in]

Blogs ▾   Search

Web Chat | Quick Links | Create a Network | Networks: 525 | Members: **44269** of 59112



## AlwaysOn : The insider's network

✚ Join this Network

**Home** | AOBlog | GlobalTech | OnMedia | OnHollywood | VCs & $ | CoolJobs | GoingGreen | VentureSummit | AboutAO

Guest

Profile Views : 0
My Connections : 0
My Networks : 0

LogIn ➡   Sign me up! ➡

AO Buzz

**Water Barium with the highest reading percent higher than the state.**
10.01.07 @ 11:37

**The future of social networks | Between the Lines | ZDNet.com**
10.01.07 @ 11:37

**Stanford Summit 2006-- Webcast Archive | AlwaysOn**
10.01.07 @ 11:37

**Frequent internet disconnects :/**
10.01.07 @ 11:37

**Fox tries to put big media back together again**
10.01.07 @ 11:37

alwayson 10.01.07 @ 11:37

**Silicon Valley VCs Go Green**
10.01.07 @ 11:37

Green Forums 10.01.07 @ 11:37

**ZENN Motor Company CEO Ian Clifford to Present at "AlwaysOn Going ...**
10.01.07 @ 11:37

**Les seize mensonges favoris de nos avocats**
10.01.07 @ 11:37

Join the ⊕ **AlwaysOn** Network! It's Free! CLICK HERE   Already a Member? SIGN IN

# This Year's OnHollywood 100



We proudly present this year's OnHollywood 100. With this list of top private companies, AlwaysOn's editors and our panel of industry experts introduce a new generation of game-changing players in the digital entertainment space.

These 100 companies have emerged in an exciting year in the world of digital content and entertainment. Google's $1.6 billion acquisition of YouTube and the introduction of the Apple iPhone are just two examples of watershed events that are driving a new wave of video entertainment out on the Internet and onto your cell phone. Other companies on the 2006 OnHollywood 100 list also achieved success this year: Shutterfly and DivX both went public, while Glu Mobile has filed for its IPO.

In last year's first-round list, enabling technologies (both enabling tools and content delivery platforms) dominated. This year, with more of the platforms in place, digital content publishers (23% of the list) and consumer services (19%) are taking center stage. More and more, we're seeing production and content companies geared specifically to digital content; examples include ManiaTV, MobuzzTV, and GoTV.

The mobile sector continues to grow, particularly in the United States. Users' high expectations that their mobile phones will do everything they need, and entertain them too, mean that 14% of our list this year consists of mobile content, marketing, video/gaming, and advertising companies.

When we look at the list in terms of geography, California is again strongly represented, with 54% of companies making their headquarters there. Other parts of the U.S. comprise 34% of the list, while non-U.S. companies make up 12% of the list, with several winners hailing from the U.K. (4%), Israel (3%), and Australia (2%).

Close to one thousand private companies were nominated by dozens of top venture capital firms and a wide breadth of digital entertainment insiders. To make the final selection, companies needed to demonstrate that they excelled in our five primary evaluation criteria: innovation, market potential, commercialization, stakeholder value creation, and media attention or "buzz." In addition to AO editors, the panel included top partners and executives from Atlas Ventures, KPMG's Emerging Markets Services practice, Bridge Bank, Manatt, Phelps & Phillips, Jeffries, DeSilva & Phillips CIBC, Fenwick & West and Montgomery & Company.

The OnHollywood 100 winners will be honored at OnHollywood, an executive summit presented by AlwaysOn and The Hollywood Repoter on May 1st-3rd at the Roosevelt Hotel in Hollywood, CA. Check out the full program for OnHollywood here.
Tickets to OnHollywood are still available—click here for more information.

**Breaking News**

- Nokia Agrees to Acquire Navteq for $8.1 Billion
- EBay Plans to Take $1.4 Billion In Skype-Related Charges
- Microsoft, Adobe Widen Data Services
- Google reportedly buying mobile social network Zingku
- CBS Creates 'EyeLab' To Woo Web Surfers
- 3Com Reaches Buyout Deal With Bain Capital, Huawei
- FCC Commissioner Expresses Doubts on Media Mergers
- Google Searches for Deal Support
- Microsoft Revamps Web Search, Trying to Close Gap with Google
- Amazon Launches Digital Music Store
- Steve Case Backs New Internet-Based Credit Card
- Microsoft Is in Talks To Buy Facebook Stake
- Microsoft Goes Behind the Scenes
- Nvidia Takes On Intel Over Graphics Chips
- Sony Hatches Plan To Address PS3 Problems
- Entrepreneurs Defend a Tax Benefit Despite a Dubious Congress
- Google Plans Undersea Pacific Cable
- 'Web 2.0' Deals Spread Beyond San Francisco
- New York Times to end paid Internet service
- SAP's New Model: Think Smaller
- Google Hires Ad-Agency Liaison
- Yahoo to Acquire Email Provider Zimbra
- Nokia Agrees to Buy Cellphone-Ad Firm
- Who Will Follow Classmates.com?
- FCC Sale Rules Draw Appeal
- Salesforce.com Builds on 'Platform' Plan
- Sun Is Warming Up to Windows
- -> View all Breaking News

http://alwayson.goingon.com/permalink/post/12780   Go   AUG **OCT** NOV
44 captures                                                    ◀ **01** ▶
22 Apr 2007 – 30 Apr 2020                                      2006 **2007** 2011



Congratulations to all the OnHollywood 100 winners! AlwaysOn and our partners look forward to honoring you at OnHollywood on May 1st.

Aaahaa Media
Abazab
Akimbo
Amie Street
Amp'd Mobile
Azureus
BiggerBoat
BitGravity
BitTorrent
Blog Talk Radio
Blue Frog Mobile
Blue Lithium
Boonty
Brightcove
Buzznet
CinemaNow
ClickTV
Conduit Connect
Dave Networks
Delivery Agent
DesiHits
Doppelganger
Double Fusion
eJamming
Entertainment Media Works
Exent Technologies
ExtendMedia
Eyespot
Fabrik
Flixster
Fora.tv
Frontier Silicon
Gaia Online
Glam Media
Gotuit
GoTV
Gracenote
Groove Mobile
Handango
Hands-On Mobile
iAmplify
Ibiquity Digitial
IGA Worldwide
iLike
iLoop Mobile
Joost
King.com (formerly Midasplayer)
Last.fm
Linden Lab (Second Life)
Major League Gaming
ManiaTV
Maven Networks
mBlox
MediaZone
Mercora
Metacafe
MobiTV
Mobuzz tv
Modulus Video
Motionbox
Motricity
Move Networks
Multiply
Muvee
MyWavez
Navio Systems
Newport Media
Next New Networks
OnNetworks
Oregan Networks
Ortiva Wireless
Pando
Passalong
Photobucket
Pixsy
Podshow
Promptu (formerly Agile TV)
PureVideo
Qmecom
Revver
RGB Networks
Ruckus Network
SageTV
SayNow

**Media Gallery**

Images | Video

Screenshot | Gary Star, Chairman, ZAP

Eric Wesoff, Greentech Media | Me

William McDonough | GridPoint

📷 View All   📄 Subscribe

**Top Posts** [?]

The GoingGreen 100 Winners
👤 GoingGreen    Views: 6301

Venture Summit West 2007
👤 Venture Su...   Views: 1793

GoingGreen Webcast Archives
👤 GoingGreen    Views: 1296

VM Security: The Keys to the Virtualization Kingdom
👤 Greg Ness     Views: 1274

The Top Ten (Sixteen) Lies of Lawyers

**Top Company Deals**

OnHollywood 100
AO 100
OnMedia 100

**Tag Cloud**

This Week | This Month | All

berg  **CEO Showcase**

credit crunch  cubic kilometers
water  Demand Media  etailers
Facebook

http://alwayson.goingon.com/permalink/post/12780 | Go

44 captures
22 Apr 2020 - 30 Apr 2020

AUG  OCT  NOV
◄  01  ►
2006  2007  2011
About this capture



Burning seawater as fuel
dougvining     Views: 956

The Next Generation Automobile
GoingGreen     Views: 902

Your Friend, the Semantic Web
bradfield     Views: 890

TechShop: Geek Heaven
guykawasaki     Views: 852

**Newest Members**

Katie_Ca.. Drew_Kis.. marlboro..

Arie_Str.. Jamie_Ad.. lomtralc..

vlwbuina.. judy_fur.. Gary_Baker

Scott_Allen
Scott_Al..

View all members

**Who's Online**

Online now : This network: 6 | All networks: 3357

Syven
Syven

Don_L.Venture ..

N.G._Gor..andy_she..

mattwbow..

View all members online (6)

**Recent Posts**

Take the Points?
Michael Moe     Views: 102

Nokia Agrees to Acquir...
Venture Summit West     Views: 33

EBay Plans to Take $1...
Venture Summit West     Views: 50

Microsoft, Adobe Widen...
Venture Summit West     Views: 35

When God Came Online
kris     Views: 107

« Leave this network

Snocap
Solid State Networks
Songbird
Sonos
Spot Runner
Streamcast Networks
Thumbplay
TileFile
Veoh Networks
Vidavee
VideoEgg
Zing

**Tags :** alwayson, onhollywood   **Current Rating :** ★★★★★ (2 votes)
**Posted by** AlwaysOn alwayson at May 01, 07 10:00 PM | Permalink
Printable View | Comments (2) | Trackbacks (0) | Views : 16353
Also posted in Networks: About AlwaysOn | AlwaysOn |

Thank you for being a free member of the ⊕ AlwaysOn Network!
Become an AO Insider Member today to enjoy more benefits!

FULL SUBSCRIPTION TO THE ALWAYSON MAGAZINE:
A QUARTERLY BRIEFING ON THE BUSINESS OF INNOVATION

CLICK HERE. SUBSCRIBE NOW! GET 40% OFF THE REGULAR PRICE OF $65.00! NOW ONLY $39.00

To post a comment, become an ⊕ AlwaysOn member
by filling in the fields below - **It's free!**

_____   **First Name**

_____   **Last Name**

_____   **Email (will not be published)**

_____   **Password**

_____   **Confirm Password**

[Captcha Image: you need to recognize the text in it.]

_____   **Security Code**

**Comment**

_____

By Clicking, I agree to the Terms of Services and Privacy Policy    **SUBMIT COMMENT & SIGN UP ►**

filmcommunity     Sorry we can't join you this

Sorry we can't join you this year. We're getting ready for the 60th Cannes Film Festival.

By the opening day of the Festival, it will be Sixty YEARS of Cannes & Sixty DAYS of filmcommunity.com. There's a new kid on the block!

filmcommunity.com - film is what its about

filmcommunity – April 30, 2007 10:20 PM

David_Yorka     This is one dense site that

This is one dense site that is fully loaded.

Great work!

David_Yorka – September 9, 2007 01:04 AM

Personal Links
My Member Page        Message Center  My Blog      My Media Gallery Tools
-Edit Basic Profile    -Inbox          -Blog        -View Gallery    -Skype
-Edit Personal Profile -Editorial      -Upload Images   -External Widgets
-Edit Professional Profile -Invites     -Edit Posts  -Upload Audios   -Bookmarks
                                        -Create Blog Post -Upload Videos  -Profile Visitors

**Calendar**

« **October 2007** »

| M | Tu | W | Th | F | Sa | Su |
|---|----|----|----|----|----|----|
| 1 | 2 | 3 | 4 | 5 | 6 | 7 |
| 8 | 9 | 10 | 11 | 12 | 13 | 14 |
| 15 | 16 | 17 | 18 | 19 | 20 | 21 |
| 22 | 23 | 24 | 25 | 26 | 27 | 28 |
| 29 | 30 | 31 | | | | |

subprime loans  Use  verdiem
video conferencing  web video
weekends  wize

http://alwayson.goingon.com/permalink/post/12780          Go    AUG  OCT  NOV
44 captures                                                     ◀  01  ▶
22 Apr 2007 - 30 Apr 2020                                      2006 2007 2011

-Alphabetical
-Categories
-Most Active

**Media Partners**

Business Wire | atlas venture | Novell | BRIDGE BANK | CANAAN PARTNERS | Etelos | Fenwick FENWICK & WEST LLP. | hp | IBM

Jefferies | KPMG | LEWIS | LIMELIGHT NETWORKS | manatt | MERRILL CORPORATION | MOTOROLA | Akamai | Sun microsystems

SoftBank Capital | Level(3)

**Affiliate Partners**

AAMA | bdbl brokers dealers | CHURCHILL CLUB | silicon Ventures | ENTREPRENEURS FOUNDATION | Executive Council | IME | HOLY FAMILY DAY HOME | IT solution journal

KEIRETSU FORUM | Larta Institute | VLAB MIT/Stanford Venture Lab | socalTECH.com | SVASE EMPOWERING ENTREPRENEURS | SVC WIRELESS | Technology Review | VC TASKFORCE | ECO WORLD

**AO Home | AO Blog | Stanford Summit | OnHollywood | AlwaysOn Media | GoingGreen | Member Posts | Subscribe: AO Insiders | RSS | Mobile**

About AO | Contact us | Terms of Use | Privacy Policy | © AlwaysOn Network, LLC 2003-2007

# EXHIBIT 12

http://vote.crunchies.techcrunch.com/ | Go

142 captures
5 Dec 2007 - 4 Oct 2010

NOV DEC FEB
◀ 24 ▶
2006 2007 2009

About this capture

- Blog
- Vote
- Badges
- Rules
- Sponsors
- Press

# Crunchies 2007 - Vote now!

Readers are invited to vote for their favorite product or company in each of the 20 award categories below. Readers can vote once a day until voting ends at midnight pst Thursday, January 10. Award winners will be announced live at the Awards Ceremony at the Herbst Theater in San Francisco on Friday, January 18.

# 10637 votes cast

Total votes so far. Updated every 5 minutes

# Crunchies categories:

## Best technology innovation / achievement

Recognition for best new technology achievement or breakthrough
**Nominees:** Earthmine, Like, Move Networks, Twine, Viewdle
Vote on this category Fwd

## Best bootstrapped start-up

For a company that has raised less than $100.000 from individuals, angels or others
**Nominees:** FriendFeed, PoliticalBase, ProductWiki, Techmeme, UpNext
Vote on this category Fwd

## Best new gadget / device

For the best new Internet-accessible electronics device launched in 2007
**Nominees:** iPhone, Kindle, Ooma, Pleo, Wii
Vote on this category Fwd

## Best business model

http://vote.crunchies.techcrunch.com/ [Go]

142 captures
5 Dec 2007 - 4 Oct 2010

NOV DEC FEB
◀ 24 ▶
2006 2007 2009

About this capture

# Best design

Recognition for best user-interface design
**Nominees:** Etsy, Jackson Fish Market, Netvibes, SmugMug, Songza
Vote on this category Fwd

# Best enterprise start-up

For a start-up focused on enterprise or business-to-business applications and services
**Nominees:** 37Signals, Attributor, EditGrid, Ribbit, Zoho
Vote on this category Fwd

# Best consumer start-up

For a start-up focused on consumer-facing applications and services
**Nominees:** 1800-FREE-411, 23andMe, LinkedIn, Meebo, Zillow
Vote on this category Fwd

# Best mobile start-up

For companies who provide mobile content or mobile distribution platforms
**Nominees:** AdMob, Fring, Loopt, Shozu, Twitter
Vote on this category Fwd

# Best international start-up

To recognize start-up achievement outside the United States (company must be founded, headquartered and operated primarily outside the US)
**Nominees:** Atlassian, Gizmoz, MusicShake, Netvibes, Openads
Vote on this category Fwd

# Best user-generated content site

For sites who rely on content created primarily from users
**Nominees:** Digg, Facebook, Geni, Instructables, Yelp
Vote on this category Fwd

# Best video site

For sites who distribute video and/or other rich-media content

http://vote.crunchies.techcrunch.com/    Go

142 captures
5 Dec 2007 - 4 Oct 2010

NOV  DEC  FEB
◀  24  ▶
2006  2007  2009

About this capture

# Best clean tech start-up

For companies focused on environmentally conscious technology applications
**Nominees:** A123Systems, Ausra, Gridpoint, NanoSolar, Tesla Motors
Vote on this category Fwd

# Best use of viral marketing

For the company that has demonstrated the best use of viral marketing techniques to drive distribution
**Nominees:** Flixster, iLike, iminlikewithyou, RockYou, StumbleUpon
Vote on this category Fwd

# Best time sink site

Favorite site to use when you're not working or not wanting to think about work
**Nominees:** College Humor, Duels, Kdice, Kongregate, Pandora
Vote on this category Fwd

# Most likely to make the world a better place

To recognize a site that is making an important social impact in the world. Site does not need to be a non-profit to qualify.
**Nominees:** Causes, DonorsChoose, ZeroFootprint, Kiva, One Laptop Per Child
Vote on this category Fwd

# Most likely to succeed

Site most likely to meet with future financial success (may be defined as revenue creation, a big exit, or other future accomplishment)
**Nominees:** Kayak, Mint, Slide, Wordpress, Zivity
Vote on this category Fwd

# Best start-up founder

Award to recognize an exemplary start-up business founder
**Nominees:** Reid Hoffman (LinkedIn), Max Levchin (Slide), Kevin Rose (Digg), Evan Williams (Twitter), Mark Zuckerberg (Facebook)
Vote on this category Fwd

# Best start-up CEO

http://vote.crunchies.techcrunch.com/   | Go |

NOV   **DEC**   **FEB**

**142 captures**   ◀ **24** ▶

5 Dec 2007 - 4 Oct 2010   2006   **2007**   **2009**

▼ About this capture

Vote on this category  Fwd

# Best new start-up of 2007

Company must have been founded in 2007
**Nominees:** Hulu, iMedix, Joost, Ribbit, Tumblr
Vote on this category  Fwd

# Best overall

For the best overall site or product of 2007
**Nominees:** Digg, Facebook, GrandCentral, Twitter, Zillow
Vote on this category  Fwd

# Blog Co-hosts

   

# About the Crunchies 2007

The 2007 Crunchies is our first annual competition and award ceremony to recognize and celebrate the most compelling startups, internet and technology innovations of the year. The Crunchies is a collaboration project between GigaOm, Read/WriteWeb, VentureBeat and TechCrunch. Best of all, the internet community is invited to choose who wins.

# Awards Benefactors

ADOBE®







http://vote.crunchies.techcrunch.com/ — Go

142 captures
5 Dec 2007 - 4 Oct 2010

NOV **DEC** FEB
◀ **24** ▶
2006 **2007** **2009**

About this capture



The Crunchies are brought to you by GigaOm, Read/WriteWeb, VentureBeat and Techcrunch
Design and development by Webreakstuff | Hosted by MediaTemple

# EXHIBIT 13

screenshot-www.mirror.co-2021.03.30-16_50_04
https://www.mirror.co/workouts
30.03.2021



THRU 3/30, GET FREE DELIVERY & INSTALLATION WITH CODE MARCH21 ($250 VALUE)! **SHOP NOW**

MIRROR — HOW IT WORKS — WORKOUTS — REVIEWS — HOME TRIAL — ACCESSORIES — **BUY THE MIRROR**

# YOUR PERFECT WORKOUT

LATIN DANCE · TAI CHI · KETTLEBELL · COMPETITIVE · YOGA FLOW · BOXING

## BEST-IN-CLASS WORKOUTS


### EVERY TYPE OF WORKOUT
With 50+ different genres, 5-60 minute classes and beginner to expert levels, we have the perfect class for everyone!


### THOUSANDS OF CLASSES
Access any class you want from our extensive library, available 24/7. Included in the $39/mo MIRROR All-Access Membership required to access classes.


### WEEKLY LIVE CLASSES
Join other MIRROR Members and get real-time feedback and personal shout outs to keep you motivated.


### 1:1 PERSONAL TRAINING
Bring the country's top trainers into your home through our immersive technology.


### WORLD CLASS INSTRUCTORS
Certified instructors from the country's top fitness studios provide expert instruction, motivation, and live feedback.


### FULL FAMILY FUN
Your subscription provides unlimited access for up to six household members, so your whole family can sweat together!



# EXPERIENCE MIRROR RISK FREE FOR 30 DAYS

SHOP NOW



## FIND YOUR FAVORITE CLASS

### BEGINNER TO EXPERT LEVELS

From absolute beginner to advanced expert, find classes specifically designed for any skill level.

### 5 TO 60 MINUTE CLASSES

Whether you're looking for a 15 minute session to get moving or a 1 hour blood pumping sweat session, we have the class you want!

### WORKS WITH ALL EQUIPMENT

We have workouts featuring bodyweight, dumbbells, kettlebells, resistance bands and more.

### CHOOSE YOUR MUSIC

Choose from expertly curated playlists featuring popular music in a variety of genres perfect for your workout.



## LIVE AND ON-DEMAND CLASSES

With new live classes weekly, and thousands of on-demand classes, your workouts always stay fresh. Included in the $39/mo MIRROR All-Access Membership required to access classes



# TRAIN NOW, PAY OVER TIME

**$0**
NO MONEY DOWN

AS LOW AS
**$42** /MO
FOR 36 MONTHS

**0%**
APR FINANCING

**Prequalify Now**
MIRROR Membership Separate



COMPETITIVE
**INTRO TO
WEIGHT LOSS**
COLLECTION | 7 WORKOUTS
BEGINNER

## PROGRAMS FOR EVERYONE

With programs like Absolute Beginner, Train for A Marathon, Move Through Maternity, Intro to Weight Loss and more, you have an endless array of choices!

**GET THE MIRROR**



## PERSONAL TRAINING

Bring the country's top trainers into your home through our immersive technology. Sessions are just $40, and extra participants are encouraged to join at no additional cost!

## WORLD CLASS INSTRUCTORS

Certified instructors from the country's top fitness studios provide expert instruction, motivation, and live feedback. Choose the instructor that fits your mood and style.



**ALEX**

Yoga, Strength, Cardio

Watch Bio



**ARMOND**

Boxing, Kickboxing, Cardio, Strength, Stretch

Watch Bio



**JULIE**

Barre, Sculpt, Dance Cardio, Pilates

Watch Bio



**GERREN**

Cardio, Strength, Stretch, Boxing

Watch Bio


**KATIE**
Yoga, Stretch, Cardio, Strength
Watch Bio


**LANCE**
Cardio, Strength, Stretch, Tai Chi
Watch Bio


**RACHEL**
Pre/Postnatal, Sculpt, Pilates, Barre, Cardio, Yoga
Watch Bio


**CHRIS**
Cardio, Strength, Stretch
Watch Bio

# MIRROR REVIEWS

★★★★★ 4.9/5   407 reviews

"The Mirror has been truly life changing. I now have a gym/studio class solution that is not only convenient but super effective! The programming, instructors, training and attention to detail are world class. I cannot imagine my life without it!"

Kylie | Newport Beach, California

"I was pessimistic when my friend introduced me to the Mirror. Boy was I wrong! The diversity of workouts as well as user friendly interface makes it truly a bargain. Cutting out the commute to the gym has redefined how I workout. Recommend to all busy professionals who want to prioritize themselves!"

**Jack** | Houston, Texas

"I have one year to get in shape for my son's wedding. I love this... Privacy (nobody sees you), Variety (Yoga , cardio stretching, weights, boxing), Levels (beginners to experts), Fun Fun Fun. Worth the money, less than a personal trainer. An investment into your healthy and wellness."

Stacey | Nashua, New Hampshire

● · · · · ·

**SEE ALL REVIEWS**



## WORK OUT WITH YOUR FITNESS TRIBE

Grab a friend and use the Mirror together, or train live with other members of the community. Work out together and stay motivated!

# MIRROR DIGITAL



Enjoy unlimited access to MIRROR's best-in-class workouts through the MIRROR App. Access the full MIRROR workout library from your phone, tablet and smart TV devices and enjoy thousands of classes 24/7. Access available to MIRROR owners only immediately on purchase.

# EXPERIENCE MIRROR RISK FREE FOR 30 DAYS

**SHOP NOW**

## STAY IN TOUCH

Get product updates and news from MIRROR right in your inbox. We won't spam you, promise.

Your Email

**SUBMIT**

Email address

**STAY IN TOUCH**

| | | | |
|---|---|---|---|
| FAQ | COVID-19 UPDATE | REFERRAL TERMS | CAREERS |
| AMAZON | PRIVACY POLICY | WARRANTY | SIGN IN |
| LOCATIONS | TERMS OF SERVICE | RISK-FREE TRIAL | |

**EMAIL US**
HELLO@MIRROR.CO

**CALL US**
+1 (888) 288-1588

**CHAT WITH US**
EVERYDAY 10AM - 6PM ET

© Curiouser Products Inc. 2021

# EXHIBIT 14



## Meet MIRROR.

The nearly invisible home gym that transforms less than two feet of wall space into a cardio class, a yoga studio, a boxing ring, and so much more.

**Shop The Mirror**

**Book In-Store Demo**



WATCH VIDEO

### VOGUE

"The wellness industry's most game-changing device yet."

### The New York Times

"The future of personalized remote exercise."

### FAST COMPANY

"Mirror solves the problem of bulky, eyesore fitness equipment."

Every type of workout—50+ genres—with new Live Classes every week and thousands of on-demand classes in 5- to 60-minute sessions, and beginner to expert levels.





## At home, in any home.

The Mirror's elegant design fits seamlessly into any room in your home. Less than two feet of wall space becomes your personal fitness studio and when you're not using it to work out it's a polished, functional mirror.





## A device that gets to know you.

Real-time optimizations based on your preferences and personal profile. You pick your own music. Sync to The Mirror via Bluetooth to measure your heart rate. MIRROR's algorithms track your results and build you a personalized program.



## Live, personal training—at home.

Join other MIRROR Members in a Live Class and get real-time feedback and personal shout-outs to keep you motivated. Or, take a Personal Training Session and get 1:1 expert instruction.

**Shop The Mirror**

**Book In-Store Demo**



### 30-Day Risk-free Trial

If you're not 100% satisfied you can return it for a replacement or a refund.



### Warranty Included

Your Mirror comes with a one-year warranty. Extended protection plans are also available.



### 0% APR Financing

Pay over time with real-time credit approval and fixed monthly payments.





## What MIRROR Members are saying.

Invest in your future.
Invest in your goals.
Invest in The Mirror.
It's simply amazing.

★★★★★

I admired The Mirror for a full year before taking the plunge 6 months ago and my only regret is that I did not buy it sooner.

★★★★★

The Mirror provides constant feedback on the workout and how you are progressing through it. You feel like you're really in a class!

★★★★★

Read More Reviews



### More than meets the eye.

With its elegant design, thousands of classes, and studio feel, MIRROR is the smart home gym that everyone can sweat with.

SHOP THE MIRROR

| MY SHOP PREFERENCES | | United States ∨ | | English | | $USD |

| MY ACCOUNT | HELP | ABOUT US | SCIENCE OF FEEL |
|---|---|---|---|
| Sign In | COVID-19 FAQ | Our Story | Product care |
| Register | Services | Media | |
| Order Status | Ordering | Investors | |
| Returns | Shipping Policy | Strategic Sales | |
| | Returns | lululemon Collective | |
| | Sizing | Sweat Collective | |
| | Our Products | | |

| CONTACT US | CAREERS | GIFT CARDS |
|---|---|---|
| Live Chat | SUSTAINABILITY | STORE LOCATOR |
| 1.877.263.9300 | SOCIAL IMPACT | Privacy Policy (Last Updated: 9/10/20) |
| Email Sign Up | DIVERSITY AND INCLUSION | California Privacy Rights (Last Updated: 9/10/20) |
| | LULULEMON APPS | California Transparency Act |
| | | Accessibility Statement |

© lululemon athletica 1818 Cornwall Ave, Vancouver BC V6J 1C7                    Privacy Policy (Last Updated: 9/10/20)   Terms of Use

# EXHIBIT 15



November 11, 2019 | Fitness, Fitness App, Health, Sports Technology, Sports Business

**Sit Down With Mirror Founder Brynn Putnam**

RR: When did you get into fitness?

BP: I have spent my entire professional life in the health and wellness space, first as a professional dancer at the New York City Ballet and most recently as the founder and CEO of Refine Method, a chain of boutique fitness studios in NYC.

RR: When did you get the idea for the Mirror?

BP: In 2016, I was newly pregnant and found myself, a gym owner, with no time to work out. I tried working out at home but felt like I was sacrificing quality for convenience. I didn't have room for a treadmill or stationary bike in my NYC apartment, nor did I like running or spinning enough to invest in a $2K+ piece of equipment. Using apps or streaming content via YouTube wasn't inspiring enough to keep me motivated, as I was scrolling through endless amounts of video and then staring at a small screen with no feedback.

At the same time, we put more "dumb" mirrors at my fitness studios, Refine Method. We polled our clients and they said the mirrors were the best thing we had done all year to improve the experience. The mirrors allowed people to see their form and self-correct, and many found it inspiring to see themselves working hard. I realized that as a former dancer I had taken for granted how integral the mirror was to any great fitness experience. Additionally, so many elements of a great at-home experience could be accomplished through using a mirror as a portal--it has a slim footprint, is a piece of beautiful home decor when not in use, and produces an immersive experience with interactive visuals and sound. Everything came together and the idea for Mirror was born.



*AI and Fitness Collide*

RR: Is the Mirror available all over the world or only in the US? If I moved to Tahiti could I access it?

BP: Right now, MIRROR is only available for purchase in the continental U.S. but we're excited to explore global expansion in the near future.

RR: Could you tell us a little bit about the Mirror's technology?

BP: MIRROR is creating a new category of in-home fitness with cutting-edge hardware, responsive software, and best-in-class content to provide a uniquely immersive, and personalized workout experience.

We create custom hardware, proprietary software, and original content so that every element of the experience is deeply aligned with the user's needs, and can quickly respond to improve the experience as those needs evolve.

However, we believe that the Mirror technology is at its core an incredible conduit for content into the home. As a result, we're not focused on tech for tech's sake, but rather, thinking about ways in which technology can amplify experiences for our audience. So we start with understanding the customer and their needs, and then we are incredibly disciplined in what features we add from there.

*Is Vaping Safe?*



*The First Medication To Extend Your Life?*

RR: Is the Mirror for everyone or just advanced fitness enthusiasts?

BP: MIRROR is made for anyone who wants a personalized workout experience with the best trainers and classes around the world, whenever and wherever they want.

We've had an incredible breadth of adoption across our audiences. We sold Mirrors in every state within a couple of months following launch and over 40% are financed, so we're reaching a broad income demographic as well.

We also average over two users per household, meaning it's truly a full-family fitness solution — with members ranging from young children to folks over 80. It's so rewarding to see whole families experience the Mirror together.

Most of our members join the platform and take about two different types of workouts, and six months in, they're taking over five different types of workouts. People are really using it as a way to discover new types of content and expand their horizons.

*Snapple: Made From the Best Stuff on Earth, But Side Effects May Include*





*Meet Your New Personal Trainer, Ai*

RR: What do you feel are the advantages of the Mirror over an in-class studio?

BP: A unique combination of the immersive experience, the excellence of the content, and the intelligence of the software.

I believe that working out shouldn't be a sacrifice, and everyone should have adequate access to the best workout experience. Yet, for a variety of reasons, access to high-quality fitness experiences remains a challenge. For some people, public workouts are uncomfortable, whether it's due to lack of experience, physical limitations, or a lack of confidence. For others, geography, cost or a busy schedule limit their ability to get the workout they want. For us, MIRROR stands apart from the traditional gym because it adapts to the needs of an individual user in real-time, so they're getting a workout that's personalized in a way that's impossible to do in a group class of multiple students with multiple needs.

Using MIRROR's immersive technology, members have an experience that is analogous to having a personal trainer or fitness coach in their home. And yet, with MIRROR, a personal trainer or fitness class is available on-demand, at home and at a fraction of the cost. Just as in the gym, MIRROR's elite fitness professionals deliver expert feedback, form corrections, and encouragement in real-time. In the not-so-distant future, you'll be able to use your Mirror to meditate and other non-fitness verticals launching soon.

*The First Medication To Extend Your Life?*



*Interview with NASA Astronaut Scott Kelly: An American Hero*
*13 Questions With General David Petraeus*
*Why Choose Machine Learning Over A Traditional Financial Advisor?*
*China Debuts Stealth Unmanned Combat Aerial Vehicle*
*Nuclear Submarines: A 7,000 Lb Swiss Watch*
*Interview with the Inventor of Amazon's Alexa*
*Ai Can Write Its Own Computer Program*
*On Black Holes: Gateway to Another Dimension, or Ghosts of Stars' Pasts?*
*Supersonic Travel: The Future of Aviation*
*Was Our Moon Once Habitable?*
*NASA Seeks New Worlds*
*Cowboy Turned Space Surgeon*
*Lockheed Martin Confirms the SR-72 – Son of Blackbird Will Reach Anywhere in the World in One Hour*
*Shedding Light on Dark Matter: Using Machine Learning to Unravel Physics' Hardest Questions*

*Aquaponics: How Advanced Technology Grows Vegetables In The Desert*
*The Perfect Beer: Using Artificial Intelligence to Personalize Goods*
*The World Cup Does Not Have a Lasting Positive Impact on Hosting Countries*
*The Implications of Machine Learning on Condensed Matter Physics & Quantum Computing*
*America's Next Spy Plane*
*Faster than Sound and Undetectable by Radar*



< Previous

**How Music Influences Our Actions, Feelings and Thoughts**

Next >

**AI Makes Missile Technology Perform Better**

< Return to site

Write comment...

# EXHIBIT 16

Limbus screenshot app/print

screenshot-mirror.kustomer.help-2021.03.30-16_44_31
https://mirror.kustomer.help/en_us/preloaded-content-Syv7O5_Uv
30.03.2021



FAQ › ABOUT MIRROR › PRELOADED CONTENT

## PRELOADED CONTENT

We offer an option to preload any of our thousands of classes from our On Demand library to optimize your streaming experience and prevent buffering throughout your workout. It is not currently possible to preload a Live Class, Personal Training Session or MIRROR Digital.

Each Mirror can store up to 10 hours of workouts. Note, you will need an active internet connection, but there is no minimum WiFi speed

To preload a workout:
- Select the workout you would like to preload. On the Workout Preview page click **PRELOAD** to initiate the preload.
- Click **PRELOAD** on the Workout Preview Page
- Preload time depends on your internet speeds. We recommend preloading a workout at least 15 minutes before you want to start the class. Note, you can always start another workout while you wait.

To see all your preloaded workouts or delete a preloaded workout:
- Open your MIRROR App and connect your Mirror & phone (Instructions here)
- Click the "Classes" tab on the bottom of your App
- Scroll to the bottom of the page and click **PRELOADED WORKOUTS**
- To remove a workout, swipe to the left
- You will also see a bar at the top of that page that displays your remaining preloaded hours

Please note, you must be on MirrosOS version 1.16+ to use this feature. To check your MirrorOS, connect your Mirror & App and then tap "Settings" within your App. Tap "MIRROR" and see "Software Version." Click here for instructions on how to update if needed.

## DIDN'T FIND WHAT YOU WERE LOOKING FOR?

CONTACT US

Powered by Kustomer

# EXHIBIT 17

screenshot-www.mirror.co-2021.03.30-16_42_05
https://www.mirror.co/showroom
30.03.2021



THRU 3/30, GET FREE DELIVERY & INSTALLATION WITH CODE MARCH21 ($250 VALUE)! **SHOP NOW**

**MIRROR**   HOW IT WORKS   WORKOUTS   REVIEWS   HOME TRIAL   ACCESSORIES   **BUY THE MIRROR**

## SEE THE MIRROR FOR YOURSELF

Seeing is believing. Visit a showroom to try a sample workout and experience the Mirror for yourself.

---

**MIRROR BAY AREA**
**PALO ALTO, CA**

Stanford Shopping Center
180 El Camino Real
Unit #74A, BLDG. D
Palo Alto CA 94303
(888) 288-1588

**HOURS**

BY APPOINTMENT ONLY
Monday & Tuesday: Closed
Wednesday: 12pm-5pm
Thursday-Sunday: 12pm-5pm
BOOK A MIRROR DEMO HERE

---

**MIRROR AT LULULEMON SOHO**
**NEW YORK, NY**

Soho Broadway
520 Broadway
New York, NY 10012
212-777-4248

**HOURS**

See lululemon.com for store hours
BOOK A MIRROR DEMO HERE

---

**MIRROR AT LULULEMON THE GROVE**
**LOS ANGELES, CA**

The Grove
189 The Grove Drive, Space F2
Los Angeles, CA 90036
323-939-1815

**HOURS**

See lululemon.com for store hours
BOOK A MIRROR DEMO HERE

---

**MIRROR AT LULULEMON**
**SAN FRANCISCO, CA**

Westfield San Francisco Centre
845 Market Street, Unit 225
San Francisco, CA 94103
415-546-3985

**HOURS**

See lululemon.com for store hours
BOOK A MIRROR DEMO HERE

---

**MIRROR AT LULULEMON**
**SANTA MONICA, CA**

Third Street Promenade
1457 Third Street Promenade
Santa Monica, CA 90401
310-319-9900

**HOURS**

See lululemon.com for store hours
BOOK A MIRROR DEMO HERE

---

**MIRROR AT LULULEMON**
**CORTE MADERA, CA**

The Village
1620 Redwood Hwy
Corte Madera, CA 94925
415-927-2891

**HOURS**

See lululemon.com for store hours

---

**MIRROR AT LULULEMON 5TH AVENUE**
**NEW YORK, NY**

Midtown- 5th Ave
592 5th Avenue
New York, NY 10036
212-221-7402

**HOURS**

See lululemon.com for store hours
BOOK A MIRROR DEMO HERE

---

**MIRROR AT LULULEMON AVENTURA**
**AVENTURA, FL**

Aventura Mall
19565 Biscayne Blvd, Unit 910
Aventura, FL 33180
305-466-7294

**HOURS**

See lululemon.com for store hours
BOOK A MIRROR DEMO HERE

---

**MIRROR AT LULULEMON FLATIRON**
**NEW YORK, NY**

Flatiron
114 5th Ave
New York, NY 10011
212-627-0314

**HOURS**

See lululemon.com for store hours
BOOK A MIRROR DEMO HERE



MIRROR AT LULULEMON
NORTHPARK
DALLAS, TX

Northpark
8687 N Central Expy, C2-624
Dallas, TX 75225
214-234-0305

HOURS

See lululemon.com for store hours
BOOK A MIRROR DEMO HERE

MIRROR AT LULULEMON
BETHESDA ROW
BETHESDA, MD

4838 Bethesda Ave. Unit 16
Bethesda, MD 20814
301-652-0574

HOURS

See lululemon.com for store hours
BOOK A MIRROR DEMO HERE

MIRROR AT LULULEMON
GEORGETOWN
WASHINGTON, DC

Georgetown
3265 M Street NW
Washington, DC 20007
202-333-1738

HOURS

See lululemon.com for store hours
BOOK A MIRROR DEMO HERE

MIRROR AT LULULEMON
RIDGEDALE
MINNEAPOLIS, MN

Ridgedale
12673 Wayzata Blvd
Minneapolis, MN, US 55305
763-545-9069

HOURS

See lululemon.com for store hours
BOOK A MIRROR DEMO HERE

MIRROR AT LULULEMON MALL
OF AMERICA
BLOOMINGTON, MN

Mall of America
116 West Market
Bloomington, MN 55425
952-854-6785

HOURS

See lululemon.com for store hours
BOOK A MIRROR DEMO HERE

MIRROR AT LULULEMON
NAPERVILLE
NAPERVILLE, IL

50 South Main Street
Naperville, IL 60540
630-369-6811

HOURS

See lululemon.com for store hours
BOOK A MIRROR DEMO HERE

MIRROR AT LULULEMON
WATERSIDE SHOPS
NAPLES, FL

Waterside Shops
5435 Tamiami Trail North
Naples, FL 34108
239-254-1517

HOURS

See lululemon.com for store hours
BOOK A MIRROR DEMO HERE

MIRROR AT LULULEMON
LINCOLN PARK
CHICAGO, IL

Lincoln Park
944 West North Avenue
Chicago, IL 60642
312-601-2134

HOURS

See lululemon.com for store hours
BOOK A MIRROR DEMO HERE

MIRROR AT LULULEMON RUSH
ST.
CHICAGO, IL

930 N Rush St
Chicago, IL 60611
312-915-0627

HOURS

See lululemon.com for store hours
BOOK A MIRROR DEMO HERE

MIRROR AT LULULEMON
FASHION ISLAND
NEWPORT BEACH, CA

563 Newport Center Drive
Newport Beach, CA 92660
949-644-9642

HOURS

See lululemon.com for store hours
BOOK A MIRROR DEMO HERE

MIRROR AT LULULEMON
SANTANA ROW
SAN JOSE, CA

334 Santana Row
San Jose, CA 95128
408-557-8721

HOURS

See lululemon.com for store hours
BOOK A MIRROR DEMO HERE

MIRROR AT LULULEMON OLD
ORCHARD
SKOKIE, IL

4999 Old Orchard Center
Skokie, IL 60077
847-674-2039

HOURS

See lululemon.com for store hours
BOOK A MIRROR DEMO HERE

MIRROR AT LULULEMON
CENTURY CITY
LOS ANGELES, CA

10250 Santa Monica Blvd
Los Angeles, CA 90067
310-277-0843

HOURS

See lululemon.com for store hours
BOOK A MIRROR DEMO HERE

MIRROR AT LULULEMON
SOUTHCENTER
TUKWILA, WA

21 Southcenter, Unit 748
Tukwila, WA 98188
206-242-4594

HOURS

See lululemon.com for store hours
BOOK A MIRROR DEMO HERE

MIRROR AT LULULEMON
STANFORD
STANFORD, CA

660 Standford Shopping Center
Unit 1101
Palo Alto, CA 94304
650-321-2767

HOURS

See lululemon.com for store hours
BOOK A MIRROR DEMO HERE

MIRROR AT LULULEMON

MIRROR AT LULULEMON

MIRROR AT LULULEMON

TOPANGA

CANOGA PARK, CA

6600 Topanga Canyon Blvd
Canoga Park, CA 91303
818-932-9553

HOURS

See lululemon.com for store hours
BOOK A MIRROR DEMO HERE

MEATPACKING

NEW YORK, NY

408 W14th St.
New York, NY 10014
212-255-2978

HOURS

See lululemon.com for store hours
BOOK A MIRROR DEMO HERE

MUSIC LANE

AUSTIN, TX

1009-1123 South Congress Ave
Austin, TX 78704
512-326-1434

HOURS

See lululemon.com for store hours
BOOK A MIRROR DEMO HERE

MIRROR AT LULULEMON
SEAPORT

BOSTON, MA

62 Seaport Blvd
Boston, MA 02210
857-233-4884

HOURS

See lululemon.com for store hours
BOOK A MIRROR DEMO HERE

MIRROR AT LULULEMON
TYSONS CORNER

MCLEAN, VA

8066 Tysons Corner Center
Mclean, VA 22102
703-821-1357

HOURS

See lululemon.com for store hours
BOOK A MIRROR DEMO HERE

MIRROR AT LULULEMON
BROOKFIELD PLACE

NEW YORK, NY

250 Vessey Street
New York, NY 10281
212-786-0315

HOURS

See lululemon.com for store hours
BOOK A MIRROR DEMO HERE

MIRROR AT LULULEMON
MONTGOMERY MALL

BETHESDA, MD

7101 Democracy Blvd
Bethesda, MD 20817
301-365-0719

HOURS

See lululemon.com for store hours
BOOK A MIRROR DEMO HERE

MIRROR AT LULULEMON
GARDEN STATE

PARAMUS, NJ

100 Garden State Plaza Way
Paramus, NJ 07652
201-291-2590

HOURS

See lululemon.com for store hours
BOOK A MIRROR DEMO HERE

MIRROR AT LULULEMON
SHORT HILLS

SHORT HILLS, NJ

1200 Morris Turnpike
Short Hills, NJ 07078
973-564-6167

HOURS

See lululemon.com for store hours
BOOK A MIRROR DEMO HERE

MIRROR AT LULULEMON
WESTFIELD UTC

SAN DIEGO, CA

4545 La Jolla Village Drive Space C-8
San Diego, CA 92122
858-535-0242

HOURS

See lululemon.com for store hours
BOOK A MIRROR DEMO HERE

MIRROR AT LULULEMON
OAKBROOK CTR

OAKBROOK, IL

622 Oakbrook Center
Oakbrook, IL 60523
630-368-1610

HOURS

See lululemon.com for store hours
BOOK A MIRROR DEMO HERE

MIRROR AT LULULEMON
UNIVERSITY VILLAGE

SEATTLE, WA

2656 NE University Village Street
Seattle, WA 98105
206-524-6025

HOURS

See lululemon.com for store hours
BOOK A MIRROR DEMO HERE

MIRROR AT LULULEMON
FASHION SQUARE SEASONAL

SHERMAN OAKS, CA

4006 Riverside Dr.
Sherman Oaks, CA 91423
818-990-0287

HOURS

See lululemon.com for store hours
BOOK A MIRROR DEMO HERE



THE MIRROR



When off, it's a full-length mirror. When on, see yourself, your instructor and your classmates in a sleek, interactive display, complete with embedded camera and speakers. All you need is the space of a yoga mat for a high-energy workout in any room in your home!

**LEARN MORE**

Email address

**STAY IN TOUCH**

  

**EMAIL US**
HELLO@MIRROR.CO

**CALL US**
+1 (888) 288-1588

**CHAT WITH US**
EVERYDAY 10AM - 6PM ET

FAQ                    COVID-19 UPDATE        REFERRAL TERMS        CAREERS

AMAZON                 PRIVACY POLICY         WARRANTY              SIGN IN

LOCATIONS              TERMS OF SERVICE       RISK-FREE TRIAL

© Curlexan Products Inc. 2021.

# EXHIBIT 18



MIRROR | SUPPORT

MAIN SITE | STATUS PAGE | CONTACT

# FREQUENTLY ASKED QUESTIONS

[Search for anything...]

FAQ  >  USING THE MIRROR  >  FIND CLASSES

## FIND CLASSES

The MIRROR App features several great ways to find your next workout:

### Recommended For You This Week

We've got a new set of personalized class picks for you every week. Go to the "Home" tab to find workouts picked especially for you based on your profile. Keeping your profile up to date will help us better recommend classes for you -- see here for instructions on updating your profile.

### Classes

Our On Demand Library delivers any class you're looking for, 24/7. Jump right in by selecting the Genre you're looking for on the "Classes" page, then filter workouts by type of class, level, instructor, duration, and equipment.

Many MIRROR classes require only your bodyweight, so equipment is always optional. Current classes also feature dumbbells, yoga blocks, kettlebells, a chair, and resistance bands.

Want some more structure to your workouts? Check out MIRROR Programs! You can find them on the MIRROR App at the top of the "Classes" page. Programs are curated lists of workouts that help guide your fitness routine. They are designed to be completed in order within a set period of time. Collections are groups of workouts organized by theme, including "Beginner Toning Program", "Intermediate/Advanced Strength Program", "Learn to Meditate" & more! You can complete these workouts in whatever order you wish, or mix and match between On Demand workouts.

### Live

Craving some real-time feedback? Join a live class via the "Live" tab. On the "Live" tab, you can also access Encore classes, which are re-airings of popular Live classes. All live classes will be available in the On-Demand Library after airing.

## DIDN'T FIND WHAT YOU WERE LOOKING FOR?

CONTACT US